# Exhibit 1



December 22, 2015

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Sylvia Mathews Burwell, Secretary
Department of Health & Human Services
200 Independence Avenue S.W.
Washington, D.C. 20201

Dr. Stephen Ostroff, M.D., Acting Commissioner
Food and Drug Administration
10903 New Hampshire Ave
Silver Spring, MD 20993

Penny Pritzker, Secretary
Department of Commerce
1401 Constitution Ave., N.W.
Washington D.C. 20230

Eileen Sobeck, Assistant Administrator for NOAA
NOAA Fisheries Service
1315 East West Highway, SSMC3
Silver Spring, MD 20910

Sally Jewell, Secretary
Department of the Interior
1849 C Street N.W.
Washington D.C. 20240

Daniel Ashe, Director
Fish and Wildlife Service
1849 C. Street N.W.
Washington DC 20240

NATIONAL HEADQUARTERS
660 Pennsylvania Avenue, SE, Suite 302
Washington, D.C. 20003
T: 202·547·9359   F: 202·547·9429

CALIFORNIA OFFICE
303 Sacramento Street, 2nd Floor
San Francisco, CA 94111
T: 415·826·2770   F: 415·826·0507

PACIFIC NORTHWEST OFFICE
917 SW Oak Street, Suite 300
Portland, OR  97205
T: 971·271·7372   F: 971·271·7374

HAWAI'I OFFICE
1132 Bishop Street, Suite 2107
Honolulu, Hawaii 96813
T: 808·681·7688

office@centerforfoodsafety.org     centerforfoodsafety.org

**Sixty-Day Notice of Intent to Sue FDA Pursuant to the Endangered Species Act
Re: Approval of Genetically Engineered "AquAdvantage" Salmon**

Acting Commissioner Ostroff:

  The Food and Drug Administration is hereby notified, unless the violations described herein are remedied within sixty days, that the organizations listed below intend to sue the Food and Drug Administration and its Acting Commissioner Dr. Ostroff (collectively FDA), for violations of the Endangered Species Act (ESA), 16 U.S.C. § 1531, *et seq.*, associated with FDA's approval of the genetically engineered (GE or transgenic), "AquAdvantage" salmon (GE salmon). *See* New Animal Drugs in Genetically Engineered Animals; opAFP–GHc2 Recombinant Deoxyribonucleic Acid Construct, 80 Fed. Reg. 73,104 (Nov. 24, 2015). FDA has violated and remains in violation of Section 7 of the ESA by, *inter alia*, failing to insure, through consultation with the National Marine Fisheries Service (NOAA Fisheries) and the U.S. Fish and Wildlife Service (FWS) (collectively, the Services), that its approval of the GE salmon is not likely to jeopardize the continued existence of any threatened or endangered species and/or result in the destruction or adverse modification of the critical habitat of any listed species. Center for Food Safety and Earthjustice provide this letter pursuant to Section 11(g) of the ESA, 16 U.S.C. § 1540(g), on behalf of Cascadia Wildlands, Center for Biological Diversity, Center for Food Safety, Ecology Action Centre, Food & Water Watch, Friends of the Earth, Golden Gate Salmon Association, Institute for Fisheries Resources, and Pacific Coast Federation of Fishermen's Associations.

**I.  IDENTITY OF THE ORGANIZATIONS GIVING NOTICE**:  The names, addresses, and phone numbers of the organizations giving notice of intent to sue under the ESA are:

| | |
|---|---|
| Cascadia Wildlands | Food & Water Watch |
| PO Box 10455 | 1616 P Street NW |
| Eugene, OR 97440 | Washington, DC 20036 |
| 541-434-1463 | 202-683-2500 |
| | |
| Center for Biological Diversity | Friends of the Earth |
| 1212 Broadway, St. #800 | 1101 15th Street NW, 11th Floor |
| Oakland, CA 94612 | Washington, DC 20005 |
| 510-844-7100 | 202-783-7400 |
| | |
| Center for Food Safety | Golden Gate Salmon Association |
| 917 S.W. Oak St. | 1370 Auto Center Drive |
| Portland, OR 97205 | Petaluma, CA 94952 |
| 971-271-7372 | 855-251-4472 |
| | |
| Ecology Action Centre | Institute for Fisheries Resources |
| 2705 Fern Lane | PO Box 29370 |
| Halifax, NS B3K 4L3 | San Francisco, CA 94129-0370 |
| 902-429-2202 | 415-561-5080 |

Pacific Coast Federation of Fishermen's
Associations
PO Box 29370
San Francisco, CA 94129-0370
415-561-5080

## II.    REQUIREMENTS OF THE ESA

Section 7 of the ESA requires federal agencies such as FDA, in consultation with the expert wildlife agencies, to insure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any threatened or endangered (T&E) species, or result in the destruction or adverse modification of the critical habitat of such species. 16 U.S.C. § 1536(a)(2).  An action is considered to result in jeopardy where it would reasonably be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species. 50 C.F.R. § 402.02.  "Action" is broadly defined to include all activities or programs of any kind authorized, funded, or carried out by federal agencies, including actions directly or indirectly causing modifications to the land, water, or air.  50 C.F.R. § 402.02.

To carry out this substantive mandate, the ESA and its implementing regulations require federal agencies to consult with the wildlife agencies on the effects of their proposed actions.  16 U.S.C § 1536(a)(2); 50 C.F.R. §§ 402.12-402.16.  This process begins with the requirement that the "action" agency, such as FDA here, ask the expert agencies whether any listed or proposed species may be present in the area of the agency action.  16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.  If listed or proposed species may be present, the action agency must prepare a "biological assessment" to determine whether the listed species is likely to be affected by the proposed action.  *Id.*  The biological assessment generally must be completed within 180 days. 16 U.S.C § 1536(c)(1); 50 C.F.R. § 402.12(i).

If the action agency determines the action "may affect" a listed species or critical habitat, the action agency must formally consult with NOAA Fisheries and/or FWS to "insure" that the action is "not likely to jeopardize the continued existence" of that species, or "result in the destruction or adverse modification of habitat … determined … to be critical…."  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a); *see Citizens for Better Forestry v. United States Dep't of Agric.,* 481 F. Supp. 2d 1059, 1092 (N.D. Cal. 2007).[1]  The threshold for a finding of "may affect" is extremely low.  A triggering effect need not be significant; rather "any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement…."  Interagency Cooperation—Endangered Species Act of 1973, as Amended; Final Rule, 51 Fed. Reg. 19,926, 19,949 (June 3, 1986); Final ESA Section 7 Consultation Handbook at xvi (Mar. 1998) (defining "may affect" as "the appropriate conclusion when a proposed action may pose *any* effects on listed species….").

If a proposed action "may affect" a listed species or designated critical habitat, formal consultation is required unless the Service(s) concur in writing with an action agency's finding that the proposed action "is not likely to adversely affect" listed species or designated critical

habitat.  50 C.F.R. §§ 402.02, 402.13(a), 402.14 (a).  This "informal consultation" process consists of discussions and correspondence between the Services and the action agency and is designed to assist the action agency in determining whether formal consultation is required.  50 C.F.R. § 402.13(a).  *See also Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994).  An action is "likely to adversely affect" protected species, and formal consultation is required, if: "any adverse effect to listed species may occur as a direct or indirect result of the proposed action or its interrelated or interdependent actions, and the effect is not discountable, insignificant, or beneficial."  *Endangered Species Consultation Handbook*, March 1998, p. xv.

To complete formal consultation, NOAA Fisheries and/or FWS must provide FDA with a "biological opinion" explaining how the proposed action will affect the listed species or habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14.  In fulfilling Section 7 consultation duties, agencies are required to use the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2); *Heartwood, Inc. v. United States Forest Serv.*, 380 F.3d 428, 434 (8th Cir. 2004).  Until the consulting agency issues a comprehensive biological opinion, the action agency may not commence the action. *Pac. Rivers Council*, 30 F.3d at 1056-57; *and see* 16 U.S.C. § 1536(d). Further, during consultation, FDA is prohibited from making any irreversible or irretrievable commitment of resources with respect to the agency action which may foreclose the formulation or implementation of any reasonable and prudent alternative measures.  16 U.S.C. § 1536(d).

If NOAA Fisheries and/or FWS concludes that the proposed action "will jeopardize the continued existence" of a listed species, the biological opinion must outline "reasonable and prudent alternatives." 16 U.S.C. § 1536(b)(3)(A).  If the biological opinion concludes that the action is not likely to jeopardize the continued existence of a listed species, and will not result in the destruction or adverse modification of critical habitat, NOAA Fisheries and/or FWS must provide an "incidental take statement," specifying the amount or extent of such incidental taking on the listed species, any "reasonable and prudent measures" that they consider necessary or appropriate to minimize such impact, and setting forth the "terms and conditions" that must be complied with by FDA to implement those measures.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  In order to monitor the impacts of incidental take, FDA must monitor and report the impact of its action on the listed species to the Services as specified in the incidental take statement.  16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 402.14(i)(1)(iv), 402.14(i)(3).  If during the course of the action the amount or extent of incidental taking is exceeded, FDA must reinitiate consultation with the Services immediately.  50 C.F.R. § 402.14(i)(4).

Federal agencies have an independent and substantive obligation to insure that their actions are not likely to jeopardize the continued existence of endangered or threatened species or adversely modify critical habitat.  *See Pyramid Lake Paiute Tribe of Indians v. United States Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990).  Indeed, a "no jeopardy" biological opinion from NOAA Fisheries or FWS does not absolve the action agency of its independent duty to insure that its actions comply with the ESA.  *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1994).  Federal agencies also have a continuing duty under Section 7 of the ESA to re-initiate consultation whenever "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," where the action in question is "subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion," or where "a

new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16(b)-(d).[2]

Finally, Section 9(a) of the ESA, 16 U.S.C. § 1538(a), prohibits the "take" of an endangered species by any person.  This prohibition has generally been applied to many species listed as "threatened" through the issuance of regulations under Section 4(d) of the ESA, 16 U.S.C. § 1533(d); 50 C.F.R. § 17.31(a).[3]  "Take" includes actions that kill, harass, or harm a protected species.  16 U.S.C. § 1532(19).  "Harass" is defined to include acts that create the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns.  50 C.F.R. § 17.3.  "Harm" includes significant habitat modification or degradation that actually kills or injures wildlife by significantly impairing essential behavioral patterns.  *Id.*; 50 C.F.R. § 222.102.

## III.    FACTUAL BACKGROUND

FDA has now approved GE salmon pursuant to authority it asserts under a unique and unlawful interpretation of its Federal Food Drug and Cosmetic Act (FFDCA) duty to regulate "new animal drugs."  80 Fed. Reg. 73,104 (Nov. 24, 2015).  The GE salmon is the first GE fish (and the first GE animal for human consumption) that FDA has approved.  In doing so, FDA has made an erroneous determination that its approval action will have "no effect" on threatened or protected species or their critical habitat.  *See* FDA, Finding of No Significant Impact at 6-7 (Nov. 12, 2015).  Endangered species such as imperiled Atlantic salmon (*Salmo salar*) (and in the predictable future, Pacific salmon), may be affected by the approval.  FDA was therefore required to consult with the expert wildlife agencies under the ESA before reaching any decision.

### A.    Affected Species and Critical Habitat

The protected species and critical habitat that may be affected by FDA's approval action include, but are not limited to, the Gulf of Maine Distinct Population Segment of Atlantic salmon (*Salmo salar*) and Pacific salmonids, including certain populations of Chinook salmon (*Oncorhynchus tshawytscha*), chum salmon (*Oncorhynchus keta*), coho salmon (*Oncorhynchus kisutch*), sockeye salmon (*Oncorhynchus nerka*), and steelhead trout (*Oncorhynchus mykiss*).[4]

Wild Atlantic salmon populations have experienced steep declines due to a variety of human-induced pressures including overexploitation, degradation of water quality, and damming of rivers.[5]  In 2000, NOAA Fisheries and FWS issued a final rule designating the Gulf of Maine Distinct Population Segment (GOM DPS) as endangered under the ESA.[6]  The Services subsequently published a final rule in 2009 listing the expanded GOM DPS, updating the geographic boundaries of the freshwater range of the Atlantic salmon population to include the Androscoggin, Kennebec, and Penobscot River basins.[7]  A final rule designating critical habitat for the GOM DPS was published in the Federal Register on June 19, 2009.[8]

According to NOAA's Office of Protected Resources, "[t]he populations of Atlantic salmon present in the Gulf of Maine DPS represent the last wild populations of U.S. Atlantic salmon."[9]  NOAA recognizes aquaculture practices as one of the threats facing the remaining Atlantic salmon population as they "pose ecological and genetic risks."[10]  The same is true for transgenic salmon, which have been banned off the coast of Maine since 2003.[11]

Pacific salmonid populations have also faced significant declines on the west coast of the United States.[12]  Pacific salmonid species are vulnerable to a number of significant natural and human threats, among them: aquaculture,[13] hydropower, agriculture, flood control, natural resource extraction, and fishing.[14]

According to NOAA's Office of Protected Resources, the majority of all fish listed as endangered or threatened under the Endangered Species Act are Pacific salmonids, including certain populations of Chinook salmon (*Oncorhynchus tshawytscha*), chum salmon (*Oncorhynchus keta*), coho salmon (*Oncorhynchus kisutch*), sockeye salmon (*Oncorhynchus nerka*), and steelhead trout (*Oncorhynchus mykiss*).[15]  NOAA Fisheries has issued a final rules designating critical habitat for 25 species of West Coast salmon and steelhead under the ESA.[16]

**B.     FDA Has Taken Action that "May Affect" Listed Species and Their Designated Critical Habitat Without Consulting with the Services.**

Pursuant to the FDA approval, AquaBounty would manufacture its GE salmon at a facility located on Prince Edward Island, Canada, and transport, by land and air, the resulting eggs to a separate facility located in Panama, where they would be grown to maturity before being processed for sale in the United States.  Like its approval decision, FDA's conclusion concerning endangered or threatened species rests on an extremely limited inquiry that failed to adequately consider the significant risks of harm to listed species related to the production and proliferation of AquaBounty's GE fish at the Prince Edward Island and Panama facilities, as well as from AquaBounty's ongoing efforts to expand these operations and produce GE salmon at numerous additional facilities around the world.

Both the Prince Edward Island (PEI) and Panama facilities where GE salmon will be engineered, grown, and housed create risks of escape, and potential harm to endangered and threatened species.  The ESA requires FDA to consult on these potential impacts, even under FDA's unlawfully narrow scope of review.  These threats, and the risks of escape from these sites, are detailed in numerous comments to FDA, including those from NOAA Fisheries and FWS[17] and many independent scientists.[18]  This evidence also demonstrates that transgenic salmon are capable of surviving outside either facility.  The PEI facility, for example, is near water bodies that historically have held salmonid species and is within the current range of the species' marine habitat.  *See* Final EA at 75-6.  The GE salmon's transgenic nature makes it more likely to survive because of its more aggressive nature and enhanced growth rate.[19]  Studies have found that GE fish may be more competitive (Devlin et al., 1999), less discriminate in choosing prey (Sundström et al., 2004), more likely to attack novel prey (Sundström et al., 2004), and better at using lower quality food (Raven et al., 2006) when compared to wild relatives.  The great weight of evidence of past experiences with invasive species and escapes further supports this conclusion.[20]  When the GE salmon do escape, the impacts on the environment may be significant and irreversible, in the form of, *inter alia*, (1) ecological impacts on native species via predation and/or competition; and (2) genetic impacts via hybridization and genetic introgression.[21]

Scientists at FWS expressed these very concerns.  Commenting on the FDA's 2010 EA and Briefing Packet, FWS's Northeast Region explained:

- Transgenic fish, regardless of where they are, pose a <u>clear and present danger</u> to wild fish populations.  Given the extremely low populations of wild Atlantic salmon in the Maine DPS, <u>any interaction between wild and transgenic salmon must be considered a serious threat</u>, which can disrupt runs of wild fish, compete with wild fish for available food and habitat, interbreed with wild fish, transfer disease and/or parasites, and degrade benthic habitat.  The scientific literature is full of actions indicating that interactions of wild fish and aquaculture escapees (read transgenic escapees) may lead to decreased numbers of wild fish and in the worst scenario, <u>lead to extirpation</u> of the remaining stocks in the U.S.

- History dictates it is reasonable to assume that fish held in aquaculture facilities, either land- or water-based, will escape unless strict quarantine/water treatment/screening/ bioengineering modifications are in place and aggressively monitored.  And even then, <u>it must be assumed that escape will still occur</u>, and protocols must be in place to deal with such a non-native organism released into the environment, and its subsequent effect on native species, habitat, and aquatic communities.   Transgenic fish, whether reproductively viable or sterile, must be maintained only in biosecure (zero discharge) land-based facilities ideally positioned outside of any wild fish watersheds until appropriate laboratory and field research has been undertaken to ensure that the risk of adverse effects on wild fish has been minimized.

- [AquaBounty Technologies (ABT)] appears to have established several physical and biological containment mechanisms to prevent the escape of AquAdvantage salmon.  However, <u>there is still risk of escapement</u> and we think this risk is most prevalent at the PEI facility.  If the brood stock from the PEI facility were released either accidentally or with malicious intent, <u>we do not feel enough evidence has been provided to conclude the risks to natural populations of Atlantic salmon in Canada and the U.S. are negligible</u>.  Additional experimentation needs to be conducted to verify that any escapees from the PEI facility will not be able to tolerate the brackish water in the vicinity of the facility.  Also, the lack of information on the transport procedures from PEI to Panama is troublesome.  It is during this stage of the operation that malicious activities could result in these fish being lost from the direct control of ABT.

- If there is an escape event, competition from the GMO salmon <u>would negatively impact the wild stocks</u>.  Research has shown that aquaculture-raised salmon can outcompete wild salmon, and given the already endangered status of the wild stocks, any additional threat is amplified in their impacts.  References are available.

- Aside from the potential spread of the GMO growth gene if they escape and successfully reproduce, the genetic origin of the broodstock that has been developed is likely genetically distinct from Maine salmon.   <u>The concern is if escape and reproduction occurs, this could lead to a disruption of the locally adapted gene complexes of the endangered populations</u>.  In the FDA report-petition, we didn't see reference to the origin of the broodstock.[22]

FWS's Conservation Genetics Community of Practice[23] sent FDA a letter in October 2010 noting these same risks and the need for FDA to conduct more thorough analyses:

> [T]he biological containment at either the PEI or Panama facilities along with the possible interaction of AquAdvantage salmon with endangered wild salmon stocks is of great concern to the COP.  To this regard, AquaBounty Technologies has established several physical and biological containment mechanisms to prevent the escape of AquAdvantage salmon and the [EA] indicated escapement risk and establishment risks were low.  However, history dictates that fish held in aquaculture facilities, either land- or water-based—escape.  In addition, the information provided by AquaBounty Technologies for the likelihood of establishment relies on the assumption that farmed Atlantic salmon have not established themselves in North America.  This assumption is clearly violated because Atlantic salmon juveniles have been found in several streams in the state of Washington as well as British Columbia.  While interactions of these fish with native salmon are unknown[,] any interaction between wild and transgenic salmon must be considered a serious threat.  Numerous scientific publications have documented that interactions of wild and introduced fish have led to decreased numbers of wild fish (for ESA listed Atlantic stocks this is of great concern).[24]

Dr. Gregory Moyer, a FWS Regional Geneticist also sent FDA a letter in October 2010 outlining "several criticisms and concerns" regarding the Briefing Packet, specifically the environmental risk analysis.[25]  Dr. Moyer noted that the Briefing Packet "falls short of providing an actual risk assessment of putative environmental damages in the event of escapement."[26] He explained that the "environmental analysis should provide an overview of the general risks associated with escapement or hybridization of GE and wild type individuals" which "would provide readers with an understanding of the potential harm and the degree of harm posed by GE organisms even when the risk of escapement is low."[27]  He urged FDA to "more accurately quantif[y]" both the risk of escapement and degree of harm if escaped.  Dr. Moyer added that he was concerned with phrases like "are unlikely to survive if exposed to high salinity and low temperature" "when no data have been collected on AquAdvantage salmon to evaluate the likelihood of these scenarios," and that although AquaBounty currently has "in place various standard operating procedures to minimize escapement and test for durability of the gene construct," he "fail[s] to see any policy in place for monitoring or enforcement of these SOPs by the [FDA]."[28]

Likewise, NOAA Fisheries recognized that "[p]reventing escapes is essential to minimizing the risks to genetic deterioration of wild fish populations, especially endangered and threatened salmonids whose effective populations are particularly vulnerable to the effects of interbreeding."[29]  A memo from NOAA Fisheries notes that while it may not be likely, it is possible that AquAdvantage salmon will escape from the PEI and Panama facilities, and when they do, "they will likely [] reproduce in the wild because hatchery released fish and hatchery sterilized fish continue to behave similar to wild fish (Trested et al., 2002)."[30]  This memo also warns that "successfully sterilized salmon would be attractive mates for wild fish and may reduce wild population fitness."  It goes on to explain that, *inter alia*:

- An introduction of genetically engineered Atlantic salmon could pose catastrophic threats to wild listed species.

- The egg production facility may pose a threat to wild Atlantic salmon, including Gulf of Maine DPS Atlantic salmon.

- Any fish introduced along the Pacific Coast would have the potential to affect Pacific salmonids through hybridization.[31]

NOAA Fisheries has long recognized the potential harms associated with transgenic fish. In 2003, it issued an ESA Section 7 Biological Opinion (BiOp) for the Army Corps of Engineers regarding aquaculture fish pens within the state of Maine, banning transgenic salmonids in aquaculture sites off the coast of Maine due to the risks they could pose to wild, endangered Atlantic salmon populations.[32]  There, NOAA Fisheries expressly referenced the potential risks associated with FDA's consideration of the AquaBounty NADA, and relied on studies by Dr. Kapuscinski to call for more research "to identify the impacts [] escaped transgenic salmon would have on natural populations and their habitat before use for commercial aquaculture is considered."[33]

FDA claims that it is "highly unlikely that [GE salmon] or diploid ABT salmon would affect" endangered Atlantic salmon from the Gulf of Maine or from Maine rivers because the "environmental conditions [surrounding the Prince Edward Island facility] are hostile to survival [of salmon], as evidenced by the lack of self-sustaining salmon populations in an environment that used to possess plentiful salmon runs."  Final EA at 115.  But, as shown by the following map from NOAA, endangered Atlantic salmon from Maine rivers and the Gulf of Maine migrate in and around the waters surrounding Prince Edward Island:[34]



Because containment measures cannot guarantee that GE salmon will not escape into the wild,[35] and because survival and reproduction of escaped GE salmon is possible, such an escape or release event would be significant and irreparable.[36]  Indeed, FDA itself recognized the seriousness of these potential risks when it previously acknowledged that it would formally consult with the Services if these fish were grown in net pens.[37]  These likely impacts far exceed the low threshold for actions that "may affect" listed Atlantic and Pacific species and trigger FDA's duty to consult with FWS and NOAA Fisheries regarding its approval of AquaBounty's application. As explained above, for an action that *may* affect any species or its critical habitat— "whether beneficial, benign, adverse, or of an undetermined character"—FDA *must*, at a minimum, seek the Services' expertise through consultation.  *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2010).  "[A]ctions that have *any chance of affecting* listed species or critical habitat—even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA."  *Karuk Tribe of California v. U.S. Forest Service*, 681 F.3d 1006, 1027 (9th Cir. 2012) (en banc) (emphasis added). FDA's failure to complete consultation with the expert fish and wildlife Services violates the ESA.

For the same reasons, FDA also violated its independent duty to consult on the potential effects to any habitat designated as "critical" pursuant to ESA § 4(a)(3)(A), 16 U.S.C. § 1533(a)(3)(A).  The legal standard for triggering FDA's duty to consult where its approval "may affect" a listed species' designated critical habitat is identical to the requirement to consult where the action "may affect" the species itself.  *Karuk Tribe*, 681 F.3d at 1027 ("[A]ctions that have *any chance of affecting* listed species or *critical habitat*—even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA.") (emphases added); *id.* ("Any possible effect, whether beneficial, benign, adverse or of an undetermined character" triggers the requirement) (citations omitted).

### C.    FDA's "No Effect" Determination Is Arbitrary and Did Not Use the Best Available Scientific and Commercial Data Available.

Rather than consult with the Services after a may affect determination, FDA instead relied entirely on its own internal assessments of the risks to conclude that its approval of GE salmon will have "no effect" on any listed species or designated critical habitat.  FDA's "no effect" conclusion—and the process by which it reached that conclusion—violates the ESA.

As a threshold matter, FDA carries a heavy burden to demonstrate that its "no effect" determination is justified.  Indeed, the ESA requires FDA to prove its approval will not jeopardize any listed species, nor adversely affect any critical habitat, and it has not met that burden.  *See, e.g.*, *Wash. Toxics Coalition v. Envtl. Prot. Agency*, 413 F.3d 1024, 1035 (9th Cir. 2005) ("Placing the burden on the acting agency to prove the action is non-jeopardizing is consistent with the purpose of the ESA and what we have termed its 'institutionalized caution mandate[].'").  Consistent with these requirements, FDA may decline to undergo consultation with the expert agencies *only* if it legitimately determines that its action will have no chance of affecting any listed species or critical habitat.  This means *none*; any effect, however minor, compels consultation. *See supra.*

FDA, however, based its conclusions on its own inexpert—and fatally flawed—assumptions regarding the risk that GE salmon may escape into the environment and unilaterally concluded that the affected species have absolutely no chance of possibly being harmed.

First, as detailed above and extensively in the comments FDA received from Dr. Kapuscinski and other independent experts, the agency's assumption that GE salmon will not escape from AquaBounty's facilities is not based on the best available scientific and commercial data, including the standard practice of conducting a quantitative failure mode risk analysis. Instead, FDA relied on outdated risk analysis methods when considering risk of escapes and the direct and indirect environmental effects of AquaBounty's GE salmon on listed species. FDA cannot rely on outdated and inaccurate information to determine the potential effects on listed species. 16 U.S.C. § 1536(a)(2) (requiring agencies to use only the best available scientific and commercial data available).

Second, FDA arbitrarily limited the geographic scope of its inquiry to just the immediate vicinity of PEI and Panama sites. However, under the ESA, the "action area" is expressly defined as "all areas to be affected directly or <u>indirectly</u> by the federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02 (emphasis added). The agency's approval will affect substantially more than just areas in Panama and PEI, due to the highly mobile and migratory nature of the species, its presence throughout the Gulf of Maine and in rivers in New England and throughout Atlantic Canadian provinces, and because of the likely proliferation of GE salmon in other locations, including within the United States, as reflected by pending requests for importation of AquaBounty's GE salmon eggs and AquaBounty's stated plans for expansion following this initial approval decision.

In addition, the area affected by any GE salmon that may be released or that may escape is far greater than just the immediate area around the facility—these fish could enter any number of marine environments that are home to endangered or threatened aquatic species.[38] FDA's "no effect" determination is based on its unlawfully restricted view of the action area as limited to just the areas immediately around the facilities.

Third, FDA similarly arbitrarily limited the scope of the "action" and the "effects" it considered. Under the ESA, "'agency action' is to be construed broadly." *See Karuk Tribe*, 681 F.3d at 1020. "[T]he scope of the agency action is crucial because the ESA requires the biological opinion to analyze the effect of the entire agency action." *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988). Courts "interpret the term 'agency action' broadly," because "caution can only be exercised if the agency takes a look at all the possible ramifications of the agency action." *Id.*

Moreover, the "effects" of the broad action that must be considered under the ESA include not just direct, but also "indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action…." *Wild Fish Conserv. v. Salazar*, 628 F.3d 513, 525 (9th Cir. 2010) (quoting 50 C.F.R. § 402.02). "Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those

that have no independent utility apart from the action under consideration." *Id.  See, e.g.*, *National Wildlife Federation v. Federal Emergency Management Agency*, 345 F. Supp. 2d 1151 (W.D. Wash. 2004) (rejecting agency argument that it could limit its scope to just the issuance of floodplain insurance and holding that the agency must also assess the impacts of later housing construction that the insurance would facilitate).  FDA's duties under the ESA thus require it also consider its action's indirect effects, and the effects of all activities "interrelated or interdependent" with that action.  50 C.F.R. § 402.02.

Yet, FDA has defined the action and its effects to include only those effects it believes are directly associated with the production of the GE salmon in PEI and Panama.  FDA unlawfully ignored the reasonably foreseeable direct, indirect, and cumulative impacts of its decision.  Evidence in the record shows that petitions are already being submitted to grow these transgenic salmon elsewhere.  Indeed, AquaBounty's own public statements admit that they plan to grow them elsewhere.  And as commenters have observed, it is not economically feasible to grow these fish at just these two small facilities.  AquaBounty's current application is thus just a foot in the door; AquaBounty is clearly dependent on future growth to justify its operation.[39]

Fourth, FDA's "no effect" determination is arbitrary and contrary to law because FDA did not consider impacts to threatened or endangered aquatic species and their habitats other than Atlantic salmon.  As expert scientists have noted, the introduction of GE fish like AquaBounty's GE salmon could affect entire ecosystems.[40]  Given, in particular, the foreseeable proliferation of GE salmon and the risks of escape inherent in the current application, FDA was required to consider possible effects on Pacific salmon and other salmonids, such as steelhead and trout.[41]

Indeed, just a short time after the close of the comment period on FDA's draft EA, a new study was published on June 3, 2013 in the Proceedings of the Royal Society, further belying the agency's assumptions and concluding that the AquaBounty GE salmon can successfully cross-breed with brown trout.[42]  The scientists who authored the study "…suggest that interspecific hybridization be explicitly considered when assessing the environmental consequences should transgenic animals escape to nature."  The study also concluded that the GE hybrid offspring could outgrow wild salmon, non-GE hybrid offspring, and even GE salmon.[43]  The GE hybrids also outcompeted wild salmon in simulated stream environments. Although acknowledging this study in its Final EA, FDA dismissed the possibility of cross-breeding between brown trout and escaped GE salmon, and failed to discuss the potential of any effects from such cross-breeding on threatened and endangered species, including the GOM DPS Atlantic salmon. Final EA at 40-41 and 100, 104.

Finally, FDA violated its "rigorous" duty to "insure" against jeopardy by relying entirely on AquaBounty's third-party, uncertain measures to mitigate any harm.  *See, e.g.*, *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (holding that mitigation measures must be "certain to occur," "subject to deadlines or otherwise enforceable obligation," and "must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards").  Rather than being included as enforceable mitigation measures, the containment measures are merely described as "conditions of production and use," not even "conditions of approval."  FDA fails to describe, and apparently has failed to consider, how it would enforce or monitor AquaBounty's purported protective measures to prevent

escapes or otherwise prevent environmental harm.[44]  FDA cannot avoid consultation by relying on mitigation measures not within its control.  *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 254 F. Supp. 2d 1196, 1213-14 (D. Or. 2003) (Biological Opinion inadequate where it relied on non-federal mitigation actions not reasonably certain to occur); *Sierra Club v. Marsh*, 816 F.2d 1376, 1385 (9th Cir. 1987) ("This reliance on the proposed actions of [others] does not satisfy [FDA]'s burden of insuring that its actions will not jeopardize the continued existence of the [endangered species].").  Without any provision for enforcement, these "mitigation measures" must be considered as being outside FDA's control and unlawfully uncertain.

## IV.    CONCLUSION

In sum, FDA's "no effect" finding and failure to consult is arbitrary and capricious and violates the ESA, because it fails to follow the ESA's mandated procedures, fails to use the best scientific and commercial data available, fails to consider significant aspects of the issue, and offers an explanation that runs counter to the evidence before the agency. As more fully detailed above, FDA is hereby notified that it has violated Section 7 of the ESA, 16 U.S.C. § 1536(a)(2), in at least the following ways:

Prior to approving the GE salmon, FDA failed to request from the expert agencies whether any threatened or endangered species, or designated critical habitat, may be present within or near the areas of the proposed actions.  16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.

Prior to approving the GE salmon, FDA failed to prepare a "biological assessment" to determine whether any threatened and endangered species that may be present within or near the areas of the proposed actions may be affected.  16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.

Prior to approving the GE salmon, FDA failed to consult with the expert fish and wildlife Services regarding the potential adverse effects of the GE salmon on threatened and endangered species, and/or their critical habitat.  16 U.S.C. § 1536(a); 50 C.F.R. §§ 402.13-14.

FDA has failed to insure, in consultation with the expert agencies, that its action is not likely to jeopardize the continued existence of any threatened or endangered species or result in the destruction or adverse modification of the critical habitat of such species.  16 U.S.C. § 1536(a)(2).

FDA has failed to insure that the agency or AquaBounty will not make any irreversible or irretrievable commitment of resources with respect to the GE salmon prior to initiating and completing consultation with NOAA Fisheries.  16 U.S.C. § 1536(d).

FDA has failed, in consultation with the expert agencies, to utilize its authorities in furtherance of the purposes of the ESA by carrying out programs for the conservation of endangered and threatened species, in violation of the ESA.  16 U.S.C. § 1536(a)(1).  More specifically, FDA has failed to utilize its authorities to carry out programs for the conservation of the threatened and endangered species located in areas where GE salmon will be foreseeably farmed, in violation of the ESA.  16 U.S.C. § 1536(a)(1).

FDA's determination that its approval of AquaBounty's GE salmon NADA will have "no effect" on listed species is arbitrary and fails to use the best available science.

For the above stated reasons, FDA has violated and remains in ongoing violation of Section 7 of the ESA.  If these violations of law are not cured within sixty days, the listed organizations intend to file suit against the responsible agency/agencies and officials to enforce the ESA, seeking declaratory and injunctive relief, as well as attorney and expert witness fees and costs.  16 U.S.C. § 1540(g)(4).  This notice letter was prepared based on good faith information and belief after reasonably diligent investigation.  If you believe that any of the foregoing is factually erroneous or inaccurate, please notify us promptly.  Further, during the notice period we are available to discuss effective remedies and actions that will assure future compliance with the ESA.

Sincerely,

George Kimbrell
Center for Food Safety
918 SW Oak St.
Portland OR 97205
917-271-7372

Steve Roady
Khushi Desai
Earthjustice
1625 Massachusetts Ave NW
Washington DC 20036
202-667-4500

---

[1] "Jeopardize" means taking action that "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  A species' "critical habitat" includes those areas identified as "essential to the conservation of the species" and "which may require special management considerations or protection."  16 U.S.C. § 1532(5)(A).

[2] Section 7(a)(1) of the ESA requires FDA, in consultation with and with the assistance of the Services, to utilize its authorities in furtherance of the purposes of the ESA by carrying out programs for the conservation of endangered and threatened species.  16 U.S.C. § 1536(a)(1).

[3] NOAA has adopted rules pursuant to ESA § 4(d) that extend the take prohibition to Pacific salmon and steelhead species that are listed as "threatened."  16 U.S.C. § 1533(d); Endangered

and Threatened Species: Final Listing Determinations for 16 ESUs of West Coast Salmon, and Final 4(d) Protective Regulations for Threatened Salmonid ESUs, 70 Fed. Reg. 37,160 (June 28, 2005) (updating 4(d) rules for Pacific salmon species); Endangered and Threatened Species: Final Listing Determinations for 10 Distinct Population Segments of West Coast Steelhead, 71 Fed. Reg. 834 (Jan. 5, 2006) (incorporating updated 4(d) rules for steelhead).

[4] The specific listed species include: California coastal chinook salmon, Central Valley spring-run chinook salmon, Lower Columbia River chinook salmon, Puget Sound chinook salmon, Sacramento River winter-run chinook salmon, Snake River fall-run chinook salmon, Snake River spring/summer-run chinook salmon, Upper Columbia River spring-run chinook salmon, Upper Willamette River chinook salmon, Columbia River chum salmon, Hood Canal summer run chum salmon, Central California Coast coho salmon, Southern Oregon and Northern Coastal California coho salmon, Lower Columbia River coho salmon, Oregon Coast coho salmon, Snake River sockeye salmon, Central California Coast steelhead, California Central Valley steelhead, Lower Columbia River steelhead, Middle Columbia River steelhead, Northern California steelhead, Snake River Basin steelhead, South-Central California Coast steelhead, Southern California steelhead, Upper Columbia River steelhead, and Upper Willamette River steelhead.  70 Fed. Reg. 37,160 (June 28, 2005) (listing salmon); 71 Fed. Reg. 834 (Jan. 5, 2006) (listing steelhead).

[5] Office of Protected Resources, NOAA Fisheries, Atlantic salmon (*Salmo salar*), http://www.nmfs.noaa.gov/pr/species/fish/atlanticsalmon.htm (last visited Dec. 21, 2015).

[6] Endangered and Threatened Species; Final Endangered Status for a Distinct Population Segment of Anadromous Atlantic Salmon (*Salmo salar*) in the Gulf of Maine, Final Rule, 65 Fed. Reg. 69,459 (Nov. 17, 2000).

[7] Endangered and Threated Species; Designation of Critical Habitat for Atlantic Salmon (*Salmon salar*) Gulf of Maine Distinct Population Segment: Final Rule, 74 Fed. Reg. 29,300 (June 19, 2009).

[8] *Id.*

[9] Office of Protected Resources, NOAA Fisheries, Atlantic salmon (*Salmo salar*), *supra* n.5.

[10] *Id.*

[11] Endangered Species Act Section 7 Consultation, Biological Opinion, Proposed modification of existing ACOE permits authorizing the installation and maintenance of aquaculture fish pens within the State of Maine (November 19, 2003), attached to this letter as Attachment 1.

[12] *See generally* Endangered and Threatened Species: Listing of Several Evolutionary Significant Units (ESUs) of West Coast Steelhead, 62 Fed. Reg. 43,937 (Aug. 18, 1997); Endangered and Threatened Species: Threatened Status for Two ESUs of Steelhead in Washington, Oregon, and California, 63 Fed. Reg. 13,347 (Mar. 19, 1998); Endangered and Threatened Species: Threatened Status for Two ESUs of Steelhead in Washington and Oregon, 64 Fed. Reg. 14,517

(Mar. 25, 1999); Endangered and Threatened Species; Threatened Status for Three Chinook Salmon Evolutionarily Significant Units (ESUs) in Washington and Oregon, and Endangered Status for One Chinook Salmon ESU in Washington, 64 Fed. Reg. 14,308 (Mar. 24, 1999); Endangered and Threatened Species: Threatened Status for Ozette Lake Sockeye Salmon in Washington, 64 Fed. Reg. 14,528 (Mar. 25, 1999).

[13] *See, e.g.,* R. L. Naylor, *et al., Salmon aquaculture in the Pacific Northwest a global industry with local impacts*, Environment: Science and Policy for Sustainable Development 45(8) (2003) 18-39.

[14] *Id.*

[15] Office of Protected Resources, NOAA Fisheries, Endangered and Threatened Marine Species under NMFS' Jurisdiction, http://www.fisheries.noaa.gov/pr/species/esa/listed.htm#fish (last visited Dec. 21, 2015).

[16] Endangered and Threatened Species; Designation of Critical Habitat for 12 Evolutionarily Significant Units of West Coast Salmon and Steelhead in Washington, Oregon, and Idaho, Final Rule, 70 Fed. Reg. 52,630 (Sept. 2, 2005); Endangered and Threatened Species; Designation of Critical Habitat for Seven Evolutionarily Significant Units of Pacific Salmon and Steelhead in California, 70 Fed. Reg. 52,488 (Sept. 2, 2005) (designation of Critical Habitat for California Coastal Chinook salmon, Northern California Steelhead, Central California Coast Steelhead; South Central Coast Steelhead; Southern California Steelhead; Central Valley spring run Chinook salmon; and Central Valley Steelhead); Designated Critical Habitat; Snake River Sockeye Salmon, Snake River Spring/Summer Chinook Salmon, and Snake River Fall Chinook Salmon, 58 Fed. Reg. 68,543 (Dec. 28, 1993); Designated Critical Habitat; Central California Coast and Southern Oregon/Northern California Coasts Coho Salmon, 64 Fed. Reg. 24,049 (May 5, 1999); Endangered and Threatened Species: Final Threatened Listing Determination, Final Protective Regulations, and Final Designation of Critical Habitat for the Oregon Coast Evolutionarily Significant Unit of Coho Salmon, 73 Fed. Reg. 7,816 (Feb. 11, 2008).

[17] After FDA changed course and found that its approval would have "no effect" on listed species, FWS and NOAA sent separate letters to FDA in which the agencies did not object to FDA's determination.  *See* Final EA, Appendix D.  Neither of these letters discusses any of these agencies' previous findings and comments, or the scientific evidence concerning risks posed by the release of GE salmon from the PEI, Panama, or any other facilities.  To the extent that FDA interprets these letters to support its "no effect" determination, the letters have no legal significance in the ESA's consultation process, and to the extent that FDA believes they represent any conclusions by the Services, the positions articulated in those letters are not based on the best available science and are themselves arbitrary and capricious.

[18] *See* Dr. Jon Rosenfield Comments, attached to this letter as Attachment 2.

[19] *Id.*

---

[20] *Id.*

[21] *Id.*

[22] FWS Region 5 Fisheries Program Comments on FDA approval process for Aqua Bounty Technologies, Inc. (ABT)/AquAdvantage GMO salmon (emphases added), attached to this letter as Attachment 3.

[23] This is FWS's coalition of fish conservation genetics experts. *See* http://www.fws.gov/ ConservationGeneticsCOP/index.html.

[24] FWS Conservation Genetics Community of Practice Letter to FDA (Oct. 6, 2010) (emphases added), attached to this letter as Attachment 4.

[25] Dr. Gregory Moyer Letter to FDA (Sept. 30 2010), attached to this letter as Attachment 5.

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] NMFS, Talking Points for Senate Commerce Committee Staff Briefing on S. 1717 "Prevention of Escapement of Genetically Altered Salmon in the United States Act" (Dec. 5, 2011), attached to this letter as Attachment 6.

[30] NMFS Concerns Memo and Letter from Therese Conant, NMFS Acting Division Chief, Endangered Species Division, to Larissa Rudenko (Nov. 30, 2011), attached to this letter as Attachment 7.

[31] *Id.*

[32] 2003 BiOp, *supra* n.11.

[33] *Id.* at 74-75.

[34] http://www.nefsc.noaa.gov/press_release/2008/MediaAdv/MA0807/2Saunders_ MigrationRoute.jpg.

[35] Anne Kapuscinski and Fredrik Sundstöm, *Comments on Environmental Assessment for AquAdvantage Salmon and Briefing Packet on AquAdvantage Salmon for the Veterinary Medicine Advisory Committee* at 4 (2010) ("As scientists, we cannot agree with this approach because it assumes 100% achievement of multiple confinement without presenting the failure mode analysis that is standard practice in technology risk assessment.  Even if actual exposure is

very close to zero, it is still necessary to assess ecological consequences…."), attached to this letter as Attachment 8.

[36] See, Dr. Jonathan Rosenfeld Comments, *supra* n.18; *see also* FWS Region 5 Comments, *supra* n.22, FWS COP letter, *supra* n.24, NFMS Concerns Memo and Letter, *supra* n.30.

[37] 2009 FDA denial of 2001 CFS petition, attached to this letter as Attachment 9.

[38] As NOAA Fisheries previously indicated, because FDA's action contemplates the selling of eyed eggs commercially and rearing fertile adult males at the PEI facility, the action area must include the United States.  *See* NOAA Fisheries Concern Memo, *supra* n.30 and Letter to FDA from Therese Conant, *supra* n.29.

[39] FDA may not rely on the potential to consult later to addresses these fatal flaws in its "no effect" conclusion.  The precautionary approach embodied in Section 7(a)(2) requires consultation before an action begins, not to conduct a post mortem years later.  *See, e.g., Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 524 (9th Cir. 2010) (intent to consult later does not cure failure to complete consultation at the outset concerning action's full extent).

[40] Dr. Jonathan Rosenfeld Comments, *supra* n.18. *See also* NMFS Concerns Memo, *supra* n.30 ("Any fish introduced along the Pacific Coast would have unknown potential for affecting Pacific salmonids through hybridization.").

[41] *Id.*  Accidental or other release of fish from aquaculture facilities is plainly "reasonably certain to occur;" indeed, it is already in progress in many parts of the United States and elsewhere in the world.  *See, e.g.,* Fischer, et al., *Occupancy dynamics of escaped farmed Atlantic salmon in Canadian Pacific Coastal Salmon Streams: Implications for Sustained Invasions*, Biological Invasions, Vol. 16, Issue 10, pp 2137-2146 (October 2014), *available at* https://goo.gl/QpRWsD; Morris, et al., *Prevalence and Recurrence of Escaped Farmed Atlantic Salmon in Eastern North American Rivers*, Can. J. Fish. Aquat. Sci. Vol. 65 (2008), *available at* http://0101.nccdn.net/ 1_5/165/1c4/1be/morrisetal2008.pdf.

[42] K. B. Oke, *et al. Hybridization between genetically modified Atlantic salmon and wild bran trout reveals novel ecological interactions*, The Royal Society (May 2013), *available at* http://rspb.royalsocietypublishing.org/content/280/1763/20131047.

[43] Rebecca Morelle, *GM salmon can breed with wild fish and pass on genes*, BBC News (May 29, 2013), http://www.bbc.co.uk/news/science-environment-22694239.

[44] *See 2010* Kapuscinski and Sundström VMAC Comments at 2, *supra* n.35 (questioning how FDA will oversee the facilities; "How will FDA assure and audit the company's implementation of this 'integrated confinement system'"?).

# Attachment 1

Sixty-Day Notice of Intent to Sue FDA Pursuant to the Endangered Species Act
Re: Approval of Genetically Engineered "AquAdvantage" Salmon



**UNITED STATES  DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
NORTHEAST REGION
One Blackburn Drive
Gloucester, MA 01930-2298

NOV 1 9 2003

Christine Godfrey
Chief, Regulatory Branch
Construction/ Operations Division
New England District, Corps of Engineers
696 Virginia Road
Concord, Massachusetts 01742-2751

Ref: Transmittal of Final Biological Opinion and Response to Comments on Draft
F/NER/2002/00936

Dear Ms. Godfrey:

Enclosed is a biological opinion (Opinion) issued by the National Marine Fisheries Service
(NOAA Fisheries) on the U.S. Army Corps of Engineers (ACOE) proposed continuation and
modification of existing permits authorizing the installation and maintenance of net pens to raise
finfish off the coast of Maine.  The NOAA Fisheries national Section 7 tracking number is
F/NER/2002/00936.

The Opinion is submitted in accordance with section 7 of the Endangered Species Act (ESA) of
1973, as amended (16 U.S.C. 1531 *et seq.*).  This Opinion concludes that the proposed
continuation and modification of existing permits authorizing the installation and maintenance of
fish pens in the state of Maine (including incorporation of the special conditions to protect the
Gulf of Maine Distinct Population Segment (DPS) of Atlantic salmon) may adversely affect but
is not likely to jeopardize the continued existence of the endangered Atlantic salmon within the
DPS.  Please note that any changes to the proposed action, including any changes to the special
conditions proposed to protect wild Atlantic salmon, may change the conclusion in this Opinion
and would warrant further Section 7 consultation.  No other federally-listed species is likely to be
affected by the proposed action.

While the ACOE's proposed permit modifications do contain conditions for the protection of
wild Atlantic salmon, the incorporation of these conditions does not eliminate the potential for
the permitted activities to result in "take" of Atlantic salmon within the DPS; therefore, an
Incidental Take Statement (ITS) has been issued with this Opinion.  The anticipated incidental
take from the existing aquaculture industry's marine sites that were the subject of this
consultation (42 sites) is the detection at weirs or traps of up to 21 escaped fish per year, based
on a three year rolling average.  If the ITS is exceeded, consultation must be reinitiated.  To
validate the ITS, the ACOE must implement the non-discretionary Reasonable and Prudent
Measures contained therein.  Discretionary Conservation Recommendations are also included
with this Opinion.

Reinitiation of this consultation is required if: (1) the amount or extent of taking specified in the ITS is exceeded; (2) new information reveals effects of these actions may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) project activities are subsequently modified in a manner that causes an effect to the listed species that was not considered in this Opinion; (4) significant changes to the proposed action are made that may change the conclusion in this Opinion; or (5) a new species is listed or critical habitat designated that may be affected by the identified actions. If any one of the conditions requiring reinitiation of consultation is triggered, the ACOE should contact NOAA Fisheries. Alternatively, NOAA Fisheries may provide written advice to the ACOE relative to the need to reinitiate consultation. Requests for reinitiation must be in writing and must contain sufficient information to record the nature of the change in the action or its effects and the rationale for any modifications.

## Conclusion

NOAA Fisheries greatly appreciate your cooperation during this Section 7 consultation. If you have any questions concerning this Opinion, please contact Jessica Anthony of my staff at (978) 281-9328 ext 6532. We look forward to working with you in the future to ensure compliance with permit conditions and protection of the Atlantic salmon DPS.

Sincerely,

Patricia A. Kurkul
Regional Administrator

cc:
Jessica Anthony - NOAA Fisheries
Rick Bennett - USFWS
Wende Mahaney - USFWS

**ENDANGERED SPECIES ACT SECTION 7 CONSULTATION**

**BIOLOGICAL OPINION**

Agency:              Department of the Army, New England District, Corps of Engineers

Activity:            Proposed modification of existing ACOE permits authorizing the installation and maintenance of aquaculture fish pens within the State of Maine

Conducted by:     National Marine Fisheries Service, Protected Resources Division, Northeast Region (F/NER/2002/00936) and the U.S. Fish and Wildlife Service, New England Field Office [MEFO 02-001(F)]

Date Issued:    Nov. 19, 2003

Approved by:

Patricia A. Kurkul
Regional Administrator
Northeast Region
National Marine Fisheries Service

## INTRODUCTION

This constitutes the biological opinion (opinion) of the National Marine Fisheries Service (NOAA Fisheries) and the U.S. Fish and Wildlife Service (USFWS) (collectively referred to as the Services) on the continuation and proposed modification of existing U.S. Army Corps of Engineers (ACOE) permits previously issued under Section 10 of the Rivers and Harbors Act of 1899 (RHA Section 10) (33 U.S.C. §403), following the Services' listing of the Gulf of Maine (GOM) Distinct Population Segment (DPS) of Atlantic salmon (*Salmo salar*) as an endangered species on November 17, 2000. These existing ACOE permits have authorized the installation and maintenance of fish pens within the State of Maine. While the Services agree that the proposed modifications to the existing permits will reduce the impact of the aquaculture industry on the listed Atlantic salmon, these modifications do not eliminate the impacts to listed salmon. Since adverse effects to the listed salmon are still anticipated after implementation of the proposed permit amendments, the Endangered Species Act (ESA) requires formal consultation to: 1) ensure that the action is not likely to jeopardize the continued existence of the listed salmon in the wild; and 2) provide exemptions to the take prohibitions of Section 9 for take that may occur incidentally. This opinion is based on the following: (1) information provided in the ACOE's August 9, 2001 initiation letter and attachments in support of formal consultation under the ESA; (2) previous consultations among the Services and the Environmental Protection

e. All reproductively-viable non-North American Atlantic salmon must be removed from net pens prior to March 1, 2006. Within 30 days after removal of fish, the facility shall provide the ACOE with written confirmation regarding compliance with this condition.

2. Transgenic salmonids are prohibited at these facilities. Transgenic salmonids are defined as species of the genera *Salmo*, *Oncorhynchus* and *Salvelinus* of the family Salmonidae and bearing, within their DNA, copies of novel genetic constructs introduced through recombinant DNA technology using genetic material derived from a species different from the recipient, and including descendants of individuals so transfected. This prohibition does not apply to vaccines.

3. Prior to stocking salmonid species other than Atlantic salmon at these facilities, certification from the Maine Fish Health Technical Committee and DMR of compliance with disease management standards permitting the culture of alternative salmonid species shall be provided to the ACOE. No alternative salmonid species shall be stocked without prior written approval from the ACOE.

4. The facility shall employ a fully functional marine containment management system (CMS) designed, constructed, and operated so as to prevent the accidental or consequential escape of fish to open water. Each CMS plan shall include a site plan or schematic with specifications of that particular system. Each facility shall develop and utilize a CMS consisting of management and auditing methods to describe or address the following: inventory control procedures, predator control procedures, escape response procedures, unusual event management, severe weather procedures, and training. The CMS shall contain a facility-specific list of critical control points (CCP) where escapes have been determined to potentially occur. Each CCP must include the following: the specific location, control mechanisms, critical limits, monitoring procedures, appropriate corrective actions, verification procedures that define adequate CCP monitoring, and a defined recordkeeping system.

a. The CMS will be audited at least once per year and within 30 days of a reportable escape (more than 50 fish two kg or larger) by a party other than the facility operator or owner who is qualified to conduct such audits and is approved by the ACOE and the Services. The first annual audit shall be conducted prior to March 1, 2004. The ACOE, with the approval of the Services, may exempt a facility from an escape-triggered audit when circumstances preclude the possibility that it was the source of the escaped fish. A written report of these audits shall be provided to the facility, the ACOE, and the Services within 30 days of the audit being conducted. If deficiencies are identified during the audit, the report shall contain a corrective action plan, including a timetable for implementation and re-auditing to verify that deficiencies are addressed in accordance with the corrective action plan. Additional third party audits to verify correction of deficiencies shall be conducted in accordance with the corrective action plan or upon request of the ACOE. The facility shall notify the ACOE and the Services upon completion of corrective actions.

b. At each facility, personnel responsible for routine operation shall be properly trained and qualified to implement the CMS.

disease affecting most species of fish, including farmed Atlantic salmon. Therefore, vibriosis is also thought to affect wild salmon populations (Baum 1997).

The retrovirus salmon swimbladder sarcoma virus (SSSV) appears to exist at some level in wild populations of salmon in Maine, although symptoms have not been observed in wild salmon (AASBRT 1999). In 1998, SSSV was detected in Pleasant River broodstock held by the USFWS, resulting in the decision to destroy all captive broodstock for this river. SSSV has been identified at very low levels in captive broodstock populations from three other GOM DPS rivers.

Coldwater disease is caused by the bacterium *Flavobacterium psychrophilum* and has recently been found to be a serious problem for Atlantic salmon in New England waters. The pathogen causes mortality in juvenile salmon. The pathogen is transmitted vertically from carrier sea-run adults to offspring via eggs [U.S. Atlantic Salmon Assessment Committee (USASAC) 2000; 65 FR 69476, Nov. 17, 2000)].

The infectious salmon anemia virus (ISAV) appeared on the North American continent in 1996 in Canadian aquaculture pens, within the known infective range of U.S. sea pens. ISAV was first detected at a Maine salmon farm in Cobscook Bay in January 2001, with subsequent outbreaks at several other salmon farms in Cobscook Bay. The ISAV virus is extremely destructive to maturing salmon, and there is no known cure (USASAC 2000; 65 FR 69476, Nov. 17, 2000).

Known predators of Atlantic salmon include marine mammals (e.g., seals, porpoises, and dolphins), terrestrial mammals (e.g., otters, minks), birds, fish and sharks. Atlantic salmon post-smolts are preyed upon by cod, whiting, cormorants, ducks, terns, gulls, and many other opportunistic predators (Hvidsten and Møkkelgjerd 1987; Gunnerød et al. 1988; Hvidsten and Lund 1988; Montevecchi et al. 1988; Hislop and Shelton 1993). Cormorants and striped bass are transitory predators that impact migrant juveniles in the lower river and estuarine areas. Seals have reached high population levels not reported before, and salmon remain vulnerable to seal predation throughout much of their range.

Competitive interactions of Atlantic salmon with non-salmonine fish, especially introduced species, are not well understood (AASBRT 1999). Interactions between wild Atlantic salmon and other salmonids are mostly limited to brook trout, and occasionally brown trout. Competition appears to play an important regulatory role shortly after fry emerge from redds, when fry densities are at their highest (Hearn 1987). These interactions may cause Atlantic salmon and brook and brown trout populations to fluctuate from year to year. Since brook trout and Atlantic salmon co-evolved, however, wild populations should be able to co-exist with minimal long-term effects (Hearn 1987; Fausch 1988). Where resources are limited, interspecific competition can exist between brown trout and Atlantic salmon and may cause interactive segregation, or affect the growth and survival of these species. Several other fish species occur in the GOM DPS rivers, including smallmouth and largemouth bass, pickerel, and landlocked salmon. In general, conclusions cannot be drawn regarding the competitive effects of these species on salmon, as no data are currently available (AASBRT 1999). Atlantic salmon and rainbow trout produced by the aquaculture industry (including non-North American strains

and potentially transgenics) that escape from hatcheries or net pens also compete with wild Atlantic salmon. (This topic is discussed further later in this section of the opinion, as well as in the Effects of the Action section.)

## C. Population Dynamics

### 1. Historical Abundance

Anadromous Atlantic salmon were native to nearly every major coastal river north of the Hudson River in New York (Atkins 1874; Kendall 1935). The annual historic Atlantic salmon adult population returning to U.S. rivers has been estimated to be between 300,000 (Stolte 1981) and 500,000 (Beland 1984). The largest historical salmon runs in New England were likely in the Connecticut, Merrimack, Androscoggin, Kennebec, and Penobscot Rivers.

By the early 1800s, Atlantic salmon runs in New England had been severely depleted due to the construction of dams, over fishing, and water pollution, all of which greatly reduced the species' distribution in the southern half of its range. Restoration efforts were initiated in the mid-1800s, but there was little success due to the presence of dams and the inefficiency of early fishways (Stolte 1981). There was a brief period in the late nineteenth century when limited runs were reestablished in the Merrimack and Connecticut Rivers by artificial propagation, but these runs were extirpated by the end of the century (USFWS 1989). By the end of the nineteenth century, three of the five largest salmon populations in New England (in the Connecticut, Merrimack, and Androscoggin Rivers) had been eliminated.

### 2. Current Abundance

As with most anadromous species, Atlantic salmon can exhibit temporal changes in abundance. Angler catch and trapping data from 1970 to 1998 provide the best available composite index of recent adult Atlantic salmon population trends within the GOM DPS rivers. These indices indicate that there was a dramatic decline in the mid-1980s, and that populations have remained at low levels ever since. Figure 6 demonstrates this trend (AASBRT 1999).

Total documented (rod and trap caught fish) natural (wild and stocked fry) GOM DPS spawner returns for 1995 through 2001 are: 1995 (85); 1996 (82); 1997 (38); 1998 (23); 1999 (32); 2000 (28); and 2001 (60) (USASAC Annual Report 2002/14). These counts (as well as the counts shown in Figure 6) represent minimal estimates of the wild adult returns, because not all GOM DPS rivers have trapping facilities (e.g., weirs) to document spawner returns in all years. The counts of redds conducted annually by the Maine Atlantic Salmon Commission (ASC) demonstrate that salmon do return to those rivers for which no adult counts are possible. Since 2001, scientists have made an estimate of the total number of returning salmon to the GOM DPS. This estimate is calculated using capture data on GOM DPS rivers with trapping facilities (Dennys, Pleasant, and Narraguagus Rivers), combined with redd count data from the other five GOM DPS rivers. Documented returns based on these redd counts and trap data estimate a total of 91 adult returns in 2000 and 98 adults in 2001, at 95% probability. The 90% probability

site-specific marks will enable facility operators to work with the ACOE and the Services to quickly identify the cause of escapement and to correct problems leading to the escape. The ability to reduce, and ideally eliminate, the presence of escapees in rivers is dependent on the ability to identify and control the losses at the net pens.

Special Condition No. 5 will also minimize effects by requiring reporting of known or suspected escapes of more than 50 fish with an average weight of 2 kg each or more within 24 hours. Fifty fish was identified by the aquaculture industry as a minimum number of escapees that they could reasonably detect; a 2 kg fish was identified by the Services and the ASC as a minimum weight at which an Atlantic salmon could be sexually mature. This reporting requirement will enhance the ability to retrieve escaped fish when possible and alert field scientists operating weirs on GOM DPS rivers to the fact that an escape has occurred. The reporting requirement will also contribute to a database that, in combination with information on detection of escapees in rivers, will allow for a clearer understanding of the chain of events that starts with salmon escaping from a net pen and ends with escapees entering rivers. This system will help determine, over time, what specific factors (e.g., season, age/size class, proximity to GOM DPS rivers, etc.) are more or less likely to result in escapees entering the GOM DPS rivers.

Proper containment (Special Condition No. 4), fish husbandry practices, and disease management (Special Condition No. 3) for other salmonid species reared in marine cages will collectively reduce the risks that disease transfer and competition pose to wild Atlantic salmon.

## D. Transgenics

The potential use of transgenic salmonids in the aquaculture industry has recently been identified as a possible threat to wild Atlantic salmon populations. Transgenic salmonids include fish species of the genera *Salmo, Oncorhynchus,* or *Salvelinus* in the family Salmonidae that bear, within their DNA, copies of novel genetic constructs introduced through recombinant DNA technology using genetic material derived from a species different from the recipient, and descendants of any individuals so transfected. Escaped, reproductively-viable transgenic salmon could interbreed with wild fish. Research to develop transgenic fish for aquaculture increased through the 1980s and had advanced to the extent that, by 1989, production of 14 species of transgenic fish, including Atlantic salmon, had been reported (Kapuscinski and Hallerman 1990).

Transgenic fish produced for culture in marine net pens must be selected to survive under nearly natural physical and chemical environmental conditions. If they escape, therefore, it is likely that a portion of them will survive. In a study by Sheela *et al.* (1999), transgenes were inherited in many progeny from transformed fish, as determined through DNA analyses and through expression of the reporter gene. If an introduced construct can find its way onto or into a chromosome before the first cell division of a newly-fertilized egg, all the cells in the developing organism, including future germ cells, will contain copies (Lutz 2000). The transmission of novel genes to wild fish could lead to physiological and behavioral changes, and traits other than those targeted by the insert gene are likely to be affected. Ecological effects are expected to be greatest where transgenic fish exhibit substantial altered performance. Such fish could destabilize or change aquatic ecosystems (Kapuscinski and Hallerman 1990).

In a study by Cook *et al.* (2000), growth-enhanced transgenic Atlantic salmon exhibited a 2.62- to 2.85-fold greater rate of growth relative to non-transgenic salmon, over the body weight interval examined. This study found that the transgenic experimental subjects possessed the physiological plasticity necessary to accommodate acceleration in growth well beyond the normal range for this species, with few effects other than a greater appetite and a leaner body (Cook *et al.* 2000). Because aquatic ecosystems function through complex interactions involving transfers of energy, organisms, nutrients, and information, it is difficult to predict the community-level impacts of releasing transgenic fishes that exhibit one or more types of phenotypic change (Kapuscinski and Hallerman 1990). At this time, more research is needed to identify the impacts that escaped transgenic salmon would have on natural populations and their habitat before use for commercial aquaculture is considered.

Research and development efforts on transgenic forms of Atlantic salmon and rainbow trout are currently being directed toward their potential use for sea pen aquaculture. Emphasis has been placed on enhancement of growth and low water temperature tolerance through the transfer of genetic material from other cold-tolerant species, such as flounder. In 2002, the Food and Drug Administration received an application for approval to sell and possibly grow transgenic salmon in the United States for use by the aquaculture industry.

The prohibition on the use of transgenic salmonids at existing marine sites off the coast of Maine (Special Condition No. 2) will eliminate the potentially adverse disease and ecological risks posed by the use of transgenic salmonids in aquaculture. The risk posed by a transgenic salmonid to wild salmon would be greatly affected by the specific gene manipulation conducted. Anyone proposing the use of transgenic salmonids in aquaculture would need to provide information on the methods used and the potential for genetic, fish health and ecological impacts on wild stocks. This information would have to be evaluated to determine the level of risk posed to wild Atlantic salmon stocks and a decision would have to be made as to whether that level of risk was acceptable or not. The use of transgenic salmonids will be prohibited under Condition No. 2 until such time as these risks can be evaluated.

### Summary of Effects

In summary, the proposed action is most likely to adversely affect individual Atlantic salmon by causing take through harm or harassment in the GOM DPS rivers without weirs or traps (i.e., Sheepscot, Ducktrap, Machias, and East Machias Rivers, and Cove Brook). Some take may also occur in rivers with weirs, for example where there is spawning habitat located downstream of the weir or if a fish enters when the weir is not in place. The harm or harassment is reasonably certain to result from one or more factors discussed above, including redd superimposition, competition, and genetic introgression. The scientific studies, escape reports from the aquaculture industry, and the detection of aquaculture fish in Maine rivers all discussed in this opinion establish that the anticipated impacts are reasonably certain to occur.

In view of this, the Services have evaluated these impacts at a very detailed level of analysis and evaluated several factors influencing the impact these effects will have on the GOM DPS. This

analysis helps to distinguish the important difference between the impacts to individual GOM DPS salmon and effects to the population of salmon defined by the GOM DPS. The demonstrated influx of aquaculture fish into at least one GOM DPS river, repeatedly, over the last several years makes these impacts to wild salmon reasonably certain to occur. The greater the number of escapees that enter the GOM DPS rivers and the greater the period of time over which these events occur, the greater is the likelihood that the entire GOM DPS salmon population would be impacted versus occasional impacts to individual salmon within the GOM DPS.

Although the Services are reasonably certain that one or more of these impacts (e.g., introgression) will occur as a result of the action, the Services do not believe that every incidence of an aquaculture fish entering a GOM DPS river will result in such take of GOM DPS salmon. The Services do not anticipate that each aquaculture escapee that enters a GOM DPS river will cause introgression or redd superimposition. For example, an escapee may not find a wild fish to spawn with.

While a certain level of impact is still anticipated, including some take, there are a number of factors mitigating these impacts at the GOM DPS population level. First, the new permit conditions will both reduce the number of escapees entering GOM DPS rivers and eliminate the greatest long-term threat to wild salmon by phasing out the use of non-North American strains. Furthermore, there are multiple rivers in the GOM DPS and multiple-year classes present at any given time for each river (both within the river and at sea); consequently, each time an aquaculture escapee enters a GOM DPS river and causes an impact to wild salmon, the effect of that impact (e.g., redd superimposition or hybridization) is limited to only a subset of the entire river's population. The operation of a weir or trap on three of the GOM DPS rivers also substantially reduces the opportunities for interactions between aquaculture escapees and wild salmon. Finally, the USFWS's river-specific stocking program currently helps to maintain populations for six of the eight GOM DPS rivers, helping to offset the extremely low number of adult returns in recent years.

Therefore, while the probability of impacts to some individuals will remain high, the magnitude of these impacts to the population is anticipated to decrease over time due to the new special conditions. The potential for impacts to individuals will decrease as a result of the expected 25% decrease in escapees associated with implementation of the CMS. A decrease in the frequency of impacts to individuals will further reduce the potential for impacts to a year class and a river population. The severity of impact that any individual aquaculture escapee poses will also be decreased as the use of non-North American Atlantic salmon is eliminated.

## IV. CUMULATIVE EFFECTS

Cumulative effects include the effects of future state, tribal, local or private actions that are reasonably certain to occur in the action area considered in this opinion. Future federal actions that are unrelated to the proposed action are not considered in this section, because they require separate consultation pursuant to Section 7 of the ESA.

# Attachment 2

Sixty-Day Notice of Intent to Sue FDA Pursuant to the Endangered Species Act
Re: Approval of Genetically Engineered "AquAdvantage" Salmon

3101 Deakin St.
Berkeley, CA 94705

Division of Dockets Management (HFA–305)
Food and Drug Administration,
5630 Fishers Lane, rm. 1061,
Rockville, MD 20852

April 25, 2013

[Docket No. FDA–2011–N–0899]

*Submitted electronically to:* http://www.regulations.gov

**Introduction and Background**

My name is Jonathan Rosenfield.  I have Doctoral and Master's of Science degrees in the evolution, ecology, behavior, and conservation of vertebrates with a particular emphasis in the mechanisms and consequences of inter-specific genetic exchange among fish species.  I have authored or co-authored several published, peer-reviewed manuscripts on hybridization and genetic introgression (the gene exchange that accompanies successful reproduction by hybrid organisms) among fishes, including species in the family salmonidae.  Attached for reference is my current Curriculum Vitae.

I am writing to express grave concerns with the FDA's proposed approval of AquAdvantage transgenic salmon produced by AquaBounty Technologies (AquaBounty).  FDA approval would allow mass production of genetically engineered (GE) Atlantic salmon at two locations, Panama and Prince Edwards Island (PEI), and will likely lead to expanded production of the fish in other locations around the world, including the United States.  My concerns are that AquAdvantage salmon are likely to escape captivity (including either from the facilities described in the draft EA, from other facilities that Aquabounty may developed to produce these fish in the future, or from facilities operated by other entities, to which AquaBounty may sell their eggs) and that when these genetically engineered salmon escape their hatchery or rearing environments, they are likely to wreak havoc on natural ecosystems, endangered species, and/or commercially valuable fisheries.

These concerns are based on my background and expertise in production and rearing of fish in captivity, the ecology and behavior of salmonids and fishes in general, and, in particular, my experience with non-native invasive fish species and genetic introgression (transfer of genetic material among distinct populations) that often accompanies introduction of organisms into a novel evolutionary environment.  I urge the FDA to reconsider its proposed acceptance of the application to permit production of GE salmon until project proponents can demonstrate that there is zero risk of escape now or in the future and that the fish cannot survive outside of their hatchery environment under any circumstances.  I am aware that this request sets a high standard for certainty; these assurances are appropriate for a situation such as this, where escape of a GE organism could cause significant and potentially irreversible environmental and economic damage.  I recommend that FDA conduct a much more thorough review than is contained in the current Draft Environmental Assessment (EA) and Finding of No Significant Impact (FONSI)

and produce a full and rigorous environmental impact statement that accounts for the wide range of risks AquAdvantage Salmon could pose to any environment in which they may be released. Because it is clear that FDA's approval of the production of GE Atlantic salmon may affect the status of threatened and endangered organisms in the wild, I also call on the FDA to refrain from permitting their production until it has engaged in formal Endangered Species Act consultation with the United States Fish & Wildlife Service (USFWS) and National Marine Fisheries Service (NMFS) to assess the risks AquAdvantage salmon may pose to endangered fish populations, including, but not limited to, members of the genera *Salmo* (Atlantic salmon and trout) and *Oncorhynchus* (Pacific salmon and trout).

## I.     Genetically engineered salmon are likely to escape captivity.

I have reviewed the FDA's Draft EA and related information regarding AquaBounty Technology's plans for confining the egg, larval, and juvenile salmon they will rear.  It appears to me that the project's proponents have taken seriously the possibility of escape (as well they should); they describe a number of systems that seem as though they could impede many avenues of fish escape from their facilities.

Given the opportunities for escaped salmon to cause damage and the irreparable consequences of some of those impacts (described below), evaluation of the risk posed by these organisms must assume that these fish will escape either: (a) the containment systems described in the EA; (b) during transport between facilities; or (c) some other facility into which these fish may be introduced in the future.  One only has to look to other examples where seemingly well-designed (on paper), redundant, and expensive security systems failed in order to understand that, even when project proponents dedicate great effort, engineering, and considerable resources to preventing foreseeable accidents, accidents still happen, often repeatedly.

The prospects for fish escape and survival in the wild are far from theoretical. A great deal of the modern scientific literature on the ecology and conservation of fishes has to do with the consequences of non-native fish species invasions.  There are far too many examples of intentional and unintentional fish introductions that resulted in harm or even extirpation of native fishes and/or irreversible alteration of ecosystem function to document all of them here[1]. In his paper describing the potential and known impacts of Atlantic salmon escaped from aquacultural facilities, Gross (1998:133) reports:

---

[1] To name just two dozen examples: Wagner and Stauffer 1982; Campton 1987; Allendorf and Leary 1988; Hindar et al. 1991; Waples 1991; Dowling and Childs 1992; Mills et al. 1994; Smith et al. 1995; Moyle and Light 1996; Echelle et al. 1997; McGinnity et al. 1997; Clifford et al. 1998; Ricciardi and MacIsaac 2000; USFWS 2000; Scott and Helfman 2001; Perry et al. 2002; McGinnity et al. 2003; Ruzycki et al. 2003; Clavero et al. 2004; Streelman et al. 2004; Campton and Kaeding 2005; Hanfling 2007; Light and Marchetti 2007; and Hoagstrom et al. 2010. Many more such events are described in books that are wholly or partially dedicated to this topic, including: Courtenay and Stauffer 1984; Mooney and Drake 1986; Minckley and Deacon 1991; Avise 1994; Lockwood and McKinney 2001; Moyle 2002; and Sax et al. 2005, etc.  Finally, entire scientific periodicals are dedicated, in whole or in part, to studying the consequences of biological invasions (e.g. Biological Invasions, Aquatic Invasions, Conservation Biology, Biological Conservation, etc.).

> *At a global level, exotic introductions have shown many significant negative impacts and invading aliens are considered second only to habitat loss as the major threat to native biodiversity and the integrity of natural communities (IUCN 1997).*

The EA considers only two possible avenues of fish escape from either AquaBounty facility: vandalism or failure of all containment systems due to a physical disaster. As a result, the EA ignores the potential for the containment systems to fail under "sunny day" conditions. This faith in human infallibility appears to underlie the project proponents' choice to employ a flow-through systems rather than a land-based recirculation systems; this choice of system design creates a hydrological connection between the fish rearing facility and exterior environments and assumes that barriers to fish movement (screens, sumps, chlorine, etc) will work 100% of the time. This is a poor assumption indeed.  Whereas the containment measures described in the EA may appear to be efficacious, each requires perfectly reliable and well-trained employees who do not make mistakes (such as failing to notice a clogged or broken stem-pipe filter, failing to replace a chlorine puck at the appropriate time, etc.).  It is completely unreasonable to expect that the containment protocols described by the project proponent will be perfectly implemented *in perpetuity* or that organizations to which AquaBounty may sell its product to in the future will maintain the same set of protocols and the same commitment to implementing them.

As for the potential mechanisms of GE fish escape that the EA does consider (vandalism and natural disaster), I find its analysis and dismissal of these phenomena completely unconvincing. With regard to vandalism, we are all aware that intruders break into guarded facilities upon occasion.  In my own experience, two separate areas of my doctoral research facility were vandalized, in different events, in the four years I maintained live animals, despite the fact that both areas were behind locked doors and the fish I was studying at the time were of no commercial, recreational, or culinary value. I can offer no estimate of the likelihood that vandals will disrupt either the PEI or Panama facilities, or transit between these facilities, or other facilities that may house GE fish in the future, but it is simply naïve to assume that, just because facilities are guarded, vandalism that leads to release of GE salmon is not possible.

The potential for catastrophic events to disrupt activities at either the PEI or Panama facility (or on transit routes between the facilities) seems substantial, yet the EA dismisses them as unlikely. On page 57, the EA states that PEI:

- *"… is frequently affected by outcomes such as power outages, rain and snow storms from December until April…"*
- *"…in September 2003, high winds (~90 mph) associated with Hurricane Juan devastated central Nova Scotia[2], killing eight people and causing an estimated C$200 million in losses that extended into Prince Edward Island"*

---

[2] More recently, although Hurricane Sandy (2012) did not track towards PEI, it caused torrential rains and high winds well into Canada and generated tremendous destruction and transportation problems along all the routes (air, ground, and sea) connecting AquaBounty's PEI and Panama facilities. There is obviously no certainty that the next large hurricane on the East Coast of North America will not follow a track that leads to PEI.

- *" ...in February 2004, a blizzard nicknamed "White Juan" brought a record one-day snowfall of ~40 inches that briefly crippled the area."*
- *"Flooding and severe storm surges ... occur with regularity in the vicinity of Charlottetown on the south side of PEI (the ABT egg production facility is located on the northeast side)."*
- *"Two tsunamis have been reported east of Nova Scotia in the vicinity of southern Newfoundland and the Grand Banks, and one tornado has been reported in coastal New Brunswick northwest of Moncton ..."*

The EA's own list seems to contradict its claim that weather events that could disrupt GE salmon containment at the PEI facility are "*rare or extremely rare*". [p. 68] Rather, they indicate that the PEI facility may be subjected to extended power outages and/or significant physical damage and/or isolation from trained personnel as a result of powerful storms and that these events can be expected to occur with some frequency.

Regarding the Panama facility, the EA [p. 71] states:

> *The grow-out facility in Panama is potentially subject to flooding conditions from a nearby river. The area receives a significant amount of annual rainfall, approximately 570 cm or 224 inches per year (Table 5), with much of it coming in the wet summer months. There was a significant flood of the river in the recent past that caused extensive damage at locations downstream of the grow-out facility. The facility itself, however, was not directly affected by flood waters and sustained no serious damage. ...Considering that this flooding was among the worst to ever occur in the area, it seems improbable that the grow-out facility would be impacted by future events of this type in a manner that could cause accidental release of GE fish. In addition, all tanks in the facility have appropriately sized top netting to prevent fish escape in the unlikely event that flooding would occur on the grounds of the facility.*

Again, this revelation does not demonstrate to me that catastrophic power outages or barriers to key personnel performing essential protocols will be "rare or extremely rare".  Moreover, the fact that the Panama site is so wet only increases the likelihood that escaped fish will survive long enough to find their way to the adjacent river or coastal areas.

The fact is domesticated Atlantic salmon escape from their rearing facilities frequently, sometimes in large numbers, and from a diversity of facilities despite efforts to prevent such escapes.  Gross (1998:136) summarizes:

> *The movement of domestic* [Atlantic salmon] *... into the wild is not uncommon. Recent estimates from the salmon farming in- dustry in British Columbia suggest that up to 2% may enter the wild each year (Alverson and Ruggerone 1997). Losses can occur in large pulses or through small leakages. For example, in 1988 a single winter storm along the middle coastal region of Norway released about 700,000 individuals into the Atlantic Ocean (Gausen and Moen 1991). In the Pacific, 101,000 Atlantic salmon were released into Puget Sound, Washington*

> *State, on 2 July 1996 and over 360,000 on 18 July 1997 from mishaps at single farms (Thomson and McKinnell 1997; personal communication from A. Thomson, Atlantic Salmon Watch B.C.). Escapement into the wild is known to occur at all life stages from yolk-sac fry up to and including adults (e.g., Lough et al. 1997).* [Emphasis added]

Gross (1998) and others also report catches of escaped, domesticated Atlantic salmon *in the Pacific Ocean* (i.e. well-beyond their rearing facility) averaging almost 1500 fish per year from 1987-1997. I believe it is highly likely that each of the salmon farm facilities that has lost domesticated salmon to the wild had protocols and facilities intended to prevent such escapes – these are, after all, commercial ventures that lose revenues with each fish that escape. The point is that fish escape containment facilities (sometimes in large numbers and frequently) despite practices, protocols, and hardware designed to prevent such escapes. Whereas the proposed containment of AquAdvantage fish might conceivably reduce the number or frequency of escape, I see nothing in the description that guarantees that fish will not escape, survive escape, or cause harm if they do escape. Again, given the potential consequences, the FDA should require an exceptionally high level of certainty that the production of these transgenic fish will not cause harm to the environment, the sport angling economy, or commercial fishing operations. That standard has not been met by the current proposal or its review in the EA.

## II.  AquAdvantage salmon that escape are capable of surviving outside either the Prince Edward Island or Panama facilities.

After AquAdvantage fish escape captivity, the main factor that regulates the harm they can cause is their ability to survive and mature in the environments outside of the facilities. In short, I find no reason to believe that AquAdvantage salmon would not survive in many of the aquatic environments outside of the breeding and rearing facilities – indeed, related fish species with similar ecological requirements already survive and reproduce in close proximity to these facilities (e.g. USFWS 2000; EA at pp. 59 and 62). The FDA be aware that, once these GE salmon have escaped, they will be very difficult (or perhaps impossible) to eradicate and can potentially migrate to other environments where conditions will be even more conducive to survival and reproduction.

The EA correctly states:

> *Any consideration of the fitness of Atlantic salmon, regardless of its status with respect to genetic engineering, requires understanding that in general, Atlantic salmon display a high degree of phenotypic plasticity and complex life history that enable them to adapt to variable conditions and rigorous environments. In addition, genotype-by-environment interactions will produce different phenotypes when animals with the same genetic background are exposed to different environmental conditions. Given the high degree of phenotypic plasticity of Atlantic salmon, and the impact of genotype-by-environment interactions, it is not surprising that the wide spectrum of traits observed in wild-type Atlantic salmon generally encompasses that of AquAdvantage Salmon.* (FDA pp. 26-27).

In other words: Atlantic salmon (including GE AquAdvantage salmon) are adept at surviving in a wide range of environments and they are highly variable and plastic (reducing the relevance of findings based on small sample sizes). Despite this, the FDA relies on a small number of studies and/or a large number of assumptions that are contradicted by plain fact and/or voluminous research that suggest that escaped GE salmon are quite likely to be able to survive in environments near to the incubation and rearing facilities described in the EA (to say nothing of environments along the transport route between these two facilities or environments where these fish may be reared in the future).

In general, the EA finds that AquAdvantage fish are similar to the Atlantic salmon (both wild and domesticated) in their environmental tolerances. The EA notes only minor differences in gross anatomy, histopathology, and clinical chemistry in its very small sample of GE salmon, concluding that "*these findings were generally of low magnitude, limited distribution, and non-debilitating nature*" (EA p.27). Similarly, the EA reports no differences in susceptibility to disease among AquAdvantage relatives and other Atlantic salmon. Furthermore, the EA emphasizes similarities between GE AquAdvantage salmon and high-growth rate, non-GE salmon bred for the hatchery environment. This is ironic because the latter are well-known to escape confinement, survive in the habitats into which they escape, and have deleterious environmental effects when they escape from containment (e.g. Utter et al. 1993; Einum and Fleming 1997; McGinnity et al. 1997; Gross 1998; Clifford et al. 1998, McGinnity et al. 2003; Bourret et al. 2011).

I am unimpressed by the EA's suggestion that some differences between AquAdvantage salmon and wild counterparts make the former incapable of surviving in and emigrating to new habitats following an escape from their breeding or rearing facilities. For example, the EA's evidence that escaped AquAdvantage salmon *might* be impeded by low dissolved oxygen levels in the wild is feeble. The EA states: "*Although these AquAdvantage relatives have demonstrated an ability to reduce their metabolic rate in response to starvation, their enhanced metabolic profile and lower initial energy reserves would greatly reduce the likelihood of their growing rapidly, or even surviving, outside of the highly supportive conditions provided by commercial farming*" (EA p. 30, Emphasis Added). Thus, the EA concedes that any greater metabolic demand for oxygen exhibited by AquAdvantage salmon compared to wild Atlantic salmon is facultative (i.e. can be "switched off" in a low food environment). More importantly, the EA reveals that dissolved oxygen conditions in the river adjacent to the Panama facility are suitable for salmon (and that rainbow trout currently live outside of this facility). Because temperature and dissolved oxygen concentrations are inversely related (low temperatures produce high levels of dissolved oxygen), temperatures common outside the PEI facility (Table 4, p. 56) make it highly unlikely that escaped salmon would ever encounter low dissolved oxygen conditions in the waterways on PEI. Thus, it is hard to imagine that (a) dissolved oxygen conditions in the waterways adjacent to either facility would kill escaped AquAdavantage salmon; (b) such conditions are so extreme or persistent that escaped GE salmon could not swim to more suitable environments; or (c) even when/if such conditions did exist, they would represent a competitive advantage to wild salmonids in competition with GE salmonids (because, as noted, the GE salmon can reduce their demand for dissolved oxygen).

In assessing whether AquAdvantage salmon would survive if (when) they escaped their breeding or rearing facilities, the EA repeatedly immerses the reader in great detail about the physical characteristics of AquAdvantage salmon and their environmental tolerances while ignoring the clear fact that AquAdvantage salmon tolerate conditions like those outside of both the proposed spawning and rearing facilities; in other words, the FDA missed the forest for the trees.  For example, it is clear that AquAdvantage fish can survive out of captivity because Atlantic salmon and/or other species of the genus *Salmo* and other salmonid genera have historically survived and reproduced in the waters outside both the breeding facility on Prince Edwards Island (PEI facility) and the rearing facility in Panama.  Regarding the PEI facility, the EA states:

> *The local environment near the ABT facility has numerous shallow bays, broad estuaries, and short rivers that contain an abundance of favorable habitat for diadromous fishes, those species that use both marine and freshwater habitats. Fish common to the area include the following: mackerel; herring; eel; gaspereau (e.g., alewife & blueback herring); silverside; smelt; and, salmonids. The salmonid group comprises the following: Atlantic salmon (Salmo salar); brook trout (Salvelinus fontinalis), which is native to the region; and, rainbow trout (Oncorhynchus mykiss), which was introduced into the region in 1925.* (EA p. 59; Emphasis Added).

The fact that Atlantic salmon have been extirpated from the particular drainage on PEI where the spawning facility is located does not, in any way, demonstrate that fish or eggs that escape from the PEI facility will not survive (EA pp.88-89).  Thus, there is no reason to believe that escaped AquAdvantage Salmon would be limited by environmental conditions outside of the PEI facility.

Regarding the waterway nearest to the Panama facility, the EA states:

> *The upper part of the local river has favorable conditions for establishing salmonid populations: temperature, DO, and turbidity are all within their tolerances. These conditions change in the mid- and lower-parts of the river where water temperatures exceed the upper lethal limit (~23ºC) that has been identified for Atlantic salmon (see Appendix A.3 and Section 7.3.1.2 for additional information on their temperature tolerance).* (EA p.62).

and

> *There are few natural predatory fish in the area. Freshwater tarpon (Tarpon prochilodus) occur in the warmer waters of the lower basin, and a population of rainbow trout that were introduced in the upper basin could prey on salmon. These rainbow trout were intentionally stocked beginning in 1925, and are reported to constitute an established, naturally reproducing population (Welcomme, 1988); however, their abundance has not been well documented.* (EA p.63, Emphasis Added).

The fact that rainbow trout have survived in the watershed adjacent to the Panama facility for almost 90 years is very strong evidence that escaped AquAdvantage salmon could survive in these waters.  The EA incorrectly implies that, though the upper watershed is capable of

supporting self-sustaining populations of salmonids (and does so now), these fish cannot escape to marine environments because temperatures in the lower river exceed 23°C and this water temperature is too high to support salmon.  This assertion is deceptive because (a) the EA's appendix suggests that 23°C is a temperature at which Atlantic salmon stop feeding, but it also reveals that Atlantic salmon can survive (until starvation) in water with temperatures much higher (>27°C) and (b) the EA reports average temperatures in the lower river, which are, of course, higher than minimum water temperatures escaped fish might encounter.  Thus, there is no support for relying on water temperatures in the lower river to block the migration of escaped AquAdvantage salmon out of the Panamanian freshwater environment.

In general, the EA focuses only on the potential for AquAdvantage to escape and establish self-sustaining populations of AquaAdvantage offspring in the waterways into which they escape; little or no attention is paid to the more likely scenario that escaped fish or their progeny will swim or be transported to new environments.  For example, the EA ignores the very real possibility that, having escaped containment, a small population of AquAdvantage salmon could serve as a source population for introduction to other areas. In other words, once AquAdvantage salmon escape and survive in the wild, there is nothing to stop people from intentionally moving them to other environments. This kind of intentional introduction is quite common, especially when the target species is a sought-after, edible sportfish (for example, rainbow trout have been introduced *into* the environments outside of both AquaBounty facilities).  Furthermore, if escaped AquAdvantage salmon can survive in the site of their initial introduction, they may colonize other environments opportunistically, when conditions permit. Even if the environments immediately outside the production and rearing facilities are sometimes inhospitable to some life stages of escaped AquAdvantage fish, this does not mean that (a) they are always inhospitable or (b) a different life stage of these fish could not tolerate the new environment long enough to find its way into other habitats that would support survival and reproduction.  Because AquAdvantage fish are not bred to die prematurely and are similar to their wild relatives in many respects (except where they are superior, *see below*), there is every reason to be concerned that escaped AquAdvantage salmon can survive long enough after escaping captivity to move (or be moved) to distant environments.  None of AquaBounty's redundant containment systems will be of any use once these fish have established themselves in watersheds outside of the rearing facility.

In addition, numerous water bodies between these two facilities do now or have historically supported populations of Atlantic salmon or other species in its genus or related genera of the family salmonidae; thus, the AquAdvantage fish could survive if they escaped during transport (e.g. as a result of transport plane or truck crash during operations described in the EA at page 54).  Even if AquAdvantage fish escaped or were introduced into an environment where Atlantic salmon have never existed in the past, this would not indicate that they are not capable of surviving in the novel environment. Indeed the modern history of fisheries in North America and across the globe is overflowing with examples of fish introduced into habitats where they did not exist before (*see sample citations throughout this letter*).

In many ways, the EA finds that AquAdvantage fish may be superior to their wild counterparts; for example, the EA states: "*The main difference between AquAdvantage Salmon and non-GE Atlantic salmon, and the basis for the value of the product, is the significant increase in growth rate of the former*."  (EA p.28).  The EA notes that AquAdvantage salmon exhibit increased

aggressiveness and reduced anti-predator responses compared to wild Atlantic salmon. Increased growth rate clearly corresponds to increased viability among fishes as, within species, size is correlated positively with swimming ability and negatively with predation rates (Brett 1964; Beamish 1978); increased aggression can confer fitness in particular environments, especially when the risk of predation (and therefore the need to remain hidden) is low — this is the case in the environment immediately outside the Panama facility (EA p.63).

In addition, although the EA strains to explain why the behavior of escaped hatchery fish behavior would inhibit their survival in the wild (EA pp.31-32), the suggestion is contrary to both the abundant scientific evidence that domesticated salmon from other types of rearing facilities escape and survive quite frequently and the EA's own statements about other GE salmon with transgenic growth hormone constructs. With respect to GE coho salmon, the EA states:

> *Under laboratory conditions, GH-transgenic coho salmon (Oncorhynchus kisutch) bearing the OnMTGH1 growth hormone construct have been observed to be more competitive (Devlin et al., 1999), less discriminate in choosing prey (Sundström et al., 2004), more likely to attack novel prey (Sundström et al., 2004), and better at using lower quality food (Raven et al., 2006) when compared to wild relatives. Although these effects would have the potential to influence wild relatives both directly and indirectly, such observations were demonstrably muted when the GE fish were reared under simulated natural conditions (Sundström et al., 2007), indicating the complexity of gene-environment interactions. The extent to which this information on GE coho salmon can predict the behavior of GE Atlantic salmon is also unknown.* [EA p.32]

The citation to Sundström et al. (2007) is curious because, while that study did find that the advantages enjoyed by GE coho salmon over wild salmon were "muted" under simulated natural conditions, these authors still found that GE salmon were significantly superior competitors to wild Coho salmon.  They state:

> *"...when fish were reared under naturalized stream conditions, transgenic fish were <u>only 20% longer than the wild fish</u>, and the magnitude of difference in relative predation effects was much reduced. These data show that genotype-by-environment interactions can influence the relative phenotype of transgenic and wild-type organisms and that extrapolations of ecological consequences from phenotypes developed in the unnatural laboratory environment may lead to an <u>overestimation or underestimation</u> of ecological risk. Thus, for transgenic organisms that may not be released to nature, the establishment of a range of highly naturalized environments will be critical for acquiring reliable experimental data to be used in risk assessments."* [Sundström et al., 2007:3889, Emphasis Added]

The main point of Sundström et al. (2007) is to demonstrate "the complexity of gene-environment interactions" and speak to the importance of these interactions in understanding the likely impact of non-native fish introductions (or, in this case, escape of a GE salmon).  Other

studies of the impacts of fish interactions (e.g. Smith et al. 1995; Hatfield and Schluter 1999; Rosenfield et al. 2000; Kodric-Brown and Rosenfield 2004) make the same point: the outcomes of any given fish introduction depend on environmental conditions experienced by the escaped fish and the genotype of the introduced group of fish. Sundström et al (2007) also make clear that these interactions can work both ways, i.e., in another simulated (or actual) natural environment, GE salmon might enjoy even greater fitness advantages over wild fish. In fact, the authors explicitly state:

> *"... our results cannot be taken as evidence that growth-enhanced transgenic salmonids reared in nature will not influence prey population survival and growth differently than wild salmonids. Although development in a simulated natural environment reduced the difference in predation effects between transgenic and wild predators, the small number of replicates (n = 4 per predator type as the result of logistic reasons) reduced the likelihood of detecting small, but significant, differences (i.e., low power of test). In addition, the present experiments have only mimicked one type of "natural" environment during both rearing and experimental monitoring (e.g., for only the fresh-water phase of the salmon's life history). Because environment appears to have a strong influence on phenotype, other rearing conditions not tested in this experiment (e.g., prey density) may still affect phenotypic development of a transgenic animal and subsequent ecological consequences."* [Emphasis Added]

and

> *"For risk assessments of transgenic animals that cannot be released to nature, it is important to examine the animals under a range of contained naturalized environments that yield the full breadth of phenotypes and ecological scenarios that transgenic animals would experience in the wild. Further, determining whether rearing conditions cause permanent or reversible phenotypic changes is critical, because this determination will influence the potential of animals from a rearing facility to become more "wild-like" which, in turn, will influence their long-term fitness and ecological impact in nature."* [Emphasis Added]

The FDA's failure, to heed this extremely salient message, is a significant inadequacy of the EA. That the EA takes this study out of context and, as it does elsewhere, grasps at a small number of small studies to support (weakly) its preferred alternative is unpardonable.

Similarly, the EA's discussion of ocean return rates among domesticated triploid salmon (similar, but not identical, to AquAdvantage salmon) demonstrates that the possibility of escape, survival (through fresh and salt water environments), and return to "home" streams is not at all theoretical. But, contrary to their plain import, the EA treats the ominous findings of a few studies on GE salmon as though they were proof of the efficacy of induced triploidy in preventing harm to natural ecosystems or populations of wild fish.  The EA states:

> *Ocean migration studies in Ireland revealed that male triploids returned to their natal area in nearly the same proportions as diploids, whereas female triploids mostly did not (Wilkins et al., 2001). In another Irish study, the return rates of female triploid Atlantic salmon, both to the coast and to fresh water, were*

*substantially reduced (four- to six-fold lower) compared to those for their diploid counterparts (Cotter et al., 2000a).* [EA p. 32, Emphasis Added]

These findings do not square with the EA's interpretation that:

*".. triploidy could be used as a means both for eliminating genetic interactions between cultured and wild populations and for reducing the ecological impact of escaped farmed fish."* [EA p. 32, Emphasis Added]

The fact that, in some studies, gender-differences have been documented in adult return rate among domesticated triploid fishes actually demonstrates the potential risks of releasing these fish more than it quells such fears – some triploid salmon of both sexes home to their river of origin. In addition, the reduced detection of triploid salmon females in the wild does not mean that these fish did not (a) compete with other salmon in the ocean environment and/or (b) return to other, non-natal potential spawning streams (a process known as "straying" in the literature on Pacific salmon; Quinn 2005) where they have interacted with native fish populations. Furthermore, the Irish study referenced by the EA was conducted in 1 year with only three release groups; thus, it represents little more than an anecdotal observation of the efficacy of induced triploidy.  As elsewhere in the EA, the analysis and conclusions presented here are not based on the study of AquAdvantage salmon nor were they conducted in environments close to the AquaBounty facilities where these fish are more likely to escape.  Thus, the EA's hand waving at the importance of environment*genotype interactions to the contrary, the FDA ignores the potential for AquAdvantage salmon to behave quite differently from fish in the small sample studies it relies upon.

In sum, the FDA fails to make the case that escaped AquAdvantage salmon would not survive in the wild long enough to cause environmental impacts in waterways surrounding their incubation and rearing facilities or to escape (or be transported) to other habitats where they may cause lasting environmental impacts.  In part, this is because escaped, domesticated Atlantic salmon quite frequently survive in natural environments, where they cause significant damage, and because native and/or introduced salmonid populations (with environmental tolerances similar to those described for AquAdvantage salmon) already exist outside the PEI and Panama facilities.  In part, the FDA's case that escaped GE Atlantic salmon will not survive in the wild is unconvincing because the EA itself describes several fitness advantages of these fish relative to their wild counterparts.  Finally, the EA relies on very limited studies its case and these reports for the most part did not involve actual AquaAdvantage salmon and were not conducted in a range of environments that escaped AquAdvantage salmon might encounter; thus, the potential for environment*genotype interactions to foster undesirable results among escaped AquAdvantage salmon remains almost completely unevaluated.

III.    **If and when AquAdvantage salmon escape, their impact on environment of the US could be significant and irreversible**.

The record of negative impacts to native aquatic ecosystems and fish species resulting from both intentional and unintentional introductions of non-native fish species (or divergent genotypes within a species) is long and abundant.  The potential pathways by which escaped GE salmon may impact aquatic ecosystems, species, and/or fisheries of the U.S. can be segregated into two major categories: (1) ecological impacts on native, wild-type fishes (via predation and/or competition for resources such as food or mating opportunities) and (2) genetic impacts on native wild salmonids via hybridization and genetic introgression (which may, in turn, affect the outcome of the ecological interactions).  Gross (1998) illustrated and reviewed the taxonomy of ecological and evolutionary concerns associated with farmed, domestic Atlantic salmon escaping into the wild (Figure 1); this taxonomy is relevant regardless of the genetic background of the domesticated stock.



**Figure 1: The relationships among various mechanisms of negative impacts associated with the escape of farmed Atlantic salmon into natural ecosystems.  Copied from Gross (1998; Figure 4, p. 134)**

Gross (1998:137-138) outlined general categories of impact that escaped domesticated Atlantic salmon may have in native environments:

- Ecological impacts (these impacts may occur whether or not escaped GE salmon are reproductively viable)
    - Gross cites Ferguson et al. (1997) to illustrate that farmed Atlantic salmon behaviorally displaced wild Atlantic salmon into less productive habitats – the wild salmon grew more slowly than domesticated salmon or wild *x* domestic hybrids.
    - Gross (1998) cites Webb et al. (1991) to demonstrate the "*common reproductive habitat perturbation*" that occurs because escaped farmed fish typically arrive on the spawning grounds after wild fish spawn; the farmed fish then dig up nests of wild females.
    - Disease and parasite transfer may be facilitated by escaped domesticated fish. Although the EA presents no evidence that GE salmon are more susceptible to disease than other salmon, it is also extremely difficult to

know how these fish will respond to pathogens in the range of natural environments into which they might escape.

- Direct genetic impacts through inter-specific or inter-population hybridization.
  - o Gross (1998) cites Sægrov (1993); Youngson et al. (1993); Hindar and Balstad (1994) as indicating that farmed female Atlantic salmon have increased hybridization rates with salmonids in the wild;
  - o Gross (1998) refers to personal communication with R. Devlin (Department of Fisheries and Oceans, Vancouver, B.C., Canada) indicating that survival of F1 progeny occurred in 10 of 14 possible crosses between Atlantic salmon, and seven species of Pacific salmon;
  - o Gross does not mention the very real possibility that successful inter-specific or intra-population genetic exchange could disqualify imperiled populations (e.g. of wild Atlantic salmon) from protection under the federal Endangered Species Act (e.g., O'Brien and Mayr 1991; Smith et al. 1995) or extinguish them entirely (e.g. Rhymer and Simberloff 1996 *and sources cited therein*; Epifanio and Philipp 2001 *and sources cited therein*; Garrett et al. 2002);
  - o Similarly, Gross does not mention the potential for hybrids and their offspring to show hybrid vigor (improved fitness over parental types; e.g. Arnold and Hodges 1995; Rosenfield and Kodric-Brown 2003; Rosenfield et al. 2004) that could allow them to increase their geographic range (e.g. Echelle et al. 1997) and/or increase competition with other native species in the invaded environment.
- Indirect genetic impact of Atlantic salmon attempting to hybridize in populations of native salmonids that are locally endangered and close to extinction. Rosenfield et al. (2000) expressed similar concerns about the long-term effect of Chinook salmon hybridization with pink salmon in the Great Lakes (*see below*) and others have noted the possibility of a "Trojan Gene Effect" wherein escaped, domesticated fish might enjoy an initial mating advantage, but produce offspring that are less fit than wild types, resulting in reduced viability of the wild population in the long-term (e.g. Howard et al. 2004)[3].
- Competition with native salmonid species for food and space.

---

[3] I am aware that one researcher credited with developing the "Trojan Gene Hypothesis" has distanced himself from the suggestion that this particular outcome might arise as a result of GE salmon interbreeding with wild salmon (e.g. EA p.91). I believe that this phenomenon could be a problem (though only one of many potential problems) that arise from escape of AquAdvantage salmon into the wild. Indeed, it is the expectation of traditional biological concepts of "species" that hybrids between two species will be less viable than the parent species – whereas I present examples in which this has not been the case (*see below*), it is still quite possible that escaped GE salmon might be preferred mating partners by some wild fish (a fitness advantage) and that their offspring might experience reduced fitness in some other aspect of their life cycle. The phenomenon were single genes produce different fitness results throughout the life cycle of an organism is known as plieotropy and its study has a long history in the evolutionary ecology literature. I do not believe anyone is qualified to comment on the likelihood that particular DNA codes will be "purged" following interbreeding of AquAdvantage fish and wild fish; the outcome of such an interaction is simply unknown because it depends, in part, on environment*genotype interactions which have not been adequately studied here.

- o Because of increased growth rate, size, and aggression of domesticated Atlantic salmon, these fish may outcompete native salmonids for food and territorial resources (Gross 1998 *citing* Fausch 1998; Gibson 1981; Beall et al. 1989).
- Perturbation of the habitat resulting from different utilization of habitat by Atlantic salmon.

Gross (1998:136-137) concludes:

*Although it is difficult to quantify or partition the impacts on wild Atlantic salmon by escapement from the aquaculture niche (e.g., Fig. 4), it can no longer be reasonably questioned that major impacts do occur. Over the last decade, the primary ecological impact on wild fish health is through the transfer of diseases and parasites. While new diseases and parasites will surely appear, the current problems are now better controlled in the aquaculture niche (e.g., Aarflot 1995; Bruno and Poppe 1996; except perhaps for sea lice; also, recent outbreaks of ISA infectious salmon anemia). I suspect that the impact of most concern for wild fish in the future will be genetic, through interbreeding and introgression of aquaculture genes and through increasing drift and inbreeding due to reduced wild population size (due in part to increasing competition and further habitat perturbation). The resulting loss of the wild gene pool may give rise to yet less fit individuals for future evolutionary change and survival in the wild. There is a strong possibility that the magnitude of escapement combined with the biological divergence between the two niches will result in the disappearance of all wild Atlantic salmon populations within areas of aquaculture.* [Emphasis Added].

Below, I briefly expand upon the mechanisms outlined above.

*Ecological Impacts of Escaped GE salmon* -- The EA clearly identifies attributes of AquAdvantage salmon that would benefit these fish in competition with other salmonid species. For example, these GE fish grow faster and are more aggressive than typical Atlantic salmon. Studies of fast growing and aggressive domesticated strains of farmed salmon demonstrate that they may jeopardize wild populations; for example, Einum and Fleming (1997:634) concluded that farmed salmon were more aggressive and had higher growth rates than native fish and:

*"In the wild, observations of habitat use and diet suggested that the populations compete for territory and food, and both farmed fish and hybrids expressed higher growth rates than native fish. Our results suggest that these innate differences in behaviour and growth, that probably are linked closely to fitness, will threaten native populations through competition and disruption of local adaptations."*

McGinnity et al. (2003:2449) studied this very question and concluded:

*"..offspring of escaped farm fishes may also reduce the size of the wild population due to competition. Although overall survival of farm and 'hybrid' fish was lower in the experiment, due to their larger size, surviving fish resulted in competitive displacement of wild parr. Given the selection for increased growth in the farm*

*strain, this larger size is not surprising. Fleming et al. (2002) have shown that farm salmon show increased aggression, which may further favour such fishes in competitive encounters."*

These authors raised particular concerns about the effect of escaped farm salmon on small, imperiled wild populations of Atlantic salmon, such as those located near the PEI facility.

In a recent review of the ecology of farmed Atlantic salmon and their interaction with wild fish in natural environments,[4] Jonsson and Jonsson (2006:1171) indicate that farmed salmon may have many negative ecological effects on wild salmon populations including "*increasing their emigration and mortality, decreasing their growth rate, biomass, and production, and altering their life history traits*". They conclude:

- *Cultured salmon compete for food, space, and breeding partners with wild conspecifics in nature.*
- *Their performance and reproductive success in nature are variable, but can be much poorer than those of wild conspecifics of similar size.*
  .... [and]
- *Through density-dependent mechanisms, cultured fish in nature may displace wild fish to some extent, increase their mortality, and reduce their growth rates with effects on the associated life history traits, biomass, and production.* (Jonsson and Jonsson 2006:1174).

Given that Atlantic salmon populations across the east coast have been decimated (e.g. USFWS 2000), the addition of a superior competitor to any of their remaining habitat would be an unwelcome development. In fact, populations of Atlantic salmon located just over the U.S./Canada Border from the PEI facility are listed under the US Endangered Species Act (ESA) as threatened, in part, because concern over the impacts on wild populations of escaped farmed salmon. The USFWS found:

*Atlantic salmon that either escaped or were released from aquaculture facilities have been found in the St. Croix, Penobscot, Dennys, East Machias, and Narraguagus Rivers in the United States (Baum, 1991; USASAC, 1996; 1997). In 1994 and 1997, escaped farmed fish represented 89 percent and 100 percent, respectively, of the documented run for the Dennys River, and in 1995, 22 percent of the documented run for the Narraguagus River. Escaped farmed salmon have also been documented as an incidental capture in the recreational fishery, and observed in the Boyden, Hobart, and Pennamaquan Rivers. The first aquaculture escapee in the State of Maine was documented in 1990, and the first sexually mature escapee was documented in 1996. Escaped farmed fish are of great concern in Maine because even at low numbers they can represent a substantial portion of fish in some rivers. Also, populations at low levels are particularly*

---

[4] It is worth noting that the escape of domesticated Atlantic salmon is so common and their real and potential impacts on wild Atlantic salmon populations is of such concern that at least four separate *reviews* of literature on the topic were published between 1997 and 2006.

> *vulnerable to genetic intrusion or other disturbance caused by escapees (DFO,*
> *1999; Hutchings, 1991.* (USFWS 2000:6947; Emphasis Added)

Thus, impacts to native, imperiled Atlantic salmon and their historic riverine ecosystems from escaped farmed salmon are already occurring; in light of this, the placement of a new aquaculture facility, especially one with through-flow connection to wild environments, that rears fish which are a potentially grave threat to wild Atlantic salmon populations and their ecosystems, seems unwise, at best.  At the very least, approval of a GE salmon production facility on PEI would seem to require a consultation by FDA with USFWS and NMFS under Section 7 of the Endangered Species Act.  Similarly, if AquAdvantage fish escaped from the Panamanian rearing facility and/or were transported to the Pacific coast, they could compete with wild Pacific salmon and trout (genus: *Oncorhynchus*), many of which are also imperiled (Allendorf et al. 1997).

*Genetic Impacts of Escaped GE salmon* –The potential for escaped GE salmon to cause genetic impacts to wild populations of salmon and/or trout is higher than the EA acknowledges.  The EA's analysis of the risks posed by introduced GE salmon is premised on the assumption that the level of impacts is directly correlated with the number and frequency of fish introductions.  For example, the EA states:

> *The scale and frequency of introductions of GE fish into a particular environment*
> *will have a large influence on potential ecological risks and their magnitude.  Any*
> *introductions would have to involve a critical mass (sufficient number) that could*
> *offset natural mortality, and be of sufficient frequency in proper season to allow*
> *for long-term survival and establishment.  If the scale and frequency of the*
> *escapes (i.e., introductions to the environment) are small, the chances of*
> *becoming established in the natural setting are extremely low (Kapuscinski and*
> *Hallerman, 1991).* (EA p.20).

This assumption is wrong: Although ecological impacts are related to the frequency or number of introduced GE salmon, the potential genetic impacts of escaped GE salmon on wild populations of salmonids (Atlantic salmon and others) does **not** necessarily depend on the number of escaping individuals or their persistence in the environment; in fact, there are many examples of a small number of introduced fishes having irreversible genetic impacts on other unique populations (*see* Case Studies *below*).  As a result, the EA severely underestimates the risk of escaped GE salmon on wild populations of salmon and trout (i.e. members of the family Salmonidae).

Genetic impacts of escaped GE salmon can arise even if the escaped fish are not fertile (Hindar et al. 1991; Gross 1998).  For example, if escaped, sterile GE salmon compete successfully with wild salmon for mates, breeding opportunities, and/or limited spawning territories, the wild population will suffer decreased productivity as a result of false matings.  The release of sterile members of one sex to reduce the growth rate of an entire population is, in fact, the principle behind some efforts at pest control (see myriad examples cited in Dyck et al. 2005).  Because GE salmon females are likely to be larger and more aggressive than native salmon and size is positively correlated with reproductive success among salmon (Gross 1985; van den Berghe and Gross 1989; Healy 1991), it is very likely that they would attract and stimulate mating activity

from wild male salmon.  Because many salmon populations are small (to the point of being at peril of extinction) and because males and females die after spawning, wasted spawning opportunities may have a severe impact on population growth rates.  Similarly, the mere act of creating a nest (redd) by escaped GE salmon may lead to destruction of viable eggs from the pairing of wild males and females (nest superimposition; Gross 1998).

Successful reproduction between escaped AquAdvantage salmon and wild Atlantic salmon (or salmonids) is a clear danger, the consequences of which would likely be irreversible.  As discussed below, hybridization and gene flow (introgression) among fish species is common and gene flow in the wild ("natural" hybridization and introgression) has long been known and studied among the salmon genera *Salmo* and *Oncorhynchus*.  Interestingly, these impacts may be *more* likely to occur if (a) the number of GE salmon on the breeding grounds is small and (b) if the GE salmon are all of one sex – the observation that hybridization is more common when abundances of the two inter-breeding populations and sex ratios are asymmetrical has been well documented for over 50 years (e.g. Hubbs 1955, 1961).  Further, the potential consequences of gene flow from AquAdvantage salmon to wild salmonids are uniquely troubling because the former carry genetic material from a third species (a transgene); once that novel genetic material is transferred to viable offspring in the wild, the potential negative impacts to wild populations (and even entire species) of salmon are numerous and severe.

Hybridization and genetic introgression (meaning here: successful gene flow between species) are well-known among plants and animals and particularly among fish species[5] (e.g. Hubbs 1955, 1961; Campton 1987; Minckley and Deacon 1991; Smith 1992; Avise 1994; Smith et al. 1995; Arnold 1997; Echelle et al. 1997; Hatfield and Schluter 1999; Rosenfield and Kodric-Brown 2003, etc.).  The potential for and occurrence of genetic exchange in the wild among salmonids is exceptionally common and well-documented (Foerster 1935; Hunter 1949; Simon and Noble 1968; Smirnov 1972; Chevassus 1979; Allendorf and Leary 1988; Bartley et. al. 1990; Waples 1991; Dowling and Childs 1992; McGowan and Davidson 1992; Rosenfield 1998; Rosenfield et al. 2000; Kirkpatrick et al. 2007).  And, hybridization, genetic introgression, and other genetic effects between escaped domesticated salmon and wild populations of Atlantic salmon (and other salmonids) are already widely reported and studied mechanistically (e.g., Hindar et al. 1991; Einum and Fleming 1997; McGinnity et al. 1997, 2003; Clifford et al. 1998; Gross 1998; USFWS 2000; Bourret et al. 2011).

AquaBounty hopes to reduce the risk of gene flow between escaped AquAdvantage fish and wild Atlantic salmon (or other salmonids) by producing all-female, triploid GE salmon; the EA states:

> *The proposed conditions of use specify that a minimum of 95% of the*
> *AquAdvantage Salmon eggs sold for commercial production use would be triploid*
> *and 100% are expected to be female. Based on the method validation study, the*
> *actual average percentage of triploidy is expected to be 99.8%. The fertility of*
> *triploid females is negligible compared to normal diploid females. The*
> *combination of triploidy and an all-female population is expected to render*

---

[5] I have restricted my review to hybridization and introgression among fishes. The FDA should also consider the long record of these phenomena among plants, and even GE plants when contemplating the risks posed by GE salmon.

*AquaAdvantage Salmon effectively and functionally sterile resulting in complete reproductive containment.* [EA at p. 86].

The EA is improperly comfortable with the genetic risks presented by escaped GE salmon. As noted above, interspecific gene flow in the wild between species does not require the presence or viability of both sexes – in fact, asymmetric or unidirectional hybridization and introgression are well known among fishes (e.g. Foerster 1935; Hubbs 1955; Campton 1987; McGowan and Davidson 1992; Kirkpatrick et al. 2007). Thus, the production of all-female lines of AquaAdvantage salmon provides less than complete barriers to hybridization and introgression. Also, the induction of triploidy (infertility) is said to be 99.8% effective on average (EA p.37 footnote 18); but the terms of operation allows for retainment and use of egg batches with triploidy as low as 95%. Although this may seem impressive, the EA also describes the very large number of eggs that will be produced (e.g.~10,000 eggs/tray x 12-16 trays or up to 200,000 eggs per upwelling jars). Simple math indicates that 20-500 fish in every tray of AquaAdvantage fish produced will be fertile. Thus, the prospect that some transgene fish will be fertile is very real and cannot be ignored.

Several indisputable lessons of the past century of fish biology suggest that FDA should not be sanguine about the potential damage that could be caused by even a few escaped AquaAdvantage salmon, especially if they are even partially fertile:
1. people move fish into novel environments, intentionally and unintentionally;
2. these introductions frequently succeed (sometimes, against all odds) and non-native fish establish themselves in novel environments; and,
3. when this occurs, the results for native species and ecosystems are often devastating and irreversible
4. The mechanisms by which non-native fish impact the ecosystems they colonize include:
   a. predation on/competition with native species for food and other habitat resources
   b. competition for mates, mating territories, and reproductive opportunities that do not generate viable offspring, and thus waste the reproductive potential of the native population
   c. competition for mates, mating territories, and reproductive opportunities that generate viable offspring, which may then lead to introgression and permanent loss of a population (or species') unique genetic identity and genetic architecture

The effect of each of these mechanisms is amplified when non-native fish invade populations of of native species that are already imperiled – this would be the case for many, if not most, populations of Atlantic or Pacific salmon and trout (genus: *Salmo* and *Oncorhynchus* respectively; Slaney et al. 1996; Allendorf et al. 1997). The latter of these mechanisms (hybridization and genetic introgression) is of particular concern in this case because the AquaAdvantage salmon carry novel genetic material (transplanted from a completely different species in a different family of fish) that would be transferred into economically, culturally, and ecologically important species if hybridization and introgression were successful.

Below, I summarize some general principles of hybridization and introgression and how they are relevant to the potential for escaped GE salmon to impact wild salmonids through genetic introgression (Table 1).

Table 1: Principles arising from decades of research into animal hybridization and genetic introgression (with a small sample of citations for each) that are relevant to the potential of escaped GE salmon to impact wild salmonids through direct genetic interactions.

| Principle | Selected Citations | Relevance to GE salmon |
|---|---|---|
| Hybridization and introgression may be facilitated by asymmetry in the abundance of the interacting species or the sex ratio of either species | Hubbs 1955; Arnold 1997 | The magnitude of potential impacts due to genetic introgression are not necessarily related to the number of GE fish that escape captivity, the sex ratio of escapees, or the frequency of such escapes |
| Gene flow may be facilitated by asymmetry in size or male aggressive behavior between species or between one species and their hybrids | Hubbs 1955; Arnold 1997; Rosenfield et al. 2000; Kodric Brown and Rosenfield 2003; Rosenfield et al. 2004 | AquAdvantage GE salmon are expected to be larger and more aggressive than wild salmonids they may encounter; this may increase their mating success under some conditions) |
| Hybridization (formation of the 1st generation of organisms with interspecific heritage) is often the biggest barrier to gene flow, backcrosses and introgression are often less challenging to produce in the lab or in the wild | Arnold 1997; Rosenfield & Kodric-Brown 2003; Rosenfield et al. 2004 | Difficulty in forming F1 hybrids of with GE Atlantic salmon may be much greater than that of producing genetic introgression after F1 individuals have been produced. The risk of transgenes escaping into wild populations is greater than may implied by any difficulty in producing F1 hybrids |
| Hybridization and genetic introgression are well-documented among salmonids in the laboratory and in the wild | Foerster 1935; Hunter 1949; Simon & Noble 1968; Smirnov 1972; Chevassus 1975; Campton 1987; Bartley et al. 1990; McGowan & Davidson 1992; Smith 1992; Dowling & Childs 1992; Smith et al. 1995; Gross 1998 (citing *pers. comm.* of A. Devlin); Rosenfield et al. 2000; Donald & Alger 2003 | FDA should not doubt that the potential for hybridization and genetic introgression between Atlantic salmon and other salmonid species is very real. Obviously, there is also potential for "intraspecific introgression" from GE Atlantic salmon to non-GE Atlantic salmon. |
| Hybrids and backcrossed individuals may be as/more successful than one/both of their parental species and may lead to extirpation/loss of protection for native populations | O'Brien & Mayr 1991; Minckley & Deacon 1991; Dowling & Childs 1992; Epifanio & Philipp 2001; Arnold & Hodges 1995; Arnold 1997; Perry et al. 2002; Rosenfield et al. 2004; Campton & Kaeding 2005 | Hybrid individuals are generally not protected by laws designed to protect the environment. More likely, these laws would prompt attempts to exterminate hybrids. |
| Hybrid formation and backcross viability/fertility are context dependent (as it is for parental species) | Smith et al. 1995; Arnold 1997; Hatfield & Schluter 1999; Kodric-Brown & Rosenfield 2004; Sundström et al. 2007 | It is difficult/impossible to predict outcomes of ecological/genetic interactions based on a small number of test environment* genotype combinations |

To the reader who is unfamiliar with the history of fish ecology, introductions, and invasions, the potential for AquAdvantage GE salmon to escape captivity, survive, and cause significant environmental damage may seem distant because this outcome would rely on the contemporaneous occurrence of several unpredictable events.  However, those who have made a study of non-native species invasions and, in particular, genetic introgression following such invasions, know that unpredicted events frequently align to produce just devastating outcomes. In fact, approximately 40% of North America's threatened, endangered, and recently extinct fish species gained that status, at least in part, through hybridization and/or genetic introgression (Miller et al. 1989; Williams et al. 1989; Rosenfield et al. 2004) When species invasions occur, the results are often devastating on at least one species and they are almost always irreversible.

Below, I present two case studies from my own research that illustrate the potential for, and negative consequences of, AquAdvantage salmon escape with special reference to the principles described in Table 1. I want to stress that these two examples are far from unique in the fish biology literature or in the literature of genetically modified organisms[6].

Case Study #1 – Chinook salmon and pink salmon hybrids in the Laurentian Great Lakes.

My Master's thesis research described genetic hybridization (Rosenfield 1998) and genetic introgression (Rosenfield et al. 2000) between Chinook salmon (*Oncorhynchus tshwaytscha*) and pink salmon (*Oncorynchus gorbuscha*) after both of these species were introduced to the Great Lakes.  Chinook salmon (the largest of the Pacific salmon) were introduced intentionally and repeatedly as a sport fish; this is quite a common phenomenon as Chinook salmon, like Atlantic salmon are a prized sport and commercial fish (Healy 1991; Quinn 2005). Pink salmon (the smallest species of Pacific salmon) were introduced into Lake Superior accidentally and only once after a plan to introduce them elsewhere in Canada was abandoned (Kwain and Lawrie 1981).  Both species introductions were successful, despite the fact that these anadromous fish have no access to marine environments from the Great Lakes and other major differences between the Great Lakes ecosystem and the Pacific coast environments where both of these species originated.  In fact, offspring of the single introduced population of pink salmon eventually colonized all of the remaining four Great Lakes (Kwain and Lawrie 1981; Wagner and Stauffer 1982).

My research demonstrated that these fish hybridized in the wild and my detection of backcross individuals (offspring between F1 hybrids and Chinook salmon) demonstrated that hybrids survived and were reproductively viable. In addition, genetic analysis of my small sample of hybrids revealed that each had been produced by Chinook salmon females mating with pink salmon males; in other words, the hybridization was unidirectional and did not require female

---

[6] Although neither of these case studies deals directly with Atlantic salmon hybridization and introgression, their ability to hybridize and introgress in the wild with brown trout (*Salmo trutta*) is exceptionally well-documented (e.g. McGowan and Davidson (1992 *and sources cited therein*) as well as multiple studies references in this letter and several laboratory studies have detected at least some viability among crosses with species in the salmonid genera *Salvelinus* (e.g. Foerster 1935; Chevassus 1977) and *Oncorhynchus* (Gray et al. 1993).

pink salmon or male Chinook salmon to proceed. This hybridization and introgression continues and the number of hybrids and hybrid generations continues to increase (Kirkpatrick et al. 2007).

Because these hybrid and backcross pink x Chinook salmon are isolated from natural, native populations of either parental species and because the Great Lakes environment is already so heavily engineered and modified, it is difficult to say what their long-term impact may be (Rosenfield et al. 2000). However, if any of these Great Lakes salmonids were transported to either coast, the ecological implications and those for Pacific salmon systematics, conservation, and biogeography, could be severe.

The relevance of this case study for the potential of AquAdvantage to escape, survive, and cause harm is clear:

- Small numbers of hatchery-spawned and reared fish, released accidentally and only once can, nevertheless, colonize vast areas (e.g. the Laurentian Great Lakes);
- Introduced fish can be reproductively successful despite the fact that their new environment prohibits them from completing their life cycle in typical fashion (e.g. neither species can migrate to marine environments though, in the wild, both species are almost always obligately anadromous; Quinn 2005);
- Different fish species can hybridize with each other and produce fertile offspring despite large physical differences and extremely long evolutionary separation (e.g. Smith et al. 1995);
- Asymmetrical hybridization (involving only one parent of each species) can occur (and is, in fact, common) and may proceed despite (or perhaps because) of asymmetries in the abundance and sex ratios of each species involved (i.e. production of all-female AquAdvantage salmon provides little protection against genetic interactions with other species or Atlantic salmon populations);
- Hybridization and genetic introgression are extremely context dependent (e.g. Smith et al. 1995; Arnold 1997; Seehausen et al. 1997; Hatfield and Schluter 1999). One would have thought that their side-by-side coexistence in numerous Pacific Coast habitats for millions of years would guarantee that pink salmon and Chinook salmon could not and would not interbreed; however, when the environmental context changed, hybridization and genetic introgression occurred.

<u>Case Study #2 – The sudden and near complete replacement of Pecos pupfish by its hybrid with sheepshead minnow</u>.

My doctoral research was conducted in the North American desert southwest. Here, several species in the genus *Cyprinodon* (pupfishes) are jeopardized by genetic introgression and/or competition with a distant relative, the sheepshead minnow (*Cyprinodon variegatus*; Echelle and Echelle 1992, 1994, 1997). The introductions of sheepshead minnow are believed to have occurred as a result of "bait-bucket" transfers by sportfishermen who, having finished fishing, dumped their remaining bait (sheepshead minnow) into waterways where native *Cyprinodon* species existed. In each of these cases, the sheepshead minnow was introduced well-outside of its native marine coastal environment into hot, freshwater, saline, or, sometimes hyper-saline inland lakes, rivers, and springs (Echelle and Echelle 1992). There is evidence that (a) the initial introductions involved only a few individuals and (b) that sequential transfers (from one fishing

spot to another) were required to transport the sheepshead minnow from their source population (probably on the Gulf Coast of Texas) to the waterways that were inhabited by native members of the pupfish genus (Echelle and Echelle 1992; Childs et al. 1997).

In the case I studied, a small population of sheepshead minnow introduced into the Pecos River in western Texas quickly hybridized with the rare endemic, Pecos pupfish (*Cyprinodon pecosensis*; Echelle and Connor 1989; Childs et al. 1996).  The fertile hybrids of this initial cross replaced the native Pecos pupfish throughout most of its range in less than 5 years (Echelle and Connor 1989) vastly increasing this species' likelihood of extinction (Garrett et al. 2002; Rosenfield et al. 2004). The hybrids have been so successful that they have actually expanded beyond the former geographic range of Pecos pupfish to occupy new habitats (Echelle et al. 1997); the consequences of this range expansion on the Pecos River ecosystem or its fish fauna is currently unknown.

My research demonstrated that the explosive expansion of this hybrid swarm was due to a combination of sexual selection and hybrid vigor that favored the introduced species over the native species and that favored F1 hybrids over either parental species (Rosenfield and Kodric Brown 2003; Rosenfield et al. 2004). We also found that the degree to which hybrids were favored in competition with Pecos pupfish varied depending on the source of the native population – in other words, the rate and pattern of genetic introgression were resulted from environment*genotype interactions (Kodric-Brown and Rosenfield 2004).

Again, this case study demonstrates several salient points when considering the potential of AquAdvantage to escape, survive, and cause harm.

- An exceedingly small numbers of introduced fish, released unintentionally and only once can completely exterminate the entire population of a different species;
- Introduced fish can reproduce successfully (and even exceed the reproductive performance of a native species) despite the novelty of their new environment;
- Different fish species can hybridize with each other and produce fertile offspring that are even more fit than either of their parent species;
- People (and anglers and aquarists, in particular) tend to move fish from one water body to another, often repeatedly; when a fish population exists in the wild, there is some likelihood that it will be transported to new habitats by people (especially if it is a desirable food, bait, or aquarium species) or swim beyond its normal range when environmental conditions permit;
- When fish introductions occur, they are extremely difficult if not impossible to reverse.  Clearly, the introgression of genetic material is irreversible, and, in an interesting sidenote to this case study, the Texas Department of Fish and Wildlife attempted to eradicate invasive sheepshead minnow from the small lake that served as the source population for introductions into the habitats of three rare, endemic, *Cyprinodon* species. Despite draining the lake, treating it with copious amounts of a potent fish toxin (rotenone), and introducing non-native predators to the pond, sheepshead minnow were still present in the lake (Garrett 2002).

Conclusion: My experience studying fish species behavior and ecology, invasive species dynamics, and salmonids, leads me to conclude that, despite AquaBounty's assurances, there is

nothing exceptional about the GE AquAdvantage fish or the controls that are described for their breeding or rearing facility that is likely to prevent their escape from captivity at some point in the future, perhaps more than once.  This is particularly true because I understand that AquBounty intends to expand production in the future to other facilities not described in the current EA and to sell AquAdvantage eggs and juveniles to other entities – this raises the likelihood that GE salmon will escape into wild habitats. Also, the constraints placed on production of GE salmon by AquaBounty's existing protocols are clearly expensive and it is easy to believe that there will be pressure in the future to reduce the cost and complexity of these operations to increase profits from AquBounty fish production.  Once FDA approves GE salmon production, there will be little public oversight of AquaBounty's fish containment protocols.

If and when AquAdvantage fish escape into the wild, there is a considerable chance that they will persist and interact with resident fish populations and ecosystems to produce negative consequences.  Furthermore, there is a real likelihood that, once they have escaped, these fish will find their way or be transported to other environments where they can do even more harm – very simply, there is no way to put this genie back in its bottle. The consequences of GE salmon escape into the environment are potentially catastrophic, especially for small and imperiled populations of Atlantic or Pacific salmon with which they may interbreed and/or compete. Whereas aquaculture of Atlantic salmon has already caused great harm to wild salmon populations, the potential for additional harm caused by GE salmon is unknown (and potentially far worse) because they will carry novel genetic material (the transgene) into novel environments (both genetic and ecological). Thus, FDA's approval of GE salmon may affect the conservation status of ESA-listed populations of Atlantic salmon and warrants a formal ESA consultation with both USFWS and NMFS.

Finally, I am aware that FDA's approval of GE salmon (as proposed here) could serve as a precedent for approval of other GE animals; given the potentially extreme environmental consequences of GE salmon and/or other GE animals on natural organisms and ecosystems, I believe the FDA should set a very high standard here for preventing such unintended consequences in the future. Thus, I strongly recommend that the FDA prepare a full Environmental Impact Statement that covers all of the potential impacts I have highlighted here and that FDA initiate formal consultation with the US Fish and Wildlife Service and National Marine Fisheries Service under the federal Endangered Species Act regarding the potential effects of GE salmon production on endangered fish and wildlife species.


Sincerely

Jonathan Rosenfield, Ph.D.

## Literature Cited

Allendorf, F.W., and R.F. Leary. 1988. Conservation and distribution of genetic variation in a polytypic species, the cutthroat trout. Conservation Biology 2:170 –184.

Allendorf, F.W., D. Bayles, D. Bottom, K. Currens, C. Frissell, D. Hankin, J. Lichatowich, W. Nehlsen, P Trotter, and T. Williams. 1997. Prioritizing Pacific salmon stocks for conservation.  Conservation Biology 11:140-152.

Arnold, M.L. 1997. Natural hybridization and evolution. Oxford University Press, Oxford, UK.

Arnold, M.L., and S.A. Hodges. 1995. Are natural hybrids fit or unfit relative to their parents? Trends in Ecology and Evolution 10:67–71.

Avise, J. C. 1994. Molecular markers, natural history and evolution. Chapman and Hall, New York.

Bartley, D.M., G.A.E. Gall, and B. Bentley. 1990. Biochemical genetic detection of natural and artificial hybridization of chinook and coho salmon in northern California. Transactions of the American Fisheries Society 119:431–437.

Beamish, F.W.H. 1978. Swimming capacity. Pages 107-187 in W.S. Hoar and D.J. Randall (editors). Fish Physiology. Academic Press. NY.

Brett, J.R. 1964. The respiratory metabolism and swimming performance of young sockeye salmon. Journal of the Fisheries Research Board of Canada. 21:1183-1226.

Bourret, V., PT O'Reilly, J.W. Carr, P.R. Berg, and L Bernatchez. 2011. Temporal change in genetic integrity suggests loss of local adaptation in a wild Atlantic salmon (*Salmo salar*) population following introgression by farmed escapees. Heredity (2011) 106, 500–510.

Campton, D.E. 1987. Natural hybridization and introgression in fishes. Pages 161–192 in N. Ryman and F. Utter, editors. Population genetics and fisheries management. University Washington Press, Seattle.

Campton, D.E. and L.R. Kaeding. 2005. Westslope cutthroat trout, hybridization, and the U.S. Endangered Species Act. Conserv Biol 19:1323–1325.

Chevassus, B.1979. Hybridization in salmonids: results and perspectives. Aquaculture 17:113–128.

Childs, M.R., Echelle, A.A. & Dowling, T.E. 1996. Development of the hybrid swarm between Pecos pupfish (Cyprinodontidae: *Cyprinodon pecosensis*) and sheepshead minnow (*Cyprinodon variegatus*): a perspective from allozymes and mtDNA. Evolu- tion 50: 2014–2022.

Clavero, M., F. Blanco-Garrido, and J. Prenda. 2004. Fish fauna in Iberian Mediterranean river basins: biodiversity, introduced species and damming impacts. Aquatic Conservation 14:575–585.

Clifford, S.L., P. McGinnity, and A. Ferguson. 1998. Genetic changes in an Atlantic salmon population resulting from escaped juvenile farm salmon. Journal of Fish Biology 52: 118–127.

Cotter, D., V. O'Donovan, N. O'Maoiléidigh, et al. 2000. An evaluation of the use of triploid Atlantic salmon (*Salmo salar* L.) in minimizing the impact of escaped farmed salmon on wild populations. Aquaculture 186: 61-75.

Donald, D.B. and D.J. Alger. 1993. Geographic distribution, species displacement, and niche overlap for lake trout and bull trout in mountain lakes.  Canadian Journal of Zoology 71: 238-247.

Dowling, T. E., and M. R. Childs. 1992. Impact of hybridization on a threatened trout of the southwestern United States. Conservation Biology 6:355–364.

Dyck, V.A., J. Hendrichs, and A. S. Robinson. 2005. Sterile Insect Technique: Principles and Practice in Area-wide Integrated Pest Management. Springer, Netherlands.

Echelle, A.A. and Connor, P.J. 1989. Rapid geographically extensive genetic introgression after secondary contact between two pupfish species (Cyprinodon, Cyprinodontidae). Evolution 43: 717–727.

Echelle, A.A. and Echelle, A.F. 1992. Mode and pattern of speciation in the evolution of inland pupfishes in the Cyprinodon variegatus complex (Teleostei: Cyprinodontidae): an ancestor-descendant hypothesis. In: Systematics, Historical Ecology, and North American Freshwater Fishes (R. Mayden, ed.), pp. 691–709. Stanford Univ. Press, Palo Alto, CA, USA.

Echelle A.F. and A.A. Echelle 1994. Assesment of genetic introgression between two pupfish species, *Cyprinodon elegans* and *C. variegatus* (Cyprinodontidae), after more than 20 years of secondary contact. Copeia 1994:590-597.

Echelle, A.A. and A.F. Echelle. 1997. Genetic introgression of endemic taxa by non-natives: a case study with Leon Springs pupfish and sheepshead minnow. Conservation Biology 11:153-161.

Echelle, A. A., C. Hoagstrum, A. F. Echelle, and J. E. Brooks. 1997. Expanded occurrence of genetically introgressed pupfish (Cyprinodontidae: *Cyprinodon pecosensis x variegatus*) in New Mexico. Southwestern Naturalist 42:336–339.

Einum S., and I. A. Fleming. 1997. Genetic divergence and interactions in the wild among native, farmed and hybrid Atlantic salmon. Journal of Fish Biology 50: 634–651.

Epifanio, J. and D. Philipp. 2001. Simulating the extinction of parental lineages from introgressive hybridization: the effects of fitness, initial proportions of parental taxa, and mate choice. Reviews in Fish Biology and Fisheries 10:339-394.

Foerster, R. E. 1935. Inter-specific crossbreeding of Pacific salmon. Transactions of the Royal Society of Canada 29(3rd series):21–33.

Garrett, G.P. 2002. Community Involvement – A More Comprehensive Approach to Recovering Endangered Species. Conference Proceedings. Spring-fed Wetlands: Important Scientific and Cultural Resources of the Intermountain Region.  Available here: http://www.dri.edu/images/stories/conferences_and_workshops/spring-fed-wetlands/spring-fed-wetlands-garrett.pdf

Garrett, G.P. C. Hubbs, and R.J. Edwards. 2002. Threatened fishes of the world: *Cyprinodon pecosensis* Echelle & Echelle, 1978 (Cyprinodontidae) Environmental Biology of Fishes 65:366-366.

Gross, M. R. 1985. Disruptive selection for alternative life histories in salmon. Nature (London) 313:47– 48.

Gross, M. 1998. One species with two biologies: Atlantic salmon (*Salmo salar*) in the wild and in aquaculture. Canadian Journal of Fisheries and Aquatic Sciences. 55(Suppl. 1): 131–144.

Hanfling, B. 2007. Understanding the establishment success of non-indigenous fishes: lessons from population genetics. Journal of Fish Biology 71 (Supplement D): 115-135.

Hatfield, T., and D. Schluter. 1999. Ecological speciation in sticklebacks: environment-dependent hybrid fitness. Evolution 53:866–873.

Healey, M.C. 1991. Life-history of Chinook salmon (*Oncorhynchus tshwaytscha*). *In* Pacific salmon life- histories. C. Groot and L. Margolis, eds. UBC Press, Vancouver.

Hindar, K., N. Ryman, and F. Utter. 1991. Genetic effects of cultured fish on natural fish populations . Can. Journ. of Fish. and Aquat. Sci. 48:945-957.

Hoagstrom, C. N.D. Zymonas, S.R. Davenport, D.L. Propst, and J.E. Brooks. 2010. Rapid species replacements between fishes of the North American plains: a case history from the Pecos River. Aquatic Invasions 5(2)

Howard, R.D., J.A. DeWoody, and W.M. Muir. 2004. Transgenic male mating advantage provides opportunity for Trojan gene effect in a fish. Proc. Nat. Acad. Sci., 101: 2934-2938.

Hubbs, C. L. 1955. Hybridization between fish species in nature. Systematic Zoology 4:1–20.

Hubbs, C. L. 1961. Isolating mechanisms in the speciation of fishes. Pages 5–23 in W. F. Blair, (editor) *Vertebrate speciation*. University of Texas Press, Austin.

Hunter, J. G. 1949. Occurrence of hybrid salmon in the British Columbia commercial fishery. Fisheries Research Board of Canada, Pacific Coast Station, Progress Report. 1949:91–92. (Not seen: cited in Simon and Noble 1968.)

International Union Conservation of Nature (IUCN). 1997. Conserving vitality and diversity. *In Proceedings of the World Conservation Congress Workshop on Alien Invasive Species.* Compiled by C.D.A. Rubec and G.O. Lee. Published in partnership with the IUCN Species Survival Commission and the North American Wetlands Conservation Council (Canada). Canadian Wildlife Service, Environment Canada, Ottawa, Ont. 96 p.

Jonsson, B. and N. Jonsson. 2006. Cultured Atlantic salmon in nature: a review of their ecology and interaction with wild fish. ICES J. Mar. Sci. 63: 1162-1181.

Kirkpatrick, N.S., D.W. Everitt, B. I. Evans. 2007. Asymmetric Hybridization of pink (*Oncorhynchus gorbuscha*) and Chinook (*O. tshawytscha*) salmon in the St. Marys River, Michigan. Journal of Great Lakes Research 33:358-365.

Kodric-Brown, A. and J.A. Rosenfield. 2004. Populations of Pecos pupfish (*Cyprinodon pecosensis*) differ in their susceptibility to hybridization with sheepshead minnow (*C. variegatus*). Behavioural Ecology & Sociobiology 56: 116-123.

Kwain, W. and A.H. Lawrie. 1981. Pink salmon in the Great Lakes. Fisheries 6:2-6.

Light, T. and M.P. Marchetti. 2007. Distinguishing between Invasions and Habitat Changes as Drivers of Diversity Loss among California's Freshwater Fishes. Conservation Biology 21:434–446.

Lockwood, J.L. and M. L. McKinney. 2001. Biotic Homogenization. Kluwer Academic/Plenum Publishers. New York, NY.

Marchetti, M.P. P.B. Moyle, and R. Levine. 2004. Invasive species profiling? Exploring the characteristics of non-native fishes across invasion stages in California. Freshwater Biology. 49:646–661.

McGinnity, P., Stone, C., Taggart, J. B., Cooke, D., Cotter, D., Hynes, R. McCamley, C., Cross, T., and Ferguson, A. 1997. Genetic impact of escaped farm Atlantic salmon (*Salmo salar* L.) on native populations: use of DNA profiling to assess freshwater performance of wild, farm and hybrid progeny in a natural river environment. ICES Journal of Marine Science 54, 728–738.

McGinnity, P., Prodohl P, Ferguson K, Hynes R, Maoil NO, Baker, N. et al. 2003. Fitness reduction and potential extinction of wild populations of Atlantic salmon, *Salmo salar*, as

a result of interactions with escaped farm salmon. Proc. R. Soc. Lond. B. Biol. Sci. 270: 2443–2450.

McGowan, C., and W. S. Davidson. 1992. Unidirectional natural hybridization between brown trout (*Salmo trutta*) and Atlantic salmon (*S. salar*) in Newfoundland. Canadian Journal of Fisheries and Aquatic Sciences. 49:1953–1958.

Miller, R.R., Williams, J.D. and Williams, J.E. (1989) Extinctions of North American fishes during the past century. Fisheries, 14, 22 – 38.

Mills, E. J.H. Leach, J.T. Carlton and C.L. Secor. 1994. Exotic species and the integrity of the Great Lakes. BioScience 44:666-676

Minckley, W.L. and J.E. Deacon. (eds). 1991. Battle Against Extinction: Native fish management in the American west. The University of Arizona Press. Tuscon, AZ.

Moyle, P.B. 2002. Inland fishes of California. University of California Press. Berkeley, CA.

Moyle, P.B., and Light, T. 1996. Biological invasions of fresh water: empirical rules and assembly theory. Biological Conservation 78: 149–161.

O'Brien, S.J. and E. Mayr. 1991. Bureaucratic mischief: recognizing endangered species and subspecies. Science 25:1187-1188.

Perry, W. L., D.M. Lodge and J.L. Feder. 2002. Importance of hybridization between indigenous and nonindigenous freshwater species: an overlooked threat to North American biodiversity. Systematic Biology 51:255–275.

Quinn, TP. 2005. The behavior and ecology of Pacific salmon and trout. Bethesda, Maryland: American Fisheries Society.

Ricciardi, A. and H. J. Maclsaac. 2000. Recent mass invasion of the North American Great Lakes by Ponto-Caspian species. Trends in Ecology and Evolution 15:62–65.

Rosenfield, J. A. 1998. Detection of natural hybridization between pink salmon (*Oncorhynchus gorbuscha*) and chinook salmon (*O. tshawytscha*) in the Laurentian Great Lakes using meristic, morphological, and color evidence. Copeia 1998:706–714.

Rosenfield, J.A., S. Nolasco, S. Lindauer, C. Sandoval, and A. Kodric-Brown. 2004. The role of hybrid vigor in the replacement of Pecos pupfish by its hybrids with sheepshead minnow. Conservation Biology 18:1-10.

Rosenfield, J.A. and A. Kodric-Brown. 2003. Sexual selection promotes hybridization between Pecos pupfish, *Cyprinodon pecosensis* and sheepshead minnow, *C. variegatus*. J Evol Biol 16:595-606.

Rosenfield, J.A., T. Todd, and R. Greil. 2000. Molecular evidence of unidirectional hybridization and introgression between pink and chinook salmon of the St. Mary's River, MI. Transactions of the American Fisheries Society, 129:670-679.

Ruzycki, J.R., D.A. Beauchamp, and D.L. Yule. 2003. Effects of introduced lake trout on native cutthroat trout in Yellowstone Lake. Ecological Applications 13:23–37.

Sax, D., J. Stachowitz, and S. Gaines. 2005. Species Invasions: Insights into ecology, evolution, and biogeography. Sinauer Associates, Inc. Sunderland, MA.

Scott, M. C., and G. S. Helfman. 2001. Native invasions, homogenization, and the mismeasure of integrity of fish assemblages. Fisheries 26:6–15.

Seehausen, O. J.J. M. van Alphen, and F. Witte. 1997. Cichlid fish diversity threatened by eutrophication that curbs sexual selection. Science 277:1808-1811.

Simon, R. C., and R. E. Noble. 1968. Hybridization in *Oncorhynchus* (salmonidae). I. Viability and inheritance in artificial crosses of chum and pink salmon. Transactions of the American Fisheries Society 97: 109–118.

Slaney, T.L. K. D. Hyatt, T. G. Northcote, and R. J. Fielden. 1996. Status of anadromous Salmon and trout in British Columbia and Yukon. Fisheries 21:20-35

Smirnov, A. I. 1972. Hybrids of Pacific salmon of the genus *Oncorhynchus*, characteristics of development and prospects of utilization. *In* B. I. Cherfas (editor). Genetics, selection, and hybridization of fish. Academy of Sciences of the USSR, Ministry of Fisheries of the USSR, Moscow.

Smith, G. R. 1992. Introgression in fishes: significance for paleontology, cladistics, and evolutionary rates. Systematic Biology 41:41–57.

Smith, G. R., J. A. Rosenfield, and J. Porterfield. 1995. Processes of origin and criteria for preservation of fish species. Pages 45–57 in J. L. Nielsen (editor). Evolution and the aquatic ecosystem: defining unique units in population conservation. American Fisheries Society, Symposium 17, Bethesda, Maryland.

Streelman, J. T., S.L. Gmyrek, M.R. Kidd, C. Kidd, R.L. Robinson, E. Hert, A.J. Ambali, and T.D. Kocher. 2004. Hybridization and contemporary evolution in an introduced cichlid fish from Lake Malawi National Park. Molecular Ecology: 13: 2471–2479.

Sundström, L.F., M. Lõhmus, W. E. Tymchuk, and R.H. Devlin. 2007. Gene–environment interactions influence ecological consequences of transgenic animals. Proceedings of the National Academy of Sciences 104(10):3889–3894.

US Fish and Wildlife Service (USFWS). 2000. Endangered and Threatened Species; Final Endangered Status for a Distinct Population Segment of Anadromous Atlantic Salmon (*Salmo salar*) in the Gulf of Maine. Federal Register 65(223): 69459-69483

van den Berghe, E. P., and M. R. Gross. 1989. Natural selection resulting from female breeding competition in a Pacific salmon (coho: *Oncorhynchus kisutch*). Evolution 43:125–140.

Wagner, W.C. and T.M. Stauffer. 1982. Distribution and abundance of pink salmon in Michigan tributaries of the Great Lakes, 1967-1980. Transactions of the American Fisheries Society 111:523-526.

Waples, R. S. 1991. Genetic interactions between hatchery and wild salmonids: lessons from the Pacific northwest. Canadian Journal of Fisheries and Aquatic Sciences 48:124–133.

Wilde, G.R. and A.A. Echelle. 1992. Genetic status of Pecos pupfish populations after establishment of a hybrid swarm involving an introduced congener. Trans. Am. Fish. Soc. 121:277-286.

Williams, J.E., Johnson, J.E., Hendrickson, D.A., Contreras-Balderas, S., Williams, J.D., Navarro-Mendoza, M., McAllister, D.E. & Deacon, J.E. 1989. Fishes of North America endangered, threatened, or of special concern: 1989. Fisheries 14:2–20.

# Jonathan Alan Rosenfield, Ph.D.

3101 Deakin St.; Berkeley, CA 94705
510 684-4757; jarosenfield@gmail.com

## EDUCATION

**UNIVERSITY OF NEW MEXICO**          PHD, BIOLOGY          *2001*

Dissertation:  Conservation of North American freshwater fish species:  the micro and macro of speciation and extinction.

**UNIVERSITY OF MICHIGAN**        MS, CONSERVATION BIOLOGY          *1996*
**CORNELL UNIVERSITY**          BS, NATURAL RESOURCES          *1991*

## PEER-REVIEWED PUBLICATIONS

Nobriga, M. and J.A. Rosenfield. *Submitted*. Toward a freshwater flow recommendation for an estuarine fish: putting stock in San Francisco Estuary longfin smelt. Submitted to Estuaries and Coasts 4/4/2013.

Rosenfield, J.A. *2010.*  Conceptual life-history model for longfin smelt (*Spirinchus thaleichthys*) in the San Francisco Estuary.  *CBDA Delta Regional Ecosystem Restoration Implementation Plan*, Sacramento, CA.

Rosenfield, J.A. and R. Baxter. 2007. Population dynamics and distribution patterns of longfin smelt in the San Francisco Estuary.  *Transactions of the American Fisheries Society* 136:1577-1592.

Rosenfield, J.A., S. Nolasco, S. Lindauer, C. Sandoval, and A. Kodric-Brown.  2004.  The role of hybrid vigor in the replacement of Pecos pupfish by its hybrids with sheepshead minnow. *Conservation Biology* 18:1-10.

Kodric-Brown, A. and J.A. Rosenfield.  2004.  Populations of Pecos pupfish (*Cyprinodon pecosensis*) differ in their susceptibility to hybridization with sheepshead minnow (*C. variegatus*).  *Behavioural Ecology & Sociobiology* 56: 116-123.

Rosenfield, J.A. and A. Kodric-Brown. 2003. Sexual selection promotes hybridization between Pecos pupfish, *Cyprinodon pecosensis* and sheepshead minnow, *C. variegatus*. *J Evol Biol* 16:595-606

Parker, T., R. Knapp, and J.A. Rosenfield. 2002. Social mediation of sexually selected ornamentation and steroid hormone levels in male junglefowl.  *Animal Behaviour* 64:291-298.

Rosenfield, J.A. 2002. Pattern and process in the geographic ranges of freshwater fishes. *Global Ecology and Biogeography* 11:323-332.

Rosenfield, J.A., T. Todd, and R. Greil. 2000. Molecular evidence of unidirectional hybridization and introgression between pink and chinook salmon of the St. Mary's River, MI. *Transactions of the American Fisheries Society*, 129:670-679.

Rosenfield, J.A. 1998. Detection of natural hybridization between pink salmon (*Oncorhynchus gorbuscha*) and chinook salmon (*Oncorhynchus tshawytscha*) in the Laurentian Great Lakes using meristic, morphological, and color evidence. *Copeia* 1998:706-714.

Smith, G.R., J.A. Rosenfield, and J. Porterfield. 1995. Processes of origin and criteria for preservation of fish species. Pages 44-57 *in* J.L. Nielsen, P. Brouha, and D. Powers, eds. *Evolution and the aquatic ecosystem: Defining unique units in population conservation.*  American Fisheries Society special publication #17.  Bethesda, MD.

Rosenfield, J.A. 1991. *Municipal Compost Management: Study Guide.* Cornell University Home Study Program, Cornell University, College of Agriculture and Life Sciences. Ithaca, NY. 50 pp.

Cobb, K. and J.A. Rosenfield, eds. 1991. *Municipal Compost Management*. Cornell University Home Study Program, Cornell Univ., College of Agriculture and Life Sciences. Ithaca, NY. 250 pp.

## PROFESSIONAL EXPERIENCE

**CONSERVATION BIOLOGIST**          THE BAY INSTITUTE                    2008-PRESENT

Represent a regional environmental non-profit in efforts to protect and restore the native biological diversity and ecosystem services of the San Francisco Estuary. Advocate in policy forums, including testimony before state and federal regulators and legislative committees, for integration of best available science into management plans for the Estuary and its watershed in order to protect imperiled and economically valuable species. Analyze datasets to uncover ecosystem dynamics and recommend management of vital aquatic resources. Collaborate with technical experts and managers from the public, NGO, academic, and private sectors.

**SOLE PROPRIETOR**          AQUATIC RESTORATION CONSULTING          2005-PRESENT

Initiate and manage consulting projects focusing on fish, wildlife, and habitat restoration in and around the San Francisco Estuary and its tributaries.

**CALIFORNIA COORDINATOR**          SAVE OUR WILD SALMON                    2005-2008

Lead California campaign to generate support for restoration of endangered salmon species on the Columbia/Snake Rivers. Activities include: develop and implement media strategy, meet with Congressional staff, recruit potential California NGO partners, grassroots organizing, and coordination of coalition members (sport and commercial fishers and environmental NGO's) in these activities.

**DIRECTOR, SCIENTIFIC PEER-REVIEW**          CALFED ERP                    2004-05

Manage peer-review of proposals for a multi-million dollar ecosystem restoration grant program. Collaborate on design of web-based proposal and reviewer management databases. Recruit and assign scientists to review technical proposals for both, CalFED's ERP and Science programs. Plan, host, and manage review panels.

**POST-DOCTORAL RESEARCHER**          UC DAVIS                    2002-04

Explore long-term datasets to uncover causes of longfin smelt (*Spirinchus thaleichthys*) population decline in the San Francisco Estuary. Products of this research form the basis of an Endangered Species Act petition to list the San Francisco Estuary.

**STAR FELLOW**          US EPA                    1998-00

Investigate ecology, behavior, and evolution of a rare desert fish species under the US EPA's graduate fellowship program. Manage 5 student employees and multi-year budgets for 3 government grants totaling >$85,000/yr.

**RESEARCH ASSOCIATE**          SIERRA CLUB LEGAL DEFENSE FUND          1991-93

Analyze technical issues for lawyers in a public-interest, non-profit, environmental law firm.

## PROFESSIONAL SERVICE

**Manuscript/Grant Referee**  San Francisco Estuary and Watershed Science, North American Journal of Fisheries Management, Journal of Heredity, Conservation Biology, Behaviour, Behavioral Ecology, Biological Invasions, Global Ecology & Biogeography, Transactions of the American Fisheries Society, Reviews in Fish Biology & Fisheries, CalFed, California Fish & Game

**Member**        Research and Science Committee, California Board of Forestry and Fire Protection

**Doctoral Committee Member**   Dr. Andy Fields, University of the Pacific

## ADDITIONAL TRAINING

| | | |
|---|---|---|
| **SCUBA** | PADI | *2011* |
| **Non-profit Board Service** | Pursue/Upstart | *2010* |
| **Wilderness First Responder** | Wilderness Medical Institute | *2008* |
| **National Outdoor Leadership School** | Alaska Outdoor Educator | *2004* |
| **Legislative Lobbying** | Save Our Wild Salmon | *2004* |
| **Meeting Facilitation** | The Western Network | *1997* |

## AFFILIATIONS

American Fisheries Society; Society for Conservation Biology; California Estuarine Research Society

# Attachment 3

Sixty-Day Notice of Intent to Sue FDA Pursuant to the Endangered Species Act
Re: Approval of Genetically Engineered "AquAdvantage" Salmon

Region 5 Fisheries Program Comments on FDA approval process for
Aqua Bounty Technologies, Inc. (ABT)/AquAdvantage GMO salmon

**Issue:** FDA has released an EA and briefing packet which state the application for commercial approval is limited to raising the AquAdvantage salmon outside the USA and then importing the processed fish for sale as food in the USA.

The transgenic broodstock would be mated and eggs incubated to eyed stage in a multiple-confinement hatchery on Prince Edward Island, Canada.  Eyed stage eggs would be shipped to Panama for growout in a multiple-confinement high-elevation, undisclosed location next to a river.  At 18 months of age, fish would be harvested and processed in Panama for shipment to USA for sale.

The 'multiple-confinement' includes biological confinement (eyed eggs that are all-female triploids), 3-5 forms of mechanical and physico-chemical confinement, and geographical confinement (if any eyed eggs or fry escaped from PEI hatchery, presume fry would end up in surrounding seawater and die there; if any grow-out fish escaped the Panama grow-out facility fish would enter the river that has lethal water temperatures downstream plus many dams.

**Preferred FWS position:**  Given all the unknowns and uncertainties regarding the possible ecologic and environmental effects of these fish, combined with the awkward situation where an agency (FDA) whose jurisdiction is not focused on natural resources is entrusted with the authority to approve an act which poses such threat to the country's natural resources, we believe it is premature to approve this request for commercial rearing of transgenic salmon.

## Comments related to Regulatory Authority/Oversight.

➤ If the two locations in Canada and Panama are truly the only places these transgenic fish will ever be raised, then perhaps the EA Section 7 endangered species consultations by NOAA and USFWS are unnecessary or of little importance.  However, recent statements by AquAdvantage indicate if their application is approved they intend to sell eyed-eggs to additional confined grow-out operations in other locations.  It is my understanding that current regulations would not require the FDA to publicly release these future EAs before approval.  It is also unclear what the USFWS or NOAA roles would be if these facilities are in foreign locations.  The current EA under review was released publicly because it sets a crucial precedent regarding human consumption of a transgenic vertebrate (fish).  This is why the scientific quality of this first EA sets such a crucial precedent.  However, our review and those of other scientists found numerous issues with the scientific quality and completeness of the EA.  If the FDA approves the sale of processed AquAdvantage salmon in the USA and the company plans to submit additional EAs to grow fish at other facilities then the current EA is too narrow.  The FDA should consider a full EIS that takes into account the full scale at which the company intends to sell eyed-eggs over say the next 10 years.

➤ How will the FDA assure, monitor, and verify that multiple confinement is continually achieved at the two facilities and in future facilities as farming of these fish proliferates?
  - Failure analysis of triploid induction should quantify the frequency of triploid failure.
  - Do exceptional diploids occur among treated transgenic fish, and if so, are they fertile?

- Failure analysis of geographical confinement should include data on how AquaAdvantage salmon respond to changes in temperature and season.

➢ The Service seems to have no regulatory authority outside of ESA where applicable.

➢ This may be something that would need international regulations or agreements in writing through NASCO, etc. to address worldwide trade in these fish.

➢ After checking with the Maine FO, and based on the Army Corps Section 10 permit (of the Rivers and Harbors Act) for the aquaculture companies, for existing aquaculture sites, the aquaculture companies are not allowed to use transgenic salmon in their net pen sites. For new sites, a new permit would need to be developed.

➢ Ultimate regulatory authority should be placed with the agencies charged with responsibilities to manage wild stocks and their habitats. Once "the genie is out of the bottle", and into the environment, the consequences affect the general public and the common good. Looking at invasive species as examples of "genies", none to my knowledge have been recaptured into their respective "bottles".

➢ Consider escaped Atlantic salmon on the west coast and their impact on endangered and threatened Pacific salmonids. These fish are evidently surviving, reproducing, and producing fry and parr. We must assume that smolts will result and that the life cycle completed at some point in time. Were the present regulations sufficient to prevent this situation? Do we know the ultimate ecological consequences? How does this impact the numerous listed aquatic species under the ESA?

➢ In the case of Atlantic salmon, management responsibility is shared between the FWS and NOAA. Keys to this argument are the authorities for regulation and management of anadromous fish, and the time spent by such fish in either freshwater or saltwater. Regulatory authority must be viewed from the "worst-case" scenario, and not partitioned into a variety of regulatory agencies with disparate turf, but, ultimately, injury to wild fish populations and their habitats and the associated aquatic communities must take priority over economics and development.

➢ A cascading regulatory framework, where such activities are reviewed, evaluated, and if approved, move to the next level or cascade for review would be optimal. The ultimate or final review would lie with the authorities who manage the potentially impacted species. This would promote a "first do no harm" strategy to the target species and its habitat.

➢ The current regulatory process is not adequate. Prime examples are NDPES permits with EPA, Corps permits regarding placement of aquaculture netpen facilities, and importation/exportation of non-native species or viable gametes, eggs, etc, into/out of the country. Considering the numerous failures of the above and subsequent impacts to wild fish and their habitats should be enough to determine that we do not yet deal with evolving genetic issues in a reasoned, rational, and risk-adverse manner. The federal agencies must speak with one voice. Again, a tiered mechanism where accountability is ultimately fixed and the final decision point is reached is recommended; that fixed point should rest where the ultimate harm may be inflicted upon the public resources. In the case of

Atlantic salmon, those public resources are also far beyond just the U.S., but also into Canada, the European Union, Russia, and all other NASCO convention countries.

**Comments related to Environmental/Ecological Impacts.**

➢ Transgenic fish, regardless of where they are, pose a clear and present danger to wild fish populations. Given the extremely low populations of wild Atlantic salmon in the Maine DPS, any interaction between wild and transgenic salmon must be considered a serious threat, which can disrupt redds of wild fish, compete with wild fish for available food and habitat, interbreed with wild fish, transfer disease and/or parasites, and degrade benthic habitat.  The scientific literature is full of actions indicating that interactions of wild fish and aquaculture escapees (read transgenic escapees) may lead to decreased numbers of wild fish and in the worst scenario, lead to extirpation of the remaining stocks in the U.S.

➢ History dictates it is reasonable to assume that fish held in aquaculture facilities, either land- or water-based, will escape unless strict quarantine /water treatment/screening/ bioengineering modifications are in place and aggressively monitored.  And even then, it must be assumed that escape will still occur, and protocols must be in place to deal with such a non-native organism released into the environment, and its subsequent effect on native species, habitat, and aquatic communities. Transgenic fish, whether reproductively viable or sterile, must be maintained only in biosecure  (zero discharge) land-based facilities ideally positioned outside of any wild fish watersheds until appropriate laboratory and field research has been undertaken to ensure that the risk of adverse effects on wild fish has been minimized.

➢ ABT appears to have established several physical and biological containment mechanisms to prevent the escape of AquAdvantage salmon.  However, there is still risk of escapement and we think this risk is most prevalent at the PEI facility.  If the brood stock from the PEI facility were released either accidentally or with malicious intent, we do not feel enough evidence has been provided to conclude the risks to natural populations of Atlantic salmon in Canada and the U.S. are negligible. Additional experimentation needs to be conducted to verify that any escapees from the PEI facility will not be able to tolerate the brackish water in the vicinity of the facility.  Also, the lack of information on the transport procedures from PEI to Panama is troublesome.  It is during this stage of the operation that malicious activities could result in these fish being lost from the direct control of ABT.

➢ The Panama grow-out facility appears to minimize environmental risks of these fish.  If fish were to escape the Panama facility, we agree there may be little chance that they would outmigrate from the river and survive due to the warm temperatures in that locale.  However, additional experimentation on these fish is needed to determine the upper incipient lethal temperature limit to ensure that these fish could not survive the warmer temperatures in the lower river.  Because rainbow trout are established in the river at the Panama facility, it is very likely that escaped AquAdvantage salmon would survive in this portion of the river and potential effects on native fish populations remain.

➢ The diploid GMO salmon that are produced in this process are fertile, and the modified gene is passed from one generation to the next. The triploids are supposed to be sterile.  The concern is twofold: escape by the diploids or their reproductive products and successful reproduction in the wild, and incomplete induction of triploidy allowing reproduction of individuals thought to be non-

reproductive and therefore potentially kept under less secure conditions which could allow an escape event.

➢ If there is an escape event, competition from the GMO salmon would negatively impact the wild stocks. Research has shown that aquaculture-raised salmon can outcompete wild salmon, and given the already endangered status of the wild stocks, any additional threat is amplified in their impacts. References are available.

➢ The EA does not give the full information needed to predict environmental effects of AquaAdvantage salmon.
  • Different environmental conditions can alter the differences in overall fitness between transgenic and non-transgenic fish (e.g., Sundstrom et al 2007).
  • GH transgenesis in AquaAdvantage salmon and other salmon enhances appetite and alters behavior. Hence, they are likely to explore novel prey and novel areas (Sundstrom et al 2003).
  • Lower fitness of transgenic fish when they first escape does not necessarily translate into permanently lower environmental risk (Kapuscinski 2007 and Ahrens and Devlin in press)

The key point here is it could be very misleading to base environmental risk assessment on data for only a few traits that do not span the whole life-cycle and are measured under the limited range of environmental conditions and time frames. In short, the EA could be overly simplistic concerning statements of poor fitness of AquaAdvantage salmon without the scientific evidence required to support such a claim.

➢ Aside from the potential spread of the GMO growth gene if they escape and successfully reproduce, the genetic origin of the broodstock that has been developed is likely genetically distinct from Maine salmon. The concern is if escape and reproduction occurs, this could lead to a disruption of the locally adapted gene complexes of the endangered populations. In the FDA report-petition, we didn't see reference to the origin of the broodstock.

➢ Where the EA and briefing document give quantitative data related to environmental risk, they omit statistical analyses needed to scientifically verify conclusions.
  • Missing from many tables are: sample size, standard errors, statistical power, or description of statistical tests used.

➢ The EA and briefing document only compare AquaAdvantage salmon to farmed salmon but environmental risk assessment requires also comparing transgenic fish to wild fish in a similar ecological niche.
  • Genetic consequences of transgenic fish interbreeding with wild relatives are anticipated to be very different from those of domesticated salmon.

➢ The list of adverse effects which could be caused by transgenic fish throughout its lifecycle include:
  • Escape, with impacts on interbreeding with wild salmon, gene introgression into wild salmon stocks, hybridization with brown trout.

- Disturbance of habitat or displacement of wild stocks as a result of competition for resources, predation, or even cross-mating resulting in population impact.
- Spread of bacteria, viruses, parasites to wild salmon and other aquatic/estuarine species
- Introduction of chemicals used to treat fish diseases.
- Transgenic fish may also exhibit ecological impacts associated with their degree of fitness, interaction with other organisms, role in ecological processes, and potential for dispersal and persistence.

➢ The FDA document rationalizes weaknesses in the proponent's testing/experimental design, e.g., uncertainty, lack of historic records, lack of information.

- Pg 21 – "The primary area of uncertainty is determining the actual rate of adverse outcomes in grow-out facilities, as the relatively heavy culling rate that occurred in the space-limited broodstock facility described in these data sets may have influenced the apparent rate of abnormalities.";
- Pg 26 – "According to the information ABT provided to us, ad hoc culling was historically effected in association with inventory management activities (i.e., removing excess inventory, biomass reduction, separation of fast-growing individuals from slow-growing individuals, and broodstock selection) and often no data were collected on fish culled as excess inventory, particularly early life stages (i.e., eggs, yolk-sac fry and first-feeding fry). Although not specifically described in the report of this study, one would reasonably expect that the culling was done in a manner that selected for improving the broodstock, thus retaining the healthiest and fastest growing individuals in the facility. We have no reason to believe that ABT's culling practices were inconsistent with the approaches used in broodstock operations in the commercial salmon industry; these may differ from commercial grow-out facilities";
- Pg 42 – "Information on smoltification for triploid GE salmon is currently lacking."
- Pg 43 notes that "In addition, Stevens et al. (1998) caution that future growers of growth enhanced salmon should be prepared to either deliver more water or more oxygen in the water per unit of biomass of GE fish compared to that required by non-GE salmon." Although more pertinent to Canada and Panama, we note that delivering more water may affect ground and surface water availability, as well as water treatment facilities.

➢ Pg 121-122 describe the potential for accidental releases of AquAdvantage Salmon due to natural disasters, but the briefing package doesn't address the potential for more frequent extreme events due to climate change.

➢ We would prefer the production of these fish for the entire operation was conducted at the Panama facility. This would keep broodstock geographically isolated from natural populations of Atlantic salmon, eliminate risks associated with transporting these fish from Canada to Panama, and the Panama facility represents a location where the likelihood of establishment of an introduced migratory population is highly unlikely in the event fish escape the facility.

➢ We are pleased to see that the ABT product label warns "fish must be reared in land-based, highly contained systems that prevent their release into the environment" and that the "fish cannot be reared in conventional cages or net pens deployed in open bodies of water." However, if AquAdvantage salmon are approved for commercial production, these fish may eventually find their

way into commercial net pens either through illegal means or through approving future applications. This is a slippery slope and the only real way to be risk adverse is to not approve the current application by ABT.

➢ Now that there is a developed product, and if it is approved by the FDA for use, considerations about the potential implications to the listed Atlantic salmon stocks in Maine would need to be addressed, including the genetic issues, such as threats such as introgression if escapes occurred.

➢ We are concerned about the possible sale and transfer of the eggs to other countries where escapement could occur and triploids are not a 100 percent defense.

*Note:* Many of these comments also cover the Environmental Assessment (EA) for AquAdvanatage salmon dated August 25, 2010. Region 5 personnel have consulted with Dr. Anne Kapuscinski, Professor of Sustainable Science, Dartmouth College, NH. We agree with many of Dr. Kapuscinski's comments on these documents; many comments come directly from her written comments submitted to FDA as part of the public review process. Dr. Kapuscinski is a leader in the field of environmental risk assessment of transgenic fish. The USFWS has benefited from her knowledge on this issue by having her as a keynote speaker at the Future Challenges Workshop at NCTC - August 10-13, 2004 where she spoke about transgenic fish and the need to develop effective ecological risk assessment approaches and regulatory processes (http://www.fws.gov/science/FCWorkshopNCTC0804.html). In addition, Dr. Kapuscinski led a conference this summer which focused on Genetic Biocontrol of Invasive Fish. FHC Asst. Director Bryan Arroyo was a speaker at this conference along with FDA and NOAA administrators to discuss the regulatory process involved with approval of transgenic fish in the USA (http://www.seagrant.umn.edu/ais/biocontrol). Folks assembling any briefing products for Bryan Arroyo should review chapters 5 and 6 in Dr. Kapuscinski's 2007 book titled, "Environmental Risk Assessment of Genetically Modified Organisms, Vol 3: Methodologies for Transgenic Fish", CABI Publishing, UK. 304pp. Craig Martin or Bryan Arroyo should have a copy of this book that was distributed at the Genetic Biocontrol of Invasive Fish conference.


## SPECIFIC COMMENTS

Page 21: "...escapees from containment would be less capable of surviving."
There needs to be more information here as to what the decrease in survivorship is. What is the mortality rate and exactly how was this evaluated.
Page 32: 48 fish distributed over four groups does not seem like much of a sample size. How were these fish selected from the 400 - 800 candidates (100 - 200 for each group)?
Page 26: There should be a better description of what these ranks in the Table are. What is slight, moderate and severe?
Page 26: Is there any information on the proportion of fish that are culled and how this compares to other commercial hatcheries?
Page 43: Although the critical oxygen concentration may be higher for GE fish, it is likely that in most natural aquatic systems DO levels will be greater than the critical oxygen concentration and thus not affect survival in natural systems.
Page 52: What is an acceptable rate of triploid induction?
Page 57: So is 2% too much risk in the case of escapees?
Page 58: Don't understand the reasoning why p2 is less than p1?
2- 5% of the fish may not be sterile.

Page 115: It is good to see that ABT has issued this warning statement.  However, this does not preclude the illegal rearing of these fish in open bodies of water.

Page 116: What is magic about 3 - 5?  Some justification for this number should be presented here.

Page 120: If rainbow trout persist to any degree, survival of Atlantic salmon in this waterbody is also likely.  High gradient with abundant rock and boulder substrate would be suitable habitat for juvenile salmon.

Page 123: Not sure about the idea that older fish could not survive the sudden transition from freshwater to brackish water.  Natural Atlantic salmon often move back and forth from fresh to brackish water while on spawning runs and kelts can quickly move into brackish waters following spawning.  Not convinced that older fish would not survive if they escaped the PEI facility.

Page 123: Agree that fish would likely not be able to survive migration to the marine environment, but this does not preclude establishment within the river near the grow-out facility.  This could result in competition with native fishes.

Page 124: Experiments to determine the upper incipient lethal temperature limit are easy to conduct.  ABT should do these experiments to verify the assumption that the upper incipient lethal temperature limit of AquAdvantage salmon is the same as for natural Atlantic salmon.

Page 124: Food availability must not be too limiting - rainbow trout are persisting.

Page 127: Quantitative evaluation of the effectiveness in creating an all-female population needs to be done.

Page 128: But male Atlantic salmon are present in the environment (at least in Canadian waters) should AquAdvantage salmon escape the PEI facility.

Page 128: So according to NASCO the procedures used for AquAdvantage salmon would be OK?

Page 129: De-smolitification should be empirically tested for older AquAdvantage salmon.

Page 131: Although populations of Atlantic salmon in PEI and other rivers in North America are dependent on hatchery input, there are still some naturally reproducing fish.  Escape from the PEI facility has the potential to compromise the genetic integrity of remaining natural populations.

# Attachment 4

Sixty-Day Notice of Intent to Sue FDA Pursuant to the Endangered Species Act
Re: Approval of Genetically Engineered "AquAdvantage" Salmon



United States Department of the Interior

FISH AND WILDLIFE SERVICE



06 October 2010,

This letter briefly outlines several concerns that the Conservation Genetics Community of Practice (COP) has raised regarding the Veterinary Medicine Advisory Committee (VMAC) Briefing Packet for AquAdvantage Salmon.

The AquAdvantage Atlantic salmon (*Salmo salar*) is a genetically engineered (GE) salmon that grows at a rapid rate due to the alteration of their growth hormone gene. Specifically, a gene construct is synthesized using a growth hormone gene (GH; derived from the Chinook salmon, *Oncorhynchus tshawytscha*, pituitary gland) that is linked to an anti-freeze protein regulator sequence (opAFP) found in Ocean pout (*Zoarces americanus*). The anti-freeze regulator acts like a switch keeping the GH protein from turning off and allowing for continued growth of the fish. This gene construct (opAFP-GH) is then injected into Atlantic salmon eggs to form an all female broodstock that will produce future product.

The Briefing Packet provided by VMAC is a detailed synopsis regarding the safety and effectiveness of genetically engineered (GE) Atlantic salmon produced by Aqua Bounty Technologies. The packet provides relevant data to assess the following five critical issues or risks associated with genetically engineered organisms:

1) molecular consequences of the insertion of a gene construct into a lineage of Atlantic salmon,

2) phenotypic effects of the insertion of a gene construct in a lineage of triploid mono-sex Atlantic salmon,

3) genotypic and phenotypic durability of such gene construct,

4) analysis of food feed and safety, and

5) environmental consequences.

COP comments are based on concerns that deal with the environmental risk analysis provided by VMAC and the regulatory oversight of such a program. While this document has been reviewed by the COP, we strongly recommend that other genetic communities such as the American Fisheries Society and National Academy of Sciences review this and other supporting documents as unbiased third party reviewers.

### Environmental/Ecological Impacts

The Briefing Packet provides compelling evidence that the risk of escapement by GE AquAdvantage salmon is minimal; however, *it falls short of providing an actual risk assessment of putative environmental damages in the event of escapement.*

First, the environmental analysis should provide an historical overview of the general risks associated with escapement or hybridization of GE and wild type individuals.  Has escapement of a GE organism ever occurred?  What were the environmental consequences of such an escapement?  An overview would provide readers with an understanding of the potential harm (and the degree of harm) posed by GE organisms even when the risks of escapement is low.  Both of these risks (risk of escapement and degree of harm if escaped) should be more accurately quantified prior to any Environmental Assessment ruling.

Second, the biological containment at either the PEI or Panama facilities along with the possible interaction of AquAdvantage salmon with endangered wild salmon stocks is of great concern to the COP. To this regard, Aqua Bounty Technologies has established several physical and biological containment mechanisms to prevent the escape of AquAdvantage salmon and the Environmental Assessment indicated escapement risk and establishment risks were low. However, history dictates that fish held in aquaculture facilities, either land- or water-based, escape. In addition, the information provided by Aqua Bounty Technologies for the likelihood of establishment relies on the assumption that farmed Atlantic salmon have not established themselves in North America. This assumption is clearly violated because Atlantic salmon juveniles have been found in several streams in the state of Washington as well as British Columbia. While interactions of these fish with native salmon are unknown, any interaction between wild and transgenic salmon must be considered a serious threat. Numerous scientific publications have documented that interactions of wild and introduced fish have led to decreased numbers of wild fish (for ESA listed Atlantic stocks this is of great concern).

As highlighted in the previous paragraph, the Environmental Assessment does not give the full information needed to predict the environmental effects of AquAdvantage salmon. The interpretation of findings could be very misleading because conclusions are based on data for only a few traits that do not span the life-cycle of the organism and are measured under a limited range of environmental conditions and time frames.   The COP recommends incorporating the following scientific data in future environmental risk assessments:

- differences in overall fitness between transgenic and non-transgenic fish (e.g., Sundstrom et al 2007);
- shifts in primary  prey and utilization of habitat for AquAdvantage salmon (Sundstrom et al 2003).
- assessing how fitness of transgenic fish, when they first escape, translates into environmental risk (Kapuscinski 2007 and Ahrens and Devlin in press)

It is the view of the COP that the Environmental Analysis is overly simplistic and does not adequately capture the actual risk of environmental damages to wild Atlantic salmon or the ecosystem.  Additional studies will be necessary to assess this risk and include (but not limited to)

- interbreeding with wild salmon, gene introgression into wild salmon stocks, hybridization with brown trout,
- disturbance of habitat or displacement of wild stocks as a result of competition for resources, predation, or even cross-mating resulting in population impact,

- spread of bacteria, viruses, parasites to wild salmon and other aquatic/estuarine species,
- ecological impacts associated with their degree of fitness, interaction with other organisms, role in ecological processes, and potential for dispersal and persistence.

## Regulatory Authority/Oversight comments

Aqua Bounty Technologies currently has various standard operating procedures to minimize escapement and test for durability of the gene construct; however, the COP fails to see any oversight policy in place for assessment, monitoring, and enforcement of these procedures. The current regulatory process is ineffective in handling such a situation. Economics and development take priority over the potential impact to the species or ecosystem. Instead, agencies (FDA, NOAA, USFWS) might benefit from a tiered approach to regulatory authority where such activities are reviewed, evaluated, and if approved, move to the next level for review. The ultimate or final review should lie with the authorities who manage the potentially impacted species (in the case of Atlantic salmon, those public resources are also far beyond just U.S. jurisdiction and include Panama, Canada, the European Union, and Russia). This approach would promote a "first do no harm" strategy designed to protect public resources (i.e., the target species or ecosystem of concern).

## Concluding remarks

There are several unknowns and uncertainties regarding possible genetic, ecological, and environmental effects of AquAdvantage salmon that must be elucidated before an environmental risk assessment can be thoroughly evaluated and approved. This, along with a situation where regulatory oversight is adequate at best, suggests that approval of Aqua Bounty Technologies' request for commercial rearing of AquAdvantage salmon is premature.

Sincerely,

Meredith Bartron, PhD
Denise Hawkins, PhD
Greg Moyer, PhD
John Wenburg, PhD
Wade Wilson, PhD

# Attachment 5

Sixty-Day Notice of Intent to Sue FDA Pursuant to the Endangered Species Act
Re: Approval of Genetically Engineered "AquAdvantage" Salmon



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Warm Springs Fish Technology Center
Conservation Genetics Laboratory
5308 Spring Street
Warm Springs, Georgia 31830
Phone: (706) 655-3382  FAX: (706) 655-3389



30 September 2010

This letter briefly outlines several criticisms and concerns regarding the Veterinary Medicine Advisory Committee (VMAC) Briefing Packet for AquAdvantage Salmon.  While I feel I can provide a general overview and constructive criticism of this briefing document, more time would allow for a detailed review.

The Briefing Packet provided by VMAC is a detailed synopsis regarding the safety and effectiveness of genetically engineered (GE) Atlantic salmon produced by Aqua Bounty Technologies. The packet provides relevant data to assess the following five critical issues or risks associated with genetically engineered organisms:

1) molecular consequences of the insertion of a gene construct into a lineage of Atlantic salmon;

2) phenotypic effects of the insertion of a gene construct in a lineage of triploid mono-sex Atlantic salmon;

3) genotypic and phenotypic durability of such gene construct;

4) analysis of food feed and safety;

5) environmental consequences

Much of my major concerns are with the environmental risk analysis provided by VMAC and are addressed below.  I do not feel comfortable commenting on the analyses of food feed and safety because they are not my areas of expertise.  I would also recommend that the American Fisheries Society and National Academy of Sciences review this and other supporting documents as unbiased third party reviewers.

Major criticisms:

The Briefing Packet provides compelling evidence that the risk of escapement by GE AquAdvantage salmon is minimal; however, it falls short of providing an actual risk assessment of putative environmental damages in the event of escapement.  The environmental analysis should provide an overview of the general risks associated with escapement or hybridization of GE and wild type individuals.  An overview would provide readers with an understanding of the potential harm (and the degree of harm) posed by GE organisms even when the risks of escapement is low.  Both of these risks (risk of escapement and degree of harm if escaped) should be more accurately quantified prior to any Environmental Assessment ruling.

I am also concerned with phrases like "are unlikely to survive if exposed to high salinity and low temperature" when no data have been collected on AquAdvantage salmon to evaluate the likelihood of these scenarios.  Survival under geographical and geophysical conditions should be evaluated at all life stages in an effort to quantify the likelihood of such escapement scenarios.

Finally, while Aqua Bounty Technologies currently have in place various standard operating procedures to minimize escapement and test for durability of the gene construct, I fail to see any policy in place for monitoring and enforcement of these SOPs by the Food and Drug Administration. The environmental impact of escaped GE salmon is of great concern; therefore, the FDA should carefully monitor each facility and establish/enforce a zero tolerance policy for failure to meet specified containment guidelines.

Minor criticism:

1) Who were the reviewers (including their backgrounds) for this document? I have concerns over whether salmon ecologists and biologist have critiqued the environmental analysis of this document.

2) Scientific names of ocean pout, Chinook, and Atlantic salmon should be reported.

3) page 13 section B.5. A reference should be provided.

4) page 13 section C indicates that supporting data was provided – please reference these data in an appendix.

5) page 14 section A. Again, "data submitted support the Molecular Characterization of . . . ." please reference these data.

6) page 16. section i. "Repeat regions like this are quite variable and nonessential". This needs a citation. While they do not code for anything, repeat regions are probably not non-essential; rather, they serve some purpose.

7) page 43 "AquAdvantage salmon may have reduced tolerance for low DO" – there is much uncertainty in this statement as there is no data to support or reject this. Either a citation is warranted or consider eliminating this statement.

8) page 110 section A the working definition of AquAdvantage salmon. So what are the ones called that are <100 g body weight but are genetically engineered?

9) page111. "The VMAC meeting will be held to solicit comments from the appropriated outside experts (VMAC members)". Do VMAC members really have the expertise to rule on the environmental assessment? I would argue that outside experts such as salmon biologists be considered as a part of this panel.

10) page 123 section a. Again, the conclusion is based on limited data. More studies are necessary to determine containment risks (see major criticisms).

11) page 126. I would argue that a more stringent 98-99% probability of being triploid be invoked. The risk of escapement is too great to be relying on a 95% probability.

Please feel free to contact me regarding further questions or concerns.

Sincerely,

Gregory R. Moyer, PhD

Regional Geneticist

Email: Greg_Moyer@fws.gov

# EXHIBIT SIX

(U.S. FWS Conservation Genetics
Community of Practice (CoP) letter to U.S.
FDA, October 6, 2010)

# Attachment 6

Sixty-Day Notice of Intent to Sue FDA Pursuant to the Endangered Species Act
Re: Approval of Genetically Engineered "AquAdvantage" Salmon

Document produced by NMFS in response to Jan. 2013 FOIA Request

For Internal Use Only                                                          December 5, 2011

**Talking Points for Senate Commerce Committee Staff Briefing on S. 1717**
**"Prevention of Escapement of Genetically Altered Salmon in the United States Act"**

<u>1.  Comments on the bill</u>
- S. 1717 does not directly address the issue of escapes and its title is misleading.  This bill makes it illegal to "ship, transport, offer for sale, sell, or purchase genetically altered salmon or other marine fish, or a product containing genetically altered salmon or other marine fish, in interstate or foreign commerce; or have custody, control, or possession of, with the intent to ship, transport, offer for sale, sell, or purchase genetically altered salmon or other marine fish, or a product containing genetically altered salmon or other marine fish, in interstate or foreign commerce."

- NOAA's Aquaculture Policy (June 2011) is to support both aquaculture innovation and the protection of wild species and ecosystems.  The policy's guidance for aquaculture in federal waters (Appendix 1) establishes an "ecosystem compatibility" goal whereby NOAA will:
  - develop, implement, and enforce conservation and management measures for aquaculture designed to maintain the health, genetics, habitats, and populations of wild species; maintain water quality; prevent escapes and accidental discharges into the environment; and avoid harmful interactions with wild fish stock, marine mammals, birds, and protected species
  - support the use of only native or naturalized species in Federal waters unless best available science demonstrates use of non-native or other species in Federal waters would not cause undue harm to wild species, habitats, or ecosystems in the event of an escape.

- If Congress is interested in working on a bill to prevent escapes of live GE salmon or live GE marine fish, NOAA Fisheries can offer technical assistance on appropriate requirements based upon risk analysis and sound science.  Preventing escapes is essential to minimizing the risks to genetic deterioration of wild fish populations, especially endangered and threatened salomids whose effective population sizes are particularly vulnerable to the effects of interbreeding.   NOAA Fisheries feels this risk management is best addressed by current regulations and good management practices (which may address, for example, handling and containment of fish, sterilization, and location of facilities).

- It is the opinion of NOAA Fisheries Service that this bill S. 1717, as written, would set an unacceptable precedent by altogether closing a door on future research and innovation for sustainable seafood production in the United States and possibly resulting in an unintentional ban on valuable technologies, such as the use of DNA based vaccines that could aid in disease control in hatchery raised fish, such as Alaskan salmon; the use of GE technologies to halt the spread of invasive species, novel biologics from recombinant DNA technology, and others.

For Internal Use Only                                    December 5, 2011

- NOAA Fisheries recognizes that the use of genetically altered organisms is common within traditional agriculture and this bill would set a precedent by effectively banning transgenic marine fish, and may be seen as inconsistent with laws covering other terrestrial animals, plants, marine organisms, or freshwater fish. In addition, the Administration has expressed support for the export of genetically-modified plants.  The bill's prohibition on export of genetically-modified salmon or other marine fish would be inconsistent with this provision.

- Including products of GE fish in the prohibition is inconsistent with the stated purpose of preventing escapes.

- The bill could have implications for the domestic oyster industry on the East Coast, as 90% of oysters are triploid oysters and would be considered a "marine fish" under the bill.  As such, oyster producers that ship interstate would be in violation of the bill.

- While the bill defines "allotransgenic" and "autotransgenic", it does not include a definition of "transgenic".  According to NOAA Fisheries understanding of this term, "transgenic" could include techniques that sterilize fish, as well as DNA-based vaccines for that aid in disease control in hatchery raised fish.

2. Update on work with FDA on GE salmon application

- NOAA has provided technical assistance to the FDA in preparation of the Environmental Assessment for AquaBounty's genetically engineered organism (AquAdvantage salmon).  As per the EA, NOAA understands that AquAdvantage salmon is meant to be grown in contained culture (in land-based facilities or other means of containment not deployed in open water), and is produced as a sterile, single-sex fish.  The EA describes the potential environmental risks of AquAdvantage salmon under the specific conditions of use; namely the production of eggs in Canada and the grow-out and processing of fish in Panama.

- According to the Executive Summary of the EA, "the likelihood of escape, establishment, and spread of AquAdvantage Salmon is extremely small due to the multiple layers of containment measures, including physical, physio-chemical, geographic/geophysical, and biological measures implemented at the sites of manufacture, use and disposal."  According to the EA, even if escapes occur the fish would most likely not survive, due to the high salinity in the case of Canada (lethal to eggs and hatchlings) and to the high temperature in the case of Panama (lethal to adult fish).

- A NOAA Fisheries Aquatic Animal Health Expert, along with FDA staff, visited AquaBounty's grow-out facility in Panama, which is designed for rearing AquAdvantage Salmon® from the eyed-egg stage to market-size, on November 10-12, 2009.  This site visit was conducted primarily to verify that the conditions of rearing and containment at the grow-out facility were as described in the draft EA, and to evaluate any other factors which would influence the potential for escape.

---

**Formatted:** Font: Times New Roman, 12 pt

**Formatted:** Indent: Left:  0.5",  No bullets or numbering

**Comment [BMS1]:** Can you please fill in which segment of the oyster industry would be affected.

**Formatted:** Font: Times New Roman, 12 pt

**Formatted:** Indent: Left:  0.5",  No bullets or numbering

**Comment [BMS2]:** Can you please provide a bit more as to why that is not ideal?

For Internal Use Only                                              December 5, 2011

- NOAA Fisheries is waiting on the issuance of a final Environmental Assessment by FDA. We do not have any information as to the timeline for this, or FDA's final decision on the AquaBounty salmon application.

> Formatted: Font: Times New Roman, 12 pt
>
> Formatted: Indent: Left:  0.5", No bullets or numbering

3. <u>Status of ESA consultations on GE salmon</u>
- The FDA submitted to NOAA Fisheries an Environmental Assessment, supporting documents, and their determination that the approval of the application for AquAdvantage Salmon® will have no effect on the Gulf of Maine distinct population segment of Atlantic salmon listed under the Endangered Species Act of 1973 (ESA).  Because NOAA Fisheries does not review no effect determinations, that letter fulfilled FDA's obligation under section 7 of the ESA.

4. <u>Enforcement implications</u>
*Overview*
- Senate Bill 1717 the "Prevention of Escapement of Genetically Altered Salmon in the United States Act" has significant enforcement implications.  To be specific, it poses many challenges to effective enforcement in light of the provisions and current capabilities of NMFS, OLE and OGC Enforcement Section related to traceability of genetically engineered salmon, forensic testing needs for effective enforcement and prosecution and general enforceability concerns.

- In order to provide effective enforcement, fish must be accountable and traceable throughout the market process.  This facilitates traceability of fish and fish products wherever they are found.  It also enables enforcement to intercept unlawful seafood at various funnel points such as interstate highways, airports and secondary dealers. Required documentation and labeling protects markets, prevents downward price trends, enhances enforcement and protects the consumer.

    1- Inspection – To include at-sea and shore side facilities constituting the aquaculture operation as well as processing, point of sale, and storage facilities.  Inspections should also occur upon import, export and re-export to and from the United States.
    2- Auditing – Forensic auditing of product at all points in the stream of commerce. This auditing will include inspection and sampling of the product, inspection of documents, and biological testing.
    3- Investigation - To include simple to complex investigations, both civil and criminal. These investigations will be in the interest of industry and the general public.

- The bill's enforcement provisions (Sec. 3) are not clear with regard to whether violation of the prohibition on the shipment, transport, sale or purchase of genetically-altered salmon or other marine fish would be subject to criminal or civil penalties under the Magnuson-Stevens Act.  The Magnuson-Stevens Act is explicit about criminalizing certain violations.  In this case, merely including a prohibition does not determine whether the penalty will be civil or criminal.

> Formatted: Indent: Left:  0.5"
>
> Formatted: Bulleted + Level: 1 + Aligned at: 0.25" + Indent at:  0.5", Don't adjust space between Latin and Asian text

For Internal Use Only                                    December 5, 2011

*Enforcement Recommendations*

- The NOAA Office of Law Enforcement can provide Technical Drafting Assistance upon request.

- Section 3.  Enforcement and Penalties in S.B. 1717 describes enforcement powers of the Secretary of Commerce to reside under sections "308, 309, 310, and 311".

- NOAA OLE recommends inclusion of Section 307 "Prohibitions" under the Magnuson-Stevens Act, as well as broader, inclusive language as proposed in the "International Fisheries Stewardship and Enforcement Act (IFSEA)." IFSEA states:  "to enforce the provisions of any Act to which this section applies, the Secretary may, with the same jurisdiction, powers, and duties as through section 311 of the Magnuson – Stevens Fishery Conservation and Management Act. . . .

- NOAA OLE seeks specific inclusion of the following enforcement powers as contained within IFSEA, to wit:
  1. Search or inspect any facility or conveyance use or employed in, or which reasonably appears to be used or employed in, the storage, processing, transport, or trade of fish or fish products;
  2. Inspect records pertaining to the storage, transport, or trade of fish or fish products;
  3. Detain for a period of up to 5 days, any shipment of fish or fish product imported into, landed on, introduced into, exported from, or transported within the jurisdiction of the United States; and
  4. Make an arrest, in accordance with any guidelines which may be issued by the Attorney General, for any offense under the laws of the United States committed in the person's presence, or for the commission of any felony under the laws of the United States, if the person has reasonable grounds to believe that the person to be arrested has committed or is committing a felony; may search and seize, in accordance with any guidelines which may be issued by the Attorney General and may be executed and serve any subpoena, arrest warrant, search warrant issued in accordance with rule 41 of the Federal Rules of Criminal Procedure, or other warrant or civil or criminal process issued by any officer or court of competent jurisdiction.
  5. Subpoenas – in addition to any subpoena authority pursuant to subsection (b), the Secretary may, for the purposes of conducting any investigation under this section, or any other statute administered by the Secretary, issue subpoenas for the production of relevant papers, photographs, records, books and documents in any form, including those in electronic, electrical or magnetic form.

# Attachment 7

Sixty-Day Notice of Intent to Sue FDA Pursuant to the Endangered Species Act
Re: Approval of Genetically Engineered "AquAdvantage" Salmon

Document produced by NMFS in response to Jan. 2013 FOIA Request

FDA Salmon

Concerns:

Monitoring
- Two facilities – egg production in Canada, grow out in Panama
- On-site self-reporting required

Risk of reproductive adults escaping
- To produce eggs, transgenic females and neomales are used to produce eggs.
- These fish can reproduce in the wild and produce genetically engineered Atlantic salmon alevins.
- It is possible, though not likely, these fish escape.
- If they escape, they would be likely they reproduce in the wild because hatchery released fish and hatchery sterilized fish continue to behave similar to wild fish (Trested *et al.* 2002).

Risk of juveniles escaping
- Sterilization measures are not 100% successful (approximately 95% success).
- Diploid genetically engineered fish would be fully capable of spawning.
- All juvenile fish would be females.
- Successfully sterilized salmon would be attractive mates for wild fish and may reduce wild population fitness.

Barrier concerns
- Described as 3-4 levels of protections, but that is the maximum.  In some cases, there is only one screen between the tank and the wild.
- The facility is an old Atlantic salmon production facility and has the appropriate precautions for raising native salmon.
- The EA claims discharges go directly to saltwater, creating a chemical barrier, but in fact discharges enter a several hundred yard long creek that then flows into saltwater.  This creek could provide habitat to sustain juveniles.
- The barriers reduce the probability of an escape, but do not insure no escapes could ever happen.

Commercial sale of eggs
- Because the EA didn't address this subject, it is still unclear what risk this poses.  Likely, if there is high demand for eggs, that would require more fertile adults to produce those progeny.

Endangered Species Act
- While unlikely, an introduction of genetically engineered Atlantic salmon could pose catastrophic threats to wild listed species.
- The grow-out facility in Panama poses no threat to wild Atlantic salmon because of the location.
- The egg production facility may pose a threat to wild Atlantic salmon, including Gulf of Maine DPS Atlantic salmon.
- Dead transgenic salmon are not likely to pose a threat to ESA listed species.
- Any fish introduced along the Pacific Coast would have unknown potential for affecting Pacific salmonids through hybridization.

Document produced by NMFS in response to Jan. 2013 FOIA Request

Larisa Rudenko
Center for Veterinary Medicine
Food and Drug Administration
Parklawn Building (HFE-88) 5600 Fishers Lane
Rockville, Maryland 20857

Dear Dr. Rudenko:

NOAA's National Marine Fisheries Service (NMFS) received your determination that the Food
and Drug Administration (FDA) Center for Veterinary Medicine's approval of an application for
AquAdvantage Salmon may effect, but is not likely to adversely affect the endangered Gulf of
Maine (GOM) distinct population segment (DPS) of Atlantic salmon in accordance with section
7(a)(2) of the Endangered Species Act (ESA) of 1973, as amended (16 USC 1536(a)(2)).  The
September 13, 2010, letter included an Environmental Science Review, Briefing Packet, and
Environmental Assessment (EA).

The FDA provided all materials that are required to initiate consultation in the EA and
supporting documents, however, we would appreciate clarification on three topics prior to
initiating consultation on this action.  First, under the EA section 2.1 'Limitations of Use,' the
FDA stated that the eyed eggs can only be used in "the FDA-approved, physically contained
freshwater culture facility."  However, those limitations are made less clear by the discussion of
eyed eggs for commercial sale (see sections 3.1.1.2 on page 41 and 3.3.1 on page 46).  Because
the egg production facility and the grow-out facility are owned by Aqua Bounty Technologies,
Inc., there would be no reason to sell the eggs unless another aquaculture facility was involved.
NMFS requests clarification as to whether commercial resale of eyed eggs should be considered
as a part of this action.  If eggs will not be sold commercially, the FDA should state definitively
that these eggs will not be sold commercially nor would they be used in the United States.

Second, NMFS is unclear about the entire process Aqua Bounty Technologies, Inc. proposes to
use to produce eyed eggs.  The EA lacks a discussion on how fertile, genetically modified, adult
males are maintained on Prince Edward Island and what measures are in place to prevent those
fertile and genetically modified fish from escaping and ultimately reproducing.  NMFS requests
more information about the containment and mitigation measures for the genetically modified
adult males in captivity.

Finally, the EA describes an action area limited to Canada and Panama.  However, the action
area as defined in the ESA (50 CFR 402.02), should be identified as all areas of potential impacts
as a result of this action.  The topics of selling eyed eggs commercially and rearing fertile adult
males at the Canadian production facility both potentially increase the size of the action area to

Document produced by NMFS in response to Jan. 2013 FOIA Request

include the United States.   If the action area in the EA is described accurately, NMFS does not anticipate any listed species will occur in the action area, and believes there should be no effect to any listed species under NMFS' jurisdiction.

Thank you for the opportunity to comment on this proposed action.  If you have any questions, please contact Jason Kahn, 301-713-1401.

Sincerely,

Therese Conant
Acting Division Chief
Endangered Species Division

1/14/13

Case 3:16-cv-01574-VC Document 53-1 - Filed 07/15/16 - Page 90 of 132

NOAA.gov Mail - Dec. 3 meet to discuss AquAdvantage - lisarudenko@noaa.gov - National Oceanic and Atmospheric Administration Mail

Search   Images   Mail   Drive   Calendar   Sites   Groups   Contacts   YouTube   More ▼

**noaa**

aquabounty

**Mail**

Move to Inbox     More     60 of about 61

COMPOSE

Inbox (1)
Starred
Important
Sent Mail
Drafts
Follow up
Misc
Priority
More

Search people...

Brian Bloodworth
Colette Cairns
Craig Johnson
Gary Jackson - N...
Kristy Beard
Lucretia Grimshaw
Pat Shaw-Allen
  Telework (603)763...
Ron Dean
  Telework 904.687...
Sara McNulty
Therese Conant

### Dec. 3 meet to discuss AquAdvantage        Inbox   x

Therese Conant <Therese.Conant@noaa.gov>                              11/30/10  ☆
to Larisa, Joseph, Barry, Eric, Susan, me, Brian, Susan, Craig

Larisa,
Attached is our draft letter with the points of clarification.  As you can see, we have questions regarding containment of broodstock and marketing of eggs.  If you a feel an in-person meeting is unnecessary to address our questions, please let me know soon.  Otherwise, we look forward to your visit on Friday.
Therese

Rudenko, Larisa wrote:

Yes, it would indeed.  We're really looking forward to meeting with you, answering your questions, and perhaps looking towards working together in the future on other applications.

Happy Thanksgiving!

From: Therese Conant [mailto:Therese.Conant@noaa.gov]
Sent: Wednesday, November 24, 2010 12:02 PM
To: Rudenko, Larisa
Cc: Cormier, Joseph; Hooberman, Barry; Silberhorn, Eric
Subject: Re: Follow up

Would Tuesday November 30 provide enough time?  We don't have that many questions, so should be rather simple.  And yes we are meeting on the 3rd in Building 3 (hand sculpture out-front).  Go up elevator to Security.  You will need your government ID or other photo ID.  When you arrive, have Security call me at 301-713-1401 ext 126.  I look forward to meeting you.

Rudenko, Larisa wrote:

Hi Therese,

First, best wishes for a good Thanksgiving holiday.

I'm just confirming our meeting for Friday the 3rd at 11 at the Silver Spring offices.  Do you have any idea of when you'll be able to share your questions with us?  No rush, but it might be nice to have a day or so to take a look at them.

Looking forward to meeting with you in person,
Larisa

From: Therese Conant [mailto:Therese.Conant@noaa.gov]
Sent: Wednesday, November 17, 2010 3:54 PM

People (9)

Therese Co...
Marine Turtle R

Recent photos

Sh

# Attachment 8

Sixty-Day Notice of Intent to Sue FDA Pursuant to the Endangered Species Act
Re: Approval of Genetically Engineered "AquAdvantage" Salmon

Comments on
**Environmental Assessment for AquAdvantage Salmon**
and
**Briefing Packet on AquAdvantage Salmon for the Veterinary Medicine Advisory Committee**

By

**Anne Kapuscinski, Professor of Sustainability Science, Dartmouth College, Hanover, NH**
and
**Fredrik Sundström, Assistant Professor, Department of Ecology and Genetics, Uppsala University, Uppsala, Sweden**

Thank you for the opportunity to comment on the application from AquaBounty Technologies to the FDA for commercial approval of AquAdvantage Salmon (AAS). Our comments below focus on environmental risk assessment of these transgenic fish, our major area of expertise with respect to this application.

**I. If this application is approved, farming of transgenic AquAdvantage salmon will proliferate in the foreseeable future and other species are likely to follow.** Farmed Atlantic salmon is a global commodity, with approximately 1.5 million metric tonnes farmed in 2008 (FAO 2010, Kontali 2009) and typical salmon farms raise 500,000 to 1 million fish in poorly confined growout areas, each as large as four football fields. The applicant will likely want to sell AAS eggs to many growers to be profitable in this global industry. Thus, this is a historic application whose approval could lead to transgenic salmon becoming the first genetically engineered animal farmed on a large scale for human food.

**II. We urge the FDA to extend the public comment period on the scientific issues in this historic application before making a final decision**. The time between the release of nearly 260 pages of technical documents on Sept 3 (the day before a national holiday weekend) and the September 16 deadline for written comments was much too short for adequate examination by the community of scientific experts on the genetics and ecology of transgenic fish and on methodologies for environmental risk assessment of transgenic fish. The limited review period did not give us enough time to prepare a more complete set of comments on all relevant scientific issues in the documents. And scientists are only one group among diverse stakeholders in this decision. A rushed process does not build public confidence in a decision that requires weighing complex matters in environmental and food safety risk assessment. A rushed process with extremely limited opportunity for comment only when the agency is finally "nearing a decision" (FDA 2010) contradicts research findings on how to gain public trust in risk decision-making. Best practices involve structured deliberation with relevant stakeholders at a few key points in the risk assessment, especially at the early steps that frame the entire process--problem formulation and identification and prioritization of hazards to address in the rest of the risk assessment (NRC 1996 and 2009, Hayes et al. 2007, Nelson et al. 2007, Nelson et al. 2009, Renn 2008). Even the National Research Council report on biological confinement of genetically engineered organisms advised public participation earlier in the process (NRC 2004:189-190)

**III. Multiple confinement of these transgenic salmon is crucial to prevent environmental harm especially because of scientific uncertainty regarding their environmental risks**

(Kapuscinski et al. 2007, Devlin et al 2006). If the physical or geographical confinement measures fail and there are regular escapes of sterile transgenic fish into environments where they can thrive, they could still alter the environment "in permanent ways, especially if transgenic fish overexploit key resources" such as wild fish prey (Devlin et al. 2007:152). Yet virtually no research has been done on how transgenic fish, including AAS, might affect other fish species in environments where they might end up. Biological confinement, alone, is not sufficient to prevent environmental harm. This is why assurance of multiple confinement is crucial. **Thus, we commend the applicant for proposing multiple confinement of the AAS strain at two relatively small facilities**, a hatchery on Prince Edward Island, Canada and a grow-out facility at an undisclosed location near a river in the highlands of Panama.

**IV. However, we have two major concerns:**

**A. How will the FDA assure and verify that multiple confinement is continually achieved at the two facilities and in many future facilities as farming of these fish proliferates?** How will the FDA assure that all sales of processed AAS in the USA come from fish grown under successful multiple confinement? How will the FDA assure and audit the company's implementation of an "integrated confinement system" (Table 10 in the Environmental Assessment)? This is a good idea on paper but the actual achievement of multiple confinement depends on many human actions, and the rigor of audit and regulatory oversight. An even greater challenge is how to assure multiple confinement at many, larger facilities in different environments and nations as commercial production of these fish proliferates. Does the FDA have the staff, financial resources and sufficient overseas jurisdiction for adequate surveillance of diverse domestic and foreign hatcheries and grow-out facilities?

**B. The scope of the Environmental Assessment is too narrow and its methods inadequate for the issues at hand. We urge the FDA to now require a complete environmental risk assessment, as a fully transparent Environmental Impact Statement (EIS).** The current Environmental Assessment only assesses the likelihood of transgenic salmon escaping from multiple confinement at the two facilities but the proposed multiple confinement does not absolve the need for a complete environmental risk assessment, given the likely proliferation of sales of AAS eggs for growout beyond one facility in Panama. The Environmental Assessment does not provide the full information needed to predict environmental effects of AAS, some of which we describe below. It focuses on an outdated list of issues (from Kapuscinski and Hallerman 1991) and ignores the major advances in methodologies for assessing environmental risks of transgenic fish (Kapuscinski et al. 2007). These advanced methods systematically integrate information about the environment and the transgenic fish's genotype and phenotype to identify and prioritize hazards upon which to focus the environmental risk assessment (Devlin et al. 2007, Kapuscinski et al. 2007a, Hayes et al. 2007).

All parties will benefit from a full assessment of potential environmental harm and benefit presented in a thorough and transparent EIS. All future regulated growers will benefit from more complete information to guide their investments in grow-out facilities that are more likely to be approved. The public interest will be better served by a more complete and transparent process.

**We urge that the FDA not make a final decision on this application until our two major concerns are fully addressed.** Below, we further describe these concerns and suggestions to address them.

## V. Strengthen the assessment and assurance of multiple confinement

The FDA should require a quantitative failure mode analysis for each form of biological, mechanical, chemical, and geographical confinement and for the overall combination of confinement methods (Burgman 2005). Although the limited scope of the Environmental Assessment is justified by arguing that the AAS will be raised only in the two mentioned facilities, the proposed wording for the product label (Environmental Assessment page 48) and limitations for use (Briefing Packet, page 8) leave open the door for possible production in other FDA-approved facilities. Therefore, we urge doing failure mode analysis for the range of facilities that may obtain AAS eggs in the foreseeable future, as part of a full EIS.

### A. Biological confinement
Production of 100% all-female populations of salmon is well established, which should make this part of a quantitative failure mode analysis relatively easy. It is not as easy to achieve 100% sterility through pressure-shock induction of triploidy. Failure analysis of triploid induction in AAS should quantify the variability in percent triploids across treated batches of eggs and the frequency of "exceptional diploids". Devlin et al. (2010) obtained 97% to 99.8% successful triploidy when they treated batches of 10,000 to 19,000 transgenic coho salmon eggs. They also detected 1.1% exceptional diploids overall among all pressure-treated groups (54,787 fish). Exceptional "diploid" individuals can contain the transgene but their fertility and ability to transmit the transgene to offspring is not yet known. Do exceptional diploids occur among treated AAS? If yes, it is necessary to determine their fertility or devise a proven way to eliminate them from eggs destined for growout.

### B. Physical and chemical confinement
Physical and chemical confinement measures are especially prone to equipment failures, power failures, operational wear, and human error (Mair et al. 2007). Failure mode analysis of these confinement measures is critical. We commend the applicant's proposed "integrated confinement system" plan that aims to reduce these sources of failure. But this does not remove the need for a quantitative failure assessment.

### C. Geographical confinement
 Failure analysis of geographical confinement should include data on how AAS respond to changes in temperature and season. The Environmental Assessment suggests water temperatures in lower reaches of the Panamanian River and Pacific Ocean will be lethal to AAS but has the thermal tolerance of AAS been measured? In coho salmon, the optimal growth temperature, and presumably other physiological traits relevant for thermal tolerance, at the freshwater stage changed with growth-hormone transgenesis. Growth-enhanced transgenic coho salmon grew faster at 18°C than at 12 °C (and the upper thermal limit for their fast growth is unknown because they were not tested above 18 °C) whereas wild-type coho salmon did not grow significantly faster at 18°C than at 12 °C (Lõhmus et al.  2010). How has growth-hormone transgenesis affected thermal tolerance and optimal growth temperature in AAS? Water temperatures given

for the high-elevation portions of the Panamanian river (near the growout facility) range from 15° to 19°C (Environmental Assessment, Table 3). Are there data on whether the transgenic Atlantic salmon continue to grow fast, are able to survive or perish at these temperatures, in fresh as well as saltwater?

Overall, the Environmental Assessment does not give sufficient data on seasonal variation and habitat complexity in the receiving environments around the Canadian hatchery and Panamanian grow-out facility to identify if AAS escapes could thrive in certain locations and seasons and to estimate the likelihood of this hazard. In Panama, this needs to be examined for the watershed, with full consideration of seasonal variation and habitat complexity. Oceanographic conditions are also very complex in the Gulf of Panama and Pacific coast of Panama. During the dry season, for instance, upwelling of colder and food-rich waters could be hospitable to adult salmon if they make it downriver. Finally, a full EIS should consider seasonal and spatial variation and complexity in environments surrounding the range of possible grow-out facilities.

## VI. Require a Scientifically Rigorous Environmental Impact Statement before making a decision on the AAS application

**A. The Environmental Assessment does not give the full information needed to predict environmental effects of AAS.** It focuses on completing only the "exposure" step of risk assessment, and concludes there is "extremely small" likelihood of exposure due to multiple confinement at the two facilities, thus no consequence and no need to assess consequences. As scientists, we cannot agree with this approach because it assumes 100% achievement of multiple confinement without having presented the failure mode analysis that is standard practice in technology risk assessment. Even if actual exposure is very close to zero, it is still necessary to assess ecological consequences, from low to high severity consequences, and then estimate the overall risk. We also disagree with this approach because of the likely proliferation of farming AAS in numerous grow-out facilities where multiple confinement will be harder to implement and assure (Mair et al. 2007).

**B. Where the Environmental Assessment and Briefing Packet do present some quantitative data related to environmental risk, they omit information required to scientifically verify the stated conclusions.** Frequently missing information includes: sample sizes (or the given sample sizes seem too small to reliably assess the scientific value of the experimental outcome), standard errors, statistical power, or description of statistical tests used to reach the stated conclusion. Although we focused on sections dealing with environmental risks, we noticed similar omissions in the Briefing Packet's presentation of data for other scientific issues. Such incomplete analysis and presentation of data does not meet commonly accepted scientific standards.

**C. The Environmental Assessment does not adequately consider the growing body of research on genetic and ecological risks of transgenic fish.** This research shows there will be high scientific uncertainty in predicting the overall fitness and ecological effects of AAS if they enter nature because it is extremely challenging to extrapolate from experiments using semi-natural conditions (reviewed in Devlin et al 2007, Devlin et al. 2006, Kapuscinski et al. 2007). This is due to key biological complexities including gene-environment interactions, background

genetic effects, pleiotropic effects, tradeoffs between traits expressed across different life stages, persistent effects of the environment experienced early in life, evolution of fertile transgenic fish after escape, ecological variability, and poorly understood ecological processes (Devlin et al. 2004b, 2007, Kapuscinski et al. 2007, Neregard et al. 2008, Pennington and Kapuscinski in press, Sundström et al 2007b, 2009).

Overall, this research indicates it could be very misleading to base an environmental risk assessment on data for only a few traits that do not span the whole life-cycle and measured under a limited range of environmental conditions. We are therefore concerned about overly simplistic statements of "poor fitness" of AAS without the kinds of scientific evidence required to support such a claim (e.g. Environmental Assessment, Table 11 on p. 71; Briefing Packet, p. 43 possible implication that higher critical oxygen level of AAS leads to overall poor fitness). Also, the Environmental Assessment gave an unacceptably cursory mention of uncertainty (two paragraphs on page 73) with no application of scientific methods of uncertainty analysis (Hayes et al.2007a).

**D. The environmental analysis of AAS presented to the public largely avoids facing the complexity and uncertainty inherent to environmental risk assessment of transgenic fish. We strongly urge the FDA to require a science-driven environmental risk assessment that treats the complexity and uncertainty directly and honestly, using the most current methodologies (Kapuscinski et al. 2007, Burgman 2004).** Such an environmental risk assessment in an EIS should follow standard ecological risk assessment steps:

**1.** Conduct a problem formulation and options assessment that integrates scientific analysis and stakeholder deliberation (Nelson et al. 2007) and define conceptual models of the human and environmental system at issue (Landis 2003).

**2.** Identify all possible hazards and prioritize which hazards to fully assess (Gong et al. 2007, Kapuscinski et al 2007a, Devlin et al. 2007)

**3.** Identify and agree upon measurable assessment endpoints--based on identifying possible environmental consequences--for each prioritized hazard (Kapuscinski et al. 2007b);

**4.** Estimate exposure, i.e., the likelihood of transgenic salmon escaping into and living in natural environments – quantify as much as possible.

**5.** Estimate likelihood and severity of environmental consequences identified for each prioritized hazard – quantify as much as possible;

**6.** Identify and appropriately treat uncertainties throughout the exposure and consequence assessment, using contemporary methods (Hayes et al. 2007a); and

**7.** Characterize the overall risk (exposure x consequences), with explicit presentation of uncertainties that affect exposure and consequence assessment.

The most comprehensive peer-reviewed literature on the biology and ecology of any transgenic fish is for a line of transgenic coho salmon bearing a different salmon growth-hormone construct. Conclusions from this body of research point to the key issues that should be investigated for AAS (Table 1 below). These issues must be pursued for AAS, even though the outcomes may differ between AAS and the transgenic coho salmon due to strain-specific differences in altered traits. The environmental analysis in both the Environmental Assessment and Briefing Packet did not adequately incorporate insights from this body of research. For instance, do gene-environment interactions occur in AAS? If yes, how will this be incorporated into the environmental risk assessment, especially as sales of AAS eggs proliferate to many grow-out facilities?

The peer-reviewed literature, to date, suggests that, at a minimum, a scientifically reliable environmental risk assessment of AAS should address the following issues:

**a. Environmental conditions can lead to very different phenotypes and behavior of hatchery-reared versus stream-reared fish** which affects the relationship between transgenic and non-transgenic fish (genotype by environment interactions) (e.g. Bessey et al. 2004; Devlin et al. 2004b; Sundström et al. 2007b). Whereas this specific research was done on coho salmon, Atlantic salmon show even more plasticity in terms of life-history and behavior. Hence, the age at which AAS might escape from confinement could have dramatically different effects on their phenotype and on how they function in a natural environment. Further, if AAS are reared in different locations, specific conditions in each location are likely to affect the phenotype in a specific way.

The documents released by FDA lack data on how the environmental conditions affects the phenotypes of AAS at different life stages. These data are crucial for assessing how AAS might behave after escape and, thus, what possible impacts they may have on the ecosystem.

**b. Enhanced appetite alters behavior in transgenic salmon (Devlin et al. 1999; Raven et al. 2006). Hence, they are likely to explore novel prey and novel areas (Sundström et al. 2003, 2004b, 2007a). And they also may expose themselves to predation risk** (Sundström et al. 2004a).

Hence, using the behavior and habitat selection of wild-type salmon may only partly reveal the extent of impact by transgenic fish as they may venture into areas where wild-type fish do not exist. This should be assessed in conjunction with effects of transgenesis on environmental tolerance (e.g. thermal tolerance pointed out above). It will be very difficult to quantify the tradeoff between possible expansion of prey species versus heightened exposure to predation. What will be the overall effect of this tradeoff on fitness of transgenic salmon in nature? What will be the impact on predators from consuming AAS? How will the trophic role of AAS in the food chain affect the overall ecosystem? These questions can be addressed by conducting ecologically appropriate experiments, applying state-of-the-art methods of uncertainty analysis or a combination of both approaches (Hayes et al. 2007a).

**c. Transgenic salmon may have different responses to temperature and season, compared to wild salmon and to domesticated farmed salmon.** For instance, growth-enhanced transgenic

coho salmon will likely remain active during winter and thrive at higher temperatures (Devlin et al. 1994 and 2004a; Lõhmus et al. 2008 and 2010). Thus, ecological traits of AAS should be tested under a range of seasonal conditions, including temperature changes.

**d. Reduced prey availability will not necessarily be a disadvantage to transgenic salmon.** The flexible development of transgenic salmon (point 1) means that these fish are not dependent upon high amounts of food to survive. Studies on coho salmon also show that under most food limited conditions they do as well or better than wild-type salmon, and the transgenic individuals can survive for at least 5 months without showing much growth (Sundström and Devlin 2010). In the extreme, the stronger competitive ability of transgenic individuals may eventually result in cannibalism on outcompeted wild-type (Devlin et al. 2004b). Hence, the statement in the Ecological Assessment document (4.2.2) that "these macroinvertebrates, however, are not abundant." does not exclude persistence of AAS. Thus, AAS should be tested under different food availability conditions to determine potential survival and spread throughout possible receiving environments.

**e. Lower fitness of transgenic fish when they first escape does not translate into permanently lower environmental risk.** One successfully breeding individual transmitting the transgene is likely to result in a very different phenotype (see point 1 above) with a different fitness potential relative to its parents (Kapuscinski et al. 2007a). Over the long term, evolutionary processes will exert selection on background genetics to compensate for reductions in fitness caused by the transgene (Ahrens and Devlin in press).

**E. The Environmental Assessment and Briefing Packet compare traits of AAS to traits of farmed salmon but this is not an adequate comparator for understanding environmental effects.** It is necessary to assess ecological differences between AAS and wild fish populations that fill a similar ecological niche in the accessible ecosystems. Following this fundamental ecological principle, **appropriate comparator specimens** for the environmental risk assessment of these transgenic Atlantic salmon are:

**1. wild Atlantic salmon**, including Atlantic salmon populations in possible escape zones and accessible ecosystems,

**2. other salmon and trout species in the accessible ecosystems**, which may fill a similar ecological niche and, thus, with which the transgenic salmon could compete, and

**3. other fish species in the accessible ecosystems filling a similar niche** and, thus, with which the transgenic salmon could compete.

The environmental risk assessment should include all three categories of comparators unless AAS will be farmed only near ecosystems that clearly lack a particular category, for example, in an area where there are no wild Atlantic salmon.

**4. In places where there is farming of Atlantic salmon, the environmental risk assessment should assess if transgenic salmon pose additional ecological risks beyond those already**

**posed by farmed salmon escapees. Risks that the transgenic salmon pose to the salmon farms themselves should also be examined.**

Domesticated salmon are currently grown in commercial aquaculture and their environmental effects, as escapees from salmon farms into nature, are currently under significant scientific debate. Published research on this concern is growing. In spite of many similarities between domesticated and growth-enhanced transgenic salmon, the AAS are unlikely to pose the same environmental risks as domesticated salmon. This is because the genetic consequences of transgenic fish interbreeding with wild relatives are very different from those of domesticated salmon interbreeding with wild relatives: any individual inheriting the transgene maintains its phenotypic expression across generations, whereas the effect of integration of domesticated genotypes into wild populations are halved at each generation. To use farmed fish as comparators for the risk-assessment of transgenic fish may therefore not be valid. At a minimum, relevant comparative experimental evidence of phenotypic traits and their consequences should be provided for both farmed and transgenic lines.

## VII. Conclusion

Any failure of a multiple confinement system means that, once AquAdvantage salmon escape, the release cannot be undone because these fish are mobile organisms with very low but not zero likelihood of having some fertile escapees. Thus, we conclude it is crucial to conduct a full EIS that assesses the potential genetic and ecological impacts that AquAdvantage salmon could have on wild fish and other aspects of the environment. This is even more crucial because of the scientific uncertainty surrounding how these transgenic salmon will function in different environments, the importance of Atlantic salmon as a major global commodity, and the existing commitment of US society to restore threatened and endangered salmon populations and conserve aquatic biodiversity.

Table 1. Research findings relevant for an EIS of AAS, drawn from peer-reviewed literature on growth-hormone transgenic coho salmon

| Key Insights from Research on Growth-Hormone Transgenic Coho Salmon | Scientific Literature Reference |
|---|---|
| Background genetics can strongly modify the effects of a transgene. Need to understand the evolution of transgenic fish in nature to accurately predict risk in the long term. Modeling shows that effects may occur on non-transgenic fish in populations due to the presence of the transgene. | Ahrens and Devlin 2010, Devlin et al. 2001, Neregard et al. 2008 |
| Transgenic fish can show many changes in behaviors and phenotypes (feeding motivation, migration, dispersal, predation, spawning ability). Fish reared in naturalized stream conditions can show very different phenotypes from those reared in hatchery tanks (gene-environment interactions). Thus, data from the latter may only apply for first generation escapes and the former may require separate risk-assessment. | Bessey et al. 2004, Devlin et al 1999, Devlin et al. 2004b, Sundström et al. 2004b, Sundström et al. 2007a, Sundström et al. 2007b, Sundström et al. 2009, Sundström et al. 2010, Sundström and Devlin 2010 |
| Transgenics showed altered swimming ability, respiration rate, oxygen demand, and antioxidant activity | Farrell et al. 1997, Huang et al. 2004, Lee et al. 2003, Leggatt et al. 2003, Leggatt et al. 2007, Stevens and Devlin 2000b, Sundt-Hansen et al. 2007 |
| Environmental conditions affect the phenotypic difference between wild type and transgenic fish. | Löhmus et al. 2009, Löhmus et al. 2010, Sundström et al. 2007b, Sundt-Hansen et al. 2007 |
| Growth-hormone transgenesis can affect fitness arising from predation effects, but effects are stage and environment dependent. | Sundström et al. 2003, Sundström et al. 2004a, Sundström et al. 2005, Tymchuk et al. 2005 |
| Seasonal regulation of feeding is disrupted in transgenics (i.e. they do not slow down in winter as do wild types). Transgenics also show stronger growth response to increasing temperatures and food availability. | Devlin et al 2004b, Löhmus et al. 2008, Löhmus et al. 2010 |
| Transgenics have altered use of dietary energy (i.e. carbohydrates), and preferentially use lipid as an energy source, sparing protein. Given all the food they want, behavioral effects of GH cause fish to deposit large amounts of fat, whereas under ration limiting conditions, the fish have lower lipid levels. Gut surface area, feed conversion, and digestive capacity enhanced. Starvation endurance is not greatly affected. | Blier et al. 2002, Higgs et al. 2009, Leggatt et al. 2009, Oakes et al. 2007, Raven et al. 2006, Stevens and Devlin 2000a, Stevens et al. 2005, Sundström and Devlin 2010 |
| Disease resistance is lower in the growth-hormone transgenic coho strain | Jhingan et al. 2003 |
| Growth-hormone transgenesis strongly affects expression of many genes. Growth-hormone transgenesis and domestication affect gene expression in similar, but not identical, ways. | Devlin et al. 2009, Mori et al. 2007, Mori and Devlin 2009, Rise et al. 2006, Roberts et al. 2004 |
| GH and IGF-I elevated, the latter being strongly affected by growth rate (i.e. transgenics kept to a wild-type growth rate have normal IGF-I levels). Thyroid hormone systems strongly affected in growth-hormone transgenics. | Devlin et al. 2000, Eales et al. 2004, Kang and Devlin 2004, Raven et al. 2008 |
| Abnormalities in cellular structure and organism morphology can occur in some strains of transgenic salmon. | Devlin et al. 1995b, Hill et al. 2000, Ostenfeld et al. 1998 |
| Transgene structure is complex, and DNA integrates near integrated horizontally transmitted DNA (i.e. from infectious agents (parasites). | Uh et al. 2006 |
| Detection of transgenic by molecular methods can be reliable | Masri et al. 2002, Rehbein et al. 2002 |
| Triploidy induction does not produce 100% triploids in transgenics. Exceptions are gynogens and aneuploid individuals arising from incomplete retention of paternal chromosomes. These exceptions can contain the transgene, but their ability to transmit it to progeny is not yet known. | Devlin et al. 2010 |
| The traits of every growth-enhanced strain are unique and triploidy impairs growth. | Devlin et al. 1994, Devlin et al. 1995a, Devlin et al. 2004a |

## References Cited

Ahrens, R.N.M. and Devlin, R.H. 2010. Standing genetic variation and compensatory evolution in transgenic organisms: A growth-enhanced salmon simulation. Transgenic Res. (in press)

Bessey C., Devlin R.H., Liley N. R., and Biagi, C.A. 2004. Reproductive Performance of Growth-Enhanced Transgenic Coho Salmon (*Oncorhynchus kisutch*).  Trans. Amer. Fish. Soc. 133: 1205–1220.

Blier, P., Lemieux, H., and Devlin, R.H. 2002. Is the growth rate of fish set by digestive enzymes or metabolic capacity of the tissues?  Insight from transgenic coho salmon. Aquaculture 209:379-384.

Burgman, M. 2005. *Risks and Decisions for Conservation and Environmental Management*. Cambridge University Press: Cambridge, UK. 488 pp.

Devlin, R.H., Yesaki, T.Y., Biagi, C.A., Donaldson, E.M., Swanson, P., and Chan, W.-K.  1994.  Extraordinary salmon growth.  Nature 371: 209-210.

Devlin, R.H., Yesaki, T.Y., Donaldson, E.M., Du, S.J., and Hew, C.L.  1995a.  Production of germline transgenic Pacific salmonids with dramatically increased growth performance.  Can. J. Fish. Aquat. Sci. 52: 1376-1384.

Devlin, R.H., Yesaki, T.Y., Donaldson, E.M. and Hew, C.L.  1995b.  Transmission and phenotypic effects of an antifreeze/GH gene construct in coho salmon (Oncorhynchus kisutch).  Aquaculture 137: 161-169.

Devlin, R.H., Johnsson, J.I., Smailus, D.E., Biagi, C.A., Johnsson, E., and Bjornsson, B.T. 1999.  Increased ability to compete for food by growth hormone transgenic coho salmon (Oncorhynchus kisutch Walbaum). Aquaculture Research 30: 479-482.

Devlin, R.H., Swanson, P., Clarke, W.C., Plisetskaya, E., Dickhoff, W., Moriyama, S., Yesaki, T.Y., and Hew, C.L. 2000. Seawater adaptability and hormone levels in growth-enhanced transgenic coho salmon, Oncorhynchus kisutch.  Aquaculture 191:367-385.

Devlin, R.H., Biagi, C.A., Yesaki, T.Y., Smailus, D.E., and Byatt, J.C.  2001.  Growth of domesticated transgenic fish.  Nature 409: 781-782.

Devlin, R.H., Biagi, C.A., and Yesaki, T.Y.  2004a. Growth, viability and genetic characteristics of GH transgenic coho salmon strains. Aquaculture 236:607-632.

Devlin, R.H., D'Andrade, M., Uh, M., and Biagi, C.A. 2004b. Population effects of GH transgenic salmon are dependant upon food availability and genotype by environment interactions.  Proc. Natl. Acad. Sci. USA 101:9303-9308.

Devlin, R. H., L. F. Sundström, and W. M. Muir. 2006. Interface of biotechnology and ecology for environmental risk assessments of transgenic fish. Trends in Biotechnology 24:89-97.

Devlin, R. et al. 2007. Assessing ecological effects of transgenic fish prior to entry into nature. Pages 151-187 in Kapuscinski et al., eds. *Environmental Risk Assessment of Genetically Modified Organisms, Vol. 3: Methodologies for Transgenic Fish*, CABI Publishing, UK

Devlin, R.H., Sakhrani, D., Tymchuk, W.E., Rise, M.L., and Goh, B. 2009. Domestication and growth hormone transgenesis cause similar changes in gene expression profiles in salmon. Proc. Natl. Acad. Sci. USA 106: 3047-3052.

Devlin, R.H., Sakhrani, D., Biagi, C.A, and Eom, K.-W.  2010. Occurrence of incomplete paternal-chromosome retention in GH-transgenic coho salmon being assessed for reproductive containment by pressure-shock-induced triploidy. Aquaculture 304: 66–78.

Eales, J.G., Devlin, R., Higgs, D.A., McLeese, J.M., Oakes, J.D., and Plohman, J. 2004. Thyroid function  in growth-hormone-transgenic coho salmon (*Oncorhynchus  kisutch*).  Can. J. Zool. 82: 1225-1229.

FAO (Food and Agriculture Organization of the UN). Farmed Atlantic salmon fact sheet: http://www.fao.org/fishery/species/2929/en (Accessed Sept 12, 2010)

Farrell, A.P., Bennett, W., and Devlin, R.H.  1997.  Growth-enhanced transgenic salmon can be inferior swimmers. Can. J. Zool. 75: 335-337.

FDA 2010. Background Document: The VMAC Meeting on Science-Based Issues Associated with AquAdvantage Salmon. *www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/VeterinaryMedicineAdvisoryCommittee*. (Accessed August 27, 2010)

Gong, Z. Maclean, N., Devlin, R.H., Martinez, R., Omitogun, O., and M.P. Estrada. 2007. Gene construct and expression: Information relevant for risk assessment and management. Pages 95-111 in Kapuscinski et al., eds. *Environmental Risk Assessment of Genetically Modified Organisms, Vol. 3: Methodologies for Transgenic Fish*, CABI Publishing, UK.

Hayes, K., A.R. Kapuscinski, G. Denya, S. Li and R. Devlin. 2007.: Introduction to environmental risk assessment for transgenic fish. Pages 1-28 in Kapuscinski et al., eds. *Environmental Risk Assessment of Genetically Modified Organisms, Vol. 3: Methodologies for Transgenic Fish*, CABI Publishing, UK.

Hayes, K.R., H.M. Regan and M. A. Burgman. 2007a. Introduction to the concepts and methods of uncertainty analysis. Pages 188-208 in Kapuscinski et al., eds. *Environmental Risk Assessment of Genetically Modified Organisms, Vol. 3: Methodologies for Transgenic Fish*, CABI Publishing, UK.

Higgs, D.A, Sutton, J., Kim, H., Oakes, J.D. Smith, J., Biagi, C., Rowshandeli, M. and Devlin, R.H. 2009. Influence of dietary concentrations of protein, lipid and carbohydrate on growth, protein and energy utilization, body composition, and plasma titres of growth hormone and insulin-like growth factor-1 in non-transgenic and growth hormone transgenic coho salmon, Oncorhynchus kisutch (Walbaum). Aquaculture 286: 127-137.

Hill, J.A., Kiessling, A., and Devlin, R.H. 2000. Coho salmon (Oncorhynchus kisutch) transgenic for a growth hormone gene construct exhibit increased rates of muscle hyperplasia and detectable levels of differential gene expression. Can. J. Fish. Aquat. Sci. 57: 939-950.

Huang, C-H., Oakes, J., Higgs, D. and Devlin, R.H. 2004. In vivo vitamin E requirements for prevention of lipid oxidation and impacted immune function in growth enhanced transgenic salmon. Comparative Biochemistry and Physiology 139: 199-204.

Jhingan, E., Devlin, R.H., and Iwama, G.K. 2003. Disease resistance, stress response and effects of triploidy in Growth Hormone transgenic coho salmon. J. Fish Biol. 63:806-823.

Kang, D.-Y. and Devlin, R.H. 2004. Effects of 3,5,3'-triiodo-L-thyronine ($T_3$) and 6-n-propyl-2-thiouracil (PTU) on growth of GH-transgenic coho salmon, Oncorhynchus kisutch. Fish Physiol. Biochem. 29: 77-85.

Kapuscinski, A.R., K. Hayes, S. Li, and G. Dana, eds. 2007. *Environmental Risk Assessment of Genetically Modified Organisms, Vol. 3: Methodologies for Transgenic Fish*, CABI Publishing, UK. 304 pp.

Kapuscinski, A.R.et al. 2007a: Approaches to assessing gene flow. Pages 112-150 in Kapuscinski et al., eds. *Environmental Risk Assessment of Genetically Modified Organisms, Vol. 3: Methodologies for Transgenic Fish*, CABI Publishing, UK.

Kapuscinski, A.R. et al. 2007b: Risk assessment of transgenic fish: synthesis and conclusions. Pages 272-289 in Kapuscinski et al., eds. *Environmental Risk Assessment of Genetically Modified Organisms, Vol. 3: Methodologies for Transgenic Fish*, CABI Publishing, UK.

Kontali Analyse. Monthly Reports in 2008-2009.

Landis, W.G. 2003. Ecological risk assessment conceptual model formulation for nonindigenous species. *Risk Analysis* 24(4):847-858.

Lee, C.G., Devlin, R.H., and Farrell, A.P. 2003. Swimming performance, oxygen uptake and oxygen debt in adult transgenic and ocean-ranched coho salmon (*Oncorhynchus kisutch*, Walbaum). J. Fish Biol 62: 753-766.

Leggatt, R.A., Devlin, R.H., Farrell, A.P., and Randall, D.J. 2003. Oxygen uptake of growth hormone transgenic coho salmon (*Oncorhynchus kisutch*) during starvation, feeding, and swimming. J. Fish Biol.62: 1053-1066.

Leggatt, R.A., Brauner, C.J., Iwama, G.K., Devlin, R.H. 2007. The glutathione antioxidant system is enhanced in growth hormone transgenic coho salmon (Oncorhynchus kisutch). J Comp Physiol B: 177:413–422.

Leggatt, R.A., Raven, P.A., Mommsen· T.P., Sakhrani , D., Higgs, D. and Devlin R.H. 2009. Growth hormone transgenesis influences carbohydrate, lipid and protein metabolism capacity for energy production in coho salmon (*Oncorhynchus kisutch*). Comp. Physiol. Biochem., Part B 154: 121–133.

Lõhmus, M., Raven, P.A., Sundström, L.F., and Robert H. Devlin. 2008. Disruption of seasonality in growth hormone-transgenic coho salmon (*Oncorhynchus kisutch)* and the role of cholecystokinin in seasonal feeding behaviour. Hormones and behaviour 54: 506-513.

Lõhmus, M., Björklund, M., Sundström, L.F. and Devlin, R.H. 2009. Individual variation in growth trajectories of wild and transgenic coho salmon at three different temperatures. Journal of Fish Biology 75: 641-654.

Lõhmus, M., Sundström, L.F., Björklund, M. and Devlin, R.H. 2010. Genotype-temperature interaction in the regulation of development, growth and morphometrics in wild-type, and growth-hormone transgenic coho salmon. PLoS ONE 5:e9980.

Mair, G.C, Nam, Y.K., and I.I. Solar. 2007. Risk management: Reducing risk through confinement of transgenic fish. Pages 209-238 in Kapuscinski, A.R., Hayes, K.R., Li, S., and G. Dana (Eds) *Environmental Risk Assessment of Genetically Modified Organisms: Volume 3 Methodologies for Transgenic Fish*. CAB International: Wallingford UK.

Masri, S., Rast, H., Ripley, T., James, D., Green, M., Jia, X., and Devlin, R.H. 2002. Detection of genetically modified coho salmon using an optimized polymerase chain reaction amplification (PCR). J. Agriculture and

Food Chemistry 50:3161-3164.

Mori, T. and Devlin, R.H. 1999. Transgene and host GH gene expression in pituitary and nonpituitary tissues of normal and GH transgenic salmon.  Molec. Cell. Endocrinol. 149:129-139.

Mori, T., Hiraka, I., Kurata,Y., Kawachi, H., Devlin, R.H., Nagoya, H., and Araki, K. 2007. Changes in hepatic gene expression related to innate immunity, growth and iron metabolism in GH-transgenic amago salmon (*Oncorhynchus masou)* by cDNA subtraction and microarray analysis.  General and Comparative Endocrinology 151: 42-54.

Nelson, K.C., Z. Basio, A.M. Cooper, M. Dey, D. Fonticella, M. Lorenzo. Hernandez, S. Kunawasen, W. Leelapatra, S. Li, B.D. Ratner, and M.I. Toledo. 2007. Problem formulation and options assessment: science-guided deliberation in environmental risk assessment of transgenic fish. Pages 29-60 in Kapuscinski et al., eds. *Environmental Risk Assessment of Genetically Modified Organisms, Vol. 3: Methodologies for Transgenic Fish*, CABI Publishing, UK.

Nelson, K.C., Andow, D.A. and M.J. Banker. 2009. Problem Formulation and Option Assessment (PFOA) linking governance and environmental risk assessment for technologies: A methodology for problem analysis for nanotechnologies and genetically engineered organisms. *Journal of Law, Medicine & Ethics*, Winter:2-17.

Neregard, L., Sundt-Hansen, L., Hindar, K., Einum, S., Johnsson, J. I., Devlin, R. H., Fleming, I. A. and Bjornsson, B. Th. 2008. Wild Atlantic salmon Salmo salar L. strains have greater growth potential than a domesticated strain selected for fast growth. J. Fish Biology  73: 79–95.

NRC. 1996. *Understanding Risk: Informing Decisions in a Democratic Society*. National Academy Press, Washington, DC. Available at: http://www.nap.edu

NRC, 2004. *Biological Confinement of Genetically Engineered Organisms*. National Academy Press, Washington, DC. Available at: http://www.nap.edu

NRC. 2009. *Science and Decisions: Advancing Risk Assessment*. National Academy Press, Washington DC. Available at: http://www.nap.edu

Oakes, J.D., Higgs, D.A., Eales, J.G., and Devlin, R.H. 2007. Influence of ration level on the growth performance and body composition of non-transgenic and growth-hormone-transgenic coho salmon (Oncorhynchus kisutch). Aquaculture 265: 309-324.

Ostenfeld, T.H., Devlin, R.H., and McLean, E.  1998.  Transgenesis changes body and head shape in Pacific salmon. J. Fish Biol. 52:850-854.

Pennington, K. M., A. R. Kapuscinski, M. S. Morton, A. M. Cooper, and L. M. Miller. 2010. Full life-cycle assessment of gene flow consistent with fitness differences in transgenic and wild-type Japanese medaka fish (*Oryzias latipes*). *Environmental Biosafety Research*: in press.

Raven, P.A., Devlin, R.H., and Higgs, D.A. 2006. Influence of dietary digestible energy content on growth, protein and energy utilization and body composition of growth hormone transgenic and non-transgenic coho salmon (Oncorhynchus kisutch). Aquaculture 254: 730-747.

Raven, P.A., Uh , M., Sakhrani, D., Beckman, B.R., Cooper, K., Pinter, J., Leder, E., Silverstein, J., Devlin, R.H. 2008. Endocrine effects of growth hormone overexpression in transgenic coho salmon. Gen. Comp. Endocrinol. 159:26-37.

Rehbein, H., Devlin, R.H. and Rüggeberg, H. 2002. Detection of a genetic alteration and species identification of coho salmon (Oncorhynchus kisutch): a collaborative study. Eur Food Res Technol (2002) 214: 352-355.

Renn, O.  2008. *Risk Governance: Coping with Uncertainty in a Complex World*. International Risk Governance Council Bookseries 1. Springer. Dordrecht, the Netherlands. Pp. 367.

Rise, M.L., Douglas, S.E, Sakhrani, D., Williams, J., Ewart, K.V., Rise, M., Davidson, W.S., Koop, B.F. and Devlin, R.H. 2006.   Multiple microarray platforms utilized for hepatic gene expression profiling of GH transgenic coho salmon with and without ration restriction. Journal of Molecular Endocrinology 37:259-282.

Roberts, S.B., McCauley, L.A.R., Devlin, R.H., and Goetz, F.W.  2004. Transgenic salmon overexpressing growth hormone exhibit decreased myostatin transcript and protein expression. J. Exp. Biol. 207: 3741-3748.

Stevens, E.D. and Devlin, R.H.  2000a.  Intestinal morphology in growth hormone transgenic Pacific coho salmon, Oncorhynchus kisutch Walbaum.  J. Fish Biol 56: 191-195.

Stevens, E.D. and Devlin, R.H.  2000b.  Gill morphometry in growth hormone transgenic Pacific coho salmon, Oncorhynchus kisutch. Environmental Biology of Fishes 58: 113-117.

Stevens, E.D. and Devlin, R.H. 2005. Is enhancement of digestive capacity a direct effect of GH transgenesis or an indirect effect of enhanced appetite? J. Fish. Biol. 66: 1-16.

Sundström, L.F., Devlin, R.H., Johnsson, J.I, and Biagi, C.A. 2003. Vertical position reflects increased feeding motivation in growth-transgenic coho salmon (*Oncorhynchus kisutch*).  Ethology 109: 701-712.

Sundström, L.F., Lõhmus, M., Johnsson, J.I. & Devlin, R.H. 2004a. Growth hormone transgenic salmon pay for growth potential with increased predation mortality. Proceedings of the Royal Society of London –Series B 271 (S5): 350-352.

Sundström L.F., Lõhmus M., Devlin R.H., Johnsson J.I., Biagi C.A. & Bohlin T.  2004b. Feeding on profitable and unprofitable prey: comparing behaviour of growth-enhanced transgenic and normal coho salmon.  Ethology 110: 381-396.

Sundström, L.F., Lõhmus, M. and Devlin, R.H.  2005. Selection on increased intrinsic growth rates in coho salmon, *Oncorhynchus kisutch.* Evolution 59: 1560-1569.

Sundström, L.F., Lohmus, M., Johnsson, J.I., and Devlin, R.H. 2007a. Dispersal Potential is Affected by Growth-Hormone Transgenesis in Coho Salmon (*Oncorhynchus kisutch*).  Ethology 113: 403-410.

Sundström, L.F., Lohmus, M., Tymchuk, W.E., and Devlin, R.H.  2007b. Gene–environment interactions influence ecological consequences of transgenic animals. Proc Natl. Acad . Sci. USA 104: 3889-3894.

Sundström, L.F.,  Tymchuk, W.E., Lõhmus, M., and Devlin, R.H. 2009. Sustained predation effects of hatchery-derived growth hormone transgenic coho salmon *Oncorhynchus kisutch* in semi-natural environments. Journal of Applied Ecology 46: 762–769.

Sundström, L.F., Lõhmus, M. and Devlin, R.H. 2010. Migratory timing of coho salmon (*Oncorhynchus kisutch*) smolts is largely independent of a major shift in growth potential: implications for ecological impacts from growth enhanced fish. Ecological Applications 20: 1372–1383.

Sundström, L.F. and Devlin, R.H. 2010. Increased intrinsic growth rate is advantageous even under ecologically stressful conditions in coho salmon (Oncorhynchus kisutch). Evolutionary Ecology (in press)

Sundt-Hansen, L.,  Sundström, L.F., Einum, S., Hindar, K., Fleming, I.A., and R. H. Devlin. 2007. Genetically enhanced growth causes increased mortality in hypoxic environments. Biol. Lett. 3: 165–168.

Tymchuk W. E.,  Abrahams M. V., and Devlin R. H.  2005. Competitive ability and mortality of growth-enhanced transgenic coho salmon (*Onchorhynchus kisutch*) when foraging for food. Trans. Am. Fish. Soc. 134: 381-389.

Uh, M., Khattra, J., and Devlin, R.H. 2006.Transgene constructs in coho salmon (Oncorhynchus kisutch) are repeated in a head-to-tail fashion and can be integrated adjacent to horizontally-transmitted parasite DNA. Transgenic Research 15: 711-727.

# Attachment 9

Sixty-Day Notice of Intent to Sue FDA Pursuant to the Endangered Species Act
Re: Approval of Genetically Engineered "AquAdvantage" Salmon



DEPARTMENT OF HEALTH & HUMAN SERVICES

JAN 1 5 2009

Food and Drug Administration
Rockville MD 20857

Andrew Kimbrell
Executive Director
Center for Food Safety
660 Pennsylvania Avenue, S.E., Suite 302
Washington, D.C. 20003

Re: Docket No. O1P-0230

Dear Mr. Kimbrell:

This letter responds to the citizen petition that was submitted to the Food and Drug
Administration (FDA, Agency, we) on May 11, 2001 on behalf of the Center for Food
Safety and a coalition of over 60 associated petitioners primarily representing consumer
and environmental protection organizations.[1] We recognize that it has taken us a long
time to respond, but as you are aware, some of the legal, regulatory and policy issues
raised in your petition have been the subject of extensive discussion within FDA and
between FDA and other agencies.

The Citizen Petition requests that FDA "impose a moratorium on the domestic marketing,
importation, and exportation of transgenic fish" until FDA (1) "establishes a
comprehensive regulatory framework under the mandate of the Federal Food, Drug, and
Cosmetic Act (FFDCA [or Act]) to evaluate and fully address the human health and
environmental impacts caused by the commercialization of transgenic fish"; (2)
"completes a comprehensive environmental impact review"; (3) "reviews the impacts of
such activities on endangered species and completes the consultation requirement with
the Department of the Interior and Department of Commerce as required under the
Endangered Species Act, 15 U.S.C. § 1536"; and (4) "all other federal agencies comply
with the statutory provisions under such agencies' jurisdiction that are triggered by the
introduction of transgenic fish into the environment and/or interstate commerce." For the
reasons explained below, FDA is denying your requests.

Since submission of your petition, FDA released a final guidance, Regulation of
Genetically Engineered Animals Containing Heritable recombinant DNA Constructs (GE
animal guidance), describing how the new animal drug provisions of the FFDCA and its
implementing regulations apply to transgenic animals (which the guidance refers to as
genetically engineered or GE animals), including transgenic fish
(http://www.fda.gov/cvm/Guidance/guide187.pdf).

In brief the guidance notes that a recombinant DNA (rDNA) construct that is intended to
affect the structure or function of the body of an animal meets the FFDCA definition of a

---

[1] Petition Seeking a Moratorium on the Domestic Marketing and Importation of Transgenic Fish, Center for
Food Safety et al., May 11, 2001 (GE animal CP).

new animal drug. 21 U.S.C. § 321(v). Thus, GE animals contain a new animal drug that is subject to the new animal drug application (NADA) requirements of the Act, 21 U.S.C. § 360b, and of our implementing regulations.[2] For example, Atlantic salmon genetically engineered to grow faster and use feed more efficiently, such as the AquaBounty (previously, A/F Protein) GE fish referred to in your petition, contain a new animal drug and therefore are regulated under FDA's statutory and regulatory provisions. Such fish[3] must meet the safety and effectiveness requirements of the Act, including the agency's determination that food from such animals is safe.[4] 21 U.S.C. §§ 331, 342, 351, 360b. Imported food from GE fish also must be safe under these provisions. Additionally, FDA will comply with the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, and will prepare an environmental assessment and, if necessary, an environmental impact statement, prior to completing an approval of an NADA for such fish. Thus, FDA believes that it already has "a comprehensive regulatory framework" in place that addresses potential impacts to human health and the environment of GE fish and, because GE fish must comply with the requirements of this regulatory framework we do not believe there is a need for a "moratorium" on the domestic marketing and importation of GE fish and we are denying that request.

Below we list each of the principal arguments in the citizen petition and our responses, followed by FDA's response to the specific requests of the citizen petition.

### I. Petitioners' Principal Arguments

*A. FDA is required under the Federal Food, Drug, and Cosmetic Act (FFDCA or the Act) to review the human health impacts from consuming transgenic fish.*

**FDA response:** As noted above, and consistent with the GE animal guidance, as part of the NADA process, FDA will review the food safety of GE fish. FDA's review of the food safety of GE fish will, as you request, encompass an evaluation of potential toxicity, unintended effects, and allergenicity. You also request that FDA's evaluation include a determination of "whether the use of antibiotics to control aquaculture diseases in transgenic fish may impact human health." FDA evaluates the safety of antibiotics used to treat aquaculture diseases, including potential impacts on human health, when reviewing the NADAs for those antibiotics. Additionally, the food safety and animal safety components of the GE fish NADA review are complementary and, for example, encompass whether the conditions under which GE fish are raised may lead to food safety concerns such as might occur with increased use of antibiotics to treat or prevent an increased incidence of disease in aquacultured GE fish.

---

[2] Certain new animal drugs may qualify for either conditional approval or indexing under the minor use and minor species sections of the Act; a GE animal and its products, however, are specifically excluded from these provisions. 21 USC § 360ccc(a)(3)(A) and 21 USC § 360ccc-1(a)(2).

[3] As noted in the guidance document, as a shorthand, we sometimes refer to regulation of the article in GE animals as regulation of the GE animal. GE animal guidance at 6.

[4] The guidance explains that in certain circumstances FDA intends to exercise enforcement discretion with respect to statutory and regulatory requirements for GE animals of non-food species. GE animal guidance at 6-8.

*B. FDA must establish full transparency and public involvement in any established regulatory approval process for transgenic fish.*

**FDA response:** While the NADA provisions do not provide for a notice and comment process for NADA approval decisions, FDA is taking steps to increase the transparency of its deliberations and actions. For example, FDA intends to hold public advisory committee meetings prior to completion of GE animal approvals. We may revisit this policy in the future as we gain more experience with reviews of GE animals. For example, on January 9, 2008, CVM participated in a public meeting of the FDA Blood Products Advisory Committee on the Biologics License Application (BLA) for recombinant human antithrombin III produced in the milk of GE goats. At this meeting, with the sponsor's agreement, CVM provided a summary of its review of the NADA pertaining to the GE goats, as well as a summary of the environmental assessment (EA) submitted in support of the NADA. For GE animals intended for food or other non-biopharm use, we intend to hold advisory committee meetings dedicated to consideration of the GE animal NADAs and environmental reviews.

We have also developed a number of consumer-appropriate publications to help inform consumers and other stakeholders about the technology and the agency's regulations of these animals. These are available on the FDA website.

Additionally, FDA's new animal drug approvals (including for GE animals) are published in the Federal Register, codified in the Code of Federal Regulations, and posted on its website in its "FDA Approved Animal Drug Products (the "Green Book") at www.fda.gov/cvm/greenbook. FDA also provides electronic access to a summary of all information (other than confidential business or trade secret information) used in FDA's decisions as part of the freedom of information summary routinely published after approval. These summaries can be found at http://www.fda.gov/cvm/FOI/efoi.html.

Finally, if we intend to exercise enforcement discretion with respect to specific GE animal lineages, we plan to post a statement describing that intent on our website.

*C. FDA is required under the National Environmental Policy Act (NEPA) to review the impacts to human health and the environment.*

**FDA response:** FDA is aware of its responsibilities under NEPA and complies with those requirements.

*D. FDA is required under the Endangered Species Act (ESA) to consult with DOI and DOC before approving an activity that may affect an endangered or threatened species.*

**FDA response:** FDA is aware of its responsibilities under the ESA and complies with those requirements.

3

*E. FDA is required under the FFDCA to mandate the labeling of all transgenic fish.*

**FDA response:** There are two components of your request: (1) that GE fish be labeled under the FFDCA drug provisions, and (2) that they be labeled under the FFDCA food provisions.

With respect to the drug provisions, NADs must bear accurate labeling. 21 U.S.C. §§ 352, 360b. In the context of GE animals, the guidance explains that labeling should include a summary description of the article, the animal into which the article is introduced (e.g., common name/breed/line; genus and species), the name of the resulting GE animal line, and the intended use of the GE animal containing the article. Where the labeling for a GE animal contains animal care or safety information (e.g., husbandry or containment), the guidance states that the labeling should accompany the animal throughout all stages of its lifecycle. GE animal guidance at 14.

With respect to labeling of food, the guidance notes that labeling of food from GE animals would be subject to the same requirements as food from non-GE animals, and food from GE plants[5]. The fact that the animal from which food was obtained was genetically engineered would not itself be material information with respect to labeling. However, if food from a GE animal is different from that of its non-engineered counterpart, for example if it has a different nutritional profile, in general, that difference would be material information that would have to be revealed in labeling. Id.[6]

*F. Before transgenic fish are marketed, FDA must enact monitoring, reporting, and inspecting procedures that adequately address human food safety concerns.*

**FDA response:** We believe that our existing NADA requirements as applied to GE animals adequately address human food safety concerns. While the petition states that there are "unique food safety concerns that may develop during the production and processing of " GE fish, most of the issues the petition identified could also exist with other foods from fish or other animals treated with conventional new animal drugs and containing drug residues, nor did the petition identify any inadequacies in those NADA requirements with respect to human food safety concerns. The only "unique" concern the petition identifies is potential "physical abnormalities" due to the "juggling of genes." We note that the cited abnormality, jaw malformations, would be part of the NADA assessment that the agency would perform in determining whether the introduced rDNA construct is safe to the animal. We therefore believe that the agency has sufficient authority under the new animal drug provisions of the Act to address such concerns. We further note that the assessment would also explicitly evaluate the overall health of the animal with respect to implications for food safety, so that other potential adverse outcomes resulting from "juggling of genes" or insertional mutagenesis, would be

---

[5] See, for example, FDA's 1992 "Statement of Policy: Foods Derived from New Plant Varieties" (57 FR 22984), and FDA's 2001 draft guidance "Voluntary Labeling Indicating Whether Foods Have or Have Not Been Developed Using Bioengineering" (http://www.cfsan.fda.gov/~dms/biolabgu.html).

[6] FDA's response to the Center for Food Safety's March 21, 2000 citizen petition regarding GE foods (Docket No. 2000-1211/CP1) (CFS 2000 CP) explains why only "material" information must be revealed on labeling. See CFS 2000 CP at 7.

assessed as both posing a risk to the health of animals and as posing potential food consumption risks.

## II. Petitioners' Requests

*A. FDA should impose a moratorium on the domestic marketing, importation and exportation of GE fish, fish eggs, and food products containing any ingredient or material derived from GE fish until it establishes a comprehensive regulatory framework under the FFDCA to evaluate and fully address the human health and environmental impacts caused by the commercialization of GE fish. The framework should include:*

*(1) establishment of regulations addressing the safety and efficacy of GE fish by requiring all GE fish producers to complete a review of a GE fish as a new animal drug under 21 USC 360(b) and implementing regulations.*

**FDA response:** As noted above, FDA has published a final guidance detailing how FDA's existing NADA regulations apply to GE animals, including GE fish. FDA has determined that new regulations to address GE fish are not necessary at this time. As a result, FDA is denying petitioners' request to issue new regulations. However, for the reasons explained above, see supra at 2, FDA believes it is accomplishing what petitioners request since the application of the new animal drug statutory and regulatory provisions will address the safety and efficacy of GE fish and the human food safety of food animal fish. Therefore, the necessary regulatory framework is in place and no new regulations are necessary.

*(2)establishment of regulations requiring all GE fish to undergo food additive review under 21 U.S.C. § 321(s) and implementing regulations.*

**FDA response:** New animal drugs are excluded from the definition of food additives and so cannot be regulated as food additives. 21 U.S.C. § 321(s)(5). FDA, therefore, must deny this request. However, like food additives, new animal drugs must be found safe for use in food for the drug to be approved for use in food animals.[7] Thus, for example, the food safety of GE salmon will have to be established for FDA to approve an NADA for such a fish.

*(3) establishment of regulations providing for premarket monitoring, reporting and inspecting procedures pursuant to FFDCA and accompanying regulations.*

---

[7] The same legal standard for safety applies to both food additives and the human food safety component of a new animal drug review. Food and Drug Administration, Final Decision of the Commissioner: Withdrawal of Approval of the New Animal Drug Application for Enrofloxacin in Poultry, Docket No. 2000N-1571 (July 27, 2005) at 93.

**FDA response:** We believe that our existing investigational new animal drug (INAD) and NADA regulations as applied to GE animals provide appropriate regulatory oversight. The INAD regulations specify labeling and record-keeping requirements, animal disposition, and conditions under which food from animals used for clinical investigations can be introduced into the food supply. The regulations also require that prior to shipping a new animal drug for clinical tests, a sponsor must submit a Notice of Claimed Investigational Exemption for a New Animal Drug containing specified information. 21 CFR 511.1. In addition, FDA can inspect facilities where GE animals are developed and raised and intends to do so as part of its approval process. We, therefore, are denying this request.

    *(4) establishment of regulations requiring mandatory labeling of GE fish and food products containing ingredients or material from such fish.*

**FDA response:** As noted above, labeling is required under the new animal drug provisions of the Act. We, therefore, find it is unnecessary to establish new regulations and are denying this request as it concerns new animal drug labeling. As also explained above, labeling of food from GE animals is subject to the same requirements as food from non-GE animals. The fact that the animal from which food was obtained was genetically engineered, itself, would not be material information with respect to labeling. If food from a GE animal is different from that of its non-engineered counterpart, that difference would be material information that would have to be revealed in labeling. We are therefore denying this request as it concerns labeling under the food provisions of the Act.

    *(5) establishment of regulations providing for post-market monitoring, reporting, and inspecting procedures pursuant to FFDCA and accompanying regulations.*

**FDA response:** We believe that our existing NADA regulations as applied to GE fish provide appropriate regulatory oversight. They mandate premarket approval and post market reporting. In addition, FDA routinely inspects manufacturing facilities prior to approving new animal drugs. We, therefore, are denying this request. We note, however, that the GE animal guidance states FDA's intent to issue further guidance on the application of good manufacturing practices to GE animals. GE animal guidance at 16.

    *(6) establishment of regulations providing that importers must follow the same statutory and regulatory requirements for GE fish as domestic producers;*

**FDA response:** Under the FFDCA, in order to import food from GE animals, there must either be an approved NADA for the GE animal, 21 U.S.C. §§ 342(a)(2)(C)(ii), 360b, or an FDA-established import tolerance 21 U.S.C. § 360b(a)(6). By law, import tolerances do not require approval of the new animal drug in the United States. Therefore, the requirements for importers of food derived from GE fish and domestic producers of GE fish are not the same and we deny this request. We note, however, that establishment of an import tolerance requires that food safety be established based on "data sufficient to

demonstrate that a proposed tolerance is safe based on similar food safety criteria" used for approval of an NADA.

> *(7)establishment of regulations  providing for permanent prohibition of · domestic marketing, importation and exportation of GE fish should such products fail to be proven safe and efficacious or generally recognized as safe, or should such products be otherwise unfit for human consumption.*

**FDA response:** With respect to domestic marketing, as noted above, GE fish containing an rDNA construct intended to affect the structure or function of the body of the fish, and food from such fish, are subject to FDA's NADA regulations, including the requirement that they are safe and that the rDNA construct is effective. Imported food from GE fish also must be safe. Because FDA already has regulations imposing such requirements, we are denying petitioners' request for new regulations. However, we believe our current regulations accomplish what petitioners request. With respect to exports, FDA is denying petitioner's request because the FFDCA, 21 U.S.C. § 381(e), allows the export of products that would be adulterated or misbranded if marketed domestically, unless the product is a new animal drug that FDA has banned. Petitioners have not provided facts demonstrating reasonable grounds to justify banning GE fish. For the reasons explained above, FDA is denying petitioners' request to impose a "moratorium" on the domestic marketing, importation and exportation of GE fish, fish eggs, and food derived from GE fish until the agency establishes a regulatory framework that includes establishment of new regulations addressing the issues set forth above.

> *B. FDA should impose a moratorium on the domestic marketing, importation and export of all GE fish until it completes a comprehensive environmental impact review as required by NEPA to evaluate and address the human health and environmental impacts caused by GE fish commercialization, including*
> *- an environmental assessment and environmental impact statement as required by NEPA addressing the effects of the domestic marketing, importation and exportation for each and every transgenic fish application,*
> *- a programmatic environmental impact statement as required under NEPA, and*
> *- providing for the permanent prohibition should such activities harm the quality of the environment.*

**FDA response:** As noted above, FDA approvals of new animal drugs are subject to the requirements of NEPA, and FDA complies with those requirements.

An NADA must include either an environmental assessment (EA) or a claim for categorical exclusion (which excuses certain categories of actions from the preparation of an EA where the agency has determined that that category of action does not individually or cumulatively have a significant effect on the human environment, 40 CFR § 1508.4). 21 CFR § 514.3(b)(14).  By definition, an EA focuses on "relevant environmental issues relating to the use and disposal from use of FDA-regulated articles" and discusses the environmental impacts of the proposed action and alternatives (such as those presenting less environmental risk). 21 CFR § 25.40. An EA thus conforms to the requirements of

NEPA, which requires a comprehensive environmental review of all "major federal actions significantly affecting the quality of the human environment," such as the granting of an INAD file or approval of an NADA. If, the Agency determines from the EA or information otherwise available that the proposed action may significantly affect the quality of the human environment, it will prepare the more detailed environmental impact statement (EIS). 21 CFR § 25.22(b). However, if FDA determines that the proposed action is not expected to significantly affect the human environment and therefore does not merit the preparation of an EIS, then FDA will make a finding of no significant impact (FONSI) for the action. Thus, consistent with the Council on Environmental Quality's NEPA regulations, 40 CFR § 1508.9(a), not every action that requires preparation of an EA will also require completion of an EIS. FDA makes decisions on whether an EIS is required on a case-by-case basis based on the facts of each individual action. FDA must therefore deny petitioners' request that both an EA and EIS be prepared for every GE fish NADA.

Regarding the fast-growing GE Atlantic salmon described in the petition, FDA's NEPA evaluation, as with other NADAs, would be conducted primarily by its in-house experts, including aquatic and microbial ecologists, veterinarians specializing in the treatment of aquatic organisms, fish pathologists and aquaculturists. If warranted by the specifics of the NADA, FDA also will make use of the expertise of other federal agencies that regulate environmental resources that may be affected by an approval (e.g., the Fish and Wildlife Service and the National Marine Fisheries Service). For example, FDA recognizes that the commercial use of GE fish in ocean net pens located in public waters would trigger environmental review by several federal and state agencies to ensure compliance with NEPA and related statutes, such as the Endangered Species Act.

FDA, USDA, and other federal agencies are well aware of the potential environmental risks regarding escape associated with raising GE fish in open net pens. These agencies, along with industry and universities, have supported research and extensive educational programs for the development and use of alternative methods of raising fish, such as closed recirculating systems for aquaculture production in the United States. Such emerging technologies could be adopted for the culture of GE Atlantic salmon, and other fish to reduce the risk of an accidental release into the environment. Optimal containment will need to take into account biosecurity systems, incluing physical, geographical, and biological containment. They will, of necessity, be species- and use-specific taking into account application-specific production goals established by the producer, and approved by the agency as part of the NADA approval process. We do not believe that these developing containment strategies lend themselves to standardization of design or operational criteria; in fact, a variety of technologies could be developed for any particular application that would provide adequate confinement.

FDA will thus evaluate the technology each NADA sponsor proposes to use on a case-by-case basis to determine the potential for environmental impacts as well as the facts specific to the nature of GE fish the sponsor proposes to develop. Since FDA is not issuing new regulations concerning GE animals, FDA, therefore, is denying petitioners' request that it prepare a programmatic EIS. GE animal CP at 36 ("If FDA decides to

adopt regulations concerning the commercialization of transgenic fish, the . . . FDA is required to conduct a . . .programmatic environmental impact statement.").

Finally, with regard to petitioners' request that FDA "provide for permanent prohibition" if GE fish "harm the quality of the environment," we note that although NEPA is a procedural requirement and does not give us new authority, such as to prohibit an activity solely because it would harm the quality of the environment, it has been our experience that developers of new animal drugs much prefer to mitigate potential environmental impacts so that FDA can come to a finding of no significant impact on the environment for an NADA approval, rather than have to wait for FDA to complete an environmental impact statement for a product whose approval will have a significant environmental impact. Thus although we are denying petitioners' request, we believe that in practice, any potential environmental impacts will be mitigated in the course of approving an NADA for any GE fish.

> *C. FDA should impose a moratorium on the domestic marketing, importation and export of all transgenic fish until:*

>> *(1) it reviews the impact of such activities on endangered species, in consultation with the Department of the Interior (DOI) and Department of Commerce (DOC) as required by the Endangered Species Act (ESA).*

**FDA response:** FDA is aware of its responsibilities under the ESA and complies with these requirements.   Because the agency already complies with these requirements, we do not believe a "moratorium" is necessary and we are denying this request.

>> *(2) "all other federal agencies comply with the statutory provisions under such agencies' jurisdiction that are triggered by the introduction of transgenic fish into the environment and/or interstate commerce."*

**FDA response:**  This request is outside the scope of FDA's authority and, as a result, FDA is denying the request.  However, FDA has been working with other agencies on oversight of GE animals, including fish. FDA is not aware of any agencies not complying with their statutory provisions triggered by introduction of GE fish into the environment and/or interstate commerce.

## Conclusion

For the reasons discussed above, FDA is denying the requests in petitioner's citizen petition.

Sincerely,

Jeffrey E. Shuren, M.D., J.D.
Associate Commissioner for Policy
    and Planning

9



January 25, 2016

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Sylvia Mathews Burwell, Secretary
Department of Health & Human Services
200 Independence Avenue S.W.
Washington, D.C. 20201

Dr. Stephen Ostroff, M.D., Acting Commissioner
Food and Drug Administration
10903 New Hampshire Ave
Silver Spring, MD 20993

Penny Pritzker, Secretary
Department of Commerce
1401 Constitution Ave., N.W.
Washington D.C. 20230

Eileen Sobeck, Assistant Administrator for NOAA
NOAA Fisheries Service
1315 East West Highway, SSMC3
Silver Spring, MD 20910

Sally Jewell, Secretary
Department of the Interior
1849 C Street N.W.
Washington D.C. 20240

Daniel Ashe, Director
Fish and Wildlife Service
1849 C. Street N.W.
Washington DC 20240

---

### Sixty-Day Notice of Intent to Sue FDA Pursuant to the Endangered Species Act Re: Approval of Genetically Engineered "AquAdvantage" Salmon

Acting Commissioner Ostroff:

The Food and Drug Administration is hereby notified, unless the violations described herein are remedied within sixty days, that the organizations listed below intend to sue the Food

and Drug Administration and its Acting Commissioner Dr. Ostroff (collectively FDA), for violations of the Endangered Species Act (ESA), 16 U.S.C. § 1531, *et seq.*, associated with FDA's approval of the genetically engineered (GE or transgenic), "AquAdvantage" salmon (GE salmon).  *See* New Animal Drugs in Genetically Engineered Animals; opAFP–GHc2 Recombinant Deoxyribonucleic Acid Construct, 80 Fed. Reg. 73,104 (Nov. 24, 2015).  FDA has violated and remains in violation of Section 7 of the ESA by, *inter alia*, failing to insure, through consultation with the National Marine Fisheries Service (NOAA Fisheries) and the U.S. Fish and Wildlife Service (FWS) (collectively, the Services), that its approval of the GE salmon is not likely to jeopardize the continued existence of any threatened or endangered species and/or result in the destruction or adverse modification of the critical habitat of any listed species.  Center for Food Safety and Earthjustice provide this letter pursuant to Section 11(g) of the ESA, 16 U.S.C. § 1540(g), on behalf of Friends of Merrymeeting Bay and Kennebec Reborn.[1]

## I.   IDENTITY OF THE ORGANIZATIONS GIVING NOTICE:

The names, addresses, and phone numbers of the organizations giving notice of intent to sue under the ESA are:

Friends of Merrymeeting Bay
P.O. Box 233
Richmond, ME 04357
207-666-1118

Kennebec Reborn
131 Cony Street
Augusta, Maine 04330
207-622-1003

## II.   REQUIREMENTS OF THE ESA

Section 7 of the ESA requires federal agencies such as FDA, in consultation with the expert wildlife agencies, to insure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any threatened or endangered (T&E) species, or result in the destruction or adverse modification of the critical habitat of such species. 16 U.S.C. § 1536(a)(2).  An action is considered to result in jeopardy where it would reasonably be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species. 50 C.F.R. § 402.02.  "Action" is broadly defined to include all activities or programs of any kind authorized, funded, or carried out by federal agencies, including actions directly or indirectly causing modifications to the land, water, or air.  50 C.F.R. § 402.02.

To carry out this substantive mandate, the ESA and its implementing regulations require federal agencies to consult with the wildlife agencies on the effects of their proposed actions.  16 U.S.C § 1536(a)(2); 50 C.F.R. §§ 402.12-402.16.  This process begins with the requirement that the "action" agency, such as FDA here, ask the expert agencies whether any listed or proposed species may be present in the area of the agency action.  16 U.S.C. § 1536(c)(1); 50 C.F.R.

§ 402.12.  If listed or proposed species may be present, the action agency must prepare a "biological assessment" to determine whether the listed species is likely to be affected by the proposed action.  *Id*.  The biological assessment generally must be completed within 180 days. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(i).

If the action agency determines the action "may affect" a listed species or critical habitat, the action agency must formally consult with NOAA Fisheries and/or FWS to "insure" that the action is "not likely to jeopardize the continued existence" of that species, or "result in the destruction or adverse modification of habitat … determined … to be critical…."  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a); *see Citizens for Better Forestry v. United States Dep't of Agric.,* 481 F. Supp. 2d 1059, 1092 (N.D. Cal. 2007).[2]  The threshold for a finding of "may affect" is extremely low.  A triggering effect need not be significant; rather "any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement…."  Interagency Cooperation—Endangered Species Act of 1973, as Amended; Final Rule, 51 Fed. Reg. 19,926, 19,949 (June 3, 1986); Final ESA Section 7 Consultation Handbook at xvi (Mar. 1998) (defining "may affect" as "the appropriate conclusion when a proposed action may pose *any* effects on listed species….").

If a proposed action "may affect" a listed species or designated critical habitat, formal consultation is required unless the Service(s) concur in writing with an action agency's finding that the proposed action "is not likely to adversely affect" listed species or designated critical habitat.  50 C.F.R. §§ 402.02, 402.13(a), 402.14 (a).  This "informal consultation" process consists of discussions and correspondence between the Services and the action agency and is designed to assist the action agency in determining whether formal consultation is required.  50 C.F.R. § 402.13(a).  *See also Pac. Rivers Council v. Thomas,* 30 F.3d 1050, 1054 n.8 (9th Cir. 1994).  An action is "likely to adversely affect" protected species, and formal consultation is required, if: "any adverse effect to listed species may occur as a direct or indirect result of the proposed action or its interrelated or interdependent actions, and the effect is not discountable, insignificant, or beneficial."  *Endangered Species Consultation Handbook*, March 1998, p. xv.

To complete formal consultation, NOAA Fisheries and/or FWS must provide FDA with a "biological opinion" explaining how the proposed action will affect the listed species or habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14.  In fulfilling Section 7 consultation duties, agencies are required to use the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2); *Heartwood, Inc. v. United States Forest Serv*., 380 F.3d 428, 434 (8th Cir. 2004).  Until the consulting agency issues a comprehensive biological opinion, the action agency may not commence the action. *Pac. Rivers Council*, 30 F.3d at 1056-57; *and see* 16 U.S.C. § 1536(d). Further, during consultation, FDA is prohibited from making any irreversible or irretrievable commitment of resources with respect to the agency action which may foreclose the formulation or implementation of any reasonable and prudent alternative measures.  16 U.S.C. § 1536(d).

If NOAA Fisheries and/or FWS concludes that the proposed action "will jeopardize the continued existence" of a listed species, the biological opinion must outline "reasonable and prudent alternatives."  16 U.S.C. § 1536(b)(3)(A).  If the biological opinion concludes that the action is not likely to jeopardize the continued existence of a listed species, and will not result in the destruction or adverse modification of critical habitat, NOAA Fisheries and/or FWS must

provide an "incidental take statement," specifying the amount or extent of such incidental taking on the listed species, any "reasonable and prudent measures" that they consider necessary or appropriate to minimize such impact, and setting forth the "terms and conditions" that must be complied with by FDA to implement those measures.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  In order to monitor the impacts of incidental take, FDA must monitor and report the impact of its action on the listed species to the Services as specified in the incidental take statement.  16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 402.14(i)(1)(iv), 402.14(i)(3).  If during the course of the action the amount or extent of incidental taking is exceeded, FDA must reinitiate consultation with the Services immediately.  50 C.F.R. § 402.14(i)(4).

Federal agencies have an independent and substantive obligation to insure that their actions are not likely to jeopardize the continued existence of endangered or threatened species or adversely modify critical habitat.  *See Pyramid Lake Paiute Tribe of Indians v. United States Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990).  Indeed, a "no jeopardy" biological opinion from NOAA Fisheries or FWS does not absolve the action agency of its independent duty to insure that its actions comply with the ESA.  *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1994).  Federal agencies also have a continuing duty under Section 7 of the ESA to re-initiate consultation whenever "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," where the action in question is "subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion," or where "a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16(b)-(d).[3]

Finally, Section 9(a) of the ESA, 16 U.S.C. § 1538(a), prohibits the "take" of an endangered species by any person.  This prohibition has generally been applied to many species listed as "threatened" through the issuance of regulations under Section 4(d) of the ESA, 16 U.S.C. § 1533(d); 50 C.F.R. § 17.31(a).[4]  "Take" includes actions that kill, harass, or harm a protected species.  16 U.S.C. § 1532(19).  "Harass" is defined to include acts that create the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns.  50 C.F.R. § 17.3.  "Harm" includes significant habitat modification or degradation that actually kills or injures wildlife by significantly impairing essential behavioral patterns.  *Id.*; 50 C.F.R. § 222.102.

## III.    FACTUAL BACKGROUND AND LEGAL VIOLATIONS

FDA has now approved GE salmon pursuant to authority it asserts under a unique and unlawful interpretation of its Federal Food Drug and Cosmetic Act (FFDCA) duty to regulate "new animal drugs."  80 Fed. Reg. 73,104 (Nov. 24, 2015).  The GE salmon is the first GE fish (and the first GE animal for human consumption) that FDA has approved.  In doing so, FDA has made an erroneous determination that its approval action will have "no effect" on threatened or protected species or their critical habitat.  *See* FDA, Finding of No Significant Impact at 6-7 (Nov. 12, 2015).  Endangered species such as imperiled Atlantic salmon (*Salmo salar*) (and in the predictable future, Pacific salmon), may be affected by the approval.  FDA was therefore required to consult with the expert wildlife agencies under the ESA before reaching any decision.

### A.      Affected Species and Critical Habitat

The protected species and critical habitat that may be affected by FDA's approval action include, but are not limited to, the Gulf of Maine Distinct Population Segment of Atlantic salmon (*Salmo salar*) and Pacific salmonids, including certain populations of Chinook salmon (*Oncorhynchus tshawytscha*), chum salmon (*Oncorhynchus keta*), coho salmon (*Oncorhynchus kisutch*), sockeye salmon (*Oncorhynchus nerka*), and steelhead trout (*Oncorhynchus mykiss*).[5]

Wild Atlantic salmon populations have experienced steep declines due to a variety of human-induced pressures including overexploitation, degradation of water quality, and damming of rivers.[6]  In 2000, NOAA Fisheries and FWS issued a final rule designating the Gulf of Maine Distinct Population Segment (GOM DPS) as endangered under the ESA.[7]  The Services subsequently published a final rule in 2009 listing the expanded GOM DPS, updating the geographic boundaries of the freshwater range of the Atlantic salmon population to include the Androscoggin, Kennebec, and Penobscot River basins.[8]  A final rule designating critical habitat for the GOM DPS was published in the Federal Register on June 19, 2009.[9]

According to NOAA's Office of Protected Resources, "[t]he populations of Atlantic salmon present in the Gulf of Maine DPS represent the last wild populations of U.S. Atlantic salmon."[10]  NOAA recognizes aquaculture practices as one of the threats facing the remaining Atlantic salmon population as they "pose ecological and genetic risks."[11]  The same is true for transgenic salmon, which have been banned off the coast of Maine since 2003.[12]

Pacific salmonid populations have also faced significant declines on the west coast of the United States.[13]  Pacific salmonid species are vulnerable to a number of significant natural and human threats, among them: aquaculture,[14] hydropower, agriculture, flood control, natural resource extraction, and fishing.[15]

According to NOAA's Office of Protected Resources, the majority of all fish listed as endangered or threatened under the Endangered Species Act are Pacific salmonids, including certain populations of Chinook salmon (*Oncorhynchus tshawytscha*), chum salmon (*Oncorhynchus keta*), coho salmon (*Oncorhynchus kisutch*), sockeye salmon (*Oncorhynchus nerka*), and steelhead trout (*Oncorhynchus mykiss*).[16]  NOAA Fisheries has issued a final rules designating critical habitat for 25 species of West Coast salmon and steelhead under the ESA.[17]

### B.      FDA Has Taken Action that "May Affect" Listed Species and Their Designated Critical Habitat Without Consulting with the Services.

Pursuant to the FDA approval, AquaBounty would manufacture its GE salmon at a facility located on Prince Edward Island, Canada, and transport, by land and air, the resulting eggs to a separate facility located in Panama, where they would be grown to maturity before being processed for sale in the United States.  Like its approval decision, FDA's conclusion concerning endangered or threatened species rests on an extremely limited inquiry that failed to adequately consider the significant risks of harm to listed species related to the production and proliferation of AquaBounty's GE fish at the Prince Edward Island and Panama facilities, as well as from AquaBounty's ongoing efforts to expand these operations and produce GE salmon at numerous additional facilities around the world.

Both the Prince Edward Island (PEI) and Panama facilities where GE salmon will be engineered, grown, and housed create risks of escape, and potential harm to endangered and threatened species.  The ESA requires FDA to consult on these potential impacts, even under FDA's unlawfully narrow scope of review.  These threats, and the risks of escape from these sites, are detailed in numerous comments to FDA, including those from NOAA Fisheries and FWS[18] and many independent scientists.[19]  This evidence also demonstrates that transgenic salmon are capable of surviving outside either facility.  The PEI facility, for example, is near water bodies that historically have held salmonid species and is within the current range of the species' marine habitat.  *See* Final EA at 75-6.  The GE salmon's transgenic nature makes it more likely to survive because of its more aggressive nature and enhanced growth rate.[20]  Studies have found that GE fish may be more competitive (Devlin et al., 1999), less discriminate in choosing prey (Sundström et al., 2004), more likely to attack novel prey (Sundström et al., 2004), and better at using lower quality food (Raven et al., 2006) when compared to wild relatives.  The great weight of evidence of past experiences with invasive species and escapes further supports this conclusion.[21]  When the GE salmon do escape, the impacts on the environment may be significant and irreversible, in the form of, *inter alia*, (1) ecological impacts on native species via predation and/or competition; and (2) genetic impacts via hybridization and genetic introgression.[22]

Scientists at FWS expressed these very concerns.  Commenting on the FDA's 2010 EA and Briefing Packet, FWS's Northeast Region explained:

- Transgenic fish, regardless of where they are, pose a <u>clear and present danger</u> to wild fish populations.  Given the extremely low populations of wild Atlantic salmon in the Maine DPS, <u>any interaction between wild and transgenic salmon must be considered a serious threat</u>, which can disrupt runs of wild fish, compete with wild fish for available food and habitat, interbreed with wild fish, transfer disease and/or parasites, and degrade benthic habitat.  The scientific literature is full of actions indicating that interactions of wild fish and aquaculture escapees (read transgenic escapees) may lead to decreased numbers of wild fish and in the worst scenario, <u>lead to extirpation</u> of the remaining stocks in the U.S.

- History dictates it is reasonable to assume that fish held in aquaculture facilities, either land- or water-based, will escape unless strict quarantine/water treatment/screening/ bioengineering modifications are in place and aggressively monitored.  And even then, <u>it must be assumed that escape will still occur</u>, and protocols must be in place to deal with such a non-native organism released into the environment, and its subsequent effect on native species, habitat, and aquatic communities.   Transgenic fish, whether reproductively viable or sterile, must be maintained only in biosecure (zero discharge) land-based facilities ideally positioned outside of any wild fish watersheds until appropriate laboratory and field research has been undertaken to ensure that the risk of adverse effects on wild fish has been minimized.

- [AquaBounty Technologies (ABT)] appears to have established several physical and biological containment mechanisms to prevent the escape of AquAdvantage salmon. However, <u>there is still risk of escapement</u> and we think this risk is most prevalent at the PEl facility.  If the brood stock from the PEl facility were released either accidentally or

with malicious intent, <u>we do not feel enough evidence has been provided to conclude the risks to natural populations of Atlantic salmon in Canada and the U.S. are negligible</u>. Additional experimentation needs to be conducted to verify that any escapees from the PEI facility will not be able to tolerate the brackish water in the vicinity of the facility. Also, the lack of information on the transport procedures from PEI to Panama is troublesome. It is during this stage of the operation that malicious activities could result in these fish being lost from the direct control of ABT.

- If there is an escape event, competition from the GMO salmon <u>would negatively impact the wild stocks</u>. Research has shown that aquaculture-raised salmon can outcompete wild salmon, and given the already endangered status of the wild stocks, any additional threat is amplified in their impacts. References are available.

- Aside from the potential spread of the GMO growth gene if they escape and successfully reproduce, the genetic origin of the broodstock that has been developed is likely genetically distinct from Maine salmon. <u>The concern is if escape and reproduction occurs, this could lead to a disruption of the locally adapted gene complexes of the endangered populations</u>. In the FDA report-petition, we didn't see reference to the origin of the broodstock.[23]

FWS's Conservation Genetics Community of Practice[24] sent FDA a letter in October 2010 noting these same risks and the need for FDA to conduct more thorough analyses:

> [T]he biological containment at either the PEI or Panama facilities along with the possible interaction of AquAdvantage salmon with endangered wild salmon stocks is of great concern to the COP. To this regard, AquaBounty Technologies has established several physical and biological containment mechanisms to prevent the escape of AquAdvantage salmon and the [EA] indicated escapement risk and establishment risks were low. <u>However, history dictates that fish held in aquaculture facilities, either land- or water-based—escape</u>. In addition, the information provided by AquaBounty Technologies for the likelihood of establishment relies on the assumption that farmed Atlantic salmon have not established themselves in North America. <u>This assumption is clearly violated</u> because Atlantic salmon juveniles have been found in several streams in the state of Washington as well as British Columbia. While interactions of these fish with native salmon are unknown[,] <u>any interaction between wild and transgenic salmon must be considered a serious threat</u>. Numerous scientific publications have documented that interactions of wild and introduced fish have led to decreased numbers of wild fish (for ESA listed Atlantic stocks this is of great concern).[25]

Dr. Gregory Moyer, a FWS Regional Geneticist also sent FDA a letter in October 2010 outlining "several criticisms and concerns" regarding the Briefing Packet, specifically the environmental risk analysis.[26] Dr. Moyer noted that the Briefing Packet "falls short of providing an actual risk assessment of putative environmental damages in the event of escapement."[27] He explained that the "environmental analysis should provide an overview of the general risks associated with escapement or hybridization of GE and wild type individuals" which "would

provide readers with an understanding of the potential harm and the degree of harm posed by GE organisms even when the risk of escapement is low."[28]  He urged FDA to "more accurately quantif[y]" both the risk of escapement and degree of harm if escaped.  Dr. Moyer added that he was concerned with phrases like "are unlikely to survive if exposed to high salinity and low temperature" "when no data have been collected on AquAdvantage salmon to evaluate the likelihood of these scenarios," and that although AquaBounty currently has "in place various standard operating procedures to minimize escapement and test for durability of the gene construct," he "fail[s] to see any policy in place for monitoring or enforcement of these SOPs by the [FDA]."[29]

Likewise, NOAA Fisheries recognized that "[p]reventing escapes is essential to minimizing the risks to genetic deterioration of wild fish populations, especially endangered and threatened salmonids whose effective populations are particularly vulnerable to the effects of interbreeding."[30]  A memo from NOAA Fisheries notes that while it may not be likely, it is possible that AquAdvantage salmon will escape from the PEI and Panama facilities, and when they do, "they will likely [] reproduce in the wild because hatchery released fish and hatchery sterilized fish continue to behave similar to wild fish (Trested et al., 2002)."[31]  This memo also warns that "successfully sterilized salmon would be attractive mates for wild fish and may reduce wild population fitness."  It goes on to explain that, *inter alia*:

- An introduction of genetically engineered Atlantic salmon could pose catastrophic threats to wild listed species.

- The egg production facility may pose a threat to wild Atlantic salmon, including Gulf of Maine DPS Atlantic salmon.

- Any fish introduced along the Pacific Coast would have the potential to affect Pacific salmonids through hybridization.[32]

NOAA Fisheries has long recognized the potential harms associated with transgenic fish. In 2003, it issued an ESA Section 7 Biological Opinion (BiOp) for the Army Corps of Engineers regarding aquaculture fish pens within the state of Maine, banning transgenic salmonids in aquaculture sites off the coast of Maine due to the risks they could pose to wild, endangered Atlantic salmon populations.[33]  There, NOAA Fisheries expressly referenced the potential risks associated with FDA's consideration of the AquaBounty NADA, and relied on studies by Dr. Kapuscinski to call for more research "to identify the impacts [] escaped transgenic salmon would have on natural populations and their habitat before use for commercial aquaculture is considered."[34]

FDA claims that it is "highly unlikely that [GE salmon] or diploid ABT salmon would affect" endangered Atlantic salmon from the Gulf of Maine or from Maine rivers because the "environmental conditions [surrounding the Prince Edward Island facility] are hostile to survival [of salmon], as evidenced by the lack of self-sustaining salmon populations in an environment that used to possess plentiful salmon runs."  Final EA at 115.  But, as shown by the following map from NOAA, endangered Atlantic salmon from Maine rivers and the Gulf of Maine migrate in and around the waters surrounding Prince Edward Island:[35]



Because containment measures cannot guarantee that GE salmon will not escape into the wild,[36] and because survival and reproduction of escaped GE salmon is possible, such an escape or release event would be significant and irreparable.[37]  Indeed, FDA itself recognized the seriousness of these potential risks when it previously acknowledged that it would formally consult with the Services if these fish were grown in net pens.[38]  These likely impacts far exceed the low threshold for actions that "may affect" listed Atlantic and Pacific species and trigger FDA's duty to consult with FWS and NOAA Fisheries regarding its approval of AquaBounty's application. As explained above, for an action that *may* affect any species or its critical habitat— "whether beneficial, benign, adverse, or of an undetermined character"—FDA *must*, at a minimum, seek the Services' expertise through consultation.  *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2010).  "[A]ctions that have *any chance of affecting* listed species or critical habitat—even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA."  *Karuk Tribe of California v. U.S. Forest Service*, 681 F.3d 1006, 1027 (9th Cir. 2012) (en banc) (emphasis added). FDA's failure to complete consultation with the expert fish and wildlife Services violates the ESA.

For the same reasons, FDA also violated its independent duty to consult on the potential effects to any habitat designated as "critical" pursuant to ESA § 4(a)(3)(A), 16 U.S.C. § 1533(a)(3)(A).  The legal standard for triggering FDA's duty to consult where its approval "may affect" a listed species' designated critical habitat is identical to the requirement to consult where the action "may affect" the species itself. *Karuk Tribe*, 681 F.3d at 1027 ("[A]ctions that have *any chance of affecting* listed species or *critical habitat*—even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA.") (emphases added); *id*. ("Any possible effect, whether beneficial, benign, adverse or of an undetermined character" triggers the requirement) (citations omitted).

9

**C.  FDA's "No Effect" Determination Is Arbitrary and Did Not Use the Best Available Scientific and Commercial Data Available.**

Rather than consult with the Services after a may affect determination, FDA instead relied entirely on its own internal assessments of the risks to conclude that its approval of GE salmon will have "no effect" on any listed species or designated critical habitat.  FDA's "no effect" conclusion—and the process by which it reached that conclusion—violates the ESA.

As a threshold matter, FDA carries a heavy burden to demonstrate that its "no effect" determination is justified.  Indeed, the ESA requires FDA to prove its approval will not jeopardize any listed species, nor adversely affect any critical habitat, and it has not met that burden.  *See, e.g.*, *Wash. Toxics Coalition v. Envtl. Prot. Agency*, 413 F.3d 1024, 1035 (9th Cir. 2005) ("Placing the burden on the acting agency to prove its action is non-jeopardizing is consistent with the purpose of the ESA and what we have termed its 'institutionalized caution mandate[].'").  Consistent with these requirements, FDA may decline to undergo consultation with the expert agencies *only* if it legitimately determines that its action will have no chance of affecting any listed species or critical habitat.  This means *none*; any effect, however minor, compels consultation. *See supra.*

FDA, however, based its conclusions on its own inexpert—and fatally flawed— assumptions regarding the risk that GE salmon may escape into the environment and unilaterally concluded that the affected species have absolutely no chance of possibly being harmed.

First, as detailed above and extensively in the comments FDA received from Dr. Kapuscinski and other independent experts, the agency's assumption that GE salmon will not escape from AquaBounty's facilities is not based on the best available scientific and commercial data, including the standard practice of conducting a quantitative failure mode risk analysis.  Instead, FDA relied on outdated risk analysis methods when considering risk of escapes and the direct and indirect environmental effects of AquaBounty's GE salmon on listed species.  FDA cannot rely on outdated and inaccurate information to determine the potential effects on listed species.  16 U.S.C. § 1536(a)(2) (requiring agencies to use only the best available scientific and commercial data available).

Second, FDA arbitrarily limited the geographic scope of its inquiry to just the immediate vicinity of PEI and Panama sites.  However, under the ESA, the "action area" is expressly defined as "all areas to be affected directly or <u>indirectly</u> by the federal action and not merely the immediate area involved in the action."  50 C.F.R. § 402.02 (emphasis added).  The agency's approval will affect substantially more than just areas in Panama and PEI, due to the highly mobile and migratory nature of the species, its presence throughout the Gulf of Maine and in rivers in New England and throughout Atlantic Canadian provinces, and because of the likely proliferation of GE salmon in other locations, including within the United States, as reflected by pending requests for importation of AquaBounty's GE salmon eggs and AquaBounty's stated plans for expansion following this initial approval decision.

In addition, the area affected by any GE salmon that may be released or that may escape is far greater than just the immediate area around the facility—these fish could enter any number of marine environments that are home to endangered or threatened aquatic species.[39]  FDA's "no effect" determination is based on its unlawfully restricted view of the action area as limited to just the areas immediately around the facilities.

Third, FDA similarly arbitrarily limited the scope of the "action" and the "effects" it considered.  Under the ESA, "'agency action' is to be construed broadly."  *See Karuk Tribe*, 681 F.3d at 1020.  "[T]he scope of the agency action is crucial because the ESA requires the biological opinion to analyze the effect of the entire agency action."  *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988).  Courts "interpret the term 'agency action' broadly," because "caution can only be exercised if the agency takes a look at all the possible ramifications of the agency action."  *Id*.

Moreover, the "effects" of the broad action that must be considered under the ESA include not just direct, but also "indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action…."  *Wild Fish Conserv. v. Salazar*, 628 F.3d 513, 525 (9th Cir. 2010) (quoting 50 C.F.R. § 402.02).  "Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur.  Interrelated actions are those that are part of a larger action and depend on the larger action for their justification.  Interdependent actions are those that have no independent utility apart from the action under consideration."  *Id*.  *See, e.g.*, *National Wildlife Federation v. Federal Emergency Management Agency*, 345 F. Supp. 2d 1151 (W.D. Wash. 2004) (rejecting agency argument that it could limit its scope to just the issuance of floodplain insurance and holding that the agency must also assess the impacts of later housing construction that the insurance would facilitate).  FDA's duties under the ESA thus require it also consider its action's indirect effects, and the effects of all activities "interrelated or interdependent" with that action.  50 C.F.R. § 402.02.

Yet, FDA has defined the action and its effects to include only those effects it believes are directly associated with the production of the GE salmon in PEI and Panama.  FDA unlawfully ignored the reasonably foreseeable direct, indirect, and cumulative impacts of its decision.  Evidence in the record shows that petitions are already being submitted to grow these transgenic salmon elsewhere.  Indeed, AquaBounty's own public statements admit that they plan to grow them elsewhere.  And as commenters have observed, it is not economically feasible to grow these fish at just these two small facilities.  AquaBounty's current application is thus just a foot in the door; AquaBounty is clearly dependent on future growth to justify its operation.[40]

Fourth, FDA's "no effect" determination is arbitrary and contrary to law because FDA did not consider impacts to threatened or endangered aquatic species and their habitats other than Atlantic salmon.  As expert scientists have noted, the introduction of GE fish like AquaBounty's GE salmon could affect entire ecosystems.[41]  Given, in particular, the foreseeable proliferation of GE salmon and the risks of escape inherent in the current application, FDA was required to consider possible effects on Pacific salmon and other salmonids, such as steelhead and trout.[42]

Indeed, just a short time after the close of the comment period on FDA's draft EA, a new study was published on June 3, 2013 in the Proceedings of the Royal Society, further belying the agency's assumptions and concluding that the AquaBounty GE salmon can successfully cross-breed with brown trout.[43]  The scientists who authored the study "…suggest that interspecific hybridization be explicitly considered when assessing the environmental consequences should transgenic animals escape to nature."  The study also concluded that the GE hybrid offspring could outgrow wild salmon, non-GE hybrid offspring, and even GE salmon.[44]  The GE hybrids also outcompeted wild salmon in simulated stream environments. Although acknowledging this study in its Final EA, FDA dismissed the possibility of cross-breeding between brown trout and escaped GE salmon, and failed to discuss the potential of any effects from such cross-breeding on threatened and endangered species, including the GOM DPS Atlantic salmon. Final EA at 40-41 and 100, 104.

Finally, FDA violated its "rigorous" duty to "insure" against jeopardy by relying entirely on AquaBounty's third-party, uncertain measures to mitigate any harm.  *See, e.g.*, *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (holding that mitigation measures must be "certain to occur," "subject to deadlines or otherwise-enforceable obligation," and "must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards").  Rather than being included as enforceable mitigation measures, the containment measures are merely described as "conditions of production and use," not even "conditions of approval."  FDA fails to describe, and apparently has failed to consider, how it would enforce or monitor AquaBounty's purported protective measures to prevent escapes or otherwise prevent environmental harm.[45]  FDA cannot avoid consultation by relying on mitigation measures not within its control.  *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 254 F. Supp. 2d 1196, 1213-14 (D. Or. 2003) (Biological Opinion inadequate where it relied on non-federal mitigation actions not reasonably certain to occur); *Sierra Club v. Marsh*, 816 F.2d 1376, 1385 (9th Cir. 1987) ("This reliance on the proposed actions of [others] does not satisfy [FDA]'s burden of insuring that its actions will not jeopardize the continued existence of the [endangered species].").  Without any provision for enforcement, these "mitigation measures" must be considered as being outside FDA's control and unlawfully uncertain.

## IV.    CONCLUSION

In sum, FDA's "no effect" finding and failure to consult is arbitrary and capricious and violates the ESA, because it fails to follow the ESA's mandated procedures, fails to use the best scientific and commercial data available, fails to consider significant aspects of the issue, and offers an explanation that runs counter to the evidence before the agency. As more fully detailed above, FDA is hereby notified that it has violated Section 7 of the ESA, 16 U.S.C. § 1536(a)(2), in at least the following ways:

Prior to approving the GE salmon, FDA failed to request from the expert agencies whether any threatened or endangered species, or designated critical habitat, may be present within or near the areas of the proposed actions.  16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.

Prior to approving the GE salmon, FDA failed to prepare a "biological assessment" to determine whether any threatened and endangered species that may be present within or near the

areas of the proposed actions may be affected.  16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.

Prior to approving the GE salmon, FDA failed to consult with the expert fish and wildlife Services regarding the potential adverse effects of the GE salmon on threatened and endangered species, and/or their critical habitat.  16 U.S.C. § 1536(a); 50 C.F.R. §§ 402.13-14.

FDA has failed to insure, in consultation with the expert agencies, that its action is not likely to jeopardize the continued existence of any threatened or endangered species or result in the destruction or adverse modification of the critical habitat of such species.  16 U.S.C. § 1536(a)(2).

FDA has failed to insure that the agency or AquaBounty will not make any irreversible or irretrievable commitment of resources with respect to the GE salmon prior to initiating and completing consultation with NOAA Fisheries.  16 U.S.C. § 1536(d).

FDA has failed, in consultation with the expert agencies, to utilize its authorities in furtherance of the purposes of the ESA by carrying out programs for the conservation of endangered and threatened species, in violation of the ESA.  16 U.S.C. § 1536(a)(1).  More specifically, FDA has failed to utilize its authorities to carry out programs for the conservation of the threatened and endangered species located in areas where GE salmon will be foreseeably farmed, in violation of the ESA.  16 U.S.C. § 1536(a)(1).

FDA's determination that its approval of AquaBounty's GE salmon NADA will have "no effect" on listed species is arbitrary and fails to use the best available science.

For the above stated reasons, FDA has violated and remains in ongoing violation of Section 7 of the ESA.  If these violations of law are not cured within sixty days, the listed organizations intend to file suit against the responsible agency/agencies and officials to enforce the ESA, seeking declaratory and injunctive relief, as well as attorney and expert witness fees and costs.  16 U.S.C. § 1540(g)(4).  This notice letter was prepared based on good faith information and belief after reasonably diligent investigation.  If you believe that any of the foregoing is factually erroneous or inaccurate, please notify us promptly.  Further, during the notice period we are available to discuss effective remedies and actions that will assure future compliance with the ESA.

Sincerely,

George Kimbrell
Center for Food Safety
918 SW Oak St.
Portland OR 97205
917-271-7372

JANUARY 25, 2016  ENDANGERED SPECIES ACT SIXTY DAY NOTICE LETTER

Steve Roady
Khushi Desai
Earthjustice
1625 Massachusetts Ave NW
Washington DC 20036
202-667-4500

---

[1] This letter is substantively identical to a letter dated December 22, 2015 sent on behalf of Cascadia Wildlands, Center for Biological Diversity, Center for Food Safety, Ecology Action Centre, Food & Water Watch, Friends of the Earth, Golden Gate Salmon Association, Institute for Fisheries Resources, and Pacific Coast Federation of Fishermen's Associations. This letter is provided as notification only that Friends of Merrymeeting Bay and Kennebec Reborn intend to join in any action initiated pursuant to the original December 22, 2015 letter and does not amend, supersede, or otherwise alter the original letter.

[2] "Jeopardize" means taking action that "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  A species' "critical habitat" includes those areas identified as "essential to the conservation of the species" and "which may require special management considerations or protection."  16 U.S.C. § 1532(5)(A).

[3] Section 7(a)(1) of the ESA requires FDA, in consultation with and with the assistance of the Services, to utilize its authorities in furtherance of the purposes of the ESA by carrying out programs for the conservation of endangered and threatened species.  16 U.S.C. § 1536(a)(1).

[4] NOAA has adopted rules pursuant to ESA § 4(d) that extend the take prohibition to Pacific salmon and steelhead species that are listed as "threatened."  16 U.S.C. § 1533(d); Endangered and Threatened Species: Final Listing Determinations for 16 ESUs of West Coast Salmon, and Final 4(d) Protective Regulations for Threatened Salmonid ESUs, 70 Fed. Reg. 37,160 (June 28, 2005) (updating 4(d) rules for Pacific salmon species); Endangered and Threatened Species: Final Listing Determinations for 10 Distinct Population Segments of West Coast Steelhead, 71 Fed. Reg. 834 (Jan. 5, 2006) (incorporating updated 4(d) rules for steelhead).

[5] The specific listed species include: California coastal chinook salmon, Central Valley spring-run chinook salmon, Lower Columbia River chinook salmon, Puget Sound chinook salmon, Sacramento River winter-run chinook salmon, Snake River fall-run chinook salmon, Snake River spring/summer-run chinook salmon, Upper Columbia River spring-run chinook salmon, Upper Willamette River chinook salmon, Columbia River chum salmon, Hood Canal summer run chum salmon, Central California Coast coho salmon, Southern Oregon and Northern Coastal California coho salmon, Lower Columbia River coho salmon, Oregon Coast coho salmon, Snake River sockeye salmon, Central California Coast steelhead, California Central Valley steelhead, Lower Columbia River steelhead, Middle Columbia River steelhead, Northern California steelhead,

Snake River Basin steelhead, South-Central California Coast steelhead, Southern California steelhead, Upper Columbia River steelhead, and Upper Willamette River steelhead.  70 Fed. Reg. 37,160 (June 28, 2005) (listing salmon); 71 Fed. Reg. 834 (Jan. 5, 2006) (listing steelhead).

[6] Office of Protected Resources, NOAA Fisheries, Atlantic salmon (*Salmo salar*), http://www.nmfs.noaa.gov/pr/species/fish/atlanticsalmon.htm (last visited Dec. 21, 2015).

[7] Endangered and Threatened Species; Final Endangered Status for a Distinct Population Segment of Anadromous Atlantic Salmon (*Salmo salar*) in the Gulf of Maine, Final Rule, 65 Fed. Reg. 69,459 (Nov. 17, 2000).

[8] Endangered and Threated Species; Designation of Critical Habitat for Atlantic Salmon (*Salmon salar*) Gulf of Maine Distinct Population Segment: Final Rule, 74 Fed. Reg. 29,300 (June 19, 2009).

[9] *Id.*

[10] Office of Protected Resources, NOAA Fisheries, Atlantic salmon (*Salmo salar*), *supra* n.6.

[11] *Id.*

[12] Endangered Species Act Section 7 Consultation, Biological Opinion, Proposed modification of existing ACOE permits authorizing the installation and maintenance of aquaculture fish pens within the State of Maine (November 19, 2003), attached to this letter as Attachment 1.

[13] *See generally* Endangered and Threatened Species: Listing of Several Evolutionary Significant Units (ESUs) of West Coast Steelhead, 62 Fed. Reg. 43,937 (Aug. 18, 1997); Endangered and Threatened Species: Threatened Status for Two ESUs of Steelhead in Washington, Oregon, and California, 63 Fed. Reg. 13,347 (Mar. 19, 1998); Endangered and Threatened Species: Threatened Status for Two ESUs of Steelhead in Washington and Oregon, 64 Fed. Reg. 14,517 (Mar. 25, 1999); Endangered and Threatened Species; Threatened Status for Three Chinook Salmon Evolutionarily Significant Units (ESUs) in Washington and Oregon, and Endangered Status for One Chinook Salmon ESU in Washington, 64 Fed. Reg. 14,308 (Mar. 24, 1999); Endangered and Threatened Species: Threatened Status for Ozette Lake Sockeye Salmon in Washington, 64 Fed. Reg. 14,528 (Mar. 25, 1999).

[14] *See, e.g.,* R. L. Naylor, *et al., Salmon aquaculture in the Pacific Northwest a global industry with local impacts*, Environment: Science and Policy for Sustainable Development 45(8) (2003) 18-39.

[15] *Id.*

[16] Office of Protected Resources, NOAA Fisheries, Endangered and Threatened Marine Species under NMFS' Jurisdiction, http://www.fisheries.noaa.gov/pr/species/esa/listed.htm#fish (last visited Dec. 21, 2015).

[17] Endangered and Threatened Species; Designation of Critical Habitat for 12 Evolutionarily Significant Units of West Coast Salmon and Steelhead in Washington, Oregon, and Idaho, Final Rule, 70 Fed. Reg. 52,630 (Sept. 2, 2005); Endangered and Threatened Species; Designation of Critical Habitat for Seven Evolutionarily Significant Units of Pacific Salmon and Steelhead in California, 70 Fed. Reg. 52,488 (Sept. 2, 2005) (designation of Critical Habitat for California Coastal Chinook salmon, Northern California Steelhead, Central California Coast Steelhead; South Central Coast Steelhead; Southern California Steelhead; Central Valley spring run Chinook salmon; and Central Valley Steelhead); Designated Critical Habitat; Snake River Sockeye Salmon, Snake River Spring/Summer Chinook Salmon, and Snake River Fall Chinook Salmon, 58 Fed. Reg. 68,543 (Dec. 28, 1993); Designated Critical Habitat; Central California Coast and Southern Oregon/Northern California Coasts Coho Salmon, 64 Fed. Reg. 24,049 (May 5, 1999); Endangered and Threatened Species: Final Threatened Listing Determination, Final Protective Regulations, and Final Designation of Critical Habitat for the Oregon Coast Evolutionarily Significant Unit of Coho Salmon, 73 Fed. Reg. 7,816 (Feb. 11, 2008).

[18] After FDA changed course and found that its approval would have "no effect" on listed species, FWS and NOAA sent separate letters to FDA in which the agencies did not object to FDA's determination.  *See* Final EA, Appendix D.  Neither of these letters discusses any of these agencies' previous findings and comments, or the scientific evidence concerning risks posed by the release of GE salmon from the PEI, Panama, or any other facilities.  To the extent that FDA interprets these letters to support its "no effect" determination, the letters have no legal significance in the ESA's consultation process, and to the extent that FDA believes they represent any conclusions by the Services, the positions articulated in those letters are not based on the best available science and are themselves arbitrary and capricious.

[19] *See* Dr. Jon Rosenfield Comments, attached to this letter as Attachment 2.

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] FWS Region 5 Fisheries Program Comments on FDA approval process for Aqua Bounty Technologies, Inc. (ABT)/AquaAdvantage GMO salmon (emphases added), attached to this letter as Attachment 3.

[24] This is FWS's coalition of fish conservation genetics experts.  *See* http://www.fws.gov/ ConservationGeneticsCOP/index.html.

[25] FWS Conservation Genetics Community of Practice Letter to FDA (Oct. 6, 2010) (emphases added), attached to this letter as Attachment 4.

[26] Dr. Gregory Moyer Letter to FDA (Sept. 30 2010), attached to this letter as Attachment 5.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] NMFS, Talking Points for Senate Commerce Committee Staff Briefing on S. 1717 "Prevention of Escapement of Genetically Altered Salmon in the United States Act" (Dec. 5, 2011), attached to this letter as Attachment 6.

[31] NMFS Concerns Memo and Letter from Therese Conant, NMFS Acting Division Chief, Endangered Species Division, to Larissa Rudenko (Nov. 30, 2011), attached to this letter as Attachment 7.

[32] *Id.*

[33] 2003 BiOp, *supra* n.12.

[34] *Id.* at 74-75.

[35] http://www.nefsc.noaa.gov/press_release/2008/MediaAdv/MA0807/2Saunders_MigrationRoute.jpg.

[36] Anne Kapuscinski and Fredrik Sundstöm, *Comments on Environmental Assessment for AquAdvantage Salmon and Briefing Packet on AquAdvantage Salmon for the Veterinary Medicine Advisory Committee* at 4 (2010) ("As scientists, we cannot agree with this approach because it assumes 100% achievement of multiple confinement without presenting the failure mode analysis that is standard practice in technology risk assessment.  Even if actual exposure is very close to zero, it is still necessary to assess ecological consequences…."), attached to this letter as Attachment 8.

[37] See, Dr. Jonathan Rosenfeld Comments, *supra* n.18; *see also* FWS Region 5 Comments, *supra* n.23, FWS COP letter, *supra* n.25, NFMS Concerns Memo and Letter, *supra* n.30.

[38] 2009 FDA denial of 2001 CFS petition, attached to this letter as Attachment 9.

[39] As NOAA Fisheries previously indicated, because FDA's action contemplates the selling of eyed eggs commercially and rearing fertile adult males at the PEI facility, the action area must include the United States.  *See* NOAA Fisheries Concern Memo, *supra* n.30 and Letter to FDA from Therese Conant, *supra* n.31.

[40] FDA may not rely on the potential to consult later to addresses these fatal flaws in its "no effect" conclusion.  The precautionary approach embodied in Section 7(a)(2) requires consultation before an action begins, not to conduct a post mortem years later.  *See, e.g., Wild*

JANUARY 25, 2016  ENDANGERED SPECIES ACT SIXTY DAY NOTICE LETTER

*Fish Conservancy v. Salazar*, 628 F.3d 513, 524 (9th Cir. 2010) (intent to consult later does not cure failure to complete consultation at the outset concerning action's full extent).

[41] Dr. Jonathan Rosenfeld Comments, *supra* n.18. *See also* NMFS Concerns Memo, *supra* n.31 ("Any fish introduced along the Pacific Coast would have unknown potential for affecting Pacific salmonids through hybridization.").

[42] *Id.* Accidental or other release of fish from aquaculture facilities is plainly "reasonably certain to occur;" indeed, it is already in progress in many parts of the United States and elsewhere in the world. *See, e.g.,* Fischer, et al., *Occupancy dynamics of escaped farmed Atlantic salmon in Canadian Pacific Coastal Salmon Streams: Implications for Sustained Invasions*, Biological Invasions, Vol. 16, Issue 10, pp 2137-2146 (October 2014), *available at* https://goo.gl/QpRWsD; Morris, et al., *Prevalence and Recurrence of Escaped Farmed Atlantic Salmon in Eastern North American Rivers*, Can. J. Fish. Aquat. Sci. Vol. 65 (2008), *available at* http://0101.nccdn.net/ 1_5/165/1c4/1be/morrisetal2008.pdf.

[43] K. B. Oke, *et al. Hybridization between genetically modified Atlantic salmon and wild bran trout reveals novel ecological interactions*, The Royal Society (May 2013), *available at* http://rspb.royalsocietypublishing.org/content/280/1763/20131047.

[44] Rebecca Morelle, *GM salmon can breed with wild fish and pass on genes*, BBC News (May 29, 2013), http://www.bbc.co.uk/news/science-environment-22694239.

[45] *See 2010* Kapuscinski and Sundström VMAC Comments at 2, *supra* n.36 (questioning how FDA will oversee the facilities; "How will FDA assure and audit the company's implementation of this 'integrated confinement system'"?).