REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

GEORGE A. KIMBRELL (*Pro Hac Vice*)
AMY VAN SAUN (*Pro Hac Vice*)
Center for Food Safety
2009 NE Alberta St., Suite 207
Portland, OR 97211
T: (971) 271-7372
Emails: gkimbrell@centerforfoodsafety.org
         avansaun@centerforfoodsafety.org

STEPHEN D. MASHUDA (*Pro Hac Vice*)
Earthjustice
705 Second Avenue, Suite 203, Seattle, WA 98104
T: (206) 343-7340 / F: (206) 343-1526
Email: smashuda@earthjustice.org

BRETTNY HARDY (CSB # 316231)
Earthjustice
50 California Street, Suite 500, San Francisco, CA 94111
T: (415) 217-2142
Email: bhardy@earthjustice.org

*Counsel for Plaintiffs*

# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| INSTITUTE FOR FISHERIES RESOURCES, *et al.*, | ) ) ) | Case No. 3:16-cv-01574-VC |
| *Plaintiffs,* | ) ) ) ) | **PLAINTIFFS' REPLY IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT ON** |
| v. | ) ) | **CLAIMS 1, 8, 12, AND 13** |
| ALEX M. AZAR II, *et al.*, | ) ) | Date: October 2, 2019 |
| *Defendants,* | ) ) ) | Time: 10:00 a.m. Location: Courtroom 4 – 17th Floor The Honorable Vince Chhabria |
| and | ) ) | |
| AQUABOUNTY TECHNOLOGIES, INC., | ) ) ) | |
| *Intervenor-Defendants.* | ) ) ) | |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

I.   FDA's Genetically Engineered Animal Program Is *Ultra Vires*. ...................................... 1

II.   FDA's Failure to Ensure Environmental Safety Is Arbitrary and Capricious. .................. 5

    A.   FDA Failed to Adequately Address Environmental Safety. .......................................... 6

    B.   FDA's Position Is Contrary to NEPA. ......................................................................... 11

III.   The Guidance Is an Unlawful Rule and The Court Has Jurisdiction to Review. ......... 12

    A.   The Guidance Is a Legislative Rule and a Final Agency Action. ................................. 12

    B.   The Guidance Must Comply with NEPA. .................................................................... 15

CONCLUSION .................................................................................................................. 15

Case No. 3:16-cv-01574-VC
Pls.' Reply in Support of Cross Mot. for Summ. Judgment

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L. Pharma, Inc. v. Shalala*,
    62 F.3d 1484 (D.C. Cir. 1995) ...............................................................................................8

*Am. Pharm. Ass'n v. Weinberger*,
    377 F. Supp. 824 (D.D.C. 1974) .............................................................................................7

*Chevron v. Nat. Res. Def. Council*,
    467 U.S. 837 (1984)............................................................................................................1, 5, 7

*Ctr. For Envt'l Health v. Vilsack*
    2016 WL 3383954 (N.D. Cal. June 20, 2016) ......................................................................13

*Columbia Riverkeeper v. U.S. Coast Guard*,
    761 F.3d 1084 (9th Cir. 2014) ..............................................................................................14

*Erringer v. Thompson*,
    371 F.3d 625 (9th Cir. 2004) ................................................................................................14

*Greater Yellowstone Coal. v. Servheen*,
    665 F.3d 1015 (9th Cir. 2011) ................................................................................................8

*Gulf Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
    341 F. Supp. 3d 632 (E.D. La. 2018) .....................................................................................3

*Kirola v. City & County of San Francisco*,
    860 F.3d 1164 (9th Cir. 2017) ..............................................................................................15

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)............................................................................................................5

*Life Techs. Corp. v. Promega Corp.*,
    137 S. Ct. 734 (2017)..............................................................................................................3

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990)..............................................................................................................15

*Metro. Life Ins. Co. v. Glenn*,
    554 U.S. 105 (2008)................................................................................................................7

*Nat. Res. Def. Council v. E.P.A.*,
   643 F.3d 311 (D.C. Cir. 2011) ........................................................................12

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   524 F.3d 917 (9th Cir. 2008) ...........................................................................7

*Nutrilab, Inc. v. Schweiker*,
   713 F.2d 335 (7th Cir. 1983) ...........................................................................4

*Nutritional Health All. v. FDA*,
   318 F.3d 92 (2nd Cir. 2003)..............................................................................7

*Pac. Coast Fed'n of Fishermens's Ass'ns. v. Nat'l Marine Fisheries Serv.*,
   265 F.3d 1028 (9th Cir. 2001) .........................................................................6

*Perrin v. U. S.*
   444 U.S. 37 (1979)............................................................................................3

*Puerto Rico v. Franklin California Tax-Free Tr.*,
   136 S. Ct. 1938 (2016)......................................................................................5

*Sierra Club v. U.S. E.P.A.*,
   671 F.3d 955 (9th Cir. 2012) ...........................................................................5

*U.S. v. Mead Corp.*,
   533 U.S. 218 (2001)..........................................................................................5

*Zeneca, Inc. v. Shalala*,
   213 F.3d 161 (4th Cir. 2000) ...........................................................................8

**Statutes**

21 U.S.C. § 321(f)...................................................................................................4

21 U.S.C. § 321(g) ..........................................................................................2, 3, 4

21 U.S.C. § 355(d) .................................................................................................7

21 U.S.C. § 360b(d) ...........................................................................................6, 7

21 U.S.C. § 379j-12(d)(4)(B)................................................................................5

**Regulations**

21 C.F.R. § 510.3(g) ............................................................................................13

40 C.F.R. § 1500.1(c)..........................................................................................12

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# INTRODUCTION

The briefing on these four claims has laid bare numerous adverse consequences, illogical contradictions, and outright absurdities resulting from FDA's attempt to regulate GE animals as drugs. FDA's argument requires the Court to accept that an animal's genes are "drugs" and that somehow its drug authority over those genes also gives the agency power and expertise to regulate every aspect of a GE animal from laboratory-to-plate; that FDA adequately considered environmental risks and imposed conditions of use in its GE salmon approval to mitigate those risks, even though it strenuously argues those risks play no role in its decision; and that the guidance is not a rule because the agency only *coincidentally* began following it to approve GE animals after its issuance. This is too much to swallow. As the GE salmon approval demonstrates, FDA's attempt to regulate the square peg of GE animals with the round hole of its new animal drug regulatory framework results in the mass-production of these novel organisms despite serious environmental risks. The Court should deny FDA's motion and grant Plaintiffs' cross-motion for summary judgment on Claims 1, 8, 12, and 13.

## I.     FDA's Genetically Engineered Animal Program Is *Ultra Vires*.

Whether FDA has the authority to regulate GE animals as drugs under the Federal Food Drug and Cosmetic Act ("FFDCA") turns on the statute's plain language (including the meaning of "drug") and Congress's intent. FDA argues that the "rDNA construct"—the inseparable engineered genetic sequence within the GE animal—fits within one part of the "drug" definition and that if the FFDCA is ambiguous, FDA's interpretation is entitled to *Chevron* deference. Fed. Defs. Opp'n Br. ("Opp.") 2–9, ECF No. 206. FDA is wrong. The FFDCA's plain language is unambiguous: a GE food animal cannot be a "drug." *See* Pls. Summ. J. Mot. ("MSJ") 5–12, ECF No. 198. The Court need go no further. "If the intent of Congress is clear, that is the end of the matter." *Chevron v. Nat. Res. Def. Council*, 467 U.S. 837, 842 (1984).

The fatal flaw in FDA's argument that the drug is only the rDNA construct and not the entire GE animal is that the "rDNA construct" is *inseparable from the whole animal and inherited*. Animals cannot be drugs, and FDA cannot side-step this fundamental flaw. As FDA acknowledges in its guidance, there can be no meaningful regulation of the genetic sequence in

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

isolation from the animal of which it is a part. FDA-G187-00599-600. FDA tries to pass this admission off as shorthand used "for ease of reference," Opp. 5, but it is a scientific and practical requirement because unlike actual drugs, the "rDNA construct" cannot be separately manufactured, tested, and shipped for use in animals; it is *part* of the GE animal. FDA-G187-00600 (recognizing that GE animal drug approvals "cover[] all animals containing the same rDNA construct" because "all GE animals derived from the same [genetic] transformation event [] contain the same article and [are] subject to evaluation under a single [application]."). This practical reality is borne out in the GE salmon approval, where FDA purports to regulate not just the "rDNA construct" but (by necessity) each of the conditions under which the GE salmon are bred, shipped, raised, slaughtered, and shipped again. FDA-023113.

Regardless of whether FDA refers to the "rDNA construct" or the GE animal it is inseparably part of, FDA principally argues in its opposition that "drug" is a defined term of art in the FFDCA and therefore the Court should ignore the ordinary meaning of the word "drug." Opp. 2–5. First, while Congress defined "drug" in the FFDCA, FDA focuses narrowly on one subsection, trying to expand its meaning beyond a reasonable reading of the whole definition that takes into account the meaning of other subsections. Second, the ordinary meaning of the defined term cannot be completely disregarded, because the "meaning of the definition is almost always closely related to the ordinary meaning of the word being defined." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 228 (2012). Third, the FFDCA makes clear that GE animals cannot be a drug and food at the same time.

<u>First</u>, the FFDCA defines "drug" in pertinent part as:

> (A) articles recognized in the official United States Pharmacopeia, . . . [and other medicinal compendia]; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clause (A), (B), or (C).

21 U.S.C. § 321(g)(1). FDA's motion focuses only on subsection (C), arguing that the "rDNA construct" qualifies as an "article (other than food) intended to affect the structure or any function of the body of man or other animals." *E.g.*, Opp. 2–3. But FDA ignores the other

subsections in the "drug" definition, running afoul of the canon of *noscitur a sociis*, which holds

that when a statute contains a list, each word or phrase in that list has a similar meaning and

gathers meaning from the words around it. *Life Techs. Corp. v. Promega Corp*., 137 S. Ct. 734,

740 (2017) ("[A] word is given more precise content by the neighboring words with which it is

associated."); Scalia & Garner at 195 ("associated words bear on one another's meaning," and

"the canon especially holds that 'words grouped in a list should be given related meanings'").

The other definition subsections demonstrate that Congress, and society, understood drugs to

refer largely to medicines administered *to* animals, not to their genetic structure or the *animals*

*themselves*. MSJ 15. Subsection (A) references specific compendiums of medications, drug

substances, and other therapeutics. 21 U.S.C. § 321(g)(1)(A). Subsection (B) concerns the

"diagnosis, cure, mitigation, treatment, or prevention of *disease*," and surely the normal growth

rate of an Atlantic salmon cannot be construed as a "disease." *Id.* § 321(g)(1)(B). Like the

agency in *Gulf Fishermen's Association v. National Marine Fisheries Service*, FDA's reading

takes one part of a definition out of this context and assigns meaning that either contradicts or

goes far beyond the other parts of the definition. 341 F. Supp. 3d 632, 640 (E.D. La. 2018)

(rejecting attempt to broaden term "harvest" in definition of "fishing" to include aquaculture, and

finding "fishing" unambiguous); MSJ 8.[1]

    Second, the Court must not ignore the ordinary and fixed meaning of "drug," despite it

being a defined term in the FFDCA. MSJ 3–5. Legislative drafters rarely create completely

artificial meanings for the terms they define, so the interpretive canons of ordinary and fixed

meaning are still useful in interpreting a definition or part of one. "[T]he word being defined is

the most significant element of the definition's context. The normal sense of that word and its

associations bear significantly on the meaning of ambiguous words or phrases in the definition."

---

[1] FDA asserts that *Gulf Fishermen's* allows the Court to consider "secondary sources" only for
undefined terms, Opp. 5, but this is not what the case stands for, as "secondary sources" may be
consulted to understand a defined term, especially the undefined terms used to define it. 341 F.
Supp. 3d at 638–40; *See also Perrin v. U. S*., 444 U.S. 37, 42 (1979); Scalia & Garner at 228.
Like in *Gulf Fishermen's* FDA has misinterpreted undefined terms in the definition of "drug"
without reference to the common meaning of a "drug" or other aspects of the definition.

Scalia and Garner at 232; MSJ 6–7. Indeed, Justice Scalia and Bryan Garner used *this exact example* of an absurdly broad meaning of drug in their treatise: "The definition 'means nails' will bear one meaning when the defined term is *fasteners* and quite another when the defined term is *digital excrescences*. And when the [FFDCA] defines *drugs* as 'articles (other than food) intended to affect the structure or any function of the body' it assuredly does not include exercise bikes." *Id.* at 228–29. Defining drugs to include inherited genes suffers from the same deductive flaw as defining an exercise bike as a drug: Both may technically "affect[] the structure or function" of the body, but it is improbable that Congress meant FDA to classify either of them as a "drug."

Third, while FDA relies entirely on Subsection (C) of the "drug" definition for its authority over GE animals, this subsection *expressly* excludes food. 21 U.S.C. § 321(g)(1)(C) ("articles (other than food)…"); *Nutrilab, Inc. v. Schweiker*, 713 F.2d 335, 336 (7th Cir. 1983) (subsection (C) excludes "food articles" from drug definition). A GE food animal is plainly food, and so is the "rDNA construct" as an inseparable *component* of that fish,[2] and therefore cannot also be a drug under the FFDCA. *See supra* at 1–2. On this ground alone, the Court should find that FDA's assertion of FFDCA animal drug authority over GE food animals is *ultra vires*.

FDA continues to rely on minor FFDCA amendments to show congressional acquiescence. Opp. 6–7. But these congressional acts restrict, not bless, FDA's jurisdiction over GE animals, and fail to address the precise issue here: FDA's exclusive jurisdiction to approve and regulate the entire life cycle of GE food animals as animal drugs based ostensibly on regulation of their "rDNA construct." MSJ 11. Three of the amendments FDA points to (1988, 2004, and 2007) were enacted before FDA decided how it would regulate GE animals in its 2009 guidance. *See e.g.* FDA-004192 (stating in 2005 that AquaBounty would need to take certain steps "regardless of whether the new animal drug rubric *or any other would be employed*," (emphasis added)). These amendments cannot be read to endorse an approach to regulating GE animals that FDA had not yet declared. MSJ 10–11. The sole amendment after 2009 and the

---

[2] The FFDCA defines "food" as "(1) articles used for food or drink for man or other animals . . . and (3) *articles used for components of any such article*." 21 U.S.C. § 321(f) (emphasis added).

2015 GE salmon approval is related to human drugs, not food, and merely waives fees for drug applications for transgenic animals producing human medical products. 21 U.S.C. § 379j-12(d)(4)(B). FDA's attempt to read sweeping legislative approval of its actions into this trivial change runs afoul of the maxim that Congress does not hide elephantine legislative changes in "mouseholes." *Puerto Rico v. Franklin California Tax-Free Tr.*, 136 S. Ct. 1938, 1947 (2016);[3]

Finally, even if the drug definition was ambiguous, FDA would not be entitled to *Chevron* deference because the agency has not spoken with the force of law. *See Sierra Club v. U.S. E.P.A.*, 671 F.3d 955, 962 (9th Cir. 2012). FDA did not issue formal regulations interpreting the "drug" definition to include GE animals; it did so in its guidance, which *FDA itself* argues in its motion is not a final agency action with the force of law. Opp. 10–15. FDA cannot have its GE fish and eat it too. It chose to define GE animals as drugs in a supposedly non-binding guidance rather than adopt formal regulations that may otherwise receive *Chevron* deference. *U.S. v. Mead Corp.*, 533 U.S. 218, 226–28 (2001).[4] Thus, even if the FFDCA provisions are ambiguous, FDA is entitled to little or no deference, and for the same reasons that the provisions are unambiguous, FDA's interpretation is untenable at either step.

GE food animals themselves are not "drugs" under either the plain language of the FFDCA or any reasonable interpretation. The Court should reject FDA's attempt to expand the FFDCA new animal drug authority to regulate GE animals, including GE salmon, as *ultra vires*.

## II.    FDA's Failure To Ensure Environmental Safety Is Arbitrary And Capricious.

FDA does not raise any substantive defense to Claim 12 but instead takes the remarkable

---

[3] FDA's continued effort to deduce that it must have the authority to regulate GE animals just because Congress has not yet acted to comprehensively regulate this technology ignores the fact that for the "18 years since . . . [GE] salmon became public," Opp. 8, n.10, FDA has been reassuring the legislative branch that it would adequately ensure environmental safety in its drug approvals. *See e.g.*, F1-00210116. FDA's attempt to dismiss the other legal frameworks that would govern GE animals as *individually* inferior to its preferred solution misses the forest for the trees because each of these would provide some oversight until Congress acted.

[4] To the extent FDA is interpreting its animal drug *regulations* in its guidance, *see* FDA-G187-00600, 606–621, it is entitled to minimal or no deference. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–18 (2019) (explaining *Auer* deference and its limitations).

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

position that it has no "legal obligation" under the FFDCA to consider environmental safety *at all* and so "there was no reason" to include evaluation criteria in the guidance or to evaluate, condition, or disapprove the GE salmon based on environmental risks. Opp. 19, 31. FDA attacks a straw man. Regardless of whether the FFDCA contains an explicit mandate to evaluate environmental risks, the FFDCA and APA require that where environmental risk is a relevant factor, FDA has the authority and obligation to evaluate and ensure environmental safety in its FFDCA safety determination. MSJ 16. FDA does not dispute that environmental risk is *relevant* to GE animals and that it is the *primary* risk posed by GE salmon, yet insists that it can constrict consideration of those risks to NEPA procedural disclosures. That approach is irrational and led the agency to approve GE salmon with inadequate safeguards. The absurdity of FDA's position is worth underscoring: FDA claims to have sole regulatory authority to approve GE animals, but emphatically contends that—outside its procedural NEPA duties—it does not ensure the environmental safety of GE animals when it approves a new animal drug application. Taken to its logical end, FDA's argument means the agency is *required* to approve a new animal drug even if it would be unsafe for the environment. The FFDCA's safety requirement is not nearly so toothless as to permit, let alone require, that result.

### A. FDA Failed to Adequately Address Environmental Safety.

Neither the guidance nor the GE salmon approval includes or applies criteria or an explanatory rationale detailing how FDA considers environmental safety as part of its safety assessment. *See* MSJ 13–14. FDA's failure to adequately ensure that GE animals in general, and GE salmon in particular, are safe for the environment is arbitrary and capricious because the agency has failed to consider a highly relevant factor and failed to draw the required rational connection between the facts in the record and its decisions. *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001). Rather than confront the merits, FDA continues to frame the issue as whether environmental safety is a "factor . . . enumerated in the FDCA." Opp. 26. FDA further confuses the issue by rewriting history to contend FDA only considered environmental safety as part of the NEPA process for GE salmon. The statute, the case law, and the record all contradict FDA's arguments.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

First, FDA mischaracterizes 21 U.S.C. § 360b(d)(2)(A)-(D) as an exclusive list of factors that FDA considers its drug approval process. Opp. 21, 26. Contrary to FDA's reading, this provision is expressly non-exclusive, directing that these factors are merely four "among other relevant factors" FDA must consider. 21 U.S.C. § 360b(d)(2). *See also* MSJ 13. FDA's cabined reading of this provision ignores this plain language. Similarly, 21 U.S.C. § 360b(d)(1)(D)—which FDA does not address—requires FDA to evaluate and make its safety determination on the basis of "any information before" the agency. Taken together, it is clear that Congress assigned broad authority to the agency to ensure the safety of new animal drugs based on a broad suite of factors and the specific information most relevant to any particular drug. MSJ 16.[5] What is a "relevant factor" for a particular drug approval need not be specifically listed in the statute. Rather, it depends on the context of the agency's decision. *See e.g.*, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008) (holding that agency failed to consider relevant in-river survival of salmon in evaluating recovery impacts in biological opinion); *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 117 (2008) (recognizing that "administrative law[] can ask judges to determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together"). FDA does not argue and could not maintain (in the face of a record replete with recognition that environmental safety is a critical issue) that environmental safety is not a relevant factor under the FFDCA or that it lacks the authority to ensure environmental safety in its drug approvals.

FDA argues that it is Plaintiffs' burden under *Chevron* to prove the FFDCA specifically "*requires*" consideration of environmental safety. Opp. 22. But, in light of the agency's broad

---

[5] The cases FDA cites to support its narrow reading of this provision are inapposite. Opp. 23. *Am. Pharm. Ass'n v. Weinberger*, 377 F. Supp. 824, 828 (D.D.C. 1974), involved the safety determination for human drugs, a different process governed by a different section of the FFDCA, 21 U.S.C. § 355(d), which significantly does not contain the express language in the new animal drug provisions requiring FDA to make its safety determination after considering all "relevant factors," *Id*. at § 360b(d)(2). *Nutritional Health All. v. FDA*, 318 F.3d 92, 100–101 (2nd Cir. 2003) did not involve the safety of a drug approval at all, instead the court rejected FDA's construction of "adulteration."

authority, it is not Plaintiffs, but FDA who "assumes the wrong inquiry." *Id.*[6] The agency's related insistence that the Court should defer to its "judgment" about whether the FFDCA requires it to ensure environmental safety plays fast and loose with the case law. Opp. 23–24. The cases FDA cites stand only for the unremarkable proposition that courts can defer to FDA's consideration of specific scientific or technical matters, not to its interpretation of the scope of the factors that the agency must address in its safety determination. For example, in *A.L. Pharma, Inc. v. Shalala*, the court considered FDA's reminder that "courts give a high level of deference to an agency's evaluations of scientific data within its area of expertise," 62 F.3d 1484, 1490 (D.C. Cir. 1995), but determined that FDA failed to provide any reasoned explanation for its reliance on a specific study in its approval of a chicken drug, *id.* at 1492. *See also Zeneca, Inc. v. Shalala*, 213 F.3d 161, 170 (4th Cir. 2000) (rejecting claim that drug safety evaluation testing FDA relied on applied the wrong pH range).

It is undisputed that GE animals pose myriad risks to wildlife, native ecosystems, and the environment, and that for GE salmon in particular, "the primary risk issue . . . is environmental." F1-00183309; MSJ 17–18. FDA's failure to address environmental safety in this context is quintessentially arbitrary and capricious. *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011) (holding that agencies "must rationally explain" how they have considered relevant factors, otherwise the decision is arbitrary and capricious because "we might as well be deferring to a coin flip").

Second, contrary to its litigation position, the record reflects that FDA consistently—albeit inadequately—considered environmental safety as part of its FFDCA safety determination, not just through its NEPA process. FDA communicated numerous times with AquaBounty about environmental information the applicant needed to provide for its animal drug application. After AquaBounty first submitted its investigational new animal drug ("INAD") application in 1994,

---

[6] Claim 12 challenges FDA's failure to adequately address the relevant factor of environmental safety as arbitrary and capricious. Am. Compl., ¶¶ 248–54, ECF No. 53. This inquiry does not turn on whether FDA has a specifically enumerated *duty* to address environmental safety but whether it has the *authority* to do so. The latter is sufficient.

FDA stated that "immediate guidance should be provided on the issues which are critical" to the application, including both human food safety issues and "[e]nvironmental issues." FDA-000186. In the years that followed, FDA repeatedly communicated regarding the sufficiency and amount of environmental information required to support the application. FDA-000201-03 (outlining information needed for "environmental considerations"); FDA-000210 (stating AquaBounty not yet provided "the necessary environmental components of an INAD request"); FDA-000215–16 (outlining information needed from AquaBounty "essential to [FDA's] evaluation of the environmental safety of [the] investigations, per se, and the transgenic fish so produced," including but not limited to EA). This extensive back and forth demonstrates FDA sought and evaluated environmental information as part of the drug approval process.

The record also overwhelmingly demonstrates that FDA included environmental safety as a component of its overall safety evaluation for GE salmon in particular and as part of its guidance. MSJ 16–18; FDA-014613 (including "Environmental Safety" as one component of FDA's "Safety and Effectiveness" evaluation). Significantly, FDA does not dispute that the guidance stated the agency would consider environmental risk *independent* of NEPA when determining whether to exercise its enforcement discretion to ensure safety under the FFDCA. FDA-G187-00573–74; MSJ 16. And, contrary to FDA's and AquaBounty's misstatements, Opp. 25–26 & n.23; Intervenor-Defs. Opp'n Br. 2, ECF No. 207, the documents Plaintiffs cited are not limited to the NEPA context. Many of them explicitly state that FDA needed to review environmental information in order to make its *safety* determination. FDA-001025 (stating that

███████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████ (emphases added)).[7] Other documents

demonstrate that FDA evaluated information in addition to the EA prepared in compliance with

---

[7] *See also* FDA-000635 (explaining information needed to "ensure environmental safety" of the FFDCA drug application); FDA-001435 (including "environmental safety" as a component of drug application); FDA-001382 (discussing "requirements for environmental safety" in addition to NEPA requirements); FDA-001427 (explicitly discussing "an environmental safety framework" under both FFDCA and NEPA).

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

NEPA to review environmental safety. *See, e.g.*, FDA-013948, FDA-013973 (stating FDA reviewed the EA and "additional available information with respect to environmental safety," including a Canadian review, site visit reports, and study evaluating triploidy in order to conclude that "no additional environmental safety information" was needed "in support of the approval of a new animal drug application").[8] Plaintiffs do not dispute that FDA included the EA as one part of its safety evaluation.[9] However, the record shows the information and factors relevant to that evaluation went far beyond the NEPA process.

Moreover, the record demonstrates that FDA determined it could not approve GE salmon as safe if environmental risks were too great. For example, in early conversations with AquaBounty, FDA stated it could not approve a diploid (capable of reproduction) version of the fish because of environmental concerns. ████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████ FDA also conducted numerous site visits to evaluate containment and environmental risk mitigation measures as part of the FFDCA approval process. *See, e.g.*, FDA-009826–27.

Indeed, FDA exercised its authority to address environmental safety by imposing multiple "conditions of use" that, although inadequate, were intended to protect the environment. MSJ 18–19. FDA's attempt to characterize these conditions as only coincidentally related to the

---

[8] FDA's statement that it evaluated this additional information as part of its "NEPA review," Opp. 26 n.23, is nonsensical given that NEPA only requires preparation of an EA and that FDA repeatedly stated it reviewed this additional information to evaluate "environmental safety." FDA-014756 (listing information evaluated as part of environmental safety review in addition to the EA). Nor do these documents simply demonstrate "overlapping statutory schemes." Opp. 28 n.26. For example, although AquaBounty submitted its triploidy report to satisfy its product definition and conditions of manufacture requirements, FDA *also* reviewed the report "in support of the environmental safety" review under the FFDCA. FDA-013978 (citing this Feb. 27, 2009 submission (FDA-007362) as information FDA evaluated for environmental safety). *See also infra* at 11 (conditions linked to environmental safety).

[9] The adequacy of the EA informs both the adequacy of FDA's NEPA analysis and the adequacy of its FFDCA review, which is why the Court should consider Claim 12 together with Plaintiffs' NEPA claims. MSJ 14 n.11.

environment is nonsense.[10] FDA required AquaBounty to ensure containment in land-based

facilities and to use triploidy, among other things, specifically to reduce environmental risk.

FDA-023116. As FDA stated repeatedly in the record, these "specific proposed limitations on

the production and use (grow-out) of AquAdvantage Salmon, including the production of

triploid, all-female fish populations, are designed to mitigate potential adverse environmental

impacts." FDA-0022050–51. *See also, e.g.*, FDA-008830 ("[FDA] reminded [AquaBounty] that

the specified conditions of use are part of an effort to mitigate potential risks to the environment.

. . ."); FDA-001026 (stating that it was "critical" for environmental risk management that

"containment is maximized to eliminate potential risk of undesired events" like escape); F1-

00183309 (stating FDA needed to determine "under what conditions of use would it be possible

to mitigate the environmental risk issues sufficiently to allow an (sic) NADA approval").

> **B.      FDA's Position Is Contrary to NEPA.**

FDA's authority to address the environmental safety of GE animals is based in the

FFDCA, not, as it contends here, solely from its separate but related procedural duty to consider

the environmental impacts of its actions under NEPA. MSJ 19–21. The record demonstrates that

FDA recognized its separate, but complementary, duties under the FFDCA and NEPA in its

guidance and in its review of GE salmon. MSJ 17–19. Contrary to this record, FDA nevertheless

continues to insist that any responsibility to consider environmental risk from GE animals arises

solely under NEPA.

But NEPA does not expand an agency's existing authority and hence cannot be a

"source" of authority for addressing environmental effects. MSJ 19–20. While NEPA can and

does provide a vehicle to develop information about the action's environmental risks, FDA's

insistence that its duty and authority to address environmental safety arises from NEPA conflates

that vehicle with the substance. *Id*. at 20. FDA nonsensically contends that NEPA "can …

provide important information bearing upon the agency's drug safety evaluation," Opp. 30, and

---

[10] FDA's contention that these conditions of use, including containment measures, are to ensure
the "purity" of the GE salmon lineage, rather than to prevent environmental harm, strains
credibility. Opp. 29. If a GE salmon escapes containment, the threat is to wild salmon, not the
other way around.

that FDA "is not required to consider environmental risks in determining the safety" of a new animal drug application." Opp. 31. Yet FDA does not and cannot explain how its NEPA analysis can inform a determination that the agency contends it does not make.

Either the NEPA evaluation is meaningful because FDA has authority to act on the information it generates when making its safety determination under the FFDCA, or the NEPA process is a paperwork illusion to give the public the appearance that FDA is meaningfully addressing environmental effects when it actually is not. FDA's argument that the latter is permissible, violates both the letter and spirit of NEPA. 40 C.F.R. § 1500.1(c) ("NEPA's purpose is not to generate paperwork . . . but to foster excellent action.").[11]

### III.    The Guidance Is An Unlawful Rule And The Court Has Jurisdiction To Review.

The guidance was a final agency action that established a regulatory pathway for GE animals, creating rights and imposing obligations on FDA and regulated parties, but FDA failed to promulgate this program as a regulation. FDA recognized the likelihood of environmental risks in creating this new pathway but did not evaluate them under NEPA. MSJ 21–30. FDA's continued attempt to erect various jurisdictional bars to review of the guidance fails.

#### A.    The Guidance Is a Legislative Rule and a Final Agency Action.

The test for whether an agency action is "final" for APA review and whether it is a legislative rule are "essentially the same." *Nat. Res. Def. Council v. E.P.A.*, 643 F.3d 311, 321 (D.C. Cir. 2011). *See also* MSJ 28 & n.27; *id.* 23 (detailing Ninth Circuit three-factor test for legislative rule).[12] Whether the Court approaches this question through the *Bennett* test for finality, or the three-factor test for a legislative rule, the answer is the same: the guidance

---

[11] The Court should not credit FDA's assertion that NEPA is meaningful solely because the "lengthy delay" inherent in preparation of an environmental impact statement may motivate applicants to mitigate environmental effects in order to qualify for an EA. Opp. 29. This optimistic speculation runs head-long into FDA's zeal for limiting its authority under the FFDCA: if FDA has no authority to judge environmental safety, there is little incentive for applicants to minimize effects that they know will not factor into the agency's approval.

[12] FDA repeats its unsupported denial that the guidance is the consummation of its decision-making process. Opp. 10 n.11. This is a statement, not an argument. *See* MSJ 27.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

established a new regulatory pathway for GE animal approvals by amending the existing animal drug regulations, but without APA rulemaking or NEPA assessment.

The guidance amended existing regulations, establishing an approval system for a new class of substances (GE animals) under the animal drug regulations that were not previously allowed, creating new legal rights and responsibilities for developers of GE animals. MSJ 24–26. This is indistinguishable from the USDA's "guidance" in *Center for Environmental Health v. Vilsack*, which effectively amended the rule prohibiting compost contaminated with pesticides in the organic program. No. 15-cv-01690-JSC, 2016 WL 3383954, at *4 (N.D. Cal. June 20, 2016). FDA argues that the guidance merely provides a "roadmap" of existing regulations to explain how they govern new animal drug applications. Opp. 10. However, the detailed new provisions in the guidance go far beyond a roadmap and actually amend the regulations to include the process, criteria, data requirements, and factors that FDA will apply (and applicants must use) to approve GE animals as drugs, including how and when FDA would exercise its enforcement discretion. MSJ 24–25 & n.21. This creates rights and obligations both for FDA and the applicants. *Id.* 25.

The guidance amends the regulations in both big-picture and detailed ways. Most obviously, the guidance amended the definition of "new animal drug" in 21 C.F.R. § 510.3(g) to effectively now read: "any drug intended for use for animals other than man *[and the engineered rDNA constructs as expressed in genetically engineered animals]*." But it also amended the details of the application process. For example, in the existing regulation's labeling provisions, *id.* § 514.1(b)(3), the applicant must prominently display use instructions for either laypeople for nonprescription drugs, or veterinarians. By contrast, "in the context of GE animals" FDA in the guidance focuses on the animal itself rather than use and requires labeling to describe the "article," the animal into which the "article" was introduced, the name of the GE animal line, and the use and care of the animal (not the "article" or drug). FDA-G187-00608.[13] These changes are

---

[13] FDA also adds the "breeding strategy used to produce the lineage progenitor" to the Manufacturing Methods, Facilities, and Controls section. 21 C.F.R. § 514.1(b)(5); FDA-G187-00609.

not merely an explanation of, but a *re-write* of the standards in Section 514.1(b) to accommodate GE animals. *Erringer v. Thompson*, 371 F.3d 625, 632 (9th Cir. 2004) (amendments to legislative rule are a legislative rule).

FDA's argument that the guidance did not change its approach hinges on the Court's agreement with FDA's characterization of the timing of its actions as merely coincidental. Opp. 12–14. Until the guidance, FDA did not respond to the legal petition seeking regulation that had been pending for eight years, did not issue any GE animal approvals, and did not publically announce the GE salmon approval process. Yet *as soon as it issued the guidance* each of these things happened. FDA-014622 (showing it took a long time to review AquaBounty's application because "FDA had to determine how to regulate [GE] animals" but "now that [FDA] ha[s] secured that decision, the review process has proceeded expeditiously"). *See also* MSJ 25–26. This is not mere happenstance; it is the result of FDA's adoption of a new regulatory framework.

Contrary to FDA's mischaracterization, this is not a "strict legal inquiry" without reference to the record. Opp. 12. The Court should not rely solely on boilerplate disclaimer language or what the agency now claims, but look instead at how FDA itself treated the guidance. *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094–95 (9th Cir. 2014) (stating agency's characterization is not dispositive; courts consider practical effects); MSJ 27 n.26 (more cases). Numerous documents in the record show that FDA treated the new regulatory pathway created in the guidance as *binding* on industry. *See* F1-00219665 ("[The] guidance is a critical step along the regulatory pathway"); FDA-014610 ("A new process was developed" to deal with novel technology of GE animals); F1-00240932 (letter to Congress saying guidance established pathway and clarified statutory authority);[14] F1-00219692 (stating that "*Under the draft guidance*" safety of food will be demonstrated); *see also* MSJ 25. FDA's attempt to distinguish the guidance as "'establish[ing] a 'path *for industry* to follow,'" Opp. 13, is telling: Binding the *industry* with the guidance makes it a final agency action with legal consequences.

---

[14] FDA claims this was preliminary view of "lower-level" employee, Opp. 15 n.16, but the cover letter it cites (F1-00240928) is signed by Larisa Rudenko, the manager in charge of the FDA approval review process who made the final recommendation for approval of GE salmon to the Director. *See* FDA-022556-64; FDA-022951–54.

**B.  The Guidance Must Comply with NEPA.**

As a final agency action with legal consequences, the guidance is also a major federal action with significant environmental effects that must be evaluated in an environment impact statement. MSJ 21–22. There is no real dispute that GE animal approvals can have significant environmental impacts or that the trigger for NEPA compliance is low. *Id.* FDA's GE animal program is wholly unlike that at issue in *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990). There, the Court found the "land withdrawal review program" was not final, as it failed to reference even a "single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations." *Id.* at 890. In stark contrast, the guidance here is a final agency action that establishes a framework for GE animal approvals. Indeed, had the agency complied with the APA and promulgated this framework as a rule, there would be no question that NEPA would be triggered. FDA's argument is about form, not substance.[15]

## CONCLUSION

For all of these reasons and those in Plaintiffs' opening brief, the Court should deny Defendants' motion for judgment on the pleadings and grant Plaintiffs' cross-motion for summary judgment.

---

[15] Plaintiffs have fully demonstrated standing to challenge both the GE salmon approval (which FDA does not dispute) and the guidance framework that approval applied. MSJ 28–30 (and Decls., ECF Nos. 198-1 to 198-9). FDA offers nothing new in its opposition, but continues to improperly conflate the merits (its assertion that the guidance lacks legal consequences) with standing. Opp. 16, *but see Kirola v. City & County of San Francisco*, 860 F.3d 1164, 1175 (9th Cir. 2017) (party need not prove merits to show standing).

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Respectfully submitted this 31st day of July, 2019 in San Francisco, California.

/s/ Amy van Saun
Amy van Saun (*Pro Hac Vice*)
George A. Kimbrell (*Pro Hac Vice*)
Center for Food Safety
2009 NE Alberta Street, Suite 207
Portland, OR 97211
(971) 271-7372
Emails: avansaun@centerforfoodsafety.org
gkimbrell@centerforfoodsafety.org

/s/ Brettny Hardy
Brettny Hardy, CSB # 316231
Earthjustice
50 California St, Suite 500
San Francisco, CA 94111
T: (415) 217-2142
Email: bhardy@earthjustice.org

Stephen D. Mashuda (*Pro Hac Vice*)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA 98104
T: (206) 343-7340 / F: (206) 343-1526
Email: smashuda@earthjustice.org

*Counsel for Plaintiffs*

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2019, I caused the foregoing to be filed and served upon counsel of record via the Court's CM/ECF filing system, which will send notice of such to all counsel of record.


/s/ *Brettny Hardy*
Brettny Hardy