Pages 1 - 120

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

Institute for Fisheries      )
Resources, et al.,           )
                             )
          Plaintiffs,        )
                             )
   vs.                       )     NO. CV 16-01574-VC
                             )
Alex M. Azar, II, et al.     )
                             )
          Defendants.        )
                             )
   and                       )
                             )
AquaBounty Technologies, Inc., )
                             )
          Intervenor-Defendants.)
_____)

                          San Francisco, California
                          Wednesday, October 2, 2019

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
          RECORDING 10:03 A.M. TO 12:31 P.M.

APPEARANCES:

For Plaintiffs:
                    Earthjustice
                    810 Third Avenue - Suite 610
                    Seattle, WA 98104
              BY:   STEPHEN MASHUDA, ESQUIRE

                    EARTHJUSTICE
                    50 California Street - Suite 500
                    San Francisco, CA 94111
              BY:   BRETTNY ELAINE HARDY, ESQUIRE


       (Appearances continued on the following pages)

Transcriber:        Pamela Batalo Hebel

**<u>APPEARANCES CONTINUED:</u>**


For Plaintiffs:

        CENTER FOR FOOD SAFETY
        2009 NE Alberta Street - Suite 207
        Portland, OR 97211
    BY:  **AMY L. VAN SAUN, ESQUIRE**


For the Federal Defendants:

        UNITED STATES DEPARTMENT OF JUSTICE
        Consumer Protection Branch
        P.O. Box 386
        Washington, DC 20044
    BY:  **MARY M. ENGLEHART**
        **TRIAL ATTORNEY**

        UNITED STATES DEPARTMENT OF JUSTICE
        Environmental & Natural Resources
        Division
        Post Office Box 7611
        Washington, DC 20044
    BY:  **MARISSA PIROPATO**
        **TRIAL ATTORNEY**

        UNITED STATES DEPARTMENT OF JUSTICE
        Federal Programs Branch
        950 Pennsylvania Avenue, NW
        Washington, DC 20530
    BY:  **DAVID MORRELL**
        **DEPUTY ASSISTANT ATTORNEY GENERAL**

For the United States Food and Drug Administration:

        U.S. DEPT. OF HEALTH & HUMAN SERVICES
        Office of the General Counsel
        10903 New Hampshire Avenue
        White Oak 31, Room 4422
        Silver Spring, MD 20993
    BY:  **BARBARA J. ALKALAY**
        **ASSOCIATE CHIEF COUNSEL, LITIGATION**

        FOOD AND DRUG ADMINISTRATION
        Center for Veterinary Medicine
        7519 Standish Place
        Rockville, MD 20855
    BY:  **LAURA EPSTEIN**
        **SENIOR POLICY ADVISOR**

**<u>APPEARANCES CONTINUED:</u>**

For the United States Food and Drug Administration:
                        U.S. FOOD AND DRUG ADMINISTRATION
                        10903 New Hampshire Avenue
                        White Oak Bldg. 32, Room 4301
                        Silver Spring, MD 20993
            BY:  **LESLIE COHEN**
                 **ASSOCIATE CHIEF COUNSEL**

For Intervenor Defendant AquaBounty Technologies, Inc.:
                        Arent Fox LLP
                        1717 K Street, NW
                        Washington, DC 20006
            BY:  **KAREN E. CARR, ESQUIRE**

1    <u>**Wednesday, October 2, 2019**</u>                                      <u>**10:03 a.m**</u>.

2    (Transcriber's note:  Due to counsels' failure to identify

3    themselves when speaking, certain speaker attributions are

4    based on an educated guess.)

5                    **ELECTRONICALLY-RECORDED PROCEEDINGS**

6                                 **---o0o---**

7         **THE CLERK:**  Calling Case Number 16-CV-01574, Institute

8    for Fisheries Resources, et al., vs. Azar, et al.

9         Counsel, please step forward and state your appearances

10   for the record.

11        **MR. MASHUDA:**  Good morning, Your Honor.  Steve Mashuda

12   for the plaintiffs, and with me at counsel table are Brettny

13   Hardy and Amy van Suan.

14        **THE COURT:**  Hello.

15        **MR. MASHUDA:**  Good morning.

16        **MR. MORRELL:**  Good morning, Your Honor.  My name is

17   David Morrell on behalf of the Department of Justice, and I

18   have at counsel with me Marissa Piropato and Mary Englehart,

19   and then from the agency FDA, I have Barbara Alkalay, Leslie

20   Cohen, and Laura Epstein.

21        **THE COURT:**  Hello.

22        **MS. CARR:**  Good morning, Your Honor.  Karen Carr for

23   defendant-intervenor AquaBounty Technologies, and with me in

24   the courtroom is the president and CEO of AquaBounty, Sylvia

25   Wulf.

1      **THE COURT:**  Hello.

2          So real quick, maybe, Ms. Carr, you can stay up for a

3      quick second, and we can talk about sealing before I forget.

4          There are a couple of -- there -- there's a motion to seal

5      portions of the administrative record, and there's a motion to

6      seal portions of the reply brief.

7          Under the local rules, if -- and this was -- this was a

8      request to seal stuff that you guys designated as confidential.

9          Under the local rules, you're required to -- to file a

10     justification for sealing it, and you didn't, so I assume you

11     agree that none of the materials that the plaintiffs have

12     requested to be sealed should actually be sealed?

13         **MS. CARR:**  My understanding, Your Honor, was that the

14     materials that were indicated to be sealed were protected by

15     the deliberative process privilege, and so we do -- we do not

16     have issues with the -- the redacted copies that were filed

17     with the Court being entered in the record.

18         **THE COURT:**  Okay.  And so maybe then I should be

19     asking the government.

20         **MS. CARR:**  But let me -- let me make sure I'm clear.

21         There are pieces of the record that were produced in

22     redacted form to the Court as part of the joint appendix, and

23     so, to my understanding, the confidential business information

24     that is within the record has been redacted and was provided to

25     the Court in redacted form.

1    **THE COURT:**  Yes.  But anything that is proposed to be
2    filed under seal -- so -- so there are motions by the
3    plaintiffs to file things -- certain things under seal.  One is
4    a couple of passages in the reply brief, which clearly have no
5    business being sealed, so that motion -- to the extent anybody
6    wants those passages in the reply brief sealed, that request is
7    denied.

8    But -- but then there are parts of the administrative
9    record that I, frankly, have not looked at yet that the
10   plaintiffs have requested to be sealed, and normally when --
11   and the plaintiff -- the reason the plaintiffs gave for
12   sealing, as I recall it, is that these -- these parts of the
13   administrative record were designated as confidential by the
14   defendants.

15   Is that -- am I remembering that correctly?

16   **MR. MASHUDA:**  That is correct, Your Honor, yes.

17   **THE COURT:**  Okay.  And so when -- under our rules,
18   when there's a motion to -- when that type of motion is filed,
19   the -- the parties that have designated the materials
20   "confidential" have to file something just explaining why
21   compelling reasons justify sealing the material; that is,
22   concealing it from the public view.

23   I didn't see any filing from any of the defendants
24   justifying the concealment of any of the materials in the
25   administrative record that are proposed to be sealed, and so

1   I -- I would think that the -- the right thing for me to do

2   under these circumstances is to simply deny the request to seal

3   those materials in the administrative record and require that

4   the entire administrative record be public, but I know that

5   sometimes people don't -- sometimes -- people inadvertently

6   fail to follow our local rules on that and our requirements,

7   and also I know that there was a lot of discussion about the

8   deliberative process privilege with Judge Corley and that you

9   all may have reached some agreement about that, and I may have

10  even signed off on it without -- and I'm not remembering it

11  now, so I -- that's why I wanted to raise that before I forget.

12      So -- so with respect to the materials in the

13  administrative record that have been -- that the plaintiffs

14  have requested be sealed based on the confidentiality

15  designations by the defendants, what's the -- what's the status

16  of that?  Should they -- can they -- this should all be

17  unsealed right now, or is there -- is there some further work

18  we need to do on that question?

19          **MS. CARR:**  Based on the conversation that we're

20  having, Your Honor, I would think that there would be some

21  additional work that we would need to do.  To the extent there

22  are pieces of the administrative record that were designated as

23  confidential business information pertaining to AquaBounty, we

24  would like an opportunity to -- to justify those as

25  confidential and to be filed under seal with the Court.

1          **THE COURT:**  Okay.

2       And then what about the government?

3          **MS. PIROPATO:**  Good morning, Your Honor.  Marissa

4    Piropato for the government.

5          **THE COURT:**  Good morning.

6          **MS. PIROPATO:**  We, too, would like the ability to

7    brief it.

8       I believe the understanding at the time with the process

9    that we worked through with Judge Corley and that this Court

10   approved, that there was a protective order, and all this was

11   done pursuant to the protective order, so obviously we -- I

12   think that was why perhaps it was an inadvertent failure to

13   file that additional --

14         **THE COURT:**  No --

15         **MS. PIROPATO:**  -- justification.

16         **THE COURT:**  And that's fine.  And -- and it sounds

17   like it wasn't a failure of any sort, inadvertent or otherwise,

18   because it sounds like we may have agreed to a process by which

19   you could at least initially, you know, redact portions of the

20   administrative record, but we will add some point -- and I

21   think the point may be, you know, before we get do the next

22   part of the case, we need to figure out that -- a justification

23   needs to be presented for keeping those documents under seal;

24   right?

25         **MS. PIROPATO:**  Uh-huh.

1    **THE COURT:**  And -- and it has to be a compelling

2    justification, and if it's, you know -- like I said, the stuff

3    in the reply -- the couple passage in the reply brief that were

4    proposed to be sealed have no business being sealed, and I'm

5    concerned that that may also be the case with some aspects of

6    the administrative record.

7    So that's something that we need to -- we need to

8    establish a process for sorting that out, and I -- I'm totally

9    open to suggestions, and I'm -- and timing is not particularly

10   important for me, but I wonder if the next thing to do -- and

11   feel free to suggest some other approach, but I wonder if the

12   next thing to do is for the defendants to file a declaration --

13   declarations in support of the plaintiffs' motion to seal

14   portions of the administrative record with, you know, detailed

15   explanations for why it's appropriate to seal these materials

16   and why there are compelling reasons to seal these materials.

17   Does that make sense?

18   **MS. PIROPATO:**  I mean, we could -- could do that,

19   Your Honor.  Would that be before you or Judge Corley, because

20   we had been working out a lot of the deliberative process

21   privilege issues in front of the judge -- Judge Corley, and it

22   may be something that she's already familiar with --

23   **THE COURT:**  Yeah.

24   **MS. PIROPATO:**  -- because some of these documents --

25   **THE COURT:**  Yeah.

1          **MS. PIROPATO:**  -- we specifically have briefed, so in

2     terms of efficiencies, my suggestion might be that maybe the

3     first crack would go to Judge Corley.

4          **THE COURT:**  I -- I -- I'm fine with that, as long as

5     everybody else is fine with it.

6          **MR. MASHUDA:**  We have no objection to that,

7     Your Honor.

8          **THE COURT:**  Okay.  And I'll check with her about that.

9     And maybe she, through -- through her process of assisting

10    you -- and, by the way, she has said more than once that --

11    that you all work really, really hard and in a very cooperative

12    and productive fashion to get this record put together, and so

13    she really appreciated that, and I really appreciate that.

14         And while we're on the topic, I also really -- the

15    government's briefs in this case were just excellent, some of

16    the best briefs I've seen, so I want to compliment you on that.

17         **MS. PIROPATO:**  Thank you, Your Honor.

18         **THE COURT:**  But -- so -- so there needs to be a

19    process, and I will chat with Judge Corley about that.  As long

20    as she's okay with sorting that out, that's perfectly fine with

21    me.

22         **MS. PIROPATO:**  Thank you, Your Honor.  I appreciate

23    it.

24         **THE COURT:**  All right.  So now on to the motion.

25         The -- the question that I found the most difficult was

the question -- the -- the issue about whether the FDA's ability to consider environmental consequences are cabined to the NEPA review as opposed to included in, you know, the -- the drug approval process.  I found that to be the most confusing question in this case.

And so what -- what I'd like to do is let us assume for -- for the moment that the FDA does have the authority under the statute to regulate the -- the -- the GE salmon, and -- although I have some questions about that -- but let's assume that for -- for the moment.  And let's assume for the moment that the guidance is not final agency action, although I have even more questions about that.

And let's start by talking about the -- the authority of the FDA to consider, you know, the environmental consequences of the -- the salmon in the context of approving the salmon or approving the -- I should say, the rDNA construct.

I have a number of questions about that, and I think maybe I would like to start with the government on that, so whoever is talking about that.

**MS. PIROPATO:**  Good morning, again, Your Honor. Marissa Piropato for the United States, and we're particularly talking now about claim 12.

**THE COURT:**  So let me ask you a couple questions about it.

**MS. PIROPATO:**  Sure.

1        **THE COURT:**  So -- so the first is just a clarification

2    question about your position.

3        Is your position that the FDA, as part of its drug

4    approval process, as part of the authority that it's exercising

5    under the statute -- that the FDA is not permitted to consider

6    the environmental consequences of approval?  Or is it your

7    position that the FDA has the flexibility to consider those --

8    those consequences either in the context of sort of what it

9    needs to do to comply with NEPA or the approval process or

10   both?  I couldn't -- I couldn't quite understand your position

11   on that.

12        **MS. PIROPATO:**  Right.  And I think --

13        **THE COURT:**  And I'll -- I'll just add, like, to the

14   extent that you're contending that the FDA has no authority to

15   consider environmental consequences, other than simply doing an

16   environmental assessment or -- or an environmental impact

17   statement, I find that to be strange -- a strange position for

18   the FDA to take.  It seems like you're really cabining your own

19   authority in that way.

20        **MS. PIROPATO:**  Well, I can assure you that we're not

21   taking that strange position.

22        So the FDA's position is the FDCA does not talk about

23   whether or not it has to consider environmental risk, so the

24   statute is silent.  And so what that means is on a theoretical

25   matter, sure, the FDA could consider environmental risk, but

1    there's a few caveats I'm going to make to that.

2         First is there is within FDA's implementing regulations

3    a -- really an emphasis on the health-and-safety aspect and

4    effectiveness, so if you actually look at the regulations

5    themselves, like Section -- Section 360(b) of the FDCA, the

6    animal -- the animal -- the drug is safe for the target animal

7    and for -- for food consumption by humans.

8         So mindful of that overarching authority, it's possible

9    the FDA could consider environmental risk, but in the cases

10   where the FDA has gone further than perhaps the four corners of

11   what has Congress delegated it to do, courts have --

12        **THE COURT:**  Well, I mean, the way you're discussing

13   it, it seems like it begs the question a little bit, right,

14   because the -- because the pertinent provision, which is

15   (d)(2) --

16        **MS. PIROPATO:**  Uh-huh.

17        **THE COURT:**  -- I think -- right -- says that, "In

18   determining whether such drug is safe for use under the

19   conditions prescribed," blah, blah, blah, "the Secretary shall

20   consider, among other relevant factors," and then it identifies

21   these four factors that the Secretary shall consider.

22        I suppose you could make an argument that in those four --

23   embedded in those four factors could be some consideration of

24   environmental consequences, but in any event, it -- it says

25   "among other relevant factors."

1    **MS. PIROPATO:**  Right.  And plaintiffs are arguing that

2    the "among relevant factors" means that FDA has to consider

3    environmental risk.  Our argument is FDA does not have to

4    consider environmental risk.  It may do so, but to the extent

5    it does consider environmental risk, the main focus will be

6    under NEPA.

7         Under FDA's implementing regulations, 21 CFR Part 25, FDA

8    is required when there is an action that would trigger NEPA, so

9    something that has an effect on the environment, to do an EA or

10   an EIS.

11        **THE COURT:**  But let me ask -- let me ask it a

12   different -- or go at it from a different angle.

13        When the FDA is imposing conditions on the approval --

14        **MS. PIROPATO:**  Uh-huh.

15        **THE COURT:**  -- of a new drug, are you -- I -- I assume

16   you would argue that the FDA could impose conditions that are

17   designed to make sure that the environment doesn't get messed

18   up as a result of the manufacture or use of the new drug.

19        **MS. PIROPATO:**  So the conditions of use -- I mean,

20   that's actually an interesting point, because I do think that's

21   where I think you see a coalescence of NEPA and the FDCA, which

22   is I think what you're getting at, because that's how you know

23   the process works.

24        Sponsors, as a practical matter, will not propose

25   something that is environmental -- significant environmental

```
1    impacts because they don't want to do an environmental impact

2    statement, which is more onerous than an EA, and this is how

3    that practically matters --

4            THE COURT:  But what --

5            MS. PIROPATO:  The conditions of use are --

6            THE COURT:  I understand your argument, but I want

7    to -- I want to push back on it a little bit.

8            MS. PIROPATO:  Uh-huh.

9            THE COURT:  Because there -- let's -- let's take the

10   following hypothetical.  Okay?

11           MS. PIROPATO:  Right.

12           THE COURT:  And let's take it out of the context of

13   animals, which makes it a little confusing, but let's just say

14   there's a drug, a pill --

15           MS. PIROPATO:  Uh-huh.

16           THE COURT:  -- that a company wants to manufacture,

17   and it's seeking approval for that, and the company tells the

18   FDA, you know, there are two possible ways to manufacture this

19   drug.  One is totally environmentally safe, but it costs a ton

20   more money, a ton more money.  And there's another way to

21   manufacture this drug that is -- you know, has some

22   environmental consequences.  In fact, it risks, you know,

23   destroying the nearby national forest or something like that.

24   Right?

25           MS. PIROPATO:  Uh-huh.
```

1    **THE COURT:**  Perhaps that -- and let's -- let's say

2    that the -- the company says I don't care if you have to do an

3    environmental impact statement because the cost of -- of

4    manufacturing the drug, you know, in the totally

5    environmentally-safe way is so high that, you know, it's --

6    I'm -- I'm willing to undergo the delay associated with the

7    environmental impact statement.

8    Surely it does not follow that the FDA cannot consider the

9    effect on the environment in deciding whether to limit the

10   company to the environmentally-safe manufacturing process as

11   opposed to allowing the company to use the other -- the

12   environmentally-dangerous manufacturing process.

13   **MS. PIROPATO:**  Well, I think there's an important

14   clarification about the conditions of use.

15   The conditions of use are actually ultimately proposed by

16   the sponsor and then approved by the FDA, and the final

17   approval package for the NADA includes that conditions of use,

18   and it's part of it, but --

19   **THE COURT:**  But can't the -- during the process, can't

20   the FDA say hey, we're not going to approve it with these

21   conditions?  We're going to require additional -- we're only

22   going to approve it if there are additional conditions?

23   **MS. PIROPATO:**  There's -- there's an interactive

24   process that leads to those conditions of use, where

25   environment -- but that doesn't emanate necessarily from the

1    FDCA.  The conditions of use are not products of the FDCA.

2         Plaintiffs had suggested you can reverse engineer what the

3    FDA requires by looking at the conditions of use.  The

4    conditions of use includes things that reflect NEPA

5    considerations, FDCA considerations.  It can also include

6    conditions that a sponsor proposes because it makes business

7    sense for them, like, for example, in the case of AquaBounty,

8    they can say we want to produce this particular line of salmon

9    in -- in Canada, and actually then is incorporating the

10   conditions of use.

11        **THE COURT:**  So -- so the -- so what you're saying -- I

12   think what you're saying is that none of the -- it doesn't

13   really matter, like, whether the FDA's authority to impose

14   conditions of use that are designed to protect the environment

15   come from the FDCA itself or NEPA or some other source of

16   authority, the FDA has the authority to do that?  Is that what

17   you're saying?

18        **MS. PIROPATO:**  It has the authority to -- through the

19   interactive process to influence the final conditions of use

20   that a sponsor proposes, to answer your question.

21        **THE COURT:**  Okay.  But let's say -- let's say that the

22   sponsor proposes this environmentally-unsafe --

23        **MS. PIROPATO:**  Uh-huh.

24        **THE COURT:**  -- method of manufacturing the pill.

25   Okay?  And that's the only thing wrong with it, is that it's

1   going to mess up -- you know, it's going to kill trees or, you

2   know the -- somehow the waste from the manufacturing process is

3   going to kill a bunch of trees or something like that.

4        Can the FDA say no, I'm not approving this application.

5   The only way I'm approving this application is if you opt for

6   the manufacturing process that doesn't kill the trees?

7        **MS. PIROPATO:**  I mean, EIS you can require significant

8   mitigation measures that would perfect -- prevent that, so --

9        **THE COURT:**  Hold on.  Yes or no?  So can --

10       **MS. PIROPATO:**  But it would --

11       **THE COURT:**  Can the FDA -- does the FDA have

12  authority --

13       **MS. PIROPATO:**  Uh-huh.

14       **THE COURT:**  -- to say I'm not -- I'm not approving

15  this unless it comes with a condition that you use the

16  environmentally-safe manufacturing process?  Does the FDA have

17  the power to do that?  Putting aside for the moment where the

18  power comes from --

19       **MS. PIROPATO:**  Yes, it has that power.

20       **THE COURT:**  Okay.  And where does the power come from?

21       **MS. PIROPATO:**  That would be from NEPA.

22       **THE COURT:**  Okay.  So under NEPA -- NEPA gives the FDA

23  the authority, when approving -- when considering a new drug

24  application, to require as a condition of approval an

25  environmentally-safe manufacturing process?

1      **MS. PIROPATO:**  It would come through the process of an
2  EIS.
3      No, NEPA does not have any substantive requirements, but
4  attendant to EIS is there's usually mitigation to limit the
5  environmental impacts, so that would be practically how it
6  would come about.
7      But --
8      **THE COURT:**  And so -- so -- so because the -- so as --
9  I'm not -- I'm far from an expert on NEPA, but the -- so NEPA
10  requires the -- the agency to consider harm to the environment
11  and mitigating factors?  Is that what you're saying?
12      **MS. PIROPATO:**  When you get to an EIS, you consider
13  mitigation --
14      **THE COURT:**  Sorry?
15      **MS. PIROPATO:**  Mitigation is part of an EIS.
16      **THE COURT:**  Okay.  Is it also part of the EA, by the
17  way?
18      **MS. PIROPATO:**  I think there -- you can have
19  mitigation EAs.  I don't know the -- I don't believe it's
20  required.
21      I mean, when you get to an EA, you have a finding of no
22  significant impacts, right, so the idea that you would have to
23  mitigate anything is really -- not really going on at that
24  point.
25      I mean, what you practically have happen with these

1  applications -- and that's what happened here, is the sponsors

2  come in with their proposal.  In this case, AquaBounty started

3  out with ocean net pens, and we evolved through a process where

4  these --

5          **THE COURT:**  Ocean net pens, is that what it's called?

6          **MS. PIROPATO:**  Yes.

7          **THE COURT:**  Ocean net pens?  Okay.

8          **MS. PIROPATO:**  Which means basically they'd be in pens

9  in the ocean, right?

10         Where we ended up is not even close to that.  They're

11  being -- right now the salmon are being produced in -- in

12  Indiana in a facility that's contained with multiple levels of

13  redundancy.

14         **THE COURT:**  Right.  I understand that.  But I guess

15  from your brief, I thought you were arguing -- maybe I

16  misinterpreted, but I thought you were arguing in your brief

17  that the imposition of these conditions --

18         **MS. PIROPATO:**  Uh-huh.

19         **THE COURT:**  -- it may, by coincidence, have some

20  positive effect on the environment or some protective effect

21  for the environment, but the imposition of the conditions were

22  not because of that or based on that; rather, the imposition of

23  the conditions had something to do with, like, the purity of

24  the drug or something like that.

25         **MS. PIROPATO:**  Because --

1    **THE COURT:**  And I didn't understand that, so that's

2    sort of what got me down this --

3    **MS. PIROPATO:**  The concern with the --

4    **THE COURT:**  -- confusing road.

5    **MS. PIROPATO:**  The concern with the FDCA is solely

6    with the purity integrity in this case of the salmon as -- with

7    the integrated construct.

8    The concerns under NEPA are with environment impacts.

9    When (unintelligible) the conditions of use, it's really

10   where you get the process where the agency, when they finally

11   sponsor (unintelligible) under the conditions of use and they

12   approve it, the conditions can include things that reflect NEPA

13   considerations and FDCA considerations.

14   Containment is the perfect example.

15   **THE COURT:**  So where's the statute -- where's the --

16   where's the statutory language that talks about the conditions

17   of use that the FDA can impose?

18   **MS. PIROPATO:**  The conditions of use?

19   **THE COURT:**  Yeah.

20   **MS. PIROPATO:**  Let me get you the statutory language.

21   **THE COURT:**  Is it in 360(b) or is it --

22   **MS. PIROPATO:**  Let me see.

23   **THE COURT:**  I read it, but I can't recall.

24   **MS. PIROPATO:**  Yeah.  I have it.

25   **THE COURT:**  I think I read it.

1          **MS. PIROPATO:**  Yeah.  It's 20 -- it's actually 20

2     U.S.C. -- 21 U.S.C. Section 360(a)(1).  And these are -- these

3     are a specific set conditions that are proposed in the

4     sponsor's --

5          **THE COURT:**  Wait.  Hold on one sec.  Let me pull it

6     up.  Hold on one sec.

7          (Pause in proceedings.)

8          **THE COURT:**  20 U.S.C. what?

9          **MS. PIROPATO:**  Section 360(a) --

10         **THE COURT:**  360 little "a" with no paren?

11         **MS. PIROPATO:**  Little "a", with a paren, and then 1.

12    21 U.S.C. --

13         **THE COURT:**  (a)(1)?

14         **MS. PIROPATO:**  Uh-huh.

15         **THE COURT:**  I don't -- I think you're pointing me to

16    the wrong thing.

17         **MS. PIROPATO:**  Oh, is it 360(d)(1)?

18         (Inaudible voices in the background.)

19         **MS. PIROPATO:**  (a)(1).

20         Yeah.  So it's 361B(a)(1).  Sorry.

21         **THE COURT:**  360B(a)(1)?

22         **MS. PIROPATO:**  Yes.  Sorry.

23         **THE COURT:**  Hold on.  Let me go to that.

24         **MS. PIROPATO:**  My apologies.  I wrote the wrong thing

25    in my notes, so sorry about that.

1          **THE COURT:**  You're just pointing to the language that

2     says, "A new animal drug shall, with respect to any particular

3     use or intended use of such drug, be deemed unsafe for purposes

4     of Section 351(a)(5) of this title and Section 342(a)(2)(C)(ii)

5     of this title, unless there is in effect an approval of an

6     application filed pursuant to subsection B with respect to such

7     use or intended use of such drug, and such drug, its labeling

8     and use conform to such approved application?"

9          That's the language you're talking about?

10          **MS. PIROPATO:**  Yes.  This is the language.

11          **THE COURT:**  Okay.  So -- but that language says a new

12     animal drug shall be deemed unsafe for purposes of the statute.

13          **MS. PIROPATO:**  Right.

14          **THE COURT:**  Unless there's an approval, but unsafe, as

15     you seem to keep arguing -- unsafe does not include

16     environmental consequences, as far as I understand your

17     argument --

18          **MS. PIROPATO:**  Right.

19          **THE COURT:**  And so if -- if your argument is that

20     unsafe does not include environmental consequences, then how

21     does the FDA have the authority to impose conditions that are

22     designed to protect against adverse environmental consequences?

23          **MS. PIROPATO:**  Well, the -- I mean, I'm going to again

24     back up and say the conditions of use are ultimately imposed by

25     the FDA, but it's not like FDA is coming up with all the

1    conditions of use.

2            **THE COURT:**  It's not like FDA what?

3            **MS. PIROPATO:**  FDA itself is not crafting all the

4    conditions of use --

5            **THE COURT:**  I don't understand why that matters.  I

6    mean, the FDA has the power to say these conditions are -- I

7    mean, first of all, I don't think what you're saying is correct

8    because the conditions of use are the product of an interactive

9    process between the FDA and the regulated --

10           **MS. PIROPATO:**  And the sponsor.

11           **THE COURT:**  -- entity.

12           **MS. PIROPATO:**  Right.

13           **THE COURT:**  And the FDA has the power to say I'm not

14   approving this because the conditions of use are not adequate.

15      So to say that they don't come from the FDA, I mean, that

16   doesn't sound accurate to me.

17           **MS. PIROPATO:**  Well, I mean, ultimately the FDA

18   approves them and imposes them --

19           **THE COURT:**  Right.

20           **MS. PIROPATO:**  -- but when we talk about every

21   condition, it's not like every condition is necessarily going

22   to be tethered to the requirements in the FDCA.  That was my

23   basic point.

24           **THE COURT:**  But why not?  I mean, if you are saying

25   that the inquiry of whether a drug is safe --

1          **MS. PIROPATO:**  Uh-huh.

2          **THE COURT:**  -- within the meaning of the FDCA does not

3     include the inquiry of whether it can -- it -- it has adverse

4     environmental consequences and if the, you know, conditions of

5     approval are tied to whether the drug is safe within the

6     meaning of the statute, then how can conditions of approval

7     include environmentally-protective conditions?

8          **MS. PIROPATO:**  There can be conditions like

9     containment that contain both environmentally-protected

10    conditions and have -- are tethered to the FDCA, so that would

11    be one example.  But the conditions of use can -- can also

12    include where something -- where the fish is manufactured.

13    That's not tethered to the FDCA.  It's not tethered to NEPA.

14    This is what the sponsor said.

15         **THE COURT:**  And -- and, by the way, like as a

16    common-sense matter, everything you're saying makes perfect

17    sense.  How could it be that the FDA doesn't have the ability

18    to impose a condition of approval that, you know, is designed

19    to ensure that the manufacturing process doesn't destroy the

20    environment; right?  I -- it makes perfect sense.

21         I'm just saying the argument that you've -- you're making

22    in your brief about the narrow -- the narrow reach of the word

23    "safe" seems to preclude it, and so I -- I feel like there's --

24    you know, there's -- there's something that I'm not getting

25    about the legal argument that --

1          **MS. PIROPATO:**  Well, I mean, I think there's two

2     aspects to it.

3          Under the FDCA, "safe" includes health of the target

4     animal and human safety, food consumption.  So within the

5     confines of the FDCA, the statute itself contemplates health,

6     safety, and effectiveness.

7          Before you do a conditions of use, the sponsor, as part of

8     the application, has to submit an EA.  At that point --

9     environmental assessment.  At that point, FDA looks at it and

10    says do we need to do an EA or an EIS?

11         Now, this is where it becomes important --

12         **THE COURT:**  Wait a minute.  The sponsor doesn't submit

13    an EA, does it?

14         **MS. PIROPATO:**  Yes, it does.

15         **THE COURT:**  I thought that it was the responsibility

16    of the government to prepare the EA?

17         **MS. PIROPATO:**  The government prepares its own EA, but

18    under the regulations, I believe it's 514B, Section --

19    subsection 14, the sponsor is required to produce an EA, so it

20    is actually part of the process.

21         At that point, one of the conditions that FDA has to look

22    at, it says are we going to do an environmental impact

23    statement or our own separate EA, and that is how the process

24    interacts and why --

25         **THE COURT:**  Doesn't NEPA require the FDA to do its own

1    separate EA?  I've never heard of the idea of the -- the

2    industry -- the regulated industry doing the EA.

3         **MS. PIROPATO:**  NEPA requires FDA to do its own EA, and

4    it does do its own EA, but the sponsor, under the regulations,

5    produces its own EA first.

6         **THE COURT:**  Okay.

7         **MS. PIROPATO:**  And then FDA looks at that EA and then

8    it makes a decision, *are we going to do an EA or are we -- are*

9    *we going to submit an EIS*?

10        **THE COURT:**  Okay.

11        **MS. PIROPATO:**  And that's where, when you look at the

12   conditions of use, the environmental impacts come in.  So

13   that's where I think, you know, it's important to look at -- to

14   say that the EA is not at all part of the application process

15   would be inaccurate.  And that's how the environmental impacts

16   are considered.

17       And if -- if FDA believes *well, wait, there is going to be*

18   *significant impacts here*, through that interactive process,

19   they'll usually tell the sponsors.

20       And as a practical matter, Judge, EAs -- EIS, as I am

21   told, are really rare because most sponsors do not want to go

22   through that.  They don't want to have to go through the time,

23   money and effort --

24        **THE COURT:**  I understand that, but that doesn't -- the

25   fact that they are rare as a practical matter doesn't really

1    answer the legal question, I don't think.

2        **MS. PIROPATO:**  But the legal question is when does

3    this -- how does this interact, and the interaction comes -- as

4    part of the application process the sponsor produces the EA,

5    their own EA as required by -- again, I think it's 514B,

6    section -- subsection 14 -- it's said in our brief.  Point one,

7    subsection -- subsection 14.  At which point, FDA decides *what*

8    *are we going to do?*

9        And what it approves then and what conditions it imposed

10   reflects whether or not it -- the agency is going to do an EA

11   or EIS, and that's the interaction.

12       **THE COURT:**  So the agency can say -- I actually

13   glanced at the EA or at least the executive summary of it.  I

14   guess what I might -- I mean, it further confused me, I guess I

15   would say, because based on what you're saying now -- I'm

16   pulling it up.

17       **MS. PIROPATO:**  Uh-huh.

18       **THE COURT:**  But based on what you're saying now, it

19   seems like what the EA could have said -- what the EA in this

20   case could have said is there are, of course, you know,

21   potentially major environmental consequences associated with

22   allowing somebody -- allowing a company to produce these

23   genetically-engineered salmon, and those -- those significant

24   environmental consequences are that if they're -- if they're

25   allowed to produce and store the salmon in a way the salmon can

1  escape and mix with the -- the regular salmon --

2  **MS. PIROPATO:**  Uh-huh.

3  **THE COURT:**  -- the -- you know, that -- that would --

4  that would -- could harm the -- the regular salmon population.

5  And -- but we are imposing as a condition of approval the

6  requirement that the company breed the salmon and store the

7  salmon in a landlocked area, in a tank where there's no chance

8  they can get into the ocean.

9  And so by imposing that condition of approval, we are

10  mitigating the -- you know, we're alleviating the environmental

11  concern associated with approving this -- this -- the rDNA

12  construct, and -- and therefore there's no significant

13  environmental impact, and we don't need to do a -- we don't

14  need to do an environmental impact statement.

15  But, instead, it seems like what the agency did is, if I'm

16  recalling correctly -- and let me pull it up again.

17  (Pause in proceedings.)

18  **THE COURT:**  The agency seemed to say -- I mean, it's a

19  little -- it's a little hard to pin down, but what the agency

20  seemed to say is that, you know, we've -- we've imposed these

21  conditions pursuant to our FDA authority -- FDCA authority.

22  We've imposed these conditions in an effort to ensure that

23  the -- the animal is safe -- is safe within the meaning of the

24  FDCA.  As a byproduct of that, you know, the environmental

25  concerns are alleviated.

1      And -- and so -- and -- and I -- that is what confused me,

2   because I didn't -- you know, the idea of imposing a condition

3   of -- of, you know, keeping the salmon landlocked didn't -- to

4   the extent that -- that you're justifying the imposition of

5   that condition with reference to, you know, safety as that --

6   as you're defining that term within the FDCPA -- FDCA, I didn't

7   understand how it actually supports safety.

8          **MS. PIROPATO:**  Well, I mean, I think there's --

9          **THE COURT:**  Does my question make sense?

10         **MS. PIROPATO:**  I think it does.

11         **THE COURT:**  Okay.

12         **MS. PIROPATO:**  So I think there's two responses, and

13  the first response -- and if I'm not answering your question,

14  please let me know, and I think -- I know you'll do that.

15     The first one is that when you get to the point of the EA,

16  what the agency is specifically evaluating -- and this happens

17  in all of my cases where you have a sponsor submitting an

18  application.  This is not only FDA.  It happens in the context

19  BLM actions, for example.  You're actually -- the agency is

20  analyzing what's been proposed before; right?

21     So the NADA specifically proposed include conditions of

22  use that dealt with containment.  So the example that you were

23  talking about would actually -- an agency would be kind of --

24  for lack of a way to describe it -- saying stuff that was

25  really not before it; right?  I mean, the interactive

process -- they don't normally -- they say what -- what are we looking at now?  We're looking at a particular application proposing, in this case, a contained facility with redundant facilities where we're going to look at the risk of dispersion and propagation of this genetically-modified animal.

So, I mean, that's point one, and --

**THE COURT:**  But the risk of dispersion and propagation of a genetically-modified animal, that's an environmental concern; right?

**MS. PIROPATO:**  It is also a concern about the purity and integrity --

**THE COURT:**  That's the argument I don't understand.

**MS. PIROPATO:**  And I didn't understand it until someone explained it to me.

**THE COURT:**  Okay.

**MS. PIROPATO:**  When you are dealing with the genetically-modified salmon with the rDNA construct, to make sure -- what you have to do here is make sure that you have the founder, so that's the first particular salmon.  It is then reproduced.

You have to make sure that the subsequent generations of the salmon have the same construct that was approved as being safe.

How do you do that?  Well, through FDA's perspective, you make sure that the conditions of use are followed.  The

1    manufacturing process used are the same.   There's containment.

2    All of the things that could lead to environmental risk could

3    also undermine the purity and integrity of the salmon.

4            THE COURT:   How?

5            MS. PIROPATO:   Well, for example --

6            THE COURT:   Let's say three salmon escape and -- and

7    find their way into the ocean.   How does that compromise the

8    integrity of the salmon that remain in the -- in the net, in

9    the pen?

10           MS. PIROPATO:   Well, I mean, that particular example

11   does look more environmental risk, but if the conditions of use

12   are not being followed, you could have a salmon that has an

13   rDNA construct in a different location, in a different

14   expression.   It's what is approved as safe.

15           THE COURT:   But what does that -- I see what you're

16   saying.

17           MS. PIROPATO:   So there's different risk scenarios.

18           THE COURT:   Okay.   You're saying that -- you're saying

19   that you -- if the salmon escape, then you're going to have

20   salmon out there that may propagate that -- that -- that have

21   rDNA construct, but they're not safe?

22           MS. PIROPATO:   Actually I'm saying it a little bit

23   different.

24       When you're looking at the containment, there's different

25   risk scenarios.   Risk scenario one you might describe as what

1    if -- ocean net pens, which we don't have, and they escape.

2    That's, you could say, an environmental risk or --

3              **THE COURT:**  But we started this discussion with you

4    explaining to me --

5              **MS. PIROPATO:**  Yeah.

6              **THE COURT:**  -- that the company came forward and

7    proposed --

8              **MS. PIROPATO:**  Right.

9              **THE COURT:**  -- ocean net pens.

10             **MS. PIROPATO:**  Right.

11             **THE COURT:**  And you said no.  And if we're being

12   honest, right -- if we're being honest, the reason you said no

13   is because you were worried about the environmental impact

14   of -- of having these salmons in ocean net pens.

15             **MS. PIROPATO:**  Well, I think what FDA said if you do

16   that, you're going to have to have an EIS and all the things

17   that's (inaudible) to that.  So it wasn't a "no," but it was

18   you're not going to like the outcome if you don't do something

19   that is less environmentally risky because we're going to have

20   to undergo a process that is going to lead to outcomes that you

21   may not like.

22       But with respect to why -- let me get back to the purity

23   issue.  Let's say the --

24             **THE COURT:**  Right.  So -- so the -- so the FDA did not

25   say, you know, this condition needs to be imposed in order to

1    protect the safety of the drug to make sure that the drug was

2    safe for use.  The FDA said this condition is going to be

3    required because of environmental concerns.

4         **MS. PIROPATO:**  The ocean net pens?  I believe that was

5    focused on environmental concerns that -- that if -- because

6    that would -- I mean -- but, again, there would also be

7    concerns, I'm assuming -- but when we talked about -- and this

8    is important about the purity issues.  I didn't answer your

9    question about that.

10        It's important to keep in mind that the risk scenario you

11   described is to the environment.  There could be a risk

12   scenario that deals with the integrity of the salmon line

13   where, you know, they haven't followed the conditions of use,

14   and because of that, what was approved as being safe for the

15   target animal as safe for human consumption, there has been

16   some modification, and it is no longer safe by FDA's -- or was

17   not -- was not approved so we don't know for certain whether or

18   not it's safe.

19        So that's why -- I mean, there's different risk scenarios;

20   right?  The most obvious one is the -- in an ocean net scenario

21   is they escape, but if the conditions of use are not being

22   followed, there's less certainty that the -- from the founder

23   to its lineage that they have the construct in the right place

24   under the right conditions, which assures its safety, its

25   health and safety effectiveness.

1          **THE COURT:**  But, I mean, all of the -- all of the

2   salmon that remain in the net, in the pen --

3          **MS. PIROPATO:**  Uh-huh.

4          **THE COURT:**  -- are still pure; right?

5          **MS. PIROPATO:**  Not -- if they don't follow the

6   conditions --

7          **THE COURT:**  They're not interacting with -- if a

8   couple salmon escape, that doesn't affect the purity of the

9   salmon that remain in the pen; right?

10         **MS. PIROPATO:**  In theory -- in theory, no, but if

11  they're not following the conditions of use, there's concerns

12  that the purity of the -- the line doesn't continue, and the

13  thing that was approved as safe --

14         **THE COURT:**  But why?  Why wouldn't purity of the line

15  continue if -- if -- if a few salmon escaped?  I mean, we have

16  this line of salmon, and they're --

17         **MS. PIROPATO:**  Well, no, I'm talking more about --

18  you're asking well, why is containment a concern?  Containment

19  also ensures purity and integrity because it means that the

20  conditions of use are being followed, which was the -- which

21  was part of the application being approved.

22      So --

23         **THE COURT:**  But all of that -- that's just -- that

24  sounds very circular to me.  I mean, why is it -- what --

25  what -- what is unsafe about the salmons -- salmon that remain

1   in the pen when three salmon escape?

2           **MS. PIROPATO:**  That I'm not -- I'm not talking about

3   that scenario.  I think you're right.  That scenario deals with

4   the environment.

5       I'm talking about other scenarios where the conditions of

6   use are not followed, and we can no longer ensure the purity,

7   integrity of the line.  Containment is part of that, which --

8   it's a proxy for are you following the safe manufacturing

9   processes that have been agreed -- that have been part of the

10  approval package?

11          **THE COURT:**  Could I ask -- step back --

12          **MS. PIROPATO:**  Uh-huh.

13          **THE COURT:**  -- from this case for a minute and just

14  ask generally about -- about the FDA approval process?

15          **MS. PIROPATO:**  Uh-huh.

16          **THE COURT:**  There have to be all sorts of situations

17  where the FDA is considering drugs where there may be

18  environmental consequences of some sort.

19      Do the other -- do any other agencies ever get involved in

20  the FDA approval process, or are there ever situations where,

21  you know, a drug that the FDA approves might still need to be

22  approved by some other agency before it -- before it goes out?

23          **MS. PIROPATO:**  I'm assuming the answer is yes, but it

24  really would depend on the context.  Like, I mean, I know

25  sometimes EPA can have concurrent regulatory jurisdiction.

1      **THE COURT:**  What about my example where, you know, the

2    manufacturing process -- let's say it's a drug --

3      **MS. PIROPATO:**  Uh-huh.

4      **THE COURT:**  -- and it provides some minor benefit,

5    health benefit --

6      **MS. PIROPATO:**  Right.

7      **THE COURT:**  -- to people.  It's not a big

8    groundbreaking drug or anything like that, but the

9    manufacturing process for the drug is, you know -- there are

10   serious environmental consequences.

11     Is there -- is there -- is there -- do other agencies have

12   a role in the approval process?

13     **MS. PIROPATO:**  If I may, part of your specific

14   example, as someone who has represented the Forest Service a

15   lot, the Forest Service would probably have concurrent

16   jurisdiction, particularly the USDA.  And the Forest Service

17   has statutes that have substantive environmental requirements;

18   for example, NFMA, the National Forest Management Act,

19   requires, for example, protecting, among other things, the --

20   the health and safety of the forest.  There is other

21   (unintelligible) mandates.

22     BLM --

23     **THE COURT:**  So that would -- so -- so using my

24   example, even if the FDA were to approve the drug, the -- the

25   Forest Service could put a stop to it?

1    **MS. PIROPATO:**  Well, they could -- if -- if you're --

2    you're talking about an example like it would destroy a forest,

3    there are certain things that -- if the Forest Service were

4    part of the approval process, which they can be, they'd be, for

5    example -- in NEPA you have agencies that are cooperating

6    agencies.  They could certainly say this conflicts with our

7    statute, and that would cause problems.

8        There are agencies that have substantive environmental

9    statutes, and the Department of Interior is another example,

10   where they cannot approve things if they're adverse

11   environmental consequences, hard stop.  They're

12   (unintelligible) prohibited that.

13       The FDCA is silent on that matter, which is the problem,

14   right, and how do we be silent; right?  We -- we definitely

15   cite the *Weinberger* and *Nutritional Health Alliance* cases where

16   when the FDA has gone too far afield where it's not within the

17   confines of what Congress has its -- very precisely delegated

18   to the agency, it has been challenged, and it's lost.

19       So we're also -- would the FDA be able to consider

20   environmental risk?  Maybe, but maybe not.  A court would

21   decide that; right?  But certainly an example of the Forest

22   Service, there are statutes that have teeth to it in terms of

23   the environmental consequences or other specific

24   (unintelligible.)

25           **THE COURT:**  But your position in this case is that the

1    FDA has the authority to impose conditions as part of the

2    approval process that are designed to -- to -- to alleviate

3    environmental concerns?

4            **MS. PIROPATO:**  But that -- that comes through the NEPA

5    process.  The NEPA -- NEPA itself does not have any substantive

6    requirements, though.  And I wanted to be clear about that --

7            **THE COURT:**  NEPA doesn't have any

8    substantive requirements --

9            **MS. PIROPATO:**  It's a procedural --

10           **THE COURT:**  But --

11           **MS. PIROPATO:**  -- statute.

12           **THE COURT:**  But the -- but the agency, FDA, has the

13   authority to impose conditions designed to alleviate

14   environmental concerns because of NEPA?

15           **MS. PIROPATO:**  Well, I would say that usually it's --

16   and this is where I think we are talking past each other.  I

17   want to make sure I'm answering your question because I'm

18   afraid I'm not.

19       Because of the NEPA process, the sponsor proposes

20   conditions of use that have often an environmental -- you can

21   call it a component.  Sometimes they will also be tethered to

22   the FDCA, but the -- the authority -- I mean, when we talk

23   about the -- the authority -- the FDCA, under the NADA

24   application process -- the FDA is both looking at the health,

25   safety and effectiveness, and it's also undergoing that NEPA

1  process.  And the way the NEPA process interacts is to

2  practically put constraints on what sponsors will put forward

3  because --

4          THE COURT:  Okay, but --

5          MS. PIROPATO:  -- there's an interaction --

6          THE COURT:  -- but this gets back -- you seem like

7  you're maybe answering my earlier question --

8          MS. PIROPATO:  Yes.

9          THE COURT:  -- differently from how you're answering

10  it now.  So I'm -- I'm -- I'm -- my confusion is getting worse,

11  I guess.

12          MS. PIROPATO:  Okay.  I'm sorry about that.

13          THE COURT:  Okay?

14          MS. PIROPATO:  That was not my aim.

15          THE COURT:  Let's say -- let's say the sponsor says

16  nope, I want -- here's what I'm presenting to you.  I'm

17  presenting to you an application --

18          MS. PIROPATO:  Uh-huh.

19          THE COURT:  -- where the manufacturing process is

20  going to be one that is destructive of the environment.  Okay?

21      Let's take it back to this case.

22          MS. PIROPATO:  Uh-huh.

23          THE COURT:  Let's say the sponsor said I don't care

24  about an environmental impact statement.  I want to maintain

25  the fish in an ocean -- in ocean net pens.  Okay?

1          **MS. PIROPATO:**  Uh-huh.

2          **THE COURT:**  And I thought earlier you said to me that

3     the FDA could say no.  You have -- it has to be landlocked

4     because it's too dangerous to the environment to have the fish

5     in open net -- ocean net pens.  I thought you said that to me

6     earlier, but now you seem to be saying no, the FDA cannot

7     insist on that.  The FDA has to hope that the sponsor doesn't

8     want to deal with an EIS, and if the sponsor doesn't want to

9     deal with an EIS, great, then as a practical matter, the

10    problem is resolved, but if the sponsor insists on an EIS and

11    insists on the ocean net pens, then there's nothing the FDA can

12    do to -- to stop that because the only consideration --

13         **MS. PIROPATO:**  Uh-huh.

14         **THE COURT:**  -- implicated by the ocean net pens versus

15    landlocked is an environmental one.

16         **MS. PIROPATO:**  Well, you know -- and -- and let's say

17    that's -- I do think they're -- with the landlocked example, I

18    do think there are some purity integrity -- I think it's harder

19    to maintain the purity integrity of the animal in an ocean net

20    pen than in containment.  I mean, that was my understanding

21    from the agency, so I --

22         **THE COURT:**  Yeah.  But I don't understand that.  I

23    mean, the agency -- you intone that, but you don't explain why.

24         And -- and let's put that aside for a second --

25         **MS. PIROPATO:**  Right.

1    **THE COURT:**  -- and let's assume for the sake of
2    argument that the only concern --
3        **MS. PIROPATO:**  Right.  Is the environment.
4        **THE COURT:**  -- implicated by the difference between
5    ocean net pens and landlocked is an environmental concern.
6        **MS. PIROPATO:**  Practically what would happen, there
7    would be an EIS, and an EIS can -- and this is what I was
8    trying to say earlier.  EISs often come with strings attached,
9    including mitigation.
10       So EISs -- they're procedural, but what you find is
11   there's consideration of alternatives, there is often
12   mitigation attached to it, so I don't think the NEPA process is
13   completely toothless, and plaintiffs themselves bring seven
14   NEPA claims in this case.
15       So there is -- there is no substantive element --
16       **THE COURT:**  So if it were to go -- if it were to go to
17   an EIS --
18       **MS. PIROPATO:**  Yes.
19       **THE COURT:**  -- the FDA would have the authority in
20   connection with the preparation of that EIS to require that it
21   not be an -- that the salmon not be in ocean net pens; that the
22   salmon instead have to be landlocked?
23       **MS. PIROPATO:**  No.  What they can do is, with the
24   ocean net pens, put mitigation restrictions on it, so there
25   could be ways to ensure -- protect the salmon.

1          I mean, of course we didn't have that here because the

2     process did work, but in an EIS, there can be mitigation to say

3     look, you want to do ocean net pens.  Here are all the risks

4     and here are the things that the sponsor is going to have to do

5     to eliminate those risks.

6          **THE COURT:**  And the FDA could impose those conditions

7     on -- on the approval?

8          **MS. PIROPATO:**  That would be -- that would ultimately

9     be part of the approval, and that's how they interact.

10         **THE COURT:**  If the FDA can do that -- so if the FDA

11    can impose those conditions that are designed solely to protect

12    the environment as conditions of approval, then why couldn't

13    the FDA also say sorry, it can't -- you can't do it in ocean

14    net pens.  You have to do it -- if you want to do it, they have

15    to be landlocked.

16         **MS. PIROPATO:**  I mean, under -- there's nothing that

17    prevents FDA from saying that.  I mean, the question that I was

18    raising was if it did so, how much litigation risk would it be

19    exposing itself to.  I mean, nothing --

20         **THE COURT:**  Okay.  But you're representing the

21    government now, and your -- your job at this point is to

22    explain to me what the government can and can't do.

23         **MS. PIROPATO:**  So the government --

24         **THE COURT:**  What the government has the authority --

25    I'm not asking whether you would get sued over it.

1    **MS. PIROPATO:**  Right.

2         **THE COURT:**  I'm just asking you does the FDA have

3    authority to insist on a condition that is solely designed --

4    solely designed to alleviate environmental concerns?  Does the

5    FDA have the authority to do that?

6         **MS. PIROPATO:**  It could do so, yes.  It has that --

7    that authority.

8         **THE COURT:**  And your contention is that authority

9    comes not from the FDCA itself but from NEPA?

10        **MS. PIROPATO:**  I would say it's from the application

11   process.  I mean, nothing -- I mean, the question is -- to me

12   the authority -- it would be lack of a specific -- there is no

13   statute that gives FDA that specific authority; right?  The

14   FDCA doesn't, and NEPA does not say FDA, you affirmatively have

15   this authority.

16        So, I mean, that's where I think it gets to be a very --

17   for us to say affirmatively FDA has that authority and it's

18   tethered to a statute, we cannot say that.

19        But you're asking if FDA could do that.  Practically it

20   could, and the question is then what would be the source of the

21   authority.  I think that's what you're getting at, and the

22   source of the authority would be part of the conditions of use,

23   and it would probably be reflective of the NEPA process, saying

24   this is what we're proving, but it would not be tethered to the

25   FDCA.  There is nothing in the FDCA specifically that gives FDA

1    that authority.

2          **THE COURT:**  Let me ask -- this is -- I want to ask you

3    one other question on this topic and then maybe turn to the

4    plaintiffs on this topic before getting to the other topics.

5    And this question I'm about to ask you is mostly, I think, a

6    question from the plaintiffs, but I wanted your take -- for the

7    plaintiffs, but I wanted your take on it, too.

8          What are the consequences of this discussion we're having?

9    I mean, in other words, let us assume, for the sake of

10   argument, that -- let us assume that the FDA is required to

11   consider the environmental consequences of the approval; right?

12         **MS. PIROPATO:**  Uh-huh.

13         **THE COURT:**  Why are they insisting that it needs to be

14   under the FDCA as opposed to NEPA?  I mean, if the FDA

15   considers the environmental consequences of the action --

16         **MS. PIROPATO:**  Right.

17         **THE COURT:**  -- and if the FDA was able to impose these

18   conditions -- the -- these conditions, that is, it's got to be

19   landlocked, can't be in -- in an ocean pen --

20         **MS. PIROPATO:**  Uh-huh.

21         **THE COURT:**  -- if the FDA has the ability to consider

22   the environmental consequences and has the ability to impose

23   the condition that it imposed, why -- why are they so

24   insistent -- why does it matter so much to them that this be --

25   that consideration be pursuant to the FDCA as opposed to NEPA?

1    In other words, what do -- what would -- if it were the FDCA --

2    and why do you so furiously argue against it?  What would be

3    the consequences of a conclusion one way or the other?

4        If -- if there were a conclusion that the FDA, under the

5    FDCA, has to consider the environmental consequences of an

6    approval, what would be the consequences of that in this case?

7    I mean, it seems -- we're going to have an argument later about

8    whether there was adequate consideration --

9            **MS. PIROPATO:**  Uh-huh.

10           **THE COURT:**  -- of the environmental consequences, but

11   it seems like the FDA considered the environmental consequences

12   here, and conditions were imposed relating to those

13   environmental consequences, so why are -- why is each side

14   arguing so furiously on this question of whether it comes from

15   the FDCA or NEPA?

16           **MS. PIROPATO:**  I mean, I think you actually touch on

17   something very important because, from my perspective, what you

18   got is actually a very environmentally-protective outcome, so

19   in some ways, this -- to me, this has been an academic

20   exercise, almost, because what did we end up with?  We ended up

21   with containment.  Whatever that process was, it worked.  And

22   to me, that's the most important point.

23       So in some ways, we're having a conversation about what

24   the FDCA requires, and it doesn't -- it really doesn't matter

25   in this case.  So I a hundred percent agree with you.

1    We're trying to argue about --

2         **THE COURT:**  So why do you care so much then?  Why --

3    why do you care -- why do you argue so furiously in your brief?

4    And it seems like you're kind of backtracking a little bit from

5    your brief, I have to say, in this discussion, but why do you

6    argue so furiously in your brief that, you know, this

7    environmental consideration takes place pursuant to the NEPA

8    authority rather than the FDCA authority?

9         **MS. PIROPATO:**  Because that's practically how it

10   happens, right, and it just -- the end result doesn't matter.

11   And there's -- there's nothing in the FDCA that requires FDA to

12   consider this.

13        And what are the implications for other cases?  Let's say

14   you said the FDCA requires the agency to consider environmental

15   risk as part of its analysis.  Now, in lots of cases where

16   there really isn't any environmental risk, that only the FDA

17   has to do that.  So there are actually --

18        **THE COURT:**  Sorry.  Say that one more time.

19        **MS. PIROPATO:**  Let's say hypothetically this Court

20   makes sort of a broad ruling that the FDCA requires FDA to

21   consider environmental risk.  Well, let's think about other

22   cases where there's a similar construct, but there's really no

23   environmental risk.  Suddenly the agency has to do an analysis

24   under NEPA and under the FDCA that it never had to do before,

25   and the environmental risk --

1          THE COURT:  But, I mean, the agency already has to do

2     the analysis under NEPA; right?

3          MS. PIROPATO:  Correct.  But sometimes they only have

4     to do a categorical exclusion under NEPA.

5          THE COURT:  Right.  But so -- so if the -- if the

6     agency concludes under NEPA that a categorical exclusion

7     applies, wouldn't -- wouldn't that take care of the

8     consideration of the environmental consequences?

9          I don't understand -- I don't understand what it

10    matters -- why it matters.

11         MS. PIROPATO:  Well, in other cases, they would still

12    have to -- if it's part of the FDCA, plaintiffs are going to be

13    arguing well, your NEPA analysis is not enough because the FDCA

14    has substantive requirements.  What those are, I'm not really

15    sure because it's certainly not spelled out in the FDCA, but

16    they're going to say doing a categorical exclusion is not

17    enough.  That even though it's part of your implementing

18    regulations, FDA, you said this fits into the category of

19    actions that are appropriate for categorical exclusion.  You

20    should have done a lot more here because there's a substantive

21    requirement to the FDCA.

22         Now, keep in mind, though, the substance of the FDCA

23    requires health, safety, and effectiveness, not environmental

24    risk.

25         So then we do create a situation where the agency is now

1    thinking *okay, I have to consider environmental risk*.  But

2    what's the benchmark?  Nothing in the statute provides for

3    that.

4         **THE COURT:**  And the thing that's bothering me about

5    your argument is to the extent that you're saying that health,

6    safety, and effectiveness do not -- do not leave any room for

7    consideration of environmental concerns, then my concern is

8    that your -- by making that argument, you are inevitably also

9    arguing that you don't have the authority to impose conditions

10   that would alleviate environmental concerns, and that's -- I

11   just want --

12        **MS. PIROPATO:**  Yes.

13        **THE COURT:**  -- to articulate that one -- that concern

14   that I have one more time and see if -- give you one more -- to

15   have you take one more shot at addressing that concern.

16        **MS. PIROPATO:**  And I wouldn't say health, safety, and

17   effectiveness leave no room to consider it.  I'm saying it's

18   not specifically required within the statute.

19        And there is, to me, a distinction between that; right?

20   And so to say that there's no room for consideration of it is

21   not quite right.

22        And in this case, I would keep saying we know

23   environmental risk was considered because look where we ended

24   up.  So it was considered, and whether, as you pointed out --

25   whether we attach it to NEPA or the FDCA, maybe that's not the

1   right inquiry.  Did we end up in the right place?  And we did

2   because at the end of the day, I think what plaintiffs were

3   trying to say is because the FDCA is a substantive statute and

4   NEPA is only procedural, there's more attendant to the FDCA.

5   How that practically works in -- in realtime, I don't know.

6        We had a -- almost 200-page EA considering the

7   environmental risks.  We ended up with a facility that had

8   containment, redundancy, where it's -- now the fish are being

9   produced in Indiana.  So we're talking landlocked --

10           **THE COURT:**  That was going to be my next question,

11   which is -- which is what's the deal with the -- what's the

12   status of the fish?  I remember there used to be a facility in

13   Panama that I was hoping we were all going to go to --

14           **MS. PIROPATO:**  Me, too.

15           **THE COURT:**  -- but -- but --

16           **MS. PIROPATO:**  You're not alone.  I wanted to go to

17   Panama.

18           **THE COURT:**  But that facility is gone now?

19           **MS. PIROPATO:**  It's gone now.  It's been closed.

20           **THE COURT:**  Okay.  So what's the current status of --

21   what's the situation on the ground or in the water or whatever?

22           **MS. PIROPATO:**  In the water.  I mean, I also defer to

23   AquaBounty's counsel here, but my understanding is the salmon

24   right now, there is some production in -- in the Indiana

25   facility.

1      Is that correct?

2      It's not being put to market or anything, but that --

3 there is production in the Indiana facility.

4           **THE COURT:**  And are they --

5           **MS. PIROPATO:**  There's no production in Panama.

6           **THE COURT:**  Are the eggs still being produced in,

7 like, Nova Scotia or something?

8           **MS. PIROPATO:**  In Prince Edward Island.  I wouldn't

9 mind going there, Judge, though.

10           **THE COURT:**  We don't have to go to Indiana, I hope.

11           **MS. PIROPATO:**  I'm with you on that.  I'm like, *Ah,*

12 *Prince Edward Island?  Indiana?*  I think we're on -- we're in

13 the same position.

14           **THE COURT:**  So the -- so the eggs are being produced

15 in -- in -- on Prince Edward Island.  The -- the salmon are

16 being produced in Indiana.

17           **MS. PIROPATO:**  Throughout facilities in Indiana,

18 that's my understanding, yes.

19           **THE COURT:**  And so they're not being sold --

20           **MS. PIROPATO:**  They're not being sold yet --

21           **THE COURT:**  Or are they?

22           **MS. PIROPATO:**  No.  Not yet.

23           **THE COURT:**  Okay.  And what's preventing them from

24 being sold?

25           **MS. PIROPATO:**  Right now?  I don't think -- I don't

1  think they're ready to go to market yet.

2      Is that right?

3      I think -- there's a production timeline, and they're not

4  there yet.

5          **THE COURT:**  And what do we --

6          **MS. PIROPATO:**  Meaning they have to grow out like

7  they -- it takes several -- several months or more to grow them

8  out.  I think it's like --

9      Is it 18 months?

10     You should let -- if you don't mind, AquaBounty's counsel

11 can speak --

12         **THE COURT:**  Of course.

13         **MS. PIROPATO:**  -- more coherently.

14         **MS. CARR:**  Sure.

15     So the salmon that are currently being produced in the

16 Indiana facility where the eggs were imported in May of 2019

17 after the import alert was released by FDA in March, so those

18 eggs made it to the Indiana facility.  They are under

19 production right now and will be ready for harvest at the end

20 of 2020.

21         **THE COURT:**  They'll be ready for harvest at the end of

22 2020 --

23         **MS. CARR:**  That's correct.

24         **THE COURT:**  And -- and you'll be ready to sell them at

25 that point?

1    **MS. CARR:**  That's correct.  As filets.

2    **THE COURT:**  And so -- and so will that be the first

3    line of -- first generation of salmon that will be sold?

4    **MS. CARR:**  That will be the first generation that are

5    sold in the United States.  AquaBounty has had approval to sell

6    salmon for food in Canada since 2016 and has sold -- I think

7    sold its first salmon in Canada.  Those were the salmon that

8    were originally produced in Panama.  Those were sold in Canada

9    for the first time in 2017.

10   And then they have more salmon that are being produced in

11   Canada for sale in Canada around the same timeline as the ones

12   in Indiana.

13   **THE COURT:**  Okay.  And -- and why -- just curious, the

14   facility in Panama, what do we -- what do we know about why

15   that closed?

16   **MS. CARR:**  Sure.  So if you think about the timeline,

17   AquaBounty applied for its supplemental approval and received

18   its approval in March of 2018, so then the import alert was in

19   place, so while the import alert remained in place, the only

20   places that -- it could only grow eggs in Canada and it could

21   only grow fish in Panama.

22   Then the -- the supplemental was approved in -- for

23   Indiana, and then the import alert was removed, and so that

24   allowed eggs to be imported into Indiana.

25   So at that point, Indiana is a much larger, more

1   technologically-advanced facility, so the company made the

2   decision to -- to let its lease go in Panama to reduce its

3   operating cost so that it could focus on the Indiana facility.

4           **THE COURT:**  Got it.  Okay.

5       All right.  Maybe I could turn to the plaintiffs now on

6   this question that we've been talking about for the last hour.

7           **MR. MASHUDA:**  Thank you, Your Honor.

8       I -- I think I'll start where the -- where the Court

9   started with the first question.

10      Let's pause for a minute and maybe start with the language

11  of the statute again because that statute, as we have pointed

12  out and Your Honor was noticing before, says that the agency

13  has to consider all relevant factors for any particular drug

14  approval.

15          **THE COURT:**  Well, in deciding whether it's safe --

16          **MR. MASHUDA:**  Right.

17          **THE COURT:**  -- it has to consider all relevant

18  factors, and so you have to ask what the -- what is the inquiry

19  that the agency is charged with making when --

20          **MR. MASHUDA:**  Correct.

21          **THE COURT:**  -- it's considering whether it's safe.

22          **MR. MASHUDA:**  Right.  And we talk about environmental

23  safety -- pardon me -- we talk about environmental safety in

24  this case.  That's a term of art that came from FDA.  That is

25  not a NEPA term -- you don't see "environmental safety" or --

1   that term is not sort of a commonly-recognized feature of NEPA.

2   This is something that the agency itself came up with and --

3   and in some ways, tried to do in this approval process, and we

4   dispute the adequacy of that, of course, but the fact of it is

5   still there.

6        The agency clearly -- and I think -- I think counsel said

7   this, but the agency -- FDA has the authority to consider

8   environmental safety and to consider and mitigate environmental

9   risk under the FFDCA.  I'm still confused as to how that arises

10  under NEPA --

11       **THE COURT:**  And the authority, you agree -- the

12  authority to impose --

13       **MR. MASHUDA:**  To impose conditions --

14       **THE COURT:**  Okay.  So it has the authority to consider

15  it; right?

16       **MR. MASHUDA:**  Uh-huh.

17       **THE COURT:**  So then -- and there was some -- there was

18  some amount of consideration given to the environment.  I

19  understand you contend that the -- the consideration to

20  environmental concerns was inadequate and that will be for a

21  later -- a later day; right?

22       But -- but --

23       **MR. MASHUDA:**  I will --

24       **THE COURT:**  -- you -- you say that the FDA has the

25  authority to consider it.

1          **MR. MASHUDA:**  Yeah.

2          **THE COURT:**  Separate and apart from NEPA, it has the

3    authority to consider it.

4       What -- what -- what is the consequence of agreeing with

5    you on that question?  I just -- I still don't quite understand

6    why you're pounding that so hard in a case where it is clear

7    that some consideration was given to the environment; right?

8    And you can argue that it's inadequate --

9          **MR. MASHUDA:**  Right.

10          **THE COURT:**  -- but why is -- why is it important for

11   you to say that it -- that authority exists in this --

12          **MR. MASHUDA:**  That it has a root -- a root in the --

13          **THE COURT:**  -- statute?

14          **MR. MASHUDA:**  -- in the FDCA?

15       Because, as we are told, you know, time and time again,

16   NEPA is a procedural statute that doesn't have any substantive

17   requirements, and the risk -- the -- the horror story from --

18   of the ending for us is a situation in which there's an

19   environmental assessment or an EIS that says this is the worst

20   thing for the environment that could possibly happen, and FDA

21   says well, that's fine.  We have to approve this because we

22   have no authority under our -- our substantive authority under

23   the FDCA does not include an ability to either condition this

24   to make it less bad for the environment or to say no because

25   it's bad for the environment, and that can't be.  That is not

1   what the statute says.

2          THE COURT:   But now they seem -- they didn't say this

3   in their brief, but now they seem to be saying we do have the

4   authority to impose conditions to alleviate these environmental

5   concerns.

6          MR. MASHUDA:   I heard that, but I also heard counsel

7   say that that emanated from NEPA, not from the FDCA, and as

8   much as I would love for NEPA to have substantive authority and

9   have argued and lost that before, it doesn't, and -- and the

10  fact of the matter is that it has to come from their --

11         THE COURT:   But you're saying that NEPA does not give

12  them the authority to impose conditions that are designed to

13  alleviate environmental concerns, and so if they do have that

14  authority, which they contend they do, it must come from the --

15  the FDCA.

16         MR. MASHUDA:   Correct.

17         THE COURT:   Okay.  And if you are correct about that,

18  then as applied to this case, what follows?  Because whether

19  they thought they were considering the environment --

20         MR. MASHUDA:   Uh-huh.

21         THE COURT:   -- from the standpoint of NEPA or from

22  this statute -- from the FDCA and whether they thought that the

23  conditions they were imposing were a product of authority under

24  NEPA or authority under the FDCA, they -- they did think

25  about -- they did consider the environment and they did impose

1  these conditions, so why does it matter whether -- for purposes

2  of this case, whether it comes from the FDCA or NEPA?

3       **MR. MASHUDA:**  Because, again, NEPA requires that the

4  agency consider the environment, and there's -- obviously we

5  have a dispute about the adequacy of that consideration.

6      But on top of that, the FFDCA says that the agency has to

7  ensure that it's safe.  If the agency is going to have this

8  authority -- let's assume for purposes of argument, because we

9  haven't got there yet, that the agency has the authority to

10  regulate animals as drugs, then it's critically important that

11  it has the authority to do that well, and this is the biggest

12  threat posed by these organisms, is threats to the environment.

13      And so in this case, we'll talk about the adequacy of

14  the -- or the lack of adequacy in their assessment, both under

15  NEPA and under the FDCA because they could --

16       **THE COURT:**  But what's the difference?

17       **MR. MASHUDA:**  They should have imposed more --

18       **THE COURT:**  I mean, I guess my question is you say

19  that they didn't do a good enough job considering environmental

20  concerns.

21       **MR. MASHUDA:**  Uh-huh.

22       **THE COURT:**  They say we did a good enough job

23  considering environmental concerns, and the fight in this case

24  is about whether they did a good enough job -- the main fight

25  in this case is about whether they did a good enough job.

1      What is -- what does it matter where the authority to

2 consider environmental concerns come from?

3           MR. MASHUDA:  Well, the rubber hits the road probably

4 in two places.  Our argument is that they --

5           THE COURT:  For purposes of this case.

6           MR. MASHUDA:  Yeah.  For purposes of this case,

7 they -- they could have and should have said no to this

8 technology and this -- for GE salmon in particular based on the

9 environmental threats.

10      Second, they had -- they could and should have --

11           THE COURT:  Right, but that -- but you -- but it

12 sounds like if -- if both sides agree that they have the

13 authority to consider environmental concerns and if both sides

14 agree that they have the authority to impose conditions

15 designed to alleviate environmental concerns -- if both sides

16 agree on that, then isn't the only question in this case

17 whether they did a good enough job of it and perhaps we don't

18 even need to fight about the source of their authority to do

19 that?

20           MR. MASHUDA:  I guess I'm not entirely sure that both

21 sides agree that they have authority to impose conditions.

22           THE COURT:  Well, I wasn't sure of that coming into

23 this argument, but I -- I -- my sense now is that -- that they

24 say they do have the --

25           MR. MASHUDA:  Right.

1     **THE COURT:**  My sense now after this argument is that

2   both sides do agree that that authority exists.

3     **MR. MASHUDA:**  I guess I'm -- I'm not quite there yet,

4   Your Honor, but let me take another run at the -- the second

5   place this matters is in the conditions, because FDA could say

6   our authority to impose conditions -- and I think we heard

7   this -- is limited to conditions that affect the -- the purity

8   and the -- ensure the purity of the lineage or, you know -- and

9   otherwise have some kind of condition of use about

10  manufacturing.

11    They can coincidentally benefit the environment, and

12  that's great, but we can't go beyond that.  And so in their

13  environmental analysis -- if they've missed a factor in their

14  analysis, if they've inadequately considered something that

15  says this is a red flashing light and you should do something

16  about it, their argument is, I believe, and will still be well,

17  no, we don't because all we had to do was look at that under

18  NEPA.  We don't have any authority, let alone a duty then to

19  act on anything under the FDCA and impose a different

20  condition.

21    **THE COURT:**  But they did act, because they imposed a

22  condition that said we -- it has to be landlocked; right?  You

23  may not --

24    **MR. MASHUDA:**  That's one --

25    **THE COURT:**  -- you may not be satisfied with that, but

1   they acted.

2   **MR. MASHUDA:**  They did -- they did do that, and

3   what's -- what I find bizarre about this discussion is that the

4   record is replete with evidence that that was imposed

5   specifically to protect the environment, and so --

6   **THE COURT:**  Of course -- of course it was.  I mean,

7   that's why, again, I found their brief and their EA a little

8   bit strange, right, because they seem to run away from that --

9   **MR. MASHUDA:**  So -- so the question is what if

10  AquaBounty comes back two years from now and says well, you

11  didn't have any authority to impose that because it's in the

12  environment, and the court case showed that you only considered

13  the environment under NEPA.  We're not going to do that

14  anymore.  What's left to do?

15     I'm not accusing them of bad faith or whatever, but what's

16  to -- what's to prevent that -- what's to prevent the next

17  company that comes down the line -- because, again, a part of

18  this is about the guidance and the overall framework they're

19  applying here, and this will have consequences for that.  The

20  next company comes down the line and FDA attempts the same

21  thing and says we need to impose some conditions, and they say

22  go pound sand because we don't have to do that.  You don't have

23  any authority to tell us what to do.

24  **THE COURT:**  But what are -- okay.  So if I -- let me

25  make sure I understand your argument and why you are making it.

1          **MR. MASHUDA:**  Uh-huh.

2          **THE COURT:**  You come from the -- you come from the

3   view that under NEPA, the FDA does not have the authority to

4   impose conditions that are designed -- designed solely to

5   protect the environment; right?  Maybe they can impose a

6   condition for -- sorry.  Let me scratch that.  Let me restate

7   that.

8          **MR. MASHUDA:**  Okay.

9          **THE COURT:**  Your position is that under NEPA, NEPA

10  does not give the FDA authority to impose conditions of

11  approval designed to protect the environment.

12         **MR. MASHUDA:**  Correct.

13         **THE COURT:**  If the FDA has that authority, the only

14  place it could come from is the FDCA.

15         **MR. MASHUDA:**  That's correct.

16         **THE COURT:**  And so this argument about where the

17  authority comes from is very consequential for you because of

18  your view that NEPA doesn't give the FDA the authority to

19  impose the conditions.

20         **MR. MASHUDA:**  Right.  NEPA -- again, NEPA is the

21  vehicle.  It's not the substantive -- it's not the driver.  It

22  shows where the --

23         **THE COURT:**  Well, this is a question --

24         **MR. MASHUDA:**  It helps illuminate some of that stuff,

25  but --

1    **THE COURT:**  This is a question of whether NEPA gives

2    an agency the authority to impose conditions.  I mean, it

3    strikes me that that is an answerable question.  Like that

4    is -- there's like a verifiable answer to that question.  And

5    somebody's wrong and verifiably so.  It's not an issue that

6    I've studied; right?

7    **MR. MASHUDA:**  Correct.  I -- I would humbly suggest

8    that we're not the ones who are wrong about that,

9    unfortunately.

10    Again, if you look at --

11    **THE COURT:**  What's the case --

12    **MR. MASHUDA:**  If you look at the case law --

13    **THE COURT:**  What's the case that says --

14    **MR. MASHUDA:**  The *Public Citizen* case versus

15    *Department of Transportation*, I think, a Supreme Court case,

16    says NEPA doesn't provide substantive authority outside the

17    bounds of an agency's other authorities under other statutes.

18    It's organic acts.  It's, you know, other governing law.

19    And, again, it highlights NEPA's procedural -- the goal of

20    NEPA is to illuminate --

21    **THE COURT:**  But NEPA does contemplate mitigation

22    measures; right?  I mean, I have seen these --

23    **MR. MASHUDA:**  Yes, it does.

24    **THE COURT:**  -- EAs and environmental impact statements

25    that say, you know, yes, you know, this -- you know, the snakes

1    and frogs may die in this part of -- maybe -- I hope I'm not

2    confusing the Endangered Species Act, but snakes and frogs may

3    die in this part of the region --

4              MR. MASHUDA:  Right.

5              THE COURT:  -- but we are going to restore to its

6    natural state this other part of the region, and the snakes and

7    frogs are going to prosper there.  And as part of our action,

8    we're going to -- or as part of our approval of this

9    development project, we're going to require the -- the

10   developer to restore, you know, this other part of the -- of

11   the region to its natural habitat; right?

12             MR. MASHUDA:  Uh-huh.

13             THE COURT:  That happens in these environmental impact

14   statements.

15             MR. MASHUDA:  It does.

16             THE COURT:  Am I remembering that correctly?

17             MR. MASHUDA:  Yeah.  NEPA requires the -- the

18   consideration of mitigation measures to lessen the effects on

19   the environment, and that's its duty, because it forces -- it's

20   action-forcing in the sense that it requires the agency to

21   think about that, to analyze it, and then if it wants to

22   mitigate, as counsel for the government was saying -- if it

23   wants to mitigate from the significance trigger that would put

24   it over the threshold to an EIS to an EA and a finding of no

25   significant impact, then it can implement that mitigation and

1   sort of fall below the significance level.  Or it cannot.  It

2   doesn't have to.  There's -- there's no requirement that it

3   actually do that.

4       There's a requirement that it really look hard at it and

5   consider it from all the different angles, but -- and that's

6   where all the case law evolves from, is the failure to engage

7   in that analysis, but it doesn't require them to mitigate

8   protection of the environment.

9       NEPA was passed with the idea that agencies, once this was

10  illuminated -- they would, of course, choose the right thing,

11  and that obviously doesn't always happen, but that's -- that's

12  the animating feature of -- of NEPA.

13      **THE COURT:**  So once you go to the environmental impact

14  statement process, there's no room there for the agency -- and,

15  again, we're not talking about this case, but just general --

16      **MR. MASHUDA:**  Right.

17      **THE COURT:**  Once you go -- get to the point where the

18  agency concludes that environmental impact statement is

19  needed --

20      **MR. MASHUDA:**  Uh-huh.

21      **THE COURT:**  -- as part of the -- of the preparation of

22  the environmental impact statement, the agency doesn't have the

23  authority to require mitigation measures?

24      **MR. MASHUDA:**  It -- it does, as long as there's

25  another statute that the agency's operating under that allows

1    that.

2        So the Forest Service example that we talked about before,

3    yes, absolutely, the Forest Service has the authority to

4    require mitigation measures for a timber sale or, you know, if

5    somebody wants to do something on a national forest because it

6    has statutory authority to do so.

7        The -- the -- I'm trying to think of an example outside of

8    this context where it wouldn't, but it's usually quite common

9    that agencies have that authority, because, again, they have

10   the authority under their substantive, you know, requirements

11   and the permit scheme that they're examining.

12       Army Corps of Engineers issues a dredge and fill permit.

13   There's a lot of substantive standards in there that the Army

14   Corps can point to and say yeah, in order to meet these

15   standards as shown in the EIS, you need to do this mitigation,

16   permittee, or you don't get a permit.

17       And -- and I think that's kind of all we're looking for

18   here, is that same nexus between the environmental analysis

19   under NEPA and the authority that FDA we think pretty clearly

20   has under the statute to consider it.

21       I think we've moved off this issue of is there a specific

22   duty.  That's not the question.  The question is do they have

23   the authority, and when you look at the substantive language of

24   that provision, they clearly have the authority.  It's a very

25   broadly-worded provision.

1    **THE COURT:**  Well, I mean, it's -- and just as a matter

2    of common sense, I mean, the -- the idea that the FDA lacks the

3    authority to consider the environmental consequences of a drug

4    that it's approving, I mean, that --

5    **MR. MASHUDA:**  Yeah.

6    **THE COURT:**  Go tell that to ten people on the street

7    and see how they react to that.

8    **MR. MASHUDA:**  Right.  Right.  Which -- yes.  Agreed

9    completely, Your Honor.

10    And, again, that's why if FDA is to have the authority --

11    and hopefully we'll get to talk about that -- to regulate these

12    animals, then it's got to be able to do it right for the -- for

13    the biggest impact that they have outside of, you know,

14    potential human health.

15    **THE COURT:**  Well, "got to be able to do it right,"

16    quote/unquote, I mean, other than having the ability -- again,

17    pulling back from this case --

18    **MR. MASHUDA:**  Uh-huh.

19    **THE COURT:**  -- you're going to have -- you're going to

20    say they didn't do enough, and they're going to say they did

21    enough, but if -- if everybody agrees that they can impose

22    conditions designed to protect the environment, I mean -- okay.

23    I think I understand your argument.

24    What I still don't understand is why the government --

25    number one, I don't fully understand the government's position

1    anymore, and, number two, to the extent that the government

2    continues to steadfastly argue that it does not have the

3    authority under the FDCA to consider the environmental impact

4    of the drugs that it's approving, I don't understand why they

5    wouldn't want to argue that.  I mean --

6              MR. MASHUDA:  I'm not sure either, Your Honor.

7              THE COURT:  I would think they would want to be able

8    to impose conditions.

9              MR. MASHUDA:  Right.  And it's a little -- it's --

10   it's -- the first time we saw this was in their motion for

11   judgment on the pleadings.  This isn't something that has come

12   up before then, and so the first time we saw this argument

13   about, you know, NEPA and that's the only source of authority

14   or whatever was in the motion -- and we honestly spent quite a

15   bit of time trying to unpack what -- what it was, why they were

16   making it, and I'm still not entirely clear.  But --

17             THE COURT:  Okay.  Let me turn back to the government

18   on the question of -- and final agency action.

19             MS. PIROPATO:  Can I clarify some points, Your Honor?

20             THE COURT:  Sure.

21             MS. PIROPATO:  Because -- Marissa Piropato for the

22   government again.

23        What has been pointed out to me is you said what would be

24   the consequences if you found that FDA had to consider

25   environmental risk, and I am told by agency counsel there's a

1   risk that prior approvals where no such finding was made could

2   be invalidated.  So there are real risks because they don't

3   always consider --

4           **THE COURT:**  Why?  I mean, if the agency considered it

5   as part of the NEPA process, then what does it matter?  I mean,

6   what --

7           **MS. PIROPATO:**  I agree with you, but --

8           **THE COURT:**  -- what is the separate process that would

9   need to occur under -- the -- let's assume that the statute

10  says that the agency has the authority to consider

11  environmental risk --

12          **MS. PIROPATO:**  Uh-huh.

13          **THE COURT:**  -- or that the agency, when -- when -- when --

14  when environmental risk exists, must consider environmental

15  risk.  Let's say that FDCA says that.

16      If the agency considered environmental questions --

17          **MS. PIROPATO:**  Uh-huh.

18          **THE COURT:**  -- and thought that it was doing so

19  pursuant to NEPA, but it was doing -- but it was actually, you

20  know -- but it actually also had the authority to do that under

21  the FDCA, what does it matter?  What would be the -- what

22  action would be -- what agency action would be undone in

23  those --

24          **MS. PIROPATO:**  To the extent that someone says -- I

25  gave the example earlier that the NEPA analysis wouldn't be as

1  robust as the FDCA analysis, that -- that's a risk.

2      And --

3      **THE COURT:**  But, I mean, if the FDA has always

4  operated on the assumption that it can --

5      **MS. PIROPATO:**  Uh-huh.

6      **THE COURT:**  -- impose conditions that are designed to

7  alleviate environmental concerns and if the FDA has been

8  considering environmental issues as part of the NEPA process,

9  then what -- I mean --

10     **MS. PIROPATO:**  I agree.  It's harmless error, but

11 there's the risk.  It would be harmless -- in my view, it would

12 be harmless error.

13     **THE COURT:**  But it wouldn't even be error.  I mean, it

14 sounds like it would -- if -- if what -- if what I'm describing

15 is what actually happened in --

16     **MS. PIROPATO:**  Uh-huh.

17     **THE COURT:**  -- in prior FDA approvals, it doesn't

18 sound like it would even be error, because it doesn't matter

19 what -- what matters is that the FDA considered the

20 environment --

21     **MS. PIROPATO:**  Right.

22     **THE COURT:**  -- not what -- what, you know -- you know,

23 what bucket that consideration was put in.

24     **MS. PIROPATO:**  Well, I agree with you, which is why --

25     **THE COURT:**  Let me -- let me -- let me amend that.

1    What matters is that the FDA considered the environment

2   and believed that it had the ability to impose conditions

3   designed to alleviate environmental concerns.  So long as

4   that's true --

5         MS. PIROPATO:  Right.  And I think it might be

6   useful --

7         THE COURT:  -- who cares what bucket it falls under?

8         MS. PIROPATO:  Because I want to be clear, there is no

9   dispute that NEPA is solely a procedural statute, but if you

10  look at FDA's implementing regulations, for example, 21 CFR

11  25.40, subsection E, it says -- they talk about an EA:

12       "The responsible agency official exams the environmental

13  risk of the proposed action and the alternative courses of

14  action, selects a course of action, ensures that any necessary

15  mitigating measures are implemented as a condition for

16  approving the selected course of action."

17       That's within -- and that is -- that is part of the NEPA

18  process, and that was --

19         THE COURT:  Can you give me that cite one more time?

20         MS. PIROPATO:  Sure.  It is 21 CFR Section 24.40,

21  subsection E.

22       And so when I was talking it being a part of the NEPA

23  process, I was referring to what's contemplated within FDA's

24  own implementing regulations.  So it wasn't that it emanates

25  from NEPA per se, which is a procedural statute --

1    **THE COURT:**  But what -- what he would say is that that

2    regulation is invalid because -- because NEPA doesn't give the

3    FDA the authority to impose condition -- conditions designed to

4    protect the environment --

5    **MR. MASHUDA:**  Slight modification --

6    **THE COURT:**  -- right?

7    **MR. MASHUDA:**  -- Your Honor.  I would say the

8    regulation itself isn't invalid because that's an accurate

9    description of kind of what they can do when they're going

10   through the NEPA process.  The question is what happens after

11   that.

12   They can look at mitigation through the NEPA process.

13   They can suggest, as we talked about earlier -- they can

14   suggest anything they want, but whether or not they have any

15   authority to make those suggestions is the question that we're

16   talking about, not the process that they go through to make

17   them.

18   And so if you're just pointing to that, all that is saying

19   is this is what NEPA does.  That regulation is sort of a

20   encapsulation of a NEPA process.  It's not a separate mandate

21   that FDA then impose the conditions and mitigation that it

22   might desire.  It has to have the authority to do that from

23   somewhere else other than that regulation.

24   **MS. PIROPATO:**  Well, it is whether or not the agency

25   ultimately requires -- or, rather -- rather does its own EA or

an EIS.  So that's all part of the application package, as I was saying.

THE COURT:  Could I -- let's turn to the final agency action question.

MS. PIROPATO:  And I'm going to then give the podium to my colleague.

Thank you, Your Honor.

MR. MORRELL:  Good morning, Your Honor.

THE COURT:  So on the final agency action question, my first reaction was this isn't even close to final agency action; right?

Then I started thinking about it from the standpoint of industry; right?  And so let's say I am AquaBounty, and I was getting ready to -- to -- to develop my GE salmon totally unregulated because I was -- I was under the impression that the FDCA and the new animal drug regulations didn't map on to genetically-engineered animals.  And so I was going to, you know -- I was going to start growing them in the ocean and hope that when I blow the whistle, they come, and they don't go out and, you know, mate with other animals, whatever.

So from -- from the standpoint of industry, why is it not agency -- final agency action?  I mean, my conduct has been severely restricted, and there are serious consequences to not following the guidance that the FDA put out.

MR. MORRELL:  Your Honor, sure.  And this is David

1    Morrell on behalf of the Department of Justice.

2         I think it's important to underscore that the 2009

3    guidance really wasn't breaking new ground, even from

4    industry's perspective, so in the record at FDA-000200, so

5    basically 200, you'll see there's actually a letter -- letter

6    correspondence beginning at that page and following where the

7    predecessor to AquaBounty was actually engaging with the same

8    center at FDA, CVM, Center for Veterinary Medicine, on this

9    precise issue.

10        And what the FDA articulated in that letter at that cite

11   that I gave you was precisely the interpretation of its new

12   animal drug authorities that we're advancing now, and so in

13   1995, you have the FDA articulating this view, and that was

14   followed by a response request from the company, again, the

15   predecessor to AquaBounty, requesting the opening of an INAD,

16   the Investigational New Animal Drug file, which is usually the

17   prelude to filing a formal NADA.

18        And so what you have there is, in 1995, this articulation

19   of -- of its authorities, which immediately --

20        THE COURT:  And, by the way, is all that back and

21   forth public?

22        MR. MORRELL:  Your Honor, I'd have to look at my

23   agency counsel.

24        I was told a lot of it is, but, again, it's -- it's in --

25   it's in the administrative record here.

1    But there's also other events that I think are noteworthy

2    in the timeline.

3    So in 2001, there was an interagency effort within the

4    Executive Branch to conduct a case study on the -- on the

5    genetically-engineered salmon, and in the course of that, which

6    was coauthored -- or the FDA was involved in drafting that

7    document -- they again articulated the authority of the FDA --

8    FDA over the genetic constructs at issue here.

9    In 2003, with respect to the GloFish, there was another

10   company which wanted to bring that to market, and the FDA

11   issued a statement saying as a matter of enforcement

12   discretion, we're not going to require the submission and

13   approval of an NADA.

14   And this was actually litigated by a -- a -- the Center

15   for Food Safety.  In 2004, they filed suit in federal district

16   court asking the court to declare that the FDA was required to

17   regulate the GloFish pursuant it its new animal drug

18   authorities.  And the court expressly heard the Center for Food

19   Safety's argument that there was a mistake about the FDA's

20   authority and rejected it and said no, the FDA was not

21   mistaken, that it had the authority to regulate this; it just,

22   as a matter of enforcement discretion, decided not to.

23   And there's other examples of --

24   **THE COURT:**  So -- so at what -- I guess my question is

25   looking at it from the standpoint of industry, what -- at what

1   point was there final agency action on the question of whether

2   GE animals are subject to the FDA's new drug authority?

3           **MR. MORRELL:**   So I think what you would -- you would

4   find the agency action when an application -- an NADA is

5   actually approved.   That's when you would have final agency

6   action.   Once that decision is made -- the decision to deny --

7           **THE COURT:**   I'm talking about from the standpoint of

8   industry; right?   I'm -- I'm a company, and I don't want to

9   apply at all because I believe that the -- the -- the statute

10  doesn't give the FDA the authority to regulate

11  genetically-engineered animals as a new animal drug.

12          And I -- I want to -- I want to do this totally

13  unregulated.   I don't want the government in my business, and I

14  want to do this, but I can't because the FDA has said that I

15  need to file an application to get permission to produce these

16  genetically-engineered animals.

17          So at what point is there finally -- final agency action

18  that I can challenge?

19          **MR. MORRELL:**   Sure.   So if -- if industry believed

20  that the interpretation articulated by the FDA was wrong, then

21  they could, you know, begin the process of bringing to market

22  the product that the FDA believes it has authority to regulate,

23  and it would be through an enforcement action, which is the

24  classic way in which an agency's regulatory authority is

25  typically adjudicated.

1      If -- if --

2          **THE COURT:**  What are the consequences then for the

3      company if -- if it's wrong?  And -- in other words, it's

4      violated the -- the -- the -- the FDCA by producing and

5      marketing a product --

6          **MR. MORRELL:**  Sure.

7          **THE COURT:**  -- that is unsafe within the meaning of

8      the statute?

9          **MR. MORRELL:**  Sure.  Well, typically the FDA usually

10     sends warning letters in advance of bringing an enforcement

11     action.  In my experience, there is actually a lot of dialogue

12     leading up to the formal filing of an enforcement action.

13         So typically industry is on notice that they're in the

14     sights of the FDA and that there may be an enforcement action.

15     Typically there is a lot of conversation leading up to that to

16     avoid litigation.

17         So I think that would be the kind of first step where

18     the -- where industry would know that this is the agency's

19     interpretation, and if it looked -- looks like an enforcement

20     action is imminent, it's obviously something that the -- I

21     mean, there's a whole case law as to whether or not -- when you

22     can get pre-enforcement review, but I think the basic point is

23     industry has notice well in advance because of these kind of

24     informal conversations that often happen --

25         **THE COURT:**  Well, that's one thing I was going to ask,

is could -- you know, at any point from 1985 on, could
AquaBounty or some other company that wanted to produce
genetically-engineered animals -- could -- could it have gone
to court and said -- and -- and sought a declaration that the
conduct that the company wants to engage in is not subject to
the FDA's regulatory authority.

MR. MORRELL:  Your Honor, I know that there's a lot of
case law in this area where you can get pre-enforcement review,
and I'm not in a perfect position to articulate exactly what
the bounds are --

THE COURT:  Does there -- I guess my question was
going to be -- and that's fine, you know, if you don't know the
answer, but my question was going to be does there need to have
been final agency action before a company brings a dec relief
action along those lines?  Or if I'm a company and I bring a
dec relief action in 1995 or '98 or whatever it is and I say
hey, the FDA is saying that I have to seek approval before I do
this, and there are a whole host of consequences to my doing it
without seeking approval and so I need a declaration that --
that makes clear that what I want to do is outside the FDA's
authority, would the FDA come back and say it's not final
agency action?  You have to try -- you have to take your
chances, and -- and then, you know, we can -- we take
enforcement action against you and then you can challenge it in
court?

1          **MR. MORRELL:**  So a couple of things.

2       I mean, I think, first of all, the question that you're

3    asking arises any time that you have this dynamic, and I don't

4    think it transforms the guidance.  I don't think it has a

5    bearing on whether or not the guidance is final agency action.

6    I think this is really a separate question.

7       But -- but I do know, that, for example, you have to

8    establish constitutional standing, standing as a part of --

9          **THE COURT:**  Well, before the final -- I'm sorry.  Just

10   to push back --

11         **MR. MORRELL:**  Yeah.

12         **THE COURT:**  -- on that, before the final guidance --

13   before the final guidance came out, maybe the -- maybe the FDA

14   would have said it's not final guidance yet.  It's draft

15   guidance, and so, you know, the -- we haven't -- we haven't --

16   we haven't made a definitive pronouncement on whether we think

17   that this is within our authority yet.

18         **MR. MORRELL:**  Well, so I think there's a couple

19   different things to say.

20      First of all, if you look at -- the guidance itself

21   contemplates that there is another step before they actually

22   bring an enforcement action or grant an approval.  What I mean

23   by that is the 2009 guidance put industry -- I mean, I guess it

24   was argued while on notice, there were already INA -- several

25   INADs filed or opened with FDA before 2009, so industry was

well aware of this interpretation, but even setting that aside,
the guidance itself contemplates -- there's a whole section on
how FDA's going to exercise its enforcement discretion, and so
it's -- you know, it says it's going to look at various factors
to determine whether or not they're going to actually enforce
their interpretation, which, again, is a sort of clue, in this
case, that you don't have final agency action because the
guidance document itself contemplates that there's going to be
an intermediate step, which is the evaluation as to the
particulars of -- of a genetically-engineered product.

And then also on the application side, assuming someone
does want to comply and does want to file an NADA and FDA
agrees that they need to, then, again, the guidance
contemplates that there is going to be sort of an iterative
kind of process, a colloquy between the sponsor and the agency,
and you see that at every turn.

If you read the 26 page guidance document from cover to
cover, every turn it says hey, come contact us, consult with
us.  There's alternatives.  You know, we'll talk about your
particulars.  Let us know early in the process how things are
going, what your plans are.  And so I don't even know --

**THE COURT:**  Yeah.  But it does stand for the
proposition that we -- I think it stands for the definitive --
definitively for the proposition that the FDA has concluded
that it has regulatory authority over this and that if you're

1   going -- if you want to produce a GE animal, whether it's a GE

2   animal that then produces something that can be used to treat

3   humans or whether it's a GE animal that's, you know, bigger and

4   therefore feeds us better, you're going to need to -- you're

5   going to need to seek our approval.  You can't just go do this.

6         **MR. MORRELL:**  Sure.  But -- but to be clear, the APA

7   expressly contemplates -- the agency is allowed to articulate

8   its interpretation of a statute without transforming that into

9   agency -- final agency action.  I mean, that's what -- the

10   textbook definition of an interpretive rule, which is expressly

11   excluded from the notice and comment requirement under the APA,

12   and also a policy statement is sort of another variety of a --

13   of a non-legislative rule that allows the agency to express

14   legal views.

15         And so the courts have always required --

16         **THE COURT:**  But maybe the way to think about it is --

17   and, you know, I haven't -- this may be wrong, so tell me if

18   you think I'm wrong, but maybe the way to think about it is

19   whether or not this is final agency action, it has such a

20   significant impact on how I'm going to conduct myself that I

21   have the ability to -- to challenge it.  I have the ability to

22   challenge the FDA's conclusion that I'm required to seek

23   approval before, you know, producing this

24   genetically-engineered animal.

25         **MR. MORRELL:**  So, again, this -- this -- the case law

1   is very clear, there's -- you know, we cite several cases in

2   our brief, including the D.C. Circuit, that articulate guidance

3   and interpretive rules can have consequences.  There may be --

4   courts recognize that regulated industry or regulated parties

5   may conform their conduct knowing that the handwriting is on

6   the wall; that the courts have found that sufficient to

7   constitute final agency action.

8        And I think what you have here, the two kind of -- if you

9   think of the fork in the road, the party who thinks I disagree

10  with your interpretation and I want to market this stuff

11  without going through the FDA approval process, there is a

12  whole body of case law as to when -- when an enforcement action

13  is sufficiently imminent that they can seek and obtain judicial

14  review of that legal determination.

15       And then on the other fork of the road is if -- if a party

16  wants to file the NADA and, you know, perhaps disagrees with

17  the way the agency is interpreting the statute in that context,

18  then if FDA declines to approve the application, then judicial

19  review is available from that decision.

20       And so in either case -- and I should -- I forgot to

21  mention, it is obviously the case that once an enforcement

22  action is brought, it is certainly the case that if regulated

23  industry is correct, they can give judicial review of that.

24       And so I don't think, again, any of this bears on whether

25  or not this document is a *de facto* legislative rule.  I mean, I

1    think the courts have recognized a lot of the points that

2    you're saying, that hey, there couldn't be a practical

3    consequence because people regulated -- sophisticated parties

4    understand that this is where the ball is heading, and they may

5    go there, too.  And there is case law that, you know, allows

6    individuals pre-enforcement to get review.

7         And, again, I --

8         **THE COURT:**  Of course that wouldn't be these

9    plaintiffs because these plaintiffs don't want to develop

10   genetically-engineered animals.

11        **MR. MORRELL:**  Right.  But it's also -- I mean, I guess

12   that goes to a point that we raised, the standing point.

13        It's -- I mean, I think the colloquy between you and

14   opposing counsel earlier sort of also highlights one of the

15   ironies or just outright contradictions within this case, that

16   the plaintiffs are contending that the FDA doesn't have any

17   authority here, but at the same time, they're sort of objecting

18   that they didn't sufficiently regulate or aggressively enough,

19   and so I do think there is this question as to what the basis

20   for their standing to challenge the issuance of the guidance

21   would be for precisely that reason, because one would typically

22   expect a regulated party to object to an assertion of authority

23   that they think is unfounded, but to -- the idea that the

24   plaintiffs here are objecting to regulation on a third party is

25   just a little confusing and I think does go to some of the

1    standing points that we raised.

2         But --

3         **THE COURT:**   Okay.   Do you want -- was there anything

4    else you wanted to make sure you said on final agency

5    action/legislative rule?

6         **MR. MORRELL:**   And -- yeah.   Just to underscore that

7    I -- I think it's important that the INAD process, which,

8    again, that's the typical prelude to the filing of a formal

9    NADA, they open a file, give you a number that -- to associate

10   all of the correspondence as you develop your product, and

11   those were filed -- several of those were filed before 2009,

12   which I think is pretty strong evidence that industry

13   understood the interpretation of the agency here and was not

14   surprised or -- or sort of caught off guard because of the

15   interpretation in 2009.

16        But if Your Honor has any further questions, I'd be happy

17   to answer anything else on the --

18        **THE COURT:**   Okay.

19        **MR. MORRELL:**   -- on the guidance.

20        **THE COURT:**   Okay.   Thank you.

21        Do you want to address the -- this issue before we turn to

22   the more philosophic issue?

23        **MR. MASHUDA:**   Sure.   The existential issue.

24        Yes.   So I think the Court is right, that the -- the

25   industry had notice formally through the guidance document that

1    from here on out, whatever was happening before -- but from

2    here on out, this is the program we're following for the

3    approval of genetically-engineered organisms, and now they --

4    they ignored that at their detriment --

5          **THE COURT:**  But I -- what -- what -- what Mr. Morrell

6    is saying, which I think I might agree with, is that there is

7    no magic to that guidance document from the standpoint of

8    industry, so even before the -- the final guidance document

9    came out, you could imagine a scenario -- and I know

10   Mr. Morrell didn't quite say this, but I'm -- I took from his

11   comments -- you could imagine a scenario where industry is like

12   all right, I want to -- I want to, you know, make my

13   genetically-engineered animal.  I know from all this stuff that

14   the FDA has said that they believe that I need to file an

15   application.  I don't believe that I should be required to file

16   an application, so here's what I'm going to do.  I'm going to

17   write a letter to the FDA that says I want to make my -- I'm

18   going to make my genetically-engineered animal, and I don't

19   believe that I should be required to file an application.  I

20   believe that I should just be able to go forward because you

21   don't have the authority to make me file an application.

22   Please respond.

23        And as soon as the -- the company gets a letter back from

24   the FDA saying oh, no, you have to file an application;

25   otherwise, you're going to be producing and selling --

1    marketing an unsafe product within the meaning of the FDCA,

2    then whether there has been final guidance issued or not, I --

3    I assume that the company can go to court and seek dec relief

4    on that.

5          MR. MASHUDA:  Maybe.  I -- I'm not -- this is an area

6    of law that I'm -- because I don't have to deal with

7    pre-enforcement actions --

8          THE COURT:  You don't represent industry?

9          MR. MASHUDA:  Yeah.  I don't have to think that much

10   about, but --

11         THE COURT:  Although aren't you representing the

12   regular salmon industry in this case?

13         MR. MASHUDA:  I am, yes.  And they -- they may run

14   into this in other contexts where we're not allowed to

15   represent them, being a non-profit.

16       But the -- the -- the core here is -- I think there's two

17   things.  Number one is the public notice issue that you

18   mentioned before.  There is correspondence in the record

19   between AquaBounty and FDA going back and forth for a number of

20   years about how we're going to do this.  Some of it indicates

21   we're still figuring this out, and that's as late as like 2005.

22   We still don't know exactly how we're going to regulate this,

23   but let's keep going down this path, and then whichever pathway

24   we choose, we figure what we're doing now will be applicable,

25   that's one thing.

1    The rest of the industry, unless they were talking

2    AquaBounty, doesn't really know that or it doesn't have at

3    least a public, you know -- here's what we're going to do from

4    here on out.  That doesn't happen until at least the draft

5    guidance comes out in 2008 where FDA announced to the world and

6    asks for comment on the idea that we're going to regulate

7    animals as drugs under the new animal drug authority.  That's

8    the first time that FDA makes that pronouncement and then

9    finalizes it, of course, when it finalizes the guidance.

10   So maybe that scenario could occur if somebody was savvy

11   enough to do that and if FDA actually responded to that letter,

12   but I guess the issue then becomes --

13        **THE COURT:**  I mean, that sort of thing happens all the

14   time, I would think.

15        **MR. MASHUDA:**  I guess that's, again -- maybe.  I -- I

16   can't deny that.  But at the same time, that doesn't sort of

17   talk about what happens now after there is a -- a guidance

18   document that says this is what we're going to do.

19   And this is, you know -- again, just to sort of hit on the

20   final agency action/legislative rule issue just for a minute,

21   this is not -- this is a big-deal interpretation.  You know,

22   when FDA said we're going to regulate nicotine and tobacco as

23   drugs under the FDA -- FDCA back in '95 or '96, I think, they

24   issued hundreds of pages of regulations and codified things and

25   went through a very formal process to do that because that was

1    a big change.  And the Supreme Court ultimately said no, you

2    can't make that decision.  It's up to Congress.

3        Well, the same thing is here.  This is a -- this is a big

4    modification to a regulatory scheme that heretofore has not

5    been applied to regulate animals.  And I'm leading a little bit

6    into the next argument --

7            THE COURT:  But it had been, right, because it had

8    been applied to regulate the goat and -- what was the other

9    animal?  Was it a chicken?

10           MR. MASHUDA:  Yeah.  The goat came out after this

11   guidance --

12           THE COURT:  Okay.

13           MR. MASHUDA:  -- again.  And the other one was I

14   thinking -- well, there was the GloFish example, but that

15   was --

16           THE COURT:  GloFish.

17           MR. MASHUDA:  -- an enforcement discretion case.  That

18   was you need -- FDA, you need to regulate this -- this aquarium

19   fish, you know, which is not a food or doesn't do anything

20   other than glow nicely when you shine a light on it.  It's an

21   ornamental thing.  You need to regulate this, and FDA said

22   well, no, we don't.  We have discretion not to enforce any part

23   of the FFDCA, including the new animal drug provisions, to

24   regulate that.

25       But that -- there wasn't a pathway established for how

1   we're going to regulate it, what we're going to consider,

2   whether we consider all genetically-engineered animals to be

3   drugs under our authority or not.  Again, that happens in 2009

4   with the issuance of the guidance.

5       And so the exchange that this makes is something that is

6   new, could have been discovered possibly by industry.  I'm not

7   sure how my clients would have done that because we don't have

8   applications that we could -- you know, we can't write a letter

9   to FDA and say we want you to not regulate these animals as new

10  animals --

11      **THE COURT:**  But the thing I don't understand is you're

12  in court now challenging a final decision.

13      **MR. MASHUDA:**  Uh-huh.

14      **THE COURT:**  Which is the decision to approve the

15  genetically-engineered salmon; right?

16      **MR. MASHUDA:**  Right.  Right.

17      **THE COURT:**  So I guess one of the things I'm confused

18  about is why are you also challenging the guidance?  Like, if

19  you win on the genetically-engineered salmon, if you win on

20  your existential argument, which we'll talk about in a second,

21  then -- then the guidance, like, by default, goes away; right?

22      So you --

23      **MR. MASHUDA:**  Hopefully.

24      **THE COURT:**  You don't get anything more -- if you win

25  on your existential argument, then you don't get anything more

1  by having challenged the guidance; right?

2        **MR. MASHUDA:**  That is true, Your Honor --

3        **THE COURT:**  Okay.

4        **MR. MASHUDA:**  And I -- part of that --

5        **THE COURT:**  So if you lose on your existential

6  argument, what -- what do you get --

7        **MR. MASHUDA:**  Uh-huh.

8        **THE COURT:**  -- from challenging the guidance that you

9  don't get from challenging the -- the approval of the

10  genetically-engineered salmon?

11        **MR. MASHUDA:**  The only claim that we have in that

12  instance that remains pertinent to the guidance itself, other

13  than the -- the -- the APA claim, legislative rule needed to be

14  promulgated and codified, is the claim 8, which is our

15  programmatic NEPA claim, which says that as a major federal

16  action significantly affecting the quality of the human

17  environment, the guidance itself should have undergone a NEPA

18  review process because the guidance makes a change that has

19  ripple effects out into the world, and -- and so that's why the

20  guidance --

21        **THE COURT:**  Doesn't that claim -- doesn't existence of

22  that claim, the assertion of that claim, really help prove

23  their point that it's not final agency action because you --

24  it's too abstract to perform a real NEPA analysis of?

25        **MR. MASHUDA:**  Well, not necessarily -- I mean, that's

1    certainly FDA's argument --

2            **THE COURT:**  We have no idea which

3    genetically-engineered animals they're going to be --

4            **MR. MASHUDA:**  Sure.

5            **THE COURT:**  And which -- you know, which companies are

6    going to come to the agency to seek approval of which

7    genetically-engineered animals maintained under which

8    conditions, yet you're asking me to conduct a meaningful

9    environmental analysis of the -- of that.  I mean, that --

10   it's -- it seems so abstract.

11           **MR. MASHUDA:**  Well, two things.  I think there is a --

12   agencies do programmatic NEPA analyses all the time, which

13   doesn't mean they don't have to do them later.  They're usually

14   helpful for doing them later.

15       So a programmatic NEPA analysis on a new agency program or

16   a set of regulations that says okay, what's this going to do,

17   here are some of the things that we need to consider.  We

18   pointed out in our briefs things like --

19           **THE COURT:**  What's your best case on that, for

20   something as kind of big and abstract as this --

21           **MR. MASHUDA:**  As regulations?

22           **THE COURT:**  -- as this, a decision that this thing

23   falls within our regulatory authority, we need to do -- we need

24   to do a NEPA analysis.

25           **MR. MASHUDA:**  Dangerously consulting our brief.

1      THE COURT:  I have one -- I had a case about this.  It

2  was -- I was sitting -- I was helping out the Eastern District

3  of California because they were so overloaded on their cases,

4  and it was about cutting trees in the Tahoe National Forest,

5  and the -- the question was whether you need to do a NEPA

6  analysis when you've made the micro-decision to cut the trees

7  in the Tahoe National Forest or at the macro level, when you've

8  designated, you know, five million acres of forest as a

9  candidate for, you know, cutting trees on an emergency basis to

10 maintain safety or to protect against insect disease --

11 infestation or whatever.

12      MR. MASHUDA:  Uh-huh.

13      THE COURT:  And I concluded that you -- on that macro

14 level, you don't need -- I can't remember the name of the

15 case -- that you don't need to do -- NEPA analysis is not

16 required at that macro level, and this seems somewhat analogous

17 to that.

18      MR. MASHUDA:  Well, I think there is -- the case I'm

19 thinking of that I just had to find is on page 22, note 18, of

20 our opposition brief, ECF 198 --

21      THE COURT:  Yeah.

22      MR. MASHUDA:  -- which just demonstrates that there

23 are questions that do apply macro level --

24      THE COURT:  What case is that?

25      MR. MASHUDA:  Oh, I'm sorry.  It's *Pacific Coast*

1    *Federation of Fishermen's Association vs. NFMS*, 482 F.Supp.2d

2    1248.

3            THE COURT:  Okay.

4            MR. MASHUDA:  That case concerns the Northwest Forest

5    Plans, which is one of these bigger macro-decisions that

6    agencies make to engage in, and then they implement on

7    site-specific levels.

8        But, again, back to the regulatory context, agencies that

9    issue big regulations that have big changes in effect do NEPA

10   analyses on them.  NEPA itself, the regs define pol-- even

11   regulations, policies, and interpretations as things that are

12   potentially major federal actions, so the form is less

13   important than the substance, and so the question is are there

14   things in this guidance for which NEPA applies.

15       And, again, we ran through a few examples in our brief.

16   Off the top of my head, a few of them were -- they could have

17   considered a bunch of alternatives that included things like

18   formally involving, you know, other agencies in the approval

19   process, allowing them to exercise substantive authority or

20   veto over genetically-engineered animals that were problematic

21   from the fish and wildlife perspective, for example.  They

22   could have looked at alternatives that would have no action

23   alternative, the big one, which is let's not do this.  What are

24   the -- you know, what's the difference of establishing this

25   regulatory program versus not doing it?  And also limiting the

1    number and types of approvals that they would do in order to

2    minimize the environmental effect.

3         Whether any of those things would have adopted or would

4    have mattered in the agency's analysis, hearkening back to our

5    earlier discussion, isn't the issue for NEPA.  Triggering NEPA,

6    the question is are there things the agency could have looked

7    at and should the agency have done NEPA on this analysis, and

8    that's -- that's our contention in claim 8.

9         **THE COURT:**  Okay.  Could we go to the existential

10   question?

11        So, you know, you spend a lot of time in your briefs

12   saying they are regulating the fish, and the fish is not a

13   drug, and, you know, they respond we're not regulating the

14   fish.  We are regulating the -- the rDNA construct.

15        I mean, I think as a -- you know, when you -- when you're

16   thinking about it from a purely practical standpoint and from

17   a -- almost from like a linguistics standpoint, they are

18   regulating the fish; right?  But the reason they're -- but I'm

19   not sure there's anything wrong with that, and I'm not sure

20   that's outside the statute because the reason they're

21   regulating the fish is because the -- because the rDNA

22   construct is in the fish, and the drug is the rDNA construct,

23   and it's in the fish, and the only way to exert control over

24   the rDNA construct is to exert control over the fish.

25        **MR. MASHUDA:**  Right.

1    **THE COURT:**  And so by exerting control over the fish,

2    they're regulating the drug.  And so -- and -- and so I

3    don't -- I guess I don't -- I don't understand what -- what the

4    problem with that is.

5        I mean, just like they can require, you know -- if you're

6    requiring a particular manufacturing process, you're not

7    exerting control over the drug itself, but you need to exert

8    control over the manufacturing process to exert control over

9    the drug.

10    **MR. MASHUDA:**  Right.

11    **THE COURT:**  And here you need to exert control over

12    the fish to exert control over the drug and make sure that

13    the -- that the drug does not affect things other than in the

14    way that it is intended to affect things as reflected in the

15    approval.

16    **MR. MASHUDA:**  Uh-huh.

17    **THE COURT:**  So -- and -- and the drug does affect the

18    structure of the animal, the structure and function -- I'm not

19    sure -- probably both, but, you know, certainly the structure

20    of the -- of the animal.

21        And so I don't -- I don't -- I mean, I understand -- I

22    don't think your argument is a crazy one, but I -- I -- I don't

23    understand why that's not ultimately the answer.

24    **MR. MASHUDA:**  Well, let me unpack some of that.

25        So first of all -- let's maybe -- I'll try and start with

1    the language of the statute again, the -- the article "intended

2    to affect."  That's one clause in the definition that includes

3    other terms and other meanings of the word "drug," and so when

4    you're looking just from a statutory interpretation matter, you

5    have to understand the context in which that clause lives, and

6    I think FDA has focused very, you know, narrowly and squarely

7    on just that subsection C of the definition of "drug" to the

8    exclusion of the rest of it.

9         And so if we step back for a minute and say what's a drug,

10   drugs are usually things that are administered to somebody,

11   not -- and by doing so, even though they --

12             THE COURT:  Right --

13         MR. MASHUDA:  -- affect the structure and function --

14             THE COURT:  -- but the -- but the rDNA construct is

15   administered to a salmon; right?

16         MR. MASHUDA:  It was -- it was administered, I think,

17   to one -- the -- the forerunner or, I forget -- you know, the

18   founding fathers because of the -- of the lineage.  But

19   that's -- that's different than saying we're going to give

20   antibiotics to, you know, a chicken to prevent a bacterial

21   infection because, yes, arguably those antibiotics then alter

22   the function of the body and they fight the infection and the

23   chicken survives, but we then don't regulate the chicken after

24   we've given that -- the drug, and so --

25             THE COURT:  But if the --

1          **MR. MASHUDA:**  -- I'm coming at this from the context

2     of --

3          **THE COURT:**  But if the chicken is -- let's say that

4     the -- if -- as a result of giving the chicken the drug --

5          **MR. MASHUDA:**  Uh-huh.

6          **THE COURT:**  -- the drug -- the chicken would harm a

7     human if it came into contact with humans.  Okay?  So let's say

8     this hypothetical magic drug, you give it to the chicken.  It

9     causes the -- it prevents the chicken from getting disease, but

10    if the chicken has contact with a human --

11         **MR. MASHUDA:**  Right.

12         **THE COURT:**  -- it will kill the human.  Okay?  We

13    would regulate the chicken, right, so that the --

14         **MR. MASHUDA:**  Well --

15         **THE COURT:**  -- so that the human doesn't die as a

16    result of the drug that has been put into the chicken; right?

17         **MR. MASHUDA:**  I think we would -- I think we would

18    regulate the drug and say that you can't give the drug to that

19    chicken because it's not safe, either for the chicken or --

20         **THE COURT:**  No.  You could say --

21         **MR. MASHUDA:**  -- or for humans.

22         **THE COURT:**  -- we -- we -- you can't -- the chicken

23    must stay out of contact with humans.  You can give the chicken

24    the drug, but you have to -- you have to isolate the chicken.

25         **MR. MASHUDA:**  Yeah.  Well, I think that's a factor

1    that would get weighed in the safety determination, to be

2    honest.  I think that is more in the wheelhouse of --

3              **THE COURT:**  Right.

4              **MR. MASHUDA:**  -- is this safe and effective.

5              **THE COURT:**  But assuming that -- assuming that you --

6    we could be confident that the chicken could be kept away from

7    humans with the imposition of the right conditions --

8              **MR. MASHUDA:**  Uh-huh.

9              **THE COURT:**  -- why -- why wouldn't we say that -- why

10   isn't that an example of --

11             **MR. MASHUDA:**  Well --

12             **THE COURT:**  -- you are regulating the chicken, but

13   you're -- you're restricting the movement of the chicken, but

14   you're doing so because you need to regulate the drug?  It's

15   in -- it's the way that you can regulate the drug.

16             **MR. MASHUDA:**  Well, first, you would have concluded

17   that that is a drug first in that example, and I --

18             **THE COURT:**  But you agree that it is.  I mean, it's

19   the --

20             **MR. MASHUDA:**  Well, where I was going was more -- I

21   wanted to go back to -- I was -- I was -- I got sidetracked

22   within my chicken example, but I -- I -- going back to --

23             **THE COURT:**  You were saying that you don't believe --

24             **MR. MASHUDA:**  -- what is a drug.

25             **THE COURT:**  -- that the rDNA construct is itself a

drug.

MR. MASHUDA:  To the extent that is inseparable from the blueprint of life that it is provided to, it -- it's not, because it's not something that can be separated from the animal from which it's a part.

DNA -- my DNA --

THE COURT:  So you don't -- so the goat -- so the goat can't be -- so the -- the genetically-altered goat cannot be regulated by the FDA either then?

MR. MASHUDA:  Not the goat itself, not as a drug, correct, under -- under that interpretation, yes.

THE COURT:  So any company can go out and make any genetically-altered goat that it wants --

MR. MASHUDA:  Well, with the -- what I was going to say, the substantial caveat is of course that goat is making a drug that then is going to be turned around and given to humans, and so the drug itself --

THE COURT:  Right.  So you can regulate --

MR. MASHUDA:  -- is going to be regulated --

THE COURT:  You can regulate the drug that is given to humans, but if I'm a company and I want to just go out and make a bunch of genetically-altered goats, I -- I -- the FDA can't stop me from doing that.

MR. MASHUDA:  Well, this gets to the -- maybe not -- maybe not under the drug provisions, but that doesn't mean

1    there aren't other laws that might apply that would stop you

2    from doing that.  I mean, the idea that if we don't have this,

3    we don't have anything is something that we tried to push back

4    on a bit in the briefs because it's not, you know, a regulatory

5    free-for-all --

6         **THE COURT:**  You didn't push back very well.  I mean, I

7    didn't -- I was left wondering who -- who gets to regulate this

8    if not the FDA.

9         **MR. MASHUDA:**  Well, we should talk about that, then.

10        Let me -- let me finish that other point first.

11        Asking whether or not something is a drug before you're

12   making the determination about what you need to do to regulate

13   that drug --

14        **THE COURT:**  I apologize for interrupting, but your

15   chicken example I thought was illuminating, not in the GloFish

16   sort of way, but -- and so I want to stick to your chicken

17   example just for another minute.

18        **MR. MASHUDA:**  Okay.

19        **THE COURT:**  And then I'm happy to let you say whatever

20   you want to say.

21        **MR. MASHUDA:**  Okay.  Sure.

22        **THE COURT:**  But -- so your argument in your brief is

23   that they are regulating salmon, not -- they say they're

24   regulating the rDNA construct --

25        **MR. MASHUDA:**  Uh-huh.

1    **THE COURT:**  -- but they're not.  They're regulating

2    the salmon; right?

3    **MR. MASHUDA:**  That's --

4    **THE COURT:**  That's your argument in your brief.

5    **MR. MASHUDA:**  That's the practical reality of what's

6    going on, yeah.

7    **THE COURT:**  And that argument, I think -- I think your

8    chicken example shows why that argument does not fly; right?

9    Because you can regulate a drug by regulating the person that

10   has taken the drug or the -- or the chicken that's taken the

11   drug; right?

12   Because, again -- I mean, I would think that you would

13   have to agree that if you give a chicken a drug and that -- and

14   the -- if the -- and a chicken on that drug would cause harm to

15   humans, that the FDA could -- would be within its authority to

16   say I'm only approving this chicken drug on the condition that

17   you take the following steps to keep the chicken away from the

18   humans.

19   You agree with that?

20   **MR. MASHUDA:**  In part I would call those -- what the

21   conditions of administering that drug would be, so "thou shalt

22   not give this to a chicken unless the following two or three

23   things are done before you do it," I think is a very common

24   instance --

25   **THE COURT:**  Unless you sequester -- sequester the

1  chicken.

2  **MR. MASHUDA:**  Right.

3  **THE COURT:**  And that's what they're doing here.

4  They're saying you shall not give -- you shall not use this

5  rDNA construct on the salmon unless you sequester the salmon.

6  **MR. MASHUDA:**  The -- it's a little bit different.

7  What they're saying is you cannot -- well, I'm not even

8  sure -- they've gone straight to we need to regulate the fish

9  because, again, the rDNA construct is in the fish.  It's

10  heritable, and so you've lost control.  In the -- in the

11  chicken example, that chicken will die someday and will no

12  longer be a threat to humans.

13  Altering the DNA and creating a new organism that gets

14  passed on to its progeny in perpetuity is a very different

15  thing than saying --

16  **THE COURT:**  But the -- the rDNA construct is in -- as

17  I understand it -- and correct me if I'm misunderstanding the

18  science.  But the rDNA construct is in each of the fish; right?

19  **MR. MASHUDA:**  It is, because it's become part of their

20  genetic blueprint.  They have no -- there's no choice.  You

21  know, there's no administration that continues to happen

22  because we've made a new thing.  We haven't made --

23  **THE COURT:**  Right.

24  **MR. MASHUDA:**  We're not, you know -- it might be a

25  different story --

1          **THE COURT:**  But I understood --

2          **MR. MASHUDA:**  -- if we were injecting them, you

3     know --

4          **THE COURT:**  I understood your brief to be arguing --

5     and maybe I misunderstood your brief, but I understood you to

6     be saying you can regulate the rDNA construct.  You just can't

7     regulate the fish that is the beneficiary of the rDNA

8     construct, and -- and -- that's what I understood your brief to

9     be arguing, but maybe now -- maybe -- maybe I misunderstood

10    that, or maybe now what you're saying is no, not only are they

11    not allowed to regulate the beneficiary of the rDNA construct,

12    they're not allowed to regulate the rDNA construct itself.

13         **MR. MASHUDA:**  I think because the two are inseparable,

14    and that's -- maybe that's part of the -- the confusion, and

15    apologies for this.

16      But --

17         **THE COURT:**  But isn't the drug that we gave the

18    chicken inseparable from the chicken after we gave it the drug?

19         **MR. MASHUDA:**  Presumably the drug has left the

20    chicken's system after it's done whatever it needs to do.  I

21    mean, it is --

22         **THE COURT:**  Yeah.  But until the drug --

23         **MR. MASHUDA:**  -- it has changed the chicken, but

24    it's --

25         **THE COURT:**  Until the drug leaves the chicken's

1   system, we're going to sequester the chicken.  Why -- why --
2   the drug is --

3       **MR. MASHUDA:**  Yeah.  But there's nothing --

4       **THE COURT:**  -- is interacting with the chicken, is
5   inseparable from the chicken.  And here the rDNA construct is
6   inseparable from the salmon, but it affects the structure of
7   the salmon by causing the salmon to grow much bigger; right?

8       **MR. MASHUDA:**  It -- it does, yes, and that's the --
9   and that's the -- the sort of what I would call the narrow
10  reading of that provision C, says anything that alters the
11  structure and function of a body is -- is a drug.

12      But as we pointed out in the briefs, under that
13  definition -- if that's all you're asking, then exercise bikes
14  are drugs.  Weight lifting equipment --

15      **THE COURT:**  But you don't administer an exercise bike
16  to -- to -- to a person.

17      **MR. MASHUDA:**  And we don't administer --

18      **THE COURT:**  Or a fish or whatever.

19      **MR. MASHUDA:**  We don't administer rDNA to a line of
20  salmon that was produced through, you know, just breeding
21  techniques in Prince Edward Island.  It's not -- we're not
22  doing anything to those fish.  They're -- they are a new thing,
23  they're a new organism that hasn't existed before.

24      **THE COURT:**  By virtue of having introduced the rDNA
25  construct to the founding father.

1      **MR. MASHUDA:**  Correct.  But -- but thereafter, then we

2   sort of -- we spin out of anything that resembles the -- the

3   administration of a drug or any other article to -- to an

4   animal.  We've sort of -- we've left that far behind, and now

5   we're stuck with regulating the -- I mean, the way I think of

6   it is that we are stuck with regulating the effects of a choice

7   we made to call something a drug rather than asking up front

8   does this qualify as a drug.  Does something that fundamentally

9   and permanently and heritably alters the organism itself

10   qualify as a drug under this definition in the FDCA?

11      **THE COURT:**  So the only -- so the real difference is

12   just that it passes on from fish to fish?  That's the

13   difference --

14      **MR. MASHUDA:**  That is the biggest difference, yes.

15   Yes.  Because, again, it's -- you're stuck.

16      **THE COURT:**  And so the position is you can regulate

17   the -- the -- the founding father, but you can't regulate any

18   of the other fish?

19      **MR. MASHUDA:**  Potentially, yeah.  There is -- there is

20   an argument that, yeah, maybe you should be looking at the --

21   the safety of that for the animal.

22      And, again, we're not -- I want to be clear about this

23   because it gets to the point you made earlier.  We're not

24   saying that we're in favor of regulatory free-for-alls; we're

25   just saying that this is not the right -- this is the

1    regulatory, you know, round hole, and we're trying to fit the

2    salmon square peg into it.

3              THE COURT:  And what's the -- what's the square hole

4    that exists that you would put into it -- put it into?

5              MR. MASHUDA:  Well, I think ideally -- and I will

6    start by admitting that this is not a satisfying legal

7    answer -- ideally it's an act of Congress that recognizes that

8    this is a new thing and that we need a better regulatory

9    structure --

10             THE COURT:  So maybe your answer is what you're hoping

11   for is that a court will say that the FDA doesn't have

12   authority to do this, and the -- and then the court will stay

13   its ruling and everybody will freak out and Congress will

14   finally do something on this; right?

15        Is that -- is that your approach here?

16             MR. MASHUDA:  I wouldn't put it as deliberately as

17   that, but I think if that was the consequence of a ruling that

18   FDA doesn't have the authority, that -- that would be

19   wonderful.

20        And I -- and I would think actually --

21             THE COURT:  And let's say Congress --

22             MR. MASHUDA:  -- that that would be welcomed on all

23   sides of this issue.

24             THE COURT:  I think that's probably true, but let's

25   say Congress didn't do anything.

1          **MR. MASHUDA:**  Uh-huh.

2          **THE COURT:**  Then who --

3          **MR. MASHUDA:**  What's left?

4          **THE COURT:**  What's left?  Who, if anyone, gets to

5     regulate the production of genetically-engineered animals?

6          **MR. MASHUDA:**  So it's, again, admittedly patchwork.

7     It's not -- you know, there is not one central authority

8     because Congress hasn't done that yet, but, for example, Fish

9     and Wildlife Service under the Lacey Act has to regulate the

10    importation of the salmon eggs for salmon from Prince Edward

11    Island into the United States.

12         **THE COURT:**  What if I want to -- what if I want my

13    salmon eggs to be developed here in the United States?

14         **MR. MASHUDA:**  Well, then there's any number of other

15    laws that might apply to your development facility that are

16    going to put some regulatory hooks in it.

17         Clean Water Act if you're, you know, developing something

18    that discharges water.

19         If you're clearing land --

20         **THE COURT:**  What if it's not discharging water?

21         **MR. MASHUDA:**  If you could find an entirely

22    self-contained, private, no emissions facility that could

23    develop something without touching on any other federal law,

24    then we have a -- we -- in that instance --

25         **THE COURT:**  Well, then I want you to give me --

1      **MR. MASHUDA:**  -- I admit we have a problem.

2         **THE COURT:**  I want you to give me a practical

3   realistic answer on who can regulate this if the FDA can't, and

4   so far --

5         **MR. MASHUDA:**  So --

6         **THE COURT:**  -- it's sort of fanciful hypotheticals.

7   Or if the -- if the operation happens to touch on navigable

8   waters, then the Clean Water Act will apply.

9         **MR. MASHUDA:**  Uh-huh.

10        **THE COURT:**  But it seems very likely that a company

11  could have an operation that doesn't touch on navigable water,

12  and so the Clean Water Act wouldn't apply.

13     So give me a realistic non-fanciful answer for who can

14  regulate this if not the FDA.

15        **MR. MASHUDA:**  As a drug?  So FDA could regulate this

16  as a food, it could regulate it as a food additive.  You can't

17  go out -- you and I can't go out and produce a new form of meat

18  and just start selling it on the market unless someone has

19  found that that meat is safe.

20     So FDA -- there are other regulatory authorities that even

21  FDA has that would have come to bear here.  Again, it's -- it's

22  a crime to go out and produce food that would arguably, under

23  the definition in the act, be adultered and --

24        **THE COURT:**  What's your understanding of why the FDA

25  did not choose to regulate this through its authority to

regulate food?

        **MR. MASHUDA:**  I'm not sure why, actually, Your Honor.

        **THE COURT:**  Do you believe that that -- that would -- that would result in more --

        **MR. MASHUDA:**  I know --

        **THE COURT:**  -- rigorous restrictions on --

        **MR. MASHUDA:**  I don't know that it would result in more rigorous restrictions or anything necessarily better.  I think there are still holes, even in that scheme, and that's where I come back to yeah, we -- I don't -- unfortunately, I wish I had the perfect answer of we have the best alternative at the ready for who gets to regulate all this stuff, and just of -- the fact of the matter and the way the law is, that's unfortunately not true right now.

    But -- but there's a difference between what's the best way and whether or not --

        **THE COURT:**  Are you really -- so aren't you really taking -- taking a -- I mean, from your standpoint, from the issues that you're concerned about, you're concerned -- you don't -- you are opposed to genetically-engineered animals. You don't -- you believe that there -- people shouldn't be allowed to genetically-engineer animals; correct?

        **MR. MASHUDA:**  I think the -- we're representing a vast number of organizations and groups here, and I think it ranges from that to --

1      **THE COURT:**  Is there anybody --

2      **MR. MASHUDA:**  -- if you're going to do it, it's got to

3  be, you know -- lock down the most rigorous process that's

4  ever -- that's ever been done.

5      **THE COURT:**  Okay.

6      **MR. MASHUDA:**  And --

7      **THE COURT:**  So either you believe that -- which I

8  think is closer to the truth, you believe that there should not

9  be genetically-engineered animals or you believe that if

10  they're going to be genetically-engineered animals, they need

11  to be regulated way more tightly --

12      **MR. MASHUDA:**  Correct.

13      **THE COURT:**  -- than -- than how the FDA is regulating

14  these animals pursuant to their -- their drug authority.

15      Aren't you taking a really big chance by filing this

16  lawsuit?  Because if a court agrees with you and Congress

17  doesn't do anything, Congress doesn't step in and adopt

18  legislation covering the regulation of genetically-engineered

19  animals, then what we're left with is a situation where

20  companies are free to develop genetically-engineered animals on

21  their own unregulated.

22      You're -- you're --

23      **MR. MASHUDA:**  I think I disagree --

24      **THE COURT:**  -- putting a lot of faith --

25      **MR. MASHUDA:**  -- with the unregulated portion of that.

1          **THE COURT:**  Well, then who can regulate -- who's going

2     to regulate it then?

3          **MR. MASHUDA:**  Well, again, the -- the -- the

4     authorities I mentioned earlier.  FDA itself under the Food

5     Authority is going to have to regulate genetically-engineered

6     animals.  So it's -- it's a question of adequacy or -- and we

7     can debate the -- the policy of what's better, but I think it

8     doesn't mean that they're going to be unregulated.  We're --

9     we're not going to be in a sort of Wild West -- anybody can do

10    what they want.

11         Just because one structure doesn't fit this particular

12    instance doesn't mean that nothing else does or doesn't mean

13    that it's never going to be regulated --

14         **THE COURT:**  Why couldn't -- why couldn't the FDA still

15    regulate the -- the salmon under its Food Authority --

16         **MR. MASHUDA:**  We actually --

17         **THE COURT:**  -- even though it's -- why couldn't the

18    FDA require new drug approval for these genetically-engineered

19    animals, but then also when -- when AquaBounty starts selling

20    it in the United States, why can't the FDA nonetheless exercise

21    its regulatory authority over food to further regulate?

22         **MR. MASHUDA:**  It could.  It could.  And, in fact, some

23    of our clients petitioned FDA to do just that, you know, way

24    back -- I can't remember when, somewhere in the 2000s, saying

25    you need to throw everything you've got at this under your

1    panoply of authorities under the FFDCA and under -- and

2    regulate this not only as a drug if it's a drug, but regulate

3    it as food if it's a food, which, by the way, the definition of

4    "drug" as we highlight in the brief excludes food, and so --

5         **THE COURT:**  I understand that argument.

6         **MR. MASHUDA:**  -- it's unclear to me, again, how we can

7    talk about food animals as drugs, but I'll leave that -- that's

8    pretty self-evident, to me at least.

9         The -- and Fish and Wildlife Service, National Marine

10   Fishery Service, USDA, which regulates farming and the way we

11   raise animals very properly, so under the vested authorities

12   delegated from Congress, all -- you know, all of these agencies

13   have a role.  They've got a coordinated framework for the

14   regulation of genetically-modified organisms.

15        **THE COURT:**  Right.  But does the FDA's decision to

16   exercise its drug authority over the genetically-engineered

17   animals preclude any of these other agencies from exercising

18   their authority?

19        **MR. MASHUDA:**  Because FDA has said these are drugs and

20   we've got this, and so other agencies aren't regulating it as

21   they would something that is a -- a farm animal or, you know,

22   any other type.  So -- and that's part of the problem.

23        Again, in our world, even under the current regime without

24   an act of Congress, having a whole lot of agencies with some --

25   holding some piece of this elephant would be a wonderful thing

1    because you would have agencies applying their authorities all

2    towards the -- the goal of regulating new animals.

3         **THE COURT:**   Okay.   Thank you.

4         Any -- any last point that the government wants to make

5    here?   Sorry.   I know I've had you for about two and a half

6    hours, so we'll wrap up.

7         **MR. MORRELL:**   Sure.   I think there are a few things to

8    just correct coming out of the colloquy with opposing counsel.

9         On the food regulation point, I just want to point out

10   that part of the NAAD -- NADA approval process actually entails

11   a food safety review.   That is in part of the determination

12   that goes into whether or not a drug can be approved is

13   whether -- the way that the FDA thinks about it is you have the

14   animal and then its express product, so in the case of salmon,

15   you have larger filets of salmon meat; right?   And so they will

16   look at both the safety to the target animal, but also the food

17   safety of the expression product, which here would be the

18   filets of salmon, and so it is a little head-scratching why,

19   you know, he's invoking kind of the FDA's regulatory authority

20   over food when it has already incorporated that -- that kind of

21   food safety element as part of its NADA approval process.

22        But also, as he admitted, it would still be a patchwork

23   because of course it wouldn't cover GE animals that aren't

24   intended for food consumption, and so you just have a huge kind

25   of regulatory gap there.

1    And also kind of generally about -- comment about the food

2    additive scheme, I -- I would note that it's actually --

3    significantly weaker than or less rigorous than the new animal

4    drug approval process.  For example, the new animal drug

5    process looks at the safety to the target animal.  They

6    wouldn't do that for food additives.

7    And also when a food additive has been approved by the

8    FDA, any manufacturer can actually produce that food additive,

9    and so you sort of multiply the people that could be producing

10    it.  Here under the NADA process, it would be -- approval would

11    be limited to the particular sponsor of the application, and so

12    there's kind of a lot of respects in which this is really the

13    best in class in terms of the NADA process.

14    We're not aware of anything that would exceed in terms

15    rigor and the kind of comprehensive review to both food safety,

16    the target animal safety, and other kind of elements that go

17    into that approval process.  We're not aware of any other

18    context in which it would be matched and certainly not

19    exceeded.

20    And I think the -- the last point I'll make, unless

21    Your Honor has any further questions, is I think at best, what

22    you would have is a regulatory patchwork which we were -- sort

23    of noted, and I think that's right, but the thing that ensures

24    a comprehensive regulatory regime kind of over genetic --

25    genetically-engineered animals is the new animal drug

1   provisions of the FDCA.

2           **THE COURT:**  All right.

3           **MR. MASHUDA:**  Your Honor, two very --

4           **THE COURT:**  You seemed like you wanted to one --

5           **MR. MASHUDA:**  I just -- there were -- I got sticky

6   notes.  I -- I -- just two very quick points.

7           **THE COURT:**  I will give you two minutes.

8           **MR. MASHUDA:**  The first one is -- and just to round

9   this out -- we pointed out places in the record, industry --

10  it's not just the greenies who want regulation of this

11  technology.  Industry has a vested interest in that as well,

12  because part of selling this product is being able to tell the

13  American people that it's safe to eat, and so it's not just a

14  one-sided issue.

15      The other thing I would point out just very quickly --

16          **THE COURT:**  Incidentally, there is no -- there is no

17  labeling requirement; right?  I mean, there's no --

18          **MR. MASHUDA:**  Correct.

19          **THE COURT:**  -- requirement that the salmon, when it --

20  when it is sold as a filet in a grocery store carry the label

21  of, you know, "Frank-N-Fish" or whatever?

22          **MR. MASHUDA:**  Right.  No.

23          **MR. MORRELL:**  Your Honor, I -- actually, I don't think

24  that's correct.  The USDA has regulatory authority here to

25  require labeling.

1      **MR. MASHUDA:**  But they said they're not going to for

2  the salmon.

3          **THE COURT:**  For this, right.

4      And -- and do -- do -- do the company -- the companies

5  that don't make -- sorry.  Go ahead.

6          **MR. MASHUDA:**  I'm sorry.  I've been corrected,

7  Your Honor.  And I heard murmuring over here saying the same

8  thing, I think.  They're saying -- is that there is a law that

9  Congress passed last year about --

10         **THE COURT:**  GMO labeling?

11         **MR. MASHUDA:**  Yeah.  Sort of -- you know, QR codes on

12  GMO labeling, and salmon would be covered under that, so I

13  don't want to -- I'm just saying that there is no specific

14  requirement in this approval that FDA said you have to tell

15  people what they're getting for this particular filet.

16         **THE COURT:**  But -- but because of that law, people

17  will be told what they're getting?

18         **MR. MASHUDA:**  Because of that law, there will be an

19  adequate notice of -- of -- yeah -- of what's -- what people

20  are getting, yes.

21      The last thing I just wanted to point out, the *Gulf*

22  *Fishermen's* case that we've talked about in the briefs in which

23  a district court n Louisiana found that the fishery service's

24  attempt to regulate aquaculture in the Gulf of Mexico was *ultra*

25  *vires*.

1    Same thing, more or less, here.  The arguments were the

2    same.  If we don't regulate it, nobody will, and nothing -- you

3    know, we'll have aquaculture all over the place in the Gulf.

4    That hasn't happened, and, in fact, it's spurred at least

5    two congressional acts on opposing sides that I'm aware of just

6    in the short time since that issue --

7    **THE COURT:**  Well -- and I just want to make clear:  I

8    don't think -- you know, I don't think this issue of -- if they

9    don't regulate it, nobody will -- I'm not sure how much that

10   affects the actual legal inquiry.

11   **MR. MASHUDA:**  Oh --

12   **THE COURT:**  It's just more of a curiosity to me as to

13   why -- why you're -- what you're attempting to accomplish

14   through this lawsuit.

15   **MR. MASHUDA:**  Understood.  And I would agree, it

16   doesn't affect the legal inquiry.

17   **THE COURT:**  Okay.  All right.

18   Thank you very much.  I will give it some further

19   consideration.

20   It's possible that I might asking for further briefing on

21   a couple of these points, particularly the NEPA, FDCA -- like

22   what authority the FDA thinks it has under NEPA and whether

23   that's really true, but I'll -- I'm going to think about it a

24   little more and let you know.

25   What's our -- what's our current schedule?  Do we have --

do we --

MR. MASHUDA:  We don't have one, Your Honor, at the moment.  We have the remaining seven claims.  We have been putting off trying to propose a schedule to the Court until we've resolved our disputes about the administrative record documents that pertain to those seven claims.

THE COURT:  You're still working that -- that stuff out?

MR. MASHUDA:  We are still working that stuff out.  I think we're potentially very close, but if we have to present anything to Judge Corley, of course that will -- you know, anything -- any briefing would have to happen after we get a ruling on thumbs up or thumbs down on some of these documents, and maybe we won't get there and we can propose something quickly.

We have a summary judgment schedule the Court has approved, I think maybe twice now in the past, just about intervals for the briefs, and we would propose we stick with those --

THE COURT:  Okay.  Why don't I at least --

MR. MASHUDA:  -- intervals.  It's just when the starting gun goes off.

THE COURT:  Why don't I at least schedule a -- a further Case Management Conference as kind of a placeholder.  Does that make sense?

1          **MR. MASHUDA:**  Yeah.

2          (Pause in proceedings.)

3          **MR. MASHUDA:**  While you're considering claim 12,

4    Your Honor, one thing I forgot to point out earlier, we had

5    moved for summary judgment on claim 12 as a cross-motion, and

6    so we would ask the Court consider that cross-motion, as well

7    as, you know, the legal issue that's entwined in it with NEPA

8    and ESA, and maybe that's something we don't have to brief

9    further --

10          **THE COURT:**  Okay.

11          **MR. MASHUDA:**  -- if the Court grants our motion on

12    that.

13          **THE COURT:**  Okay.

14          Why don't we -- why don't -- why don't we put a further

15    Case Management Conference on calendar for roughly, you know,

16    ten weeks from now or something, just to make sure we're on

17    track, and at that point, hopefully we'll be able to sort of

18    nail down when we're going to -- you know, what the next dates

19    are going to be and stuff.

20          **MR. MASHUDA:**  And I presume that would not preclude

21    the parties from proposing something to you earlier than that

22    if things --

23          **THE COURT:**  Oh, yeah.  You can get in touch with us if

24    you want to have a status conference earlier or get -- you need

25    anything, just let us know.  Or propose a schedule or whatever.

1        Just as a placeholder, roughly ten weeks from now, why

2    don't we have a telephonic CMC.

3                **THE CLERK:**  December 11.

4                **THE COURT:**  Okay.  All right.  Okay.  Thank you.

5                    (Proceedings adjourned at 12:31 p.m.)

<u>CERTIFICATE OF TRANSCRIBER</u>

I, Pamela Batalo Hebel, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

DATE:  Tuesday, April, 22, 2020

*Pamela Batalo Hebel*

_____
Pamela Batalo Hebel